Robert Yaquinto, Jr. – SBT #22115750
**SHERMAN & YAQUINTO, L.L.P.**
509 North Montclair Avenue
Dallas, Texas 75208-5450
Phone:  (214) 942-5502
Fax:     (214) 946-7601
**ATTORNEYS FOR AMERICAN HOUSING
FOUNDATION, THE DEBTOR-IN-POSSESSION**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| **AMERICAN HOUSING FOUNDATION** | § | **CASE NO. 09-20232-RLJ-11** |
| | § | |
| **DEBTOR** | § | |

## MOTION FOR APPROVAL OF SALE OF LAKEWOOD TERRACE TOWNHOMES

American Housing Foundation ("<u>AHF</u>" or the "<u>Debtor</u>"), the Debtor-In-Possession in the above-referenced case, files this Motion for Approval of Sale of Lakewood Terrace Townhomes, ("Lakewood")  Baytown, Harris County, Texas (the "<u>Motion</u>") and respectfully states the following:

### Jurisdiction and Venue

1.      The Court has jurisdiction over this matter pursuant to 11 U.S.C. §363; 28 U.S.C. § 1334.  This proceeding is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

2.      On April 21, 2009, certain petitioning creditors (Robert L. Templeton, Paul King,the Frances Maddox Estate, Heron Land Company, Don Storseth, Clay Storseth, The Storseth Family Trust, David Miller, Susan Solomon Miller, and Dennis Daugherty) (collectively, the "<u>Petitioning Creditors</u>") filed an involuntary petition (the "<u>Involuntary Petition</u>") for relief under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy</u>

Code") against AHF in the United States Bankruptcy Court for the Northern District of Texas, Amarillo Division (Case No. 09-20232, the "<u>Involuntary Proceeding</u>").

3.      On June 11, 2009, AHF filed a voluntary petition (the "<u>Petition</u>") for relief under Chapter 11 of the Bankruptcy Code initiating Case No. 09-20373 (the "<u>Voluntary Proceeding</u>"). The Involuntary Proceeding and Voluntary Proceeding were consolidated by order of the Court on July 17, 2009, and the Debtor's bankruptcy proceeding is now pending in Case No. 09-20232.

### Factual Background

4.      The Debtor is a nonprofit Texas entity that owns, operates and/or controls low-income, multi-family housing units and properties in various locations.  AHF's portfolio of properties includes 163 of 167 townhomes contained within 20 different buildings located at 6900 Bayway Drive, Baytown, Harris County, Texas ("the Property").

5.      Exxon Mobil Corporation desires to purchase the Property for a purchase price of $7,553,000.  The purchase is subject to certain conditions which are described in the Purchase and Sale Agreement and Amendments thereto ("the Contract") a copy of which is attached hereto and marked Exhibit A.  This contract has been amended twice. Copies of the amendments are included as Exhibit B and Exhibit C.  A third amendment, the terms of which are described below, is being negotiated.  Once a final version of the third amendment is completed, a supplemental filing to this motion will be made.  Generally the contract calls for the acquisition of the remaining townhomes by AHF, the sale of all of the townhomes to Exxon Mobil Corporation; the payoff of the existing liens on all of the townhomes; the demolition of the townhomes, removal of the debris, and the abatement of any hazardous materials.  Payment of the purchase price shall be made as provided in the contract with the final payment of any equity to AHF upon completion of the demolition, removal and abatement and final releases of any remaining outstanding debt instruments of any kind secured by the Property.

6.      Each townhouse is financed individually.  Consequently the Property requires closing on 167 townhouses.  AHF has contracts to purchase the remaining townhouses and it is anticipated that the purchase prices for these townhomes will be advanced by Exxon Mobil Corporation.

7.      The parties contemplate a sequential series of events occurring over a period of time ending with Exxon taking title to the townhouses, streets, alleys, easements, rights of way and AHF receiving its equity out of the property.  Exxon will advance money to AHF for the purchase of the remaining townhouses not owned by AHF; AHF will acquire title to the streets, alleys, easements and rights of way; AHF will then execute a special warranty deed conveying title to the property to be held in escrow pending closing.  AHF, at its cost, will then conduct the Abatement, Demolition and Removal of the town houses, streets, alleys and the release, vacation, abandonment, discontinuance and/or closure of easements and utility rights of way.  Upon completion of the Abatement, Demolition, and Removal Activities are completed, Exxon has thirty (30) days to inspect the work and AHF has thirty (30) days to cure problems, if any.

8.      After completion of the above items, closing will occur.  The purchase price as stated above is $7,553,000.  At closing, at AHF's expense, the UCC Lien Search shall be updated and AHF will satisfy all liens and obtain releases of the liens.  Advances such as the purchase price to acquire town houses; cost overruns, certain closing costs, pro-rations, earnest money deposits and any other adjustments shall be deducted from the purchase price

9.      It is estimated that consummation of this transaction will result in the pay off of the existing debt owed on the townhomes and a potential payment to AHF in the approximate amount of $1,100,000. Approval of this transaction will provide a substantial benefit to AHF, its estate, and creditors by:   (i) paying off secured debt claims of Bank of America f/k/a

Countrywide Mortgage; U.S. Bank and other secured claims; and (ii) realizing the value of AHF's interest in Lakewood.

10.     This sale is subject to the terms and conditions of the Contract.  It is contemplated at the final closing, Exxon Mobil Corporation will receive title free and clear of all liens and encumbrances.  Under the terms of the contract, liens and encumbrances directly secured by the property shall be paid as closing and any disputed claims or claims that the proceeds are subject to some other lien or encumbrance will attach to the proceeds .

11.     The terms of the Contract have been negotiated over a long period of time in good faith by all parties.  The Contract has been amended twice and is subject to additional revisions dealing with the timing of the payments, services to be performed as part of the sale and an ultimate closing at which time title will be conveyed to Exxon and proceeds paid to AHF.

## Relief Requested

12.     AHF requests that the Court approve the sale of the Property to Exxon Mobil Corporation authorize AHF to execute and perform its obligations under the Contract including, acquisition of the remaining townhomes, demolition, removal and remediation of the property, conveyance of title to Exxon, and receipt of proceeds from the sale.

## Grounds for Relief

13.     The Debtor seeks Court approval to enter into, and perform its obligations under, the Contract pursuant to 11 U.S.C. §§ 105 and 363.  Section 363(b)(1) of the Bankruptcy Code allows a debtor-in-possession to sell property of the estate after notice and a hearing.  The sale of the Property will provide a substantial benefit to AHF, its estate, and creditors by:  (i) satisfying the indebtedness secured by the Property; and (ii) realizing the equity of AHF's interest in the Property.

**WHEREFORE PREMISED CONSIDERED**, the Debtor respectfully requests that the Court enter an order granting this Motion, allowing the Debtor to enter into and perform its obligations under the Contract, and granting other just relief to which the Debtor may be entitled.

**DATED:** <u>October 30, 2009</u>.

Respectfully submitted,

**SHERMAN & YAQUINTO, L.L.P.**
509 North Montclair Avenue
Dallas, Texas 75208-5450
(214) 942-5502 (Telephone)
(214) 946-7601 (Facsimile)

By:    /s/ Robert Yaquinto, Jr.
       Robert Yaquinto, Jr.

**ATTORNEYS FOR AMERICAN HOUSING FOUNDATION, THE DEBTOR-IN-POSSESSION**

## CERTIFICATE OF SERVICE

The undersigned counsel for the Debtor hereby certifies a copy of the foregoing Motion (excluding exhibits) was served upon all parties on the attached service list by United States First Class mail, postage-prepaid, and via e-mail (including exhibits) to the parties entitled to service pursuant to the Court's Electronic Notice System in this case, on October 30, 2009. Any party wishing to obtain copies of the exhibits referenced herein may do so by making a request to the undersigned counsel for the Debtor.

    /s/ Robert Yaquinto, Jr.
    Robert Yaquinto, Jr.

# Service List – AHF Main Case

| | | |
|---|---|---|
| Robert Yaquinto, Jr.<br>Sherman & Yaquinto, L.L.P.<br>509 N. Montclair Avenue<br>Dallas, TX 75208 | American Housing Foundation<br>1800 S. Washington, Suite 311<br>Amarillo, TX 79102 | U.S. Trustee<br>1100 Commerce Street, Room 976<br>Dallas, TX 75242-1496 |
| Michael S. Smiley<br>Underwood, Wilson, Berry, Stein &<br>Johnson<br>P. O. Box 9158<br>Amarillo, TX 79105-9158 | David R. Langston<br>Mullin, Hoard & Brown<br>P.O. Box 2585<br>Lubbock, TX 79408-2585 | Michele Fortunato and<br>Conrad D. Hester<br>BROWN & FORTUNATO, P.C.<br>905 S. Fillmore, Suite 400<br>Amarillo, Texas 79101 |
| Michelle E. Shriro, Esq.<br>Larry A. Levick, Esq.<br>Singer & Levick, P.C.<br>16200 Addison Road, Suite 140<br>Addison, Texas 75001 | Joseph D. Martinec<br>Martinec, Winn, Vickers & McElroy,<br>P.C.<br>600 Congress Avenue, Suite 500<br>Austin, TX 78701 | D'Layne Peeples<br>c/o Perdue, Brandon, Fielder, Collins<br>and Mott, LLP<br>P.O. Box 9132<br>Amarillo, Texas 79105 |
| Frederick M. Wolfram<br>The Wolfram Law Firm, P.C.<br>500 S. Taylor, Suite 1060<br>Amarillo National Bank Plaza II<br>Lobby Box 219<br>Amarillo, TX 79101-2445 | Clinton R. Snow<br>GARDERE WYNNE SEWELL, LLP<br>1601 Elm Street, Suite 3000<br>Dallas, Texas 75201-4761 | Larry Chek<br>Cameron Kinvig<br>Hunton & Williams, LLP<br>1445 Ross Avenue, Suite 3700<br>Dallas, Texas 75202- 2799 |
| Leslie M. Luttrell<br>email: luttrell@morgan-luttrell.com<br>Morgan & Luttrell, L.L.P.<br>711 Navarro, Suite 210<br>San Antonio, Texas 78205 | Don D. Sunderland<br>Mullin Hoard & Brown, LLP<br>P.O. Box 31656<br>Amarillo, TX 79120-1656 | |

EXHIBIT A

*Neither the submission of this document or any information concerning the Property for Purchaser's examination, nor discussions or negotiations between the parties constitute an offer to sell or purchase, a reservation of, or an option for the Property, and this instrument and the underlying transaction will become enforceable and binding between the parties only upon its execution and delivery by the authorized representatives of each of them.*

## SALE AND PURCHASE AGREEMENT

This Sale and Purchase Agreement ("Agreement") is made by and between **AMERICAN HOUSING FOUNDATION**, a Texas nonprofit corporation ("Seller"), and **EXXON MOBIL CORPORATION**, a New Jersey corporation, ("Purchaser"), upon the following terms and conditions:

## WITNESSETH:

**WHEREAS**, Seller wishes to sell and convey to Purchaser, and Purchaser wishes to purchase and acquire Seller's fee estate interest in 13.0 acres, more or less, located at 6900 Bayway Drive, known as Lakewood Terrace Townhomes, Baytown, Harris County, Texas;

**WHEREAS**, in addition to its other ownership interests at the Property (hereinafter defined), Seller currently owns 163 out of the 166 town homes that are located on the Property, with said 166 town homes being contained within 20 different buildings located on the Property; and

**WHEREAS**, the streets, alleys and other roadways on the Property ("Streets and Alleyways") have been dedicated by plat to the City of Baytown, or other governmental entity, for public access.

**NOW THEREFORE**, that for and in consideration of the mutual promises and covenants herein contained, Seller and Purchaser hereby agree as follows:

1.   **PROPERTY.**

Seller agrees to sell and convey, and Purchaser agrees to purchase and pay for, the following:

Fee simple estate in that certain tract or parcel of land containing 13 acres, more or less, located at 6900 Bayway Drive, known as Lakewood Terrace Townhomes, Baytown, Harris County, Texas, being further described in **Exhibit "A"** attached hereto and made a part hereof (the "Property").

## 2. PURCHASE PRICE.

A. The total monetary consideration to be paid by Purchaser to Seller for the Property shall be Seven Million Five Hundred Fifty-three Thousand and 00/100 Dollars ($7,553,000.00) ("Purchase Price").

B. In addition to the Purchase Price, and not included as a part of the Purchase Price, Purchaser will also deposit into escrow One Million Three Hundred Ninety-five Thousand Forty-three and 84/100 Dollars ($1,395,043.84) (the "Abatement, Demolition and Removal Expense") with the Title Company (hereinafter defined) at the Interim Closing (hereinafter defined) as set forth in Section 5. Alternatively, at Purchaser's sole option, Purchaser may deposit portions of the Abatement, Demolition and Removal Expense into escrow with the Title Company as draws are need pursuant to the Draw Schedule (hereinafter defined). As provided in Section 12, Seller shall be responsible in all respects for the abatement of asbestos, monitoring of asbestos, demolition of the Improvements on the Property, and removal of all concrete, rubble and debris from the Property (collectively, "Abatement, Demolition and Removal Activities"). As used herein, the term "Improvements" shall include any and all structures, fixtures and improvements of any kind located on or at the Property. As provided in Section 5, the Abatement, Demolition and Removal Expense, or portion thereof, once placed in escrow, shall, upon Purchaser's approval, be disbursed by the Title Company to Seller or, at Purchaser's sole option, to Seller's contractor(s) and sub-contractor(s) in accordance with the Draw Schedule and other terms of this Agreement.

## 3. EARNEST MONEY.

Within five (5) business days after receipt by Purchaser of Title Company's notice that Title Company has received a fully executed copy of this Agreement, Purchaser will deposit with First American Title Insurance Company, Attention: Ms. Elvira Fuentes, 24 Greenway Plaza, Suite 850, Houston, Texas 77046 (the "Title Company") an earnest money deposit in the amount of One Hundred Sixty-six Thousand and 00/100 Dollars ($166,000.00) (the "Earnest Money Deposit"). Any and all interest earned or accrued on the Earnest Money Deposit will be deemed to be part of the Earnest Money Deposit and any reference to the Earnest Money Deposit in this Agreement shall include this interest. The Earnest Money Deposit will be disbursed by the Title Company pursuant to this Agreement. If the terms of this Agreement are performed within the time specified, the Earnest Money Deposit may, at the sole option of Purchaser, either be applied to the Purchase Price in accordance with the terms of this Agreement or returned to Purchaser upon Purchaser's tender of the full Purchase Price to Seller.

## 4. SELLER'S OBLIGATIONS PRIOR TO INTERIM CLOSING.

Seller shall have one hundred eighty (180) days from the Effective Date (hereafter defined) ("Seller's 180 Day Period") to a) purchase all the remaining town homes not currently owned by Seller at the Property, and b) successfully merge title for

the Improvements, to include, without limitation, said remaining town homes and any common areas, and title for the underlying land owned by the homeowner's association, such that Seller has title to the Improvements (to include, without limitation, all 166 town homes and any common areas) and the underlying land in one entity (collectively "Seller's Pre-Interim Closing Obligation"). Purchaser shall have no obligation a) to take any action of any kind, to include, without limitation, signing any documents or advancing any funds, under this Agreement, except for the actions set forth in Section 11 related to the Feasibility Period (hereinafter defined), or b) to close, in any way, the transaction contemplated by this Agreement, unless and until Purchaser has received notice from Seller that it has completed Seller's Pre-Interim Closing Obligation. In the event Purchaser does not receive notice from Seller within three (3) days after Seller's 180 Day Period that Seller has completed Seller's Pre-Interim Closing Obligation, Purchaser shall have the right, at its sole option, to terminate this Agreement, with no further obligation, and receive a refund of the Earnest Money Deposit.

## 5. INTERIM AND FINAL CLOSING.

A. The parties shall a) take certain specified action at an interim closing in time prior to Final Closing in order to progress the transaction contemplated by this Agreement (the "Interim Closing") and b) consummate the remainder of this transaction at a final closing (the "Final Closing").

B. The Interim Closing will be held at the offices of the Title Company, at the time and date mutually agreed upon by Seller and Purchaser, but shall occur on or before fifteen (15) days after the later of the expiration of the Feasibility Period or the expiration of the period of time provided in Section 10 for title objections by Purchaser and cure by Seller, unless Seller and Purchaser mutually agree otherwise, or as otherwise provided in this Agreement. The Interim Closing shall include Purchaser depositing the Initial Purchase Payment (hereinafter defined), the Abatement, Demolition and Removal Expense (unless Purchaser has elected to make periodic deposits as provided above in Section 2.B.), and certain specified documents into escrow with the Title Company, as more fully described in Section 5.F. Any and all interest earned on any deposits made by Purchaser to Title Company shall be credited to Purchaser. As part of the Interim Closing, Seller shall execute a promissory note, secured by a deed of trust covering the Property, with both in form and content reasonably satisfactory to Purchaser, as set forth in Section 5.E., sufficient to give Purchaser a first priority lien on the Property to secure Purchaser's payment of the Initial Purchase Payment. Prior to the Interim Closing, Seller shall, at its sole cost and expense, take all necessary actions: i) with the City of Baytown, or other governmental entity(ies), to have the Streets and Alleyways, other than Atcid Drive, vacated, abandoned, discontinued and closed such that there is no public access or right of entry unto the Streets and Alleyways ("Road Vacation"), and ii) with the appropriate utility provider(s) to have all utility rights of way or easements of record on or under the Property, if any, that connect to the Improvements released, vacated, abandoned, discontinued and closed. Seller shall also deposit certain specified documents into escrow with the Title Company, as more fully described in Section 5.E.

C.     So that Purchaser's lien created by the deed of trust shall become a first priority lien, the Title Company will disburse funds to specified lenders, in an amount not to exceed Five Million and 00/100 Dollars ($5,000,000.00) ("Initial Purchase Payment") sufficient to fully discharge all indebtedness secured by deeds of trust, mortgages, liens or security interests against the Property, or any part thereof, and to obtain the full and unconditional release of all its lender encumbrances (collectively, "Release of Lender Liens"). In the event this indebtedness exceeds the Initial Purchase Payment, such that Title Company is unable to secure the Release of Lender Liens, Seller shall be responsible to pay to Title Company the amount in excess of the Initial Purchase Payment needed to allow Title Company to secure the Release of Lender Liens. The Release of Lender Liens shall be in form and content reasonably satisfactory to Purchaser and Title Company and, upon receipt by Title Company, shall be filed of record along with any other required documents. The Interim Closing shall be complete when all specified documents and funds, as set forth in Sections 5.E. and 5.F have been deposited with Title Company and all such Release of Lender's Liens have been properly filed of record such that Purchaser has a first priority lien against the Property.

D.     The Final Closing shall occur upon satisfactory completion by Seller of the Abatement, Demolition and Removal Activities as provided in Sections 12 and 13. Purchaser shall have the right, at Purchaser's expense, following receipt of notice from Seller that it has completed the Abatement, Demolition and Removal Activities, to inspect, test and analyze the Property to determine whether it is reasonably acceptable to Purchaser in accordance with Section 13. In the event Purchaser accepts that the Abatement, Demolition and Removal Activities are complete and notifies Seller that Purchaser is willing to proceed to Final Closing, as provided in Section 13, the parties will mutually agree to a date and time for the Closing. In the event the parties are unable to mutually agree as to a date and time, the Final Closing shall be held thirty (30) days from the date Seller receives written notice that Purchaser has inspected the Property and either i) accepts Seller's Abatement, Demolition and Removal Activities, or ii) has not accepted Seller's Abatement, Demolition and Removal Activities, but is willing to proceed to Final Closing, both as provided in Section 13. At the Final Closing, the Purchase Price remaining after deduction of both (1) the Initial Purchase Payment and (2) the amount of any accrued interest due and payable to Purchaser by Seller under the Note (the "Remaining Purchase Payment") shall be paid by Purchaser to Seller, subject to the terms of Sections 5.H.2 and 13, and all the required documents for transfer of the Property shall be recorded by the Title Company, as well as all documents required to release the first priority lien held by Purchaser, as set forth in this section.

E.     At the Interim Closing, Seller will:

(1)     Deliver into escrow with the Title Company a duly executed and acknowledged Special Warranty Deed ("Deed") in form and content reasonably satisfactory to Seller and Purchaser, conveying to Purchaser good and marketable fee

simple title to the Property, subject only to the Permitted Encumbrances (hereinafter defined).

(2)     Execute and deliver to the Title Company and Purchaser a Non-foreign Affidavit stating that Seller is not a foreign person pursuant to IRC § 1445 and providing Seller's tax identification number(s).

(3)     Deliver to the Title Company evidence of Seller's authority to execute and deliver the documents required under this Agreement and to close this transaction.

(4)     Deliver to Purchaser and Title Company written proof of the total amount of the existing loans outstanding on the Property and any other related fees or charges related to said loans that may be required to payoff the loans.

(5)     Deliver to the Title Company a duly executed and acknowledged promissory note substantially in the form of **Exhibit "B"** attached ("Note"), secured by a deed of trust on the Property substantially in the form of **Exhibit "C"** attached ("Deed of Trust"), so as, upon payoff of the existing loans outstanding on the Property, to give the Purchaser a first priority lien on the Property to secure the payment of the Initial Purchase Payment.

(6)     Deliver to the Title Company a duly executed schedule that provides for periodic disbursement by Title Company to Seller or, at Purchaser's sole option, to Seller's contractor(s) or subcontractor(s), of a portion of the Abatement, Demolition and Removal Expense as Seller incurs costs while conducting the Abatement, Demolition and Removal Activities and completes portions of said activities, with said schedule to be mutually agreed upon by Purchaser and Seller (the "Draw Schedule") and to become Exhibit D to this Agreement and made a part hereof.

(7)     Deliver to Title Company evidence that Seller has obtained the Road Vacation, in form and content reasonably satisfactory to Purchaser and Title Company.

(8)     Deliver all other instruments reasonably required to complete the Interim Closing.

F.     At the Interim Closing, Purchaser will:

(1)     Deposit into escrow with the Title Company the Initial Purchase Payment to be paid by Cashier's Check or by federal wire transfer pursuant to transfer instructions provided by the Title Company in writing. Any and all interest accrued on the Initial Purchase Payment while held in escrow shall be credited to Purchaser.

(2)     Deposit into escrow with the Title Company the Abatement, Demolition and Removal Expense, or portion thereof, to be paid by Cashier's Check or by federal wire transfer pursuant to transfer instructions provided by the Title Company in writing. Any and all interest accrued on the Abatement, Demolition and Removal Expense fund, or portion thereof, while in escrow shall be credited to Purchaser.

(3)     Deliver to Seller and the Title Company evidence of Purchaser's authority to execute and deliver the documents required under this Agreement and to close this transaction.

(4)     Instruct the Title Company to disburse the Initial Purchase Payment to specified lenders in order to obtain the Release of Lender Liens, as described above in this Section 5, upon Seller's execution of the Note and Deed of Trust as provided in this section.

(5)     Instruct the Title Company to disburse to Seller the Abatement, Demolition and Removal Expense, or portion thereof, in accordance with the Draw Schedule.

(6)     Deliver all other instruments reasonably required to complete the Interim Closing.

G.     At the Final Closing, Seller will:

(1)     Have obtained full and unconditional releases of any remaining outstanding debt instruments of any kind secured against the Property or any Improvements and forwarded said releases, in form and content reasonably satisfactory to Purchaser and Title Company, to the Title Company to be filed of record along with any other required documents.

(2)     Instruct the Title Company to a) deliver to Purchaser, as soon as practicable after Final Closing, the Deed and the Title Policy (hereinafter defined) in accordance with the updated Title Commitment (hereinafter defined), and b) properly file of record the Deed and deliver the original recorded copy to Purchaser.

(3)     Pay the following: a) the Title Policy and UCC Lien Search fee (hereinafter defined), b) fees for i) preparing the Title Commitment, ii) any title examination fees, and iii) any title gap coverage charged by the Title Company, c) any documentary stamp and transfer fees and taxes, as applicable, d) Seller's attorneys' fees, e) all costs of recording the instruments to release all liens to be released at the Interim Closing or Final Closing and to cure title objections that Seller has agreed to cure, f) one-half of the i) escrow fees and ii) Title Company's attorneys' fees; and g) any other closing costs customarily paid by a seller.

(4)     Instruct the Title Company to release the remaining amount or portion of the Abatement, Demolition and Removal Expense, if any, that was

deposited into escrow by Purchaser but not advanced, as provided in the Draw Schedule, to Seller, or its contractor(s) or sub-contractor(s).

(5)     Deliver all other instruments reasonably required to complete the Final Closing.

H.     At the Final Closing, Purchaser will:

(1)     Pay the following:  a) the Survey (hereinafter defined) fees, b) any Title Policy endorsements other than the Shortages in Area Endorsement (hereinafter defined), c) Purchaser's attorneys' fees, d) the costs of recording all instruments other than those to be recorded at Seller's expense, e) one-half of the i) escrow fees and ii) Title Company's attorneys' fees, f) and any other closing costs customarily paid by a purchaser.

(2)     Instruct the Title Company to disburse the Remaining Purchase Payment to Seller, to be paid by Cashier's Check or by federal wire transfer pursuant to transfer instructions provided by the Title Company in writing, with such amount to be increased or decreased by closing costs, prorations, the Earnest Money Deposit and other adjustments, if any, as provided in this Agreement.

(3)     Execute a release of the first priority lien held by Purchaser and cause Title Company to properly record said release.

I.     Possession of the Property will be delivered to Purchaser at Final Closing, subject to the terms of Sections 12 and 13.

6.     **SELLER'S DOCUMENTS.**

Within five (5) business days from the Effective Date, Seller shall deliver to Purchaser, at Seller's sole cost and expense, legible copies of all information and documents in Seller's possession or control relating to the Property concerning title, tax status, townhome associations, environmental status and prior surveys (collectively, the "Inspection Documents"), to include, without limitation, the following:

A.     Copies of the most recent surveys of the Property and copies of engineering reports, maintenance reports, utilities, drawings, appraisals and related information.

B.     All asbestos, soil, environmental and structural engineering information, reports or studies and related information.

C.     Copies of all unrecorded instruments and notices, if any, that may affect title or ownership to the Property.

D.   All development agreements, utility district agreements and any other agreement with any governmental authority affecting or restricting occupancy, use or development of the Property.

E.   Any tax records relating to the tax status of the Property.

F.   All townhome association agreements, maintenance agreements, and other agreements in effect with respect to the Property and all related documents therein.

## 7.   CONVEYANCE AND TITLE INSURANCE.

Conveyance will be by the Deed, in form and content reasonably satisfactory to Purchaser and Seller. Seller will furnish Purchaser, at Seller's expense, an Owner Policy of Title Insurance (the "Title Policy"), insuring good and marketable fee simple title to the Property, in the standard form promulgated by the American Land Title Association (i.e., an ALTA Owner's Policy), issued by and through the Title Company, and in the amount of the Purchase Price, subject to no exceptions or reservations other than the following:

A.   The customary and standard printed exceptions contained in the form of Title Policy, except that the standard exception regarding discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions, or any overlapping of improvements shall be limited to "Shortages in Area" (the "Shortages in Area Endorsement").

B.   The easements, exceptions, conditions, reservations, rights-of-way, restrictions, and other encumbrances or conditions as are approved or waived by Purchaser to become Permitted Encumbrances (hereinafter defined).

C.   Any and all other matters as shown on the Survey and approved or waived by Purchaser to become Permitted Encumbrances.

D.   The exceptions, reservations, and restrictions, if any, stated in the Deed.

E.   Taxes and annual and special assessments for the current year, and subsequent assessments for prior years due to a change in land usage or ownership.

## 8.   SURVEY.

At Purchaser's expense and election, Purchaser may, within twenty (20) days from the Effective Date, request a certified boundary survey of the Property (the "Survey"), prepared by a duly licensed Texas land surveyor, selected by Purchaser and reasonably satisfactory to the Title Company and Seller, and conducted in accordance

with those standards set out by the current Texas Surveyors Association Standards and Specifications for a Category 1A, Condition II Survey. Upon completion of the Survey, if one is undertaken, Purchaser shall deliver one (1) copy of the Survey to Seller and one (1) copy to the Title Company within five (5) days of receipt of the Survey by Purchaser.

### 9. UCC LIEN SEARCH.

Within ten (10) days of the Effective Date, Seller, at its sole cost and expense, will cause the Title Company to furnish to Purchaser UCC searches in the name of Seller made of the Uniform Commercial Code Records of Harris County, Texas, and those maintained in the Office of the Secretary of the State of Texas (collectively, "UCC Lien Search"), to determine whether any of the Improvements or personal property to be conveyed by Seller are encumbered by liens other than such liens as will be released at Seller's expense at the Interim Closing. At or prior to the Final Closing, the foregoing UCC Lien Search shall be updated at Seller's expense to within one (1) week of the Final Closing. Seller shall be responsible to satisfy any such liens and obtain releases of said liens, in form and content reasonably satisfactory to Purchaser and Title Company.

### 10. PERMITTED ENCUMBRANCES, TITLE COMMITMENT, AND TITLE EXAMINATION.

A. Within ten (10) days from the Effective Date, Seller will request a current Commitment for Title Insurance (the "Title Commitment") issued by the Title Company, setting forth the state of title of the Property and all defects, objections, and exceptions which the Title Company determines are of record or which may appear on the Survey, including easements, restrictions, rights-of-way, covenants, reservations, and other conditions, if any, affecting the Property, along with copies of the documents that constitute the exceptions. Purchaser will have twenty (20) days to review the Title Commitment, Survey and related documents and to notify Seller of Purchaser's objections to title and other related objections to the Property (the "Objections"). Purchaser's twenty (20) day review period shall commence only after Purchaser has received all of the following documents: i) the Survey, ii) the Title Commitment, and iii) copies of the instruments affecting title. Encumbrances and other exceptions appearing in the Title Commitment or the Survey to which Purchaser does not object within the twenty (20) day period will be deemed approved by Purchaser and shall constitute the permitted encumbrances ("Permitted Encumbrances"); provided, however, that under no circumstances shall Purchaser be required to object to any existing liens reflected in the Title Commitment, with such liens to be fully released or satisfied by Seller at its sole expense prior to the Final Closing, or as otherwise provided in this Agreement.

B. Seller may, at its option, but without the obligation to do so, within twenty (20) days from the date Seller receives Purchaser's notice of Objections, cure the Objections. During this twenty (20) day time period, Seller shall notify Purchaser that Seller has either i) cured the Objections, in whole or in part, or ii) elected not to cure the Objections (collectively, "Seller's Cure Notice").

C.     If, for any reason, Seller does not timely cure or remove the Objections to the satisfaction of the Title Company and Purchaser, then Purchaser may, at its sole option, within the next ten (10) days following the earlier of i) the end of the twenty (20) day cure period, or ii) receipt of Seller's Cure Notice, either: i) terminate this Agreement by notifying Seller of the termination, whereupon the Earnest Money Deposit will be returned to Purchaser, and the parties will be fully and finally released from all further obligations under this Agreement, except as otherwise provided in this Agreement; or ii) waive the Objections not cured, notify Seller of this waiver and close the transaction contemplated by this Agreement in accordance with its remaining terms and provisions, whereupon the Objections waived will become Permitted Encumbrances, to be treated in the manner provided in this Agreement for Permitted Encumbrances. If Purchaser does not exercise its right to terminate under this section within the stated time period, Purchaser will be deemed to have waived its right to terminate this Agreement on the basis of Objections and to have elected to have waived the Objections.

## 11.    FEASIBILITY PERIOD.

A.     Except as provided in Sections 8, 10, and 13, Purchaser shall, for a period of forty-five (45) days from the Effective Date, have the right, in accordance with the following terms and conditions and at Purchaser's sole risk, cost and expense, to conduct an environmental analysis of the Property, and to perform surveys, assessments and other testing, and review title, access and other issues which Purchaser deems necessary ("Feasibility Period") for the purpose of determining the suitability of the Property for Purchaser's intended use.

B.     Seller will grant Purchaser and Purchaser's employees, contractors, and agents access to the Property during the Feasibility Period so that Purchaser may conduct, at Purchaser's sole risk, cost and expense, a comprehensive environmental site assessment of the Property, including the right to conduct soil borings, drill test or monitoring wells, do other excavation activities, and conduct any and all other inspection testing or analyses, including, without limitation, soil, drainage, utility, environmental, engineering, and other studies and tests, in order to determine what matter is contained on, under, or in the Property.

C.     Seller shall allow Purchaser access for inquiries to employees and consultants with knowledge of the environmental condition of and activities at the Property which may have affected the environmental condition of the Property. Purchaser shall provide Seller with a draft copy of any environmental report, if any, before the final report is issued. Seller shall be entitled to review and comment prior to the final report within ten (10) days of receiving the report, if any.

D.     Except as provided in Sections 8, 10 and 13, if Purchaser determines, in Purchaser's sole and absolute discretion, for any or no reason whatsoever, that the Property is not suitable for Purchaser's intended use, Purchaser

shall have the right to terminate this Agreement and receive a refund of the Earnest Money Deposit, by notifying Seller of the termination within three (3) days after the end of the Feasibility Period. If Purchaser does not timely notify Seller of its termination pursuant to this section, then the Earnest Money Deposit will be nonrefundable, and the parties will proceed to the Interim Closing and then to the Final Closing, except as provided elsewhere in this Agreement.

E. Purchaser will **defend, indemnify and hold harmless** Seller from and against any and all damages, mechanics' liens, liabilities, losses, demands, actions, causes of action, claims, costs and expenses (including reasonable attorneys' fees, including the cost of in-house counsel and appeals) arising from or related to Purchaser or its consultants' entry onto the Property, and any inspections or other matters performed by Purchaser with respect to the Property during the Feasibility Period. If the Interim Closing does not occur, Purchaser will restore or cause to be restored the surface of the Property to a condition similar to the condition existing prior to Purchaser's entry.

## 12. SELLER TO REMOVE IMPROVEMENTS.

Seller shall commence the Abatement, Demolition and Removal Activities on the Property after all actions required by Purchaser and Seller at the Interim Closing, as set forth in Section 5, have been completed. Seller shall: a) remove all personal property of Seller and Seller's tenants, if any, and b) conduct the Abatement, Demolition and Removal Activities. The Property shall be graded level, except for Atcid Drive, which will not be demolished or removed, subject to the following:

A. The Abatement, Demolition and Removal Expense comprises the estimated asbestos abatement bid of $995,800, asbestos monitoring fee of $20,000, and demolition and removal expense of $379,243.84, for a total of One Million Three Hundred Ninety-five Thousand Forty-three and 84/100 Dollars ($1,395,043.84). Seller shall provide Purchaser with a copy of the final contracts for the Abatement, Demolition and Removal Activities for Purchaser's review prior to their execution by Seller. The Abatement, Demolition and Removal Expense is not adjustable upward and may not be increased against the Purchaser. Any costs or expenses incurred by Seller in performing or conducting the Abatement, Demolition and Removal Activities described in this Agreement, shall be at Seller's sole risk, cost and responsibility. The Abatement, Demolition and Removal Expense shall be deposited into escrow with the Title Company by Purchaser at the Interim Closing, or, at Purchaser's sole option, as draws are needed and shall be disbursed by Title Company, upon Purchaser's instructions, to Seller or, at Purchaser's sole option, to Seller's contractor(s) and subcontractor(s) in accordance with the Draw Schedule, as provided in Section 5. Seller shall require that its contractor(s) conducting the Abatement, Demolition and Removal Activities maintain and carry adequate insurance while conducting said activities. For purposes of this Agreement, "adequate insurance" shall mean insurance with coverage and policy limits consistent with and substantially similar to the insurance described in paragraph VI of the CST Environmental, LP bid document, dated July 28, 2008, relating to the Property.

(CST Proposal No: 08-31-75-1). Purchaser shall be named as an additional insured on such insurance policy(ies). Prior to commencement of the Abatement, Demolition and Removal Activities, Seller shall provide Purchaser with a certificate(s) of insurance reflecting Purchaser's status as an additional insured.

B.     Seller shall obtain the written consent of any of Seller's lien holders of any kind that have not executed an unconditional release of lien prior to conducting the Abatement, Demolition and Removal Activities.

C.     Seller shall obtain any and all necessary consents, approvals and permits for the Abatement, Demolition and Removal Activities and shall be responsible for the proper disconnection of all utilities from the Property. All such operations shall be coordinated by Seller with the appropriate utility providers and agencies having jurisdiction over the Property. Any permits remaining in effect will be transferred by Seller to Purchaser at Final Closing. As between Purchaser and Seller, Seller assumes all risks in conducting the Abatement, Demolition and Removal Activities. Seller shall comply with all applicable state, federal and local laws, statutes, rules and regulations in conducting the Abatement, Demolition and Removal Activities.

D.     The Abatement, Demolition and Removal Activities shall not result in the Property being left in an unsafe or dangerous condition. Further, in the event such activities shall cause damage to the surface of the Property, Seller shall take such measures as may be required to restore such surface to a reasonably level and safe condition.

E.     Seller shall be solely responsible for any damage to streets, curbs, gutters, or sidewalks, that not are located on the Property, or to the persons or property of others arising out of the Abatement, Demolition and Removal Activities. Upon commencement of these activities, Seller shall indemnify Purchaser, as provided in Section 14.

### 13.     PURCHASER'S INSPECTION.

A.     Seller shall, upon completion of the Abatement, Demolition and Removal Activities as set forth in Section 12, notify Purchaser that said activities have been completed, and grant Purchaser access to the Property for the purpose of inspecting the Property to assure that these activities have been completed in accordance with the terms of Section 12. Purchaser shall have thirty (30) days from receipt of Seller's notification that said activities have been completed to conduct Purchaser's inspection and to notify Seller of the results of its inspection. Purchaser shall not be obligated to fund Final Closing until Purchaser has had the right to inspect, test and analyze the Property to determine whether it is acceptable to Purchaser as set forth in this section. Any work necessary to make the Property reasonably acceptable to Purchaser shall be performed by Seller, at Seller's own risk, cost and expense.

B.     In the event Purchaser's inspection results in a finding of damage to the Property resulting from the Abatement, Demolition and Removal Activities or failure

of Seller to complete said activities in accordance with the provisions of Section 12, Seller shall correct or repair the damages or fully complete said activities, to Purchaser's reasonable satisfaction, within thirty (30) days after receipt of Purchaser's notice of the existence of such damage or failure to complete said activities. Seller shall send notice to Purchase once said repairs or activities, if any, are completed.

C. If Purchaser is reasonably satisfied with Seller's completion and accepts the Property, Purchaser shall notify Seller of its acceptance and that Purchaser is ready to proceed to Final Closing. In the event Seller fails to correct or repair the damages or fully complete the Abatement, Demolition and Removal Activities within thirty (30) days after receipt of notice from Purchaser of the existence of such damage or failure to complete said activities, then Purchaser will notify Seller that Purchaser will proceed to Final Closing to take title to the Property and then, at Seller's cost and expense, Purchaser will complete any remaining Abatement, Demolition and Removal Activities Seller failed to perform or inadequately performed. In such event, Seller shall i) pay or credit Purchaser at Final Closing, the costs and expenses Purchaser has incurred, or determines in its sole and reasonable opinion that it will incur, to complete said activities, and ii) promptly assign for Purchaser's benefit, any agreement(s) between Seller and its contractor(s) and/or sub-contractor(s), related to the Abatement, Demolition and Removal Activities, if Purchaser requests such assignment in writing.

## 14. RELEASE OF CLAIMS AND INDEMNIFICATION.

A. Upon commencement of the Abatement, Demolition and Removal Activities, Seller, for itself, its heirs, legal representatives, successors and assigns (collectively, "Seller Entities"), hereby **releases, acquits and forever discharges** Purchaser, its affiliates, subsidiaries, employees, agents and representatives (collectively, "Purchaser Entities") from any and all Claims, whether known or unknown, that Seller Entities may have against Purchaser Entities arising out of or relating to, in any way, the Abatement, Demolition and Removal Activities. To the extent said Claims in the preceding sentence are not herein released, Seller Entities hereby irrevocably and without recourse assign these Claims to Purchaser. The term "Claims" shall mean, without limitation, claims, demands, causes of action, damages, suits, liabilities, losses, costs, expenses, fees, attorney fees (including, without limitation, the cost of in-house counsel and appeals), penalties and fines (whether civil or criminal), charges, liens, and payments of any kind whatsoever, without limitation, for personal injury, death, loss of or damage to personal or real property, or otherwise.

B. Notwithstanding any other provision of this Agreement, and upon commencement of the Abatement, Demolition and Removal Activities, Seller Entities agree to **defend, indemnify and hold harmless** Purchaser Entities from any and all Claims that are asserted or made by any person or entity, whether public or private, under any law, statute, rule or regulation, whether state or federal, whether at law or equity, in tort, contract or otherwise, that arise out of or relate to, in any way, the Abatement, Demolition and Removal Activities, except to the extent caused by Purchaser, its agents, employees or contractors.

C.    Upon Final Closing, Seller Entities hereby **release, acquit and forever discharge** Purchaser Entities from any and all Claims, whether known or unknown, that Seller Entities may have against Purchaser Entities arising out of or relating to, in any way, the use, condition (to include, without limitation, the environmental and physical condition or status), ownership or operation of the Property. To the extent said Claims in the preceding sentence are not herein released, Seller Entities hereby irrevocably and without recourse assign these Claims to Purchaser.

D.    Upon Final Closing, and notwithstanding any other provision of this Agreement, Seller Entities agree to **defend, indemnify and hold harmless** Purchaser Entities from any and all Claims that are asserted or made by any person or entity, whether public or private, under any law, statute, rule or regulation, whether state or federal, whether at law or equity, in tort, contract or otherwise, that arise out of or relate to, in any way, to the use, condition (to include, without limitation, the environmental and physical condition or status), ownership or operation of the Property.

E.    The provisions of this section will survive the Final Closing and delivery of the Deed or the termination of this Agreement.

## 15.    CONFIDENTIAL INFORMATION.

Seller and Purchaser may not disclose, before Final Closing, the information contained in the environmental assessment or other studies and tests concerning the Property to any person other than a) its employees, b) consultants who are engaged to assist Purchaser in deciding whether to acquire the Property, c) lenders for financial purposes, and d) each other. Prior to disclosing information to any person, including those listed, Purchaser or Seller will require that the person agree in writing to keep the information confidential. If Purchaser is required by law to disclose any information contained in the environmental assessment or related studies and tests, Seller or Purchaser will not disclose the information until after first disclosing the information to each other and providing each other with a complete copy of all transmittals of the information to be provided to the applicable governmental body.

## 16.    TAXES.

Seller represents and warrants to Purchaser that a) all ad valorem taxes, if any, relating to the Property have been paid through all calendar years preceding the Effective Date, and b) Seller is tax exempt. If any taxing authority changes the status of any taxes for any reason for the year in which Final Closing occurs, then all current charges for such taxes shall be adjusted and prorated as of the Final Closing date as if Seller had not qualified for such tax exemption status. If the amount of the ad valorem taxes is unavailable on the Final Closing date, the taxes shall be prorated on the basis of taxes assessed in the previous year, with a subsequent cash adjustment of such proration to be made between Seller and Purchaser, if necessary, when actual tax figures become available.

## 17. REPRESENTATIONS AND WARRANTIES.

Seller represents and warrants that:

A.     Seller holds fee simple title to the Property, and has a good and lawful right to sell the Property to Purchaser hereunder, and such sale has been duly authorized by all requisite regulating authority action on the part of Seller.

B.     Seller has entered into no agreements, oral or written, and there are no contracts, agreements or obligations of any kind or nature relating to the Property and to which Purchaser will be bound, or the Property will be subject, after the Final Closing.

C.     There are no judgments or decrees of any court which would limit or restrict Seller's right to enter into this Agreement and fulfill its obligations hereunder.

D.     Seller has not received notice of any condemnation or eminent domain proceedings either pending or threatened against the whole or any part of the Property.

E.     There are no liens, charges, assessments, payback agreements, or other similar capital installation obligations, which are or may become a charge or lien upon the Property or which may become the obligation of Purchaser other than those disclosed on the Title Commitment delivered to Purchaser.

F.     At Final Closing, there will be no outstanding contracts made by Seller for any Improvements to the Property which have not been fully paid for, and Seller shall cause to be discharged all mechanics' and material men's liens arising from any labor or materials furnished prior to Final Closing which pertain to the Property in any way.

G.     Seller has or will have at Final Closing record title to the Property, which title shall be free and clear of all liens, encumbrances, covenants, restrictions, reservations, rights-of-way, easements, leases and all other matters affecting title except for the Permitted Encumbrances.

H.     Seller is not a party to any written or oral executory contracts affecting the Property, excluding any contracts related to the Abatement, Demolit on and Removal Activities.

I.     There are or will be no parties in possession or occupants or tenants of any space in any part of the Property by the time of Interim Closing or thereafter.

J.     Except as to agreements to be cancelled by Seller prior to Final Closing with no obligation to Purchaser (evidence of such cancellations to be furnished

to Purchaser prior to or at Final Closing), Seller has no contracts of employment, management, service, supply or rental outstanding which affect the Property in any way.

K.    There are no actions, suits, claims, assessments or proceedings pending or, to the knowledge of Seller, threatened or contemplated that affect the ownership, use, operation or maintenance of the Property or Seller's ability to perform hereunder.

L.    Seller has full right, power and authority to execute and deliver this Agreement and to consummate this transaction provided for herein without obtaining any further consents or approvals from or the taking of any actions with respect to any regulating authorities; and this Agreement and all documents required hereby to be executed by Seller are and shall be valid, legally binding obligations and enforceable against Seller in accordance with their terms.

M.    All bills and other payment due with respect to the ownership, operation and maintenance of the Property which are the responsibility of Seller have been paid or will be paid prior to Final Closing.

## 18.    REAL ESTATE COMMISSION / BROKERS.

Each party represents and warrants to the other that it has had no dealings or contacts of any kind with any real estate broker or agent with respect to this Agreement, the negotiation of this Agreement, or any transaction incident or related to this Agreement. Each party agrees to **defend, indemnify and hold harmless** the other party with respect to any and all Claims asserted or made by any person or entity that arise out of or relate to, in any way, finder's or broker's fees or commissions asserted by a party claiming to have acted as agent for or to have been engaged by the indemnifying party. The provisions of this section will survive, as applicable, the Final Closing and delivery of the Deed or the termination of this Agreement.

## 19.    TERMINATION, DEFAULT, AND REMEDIES.

A.    If Purchaser does not close the transaction contemplated by this Agreement for any reason other than i) termination of this Agreement by Purchaser pursuant to a right to terminate provided for in this Agreement, or ii) Seller's failure to perform Seller's obligations under this Agreement, then, in either case, Seller, as Seller's **sole and exclusive remedy**, except as otherwise provided in this Agreement, will have the right to terminate this Agreement by written notice to Purchaser, whereupon neither party will have any further rights or obligations under this Agreement, and Seller will be entitled to the Earnest Money Deposit as liquidated damages, free of any claims by Purchaser or any other person.

B.    If Seller does not close the transaction contemplated by this Agreement or fails to perform any of Seller's other obligations hereunder for any reason other than the termination of this Agreement by Seller pursuant to a right to terminate or

because of Purchaser's failure to perform Purchaser's obligations under this Agreement, then Purchaser, as Purchaser's **sole and exclusive remedy,** will have the right to either i) enforce specific performance of Seller's obligations under this Agreement, or ii) terminate this Agreement by notice to Seller, whereupon Purchaser will be entitled to the release of any and all remaining funds, including any accrued interest, held in escrow by the Title Company back to Purchaser free of any and all claims by Seller, and neither party will have any further rights or obligations under this Agreement, except as otherwise provided in the Note and the Deed of Trust.

        C.     Notwithstanding any other provision of this Agreement, if Purchaser terminates this Agreement and becomes entitled to a return of the Earnest Money Deposit, the Title Company is instructed to deliver the sum of One Hundred Dollars ($100.00) to Seller as independent consideration for the right granted by Seller to Purchaser to terminate this Agreement.

## 20. CONDEMNATION.

        A.     If prior to the Final Closing, any taking or condemnation of all or any portion of the Property as to which would, in Purchaser's sole and reasonable opinion, materially interfere with Purchaser's use thereof, then, in any such event, the Purchaser, at its sole option, may terminate this Agreement by written notice delivered to Seller within twenty (20) days after Purchaser has received written notice from Seller of such taking or condemnation. If the Purchaser does not so elect to terminate this Agreement, then the Final Closing shall take place as provided herein, and there shall be assigned to the Purchaser at the Final Closing all interest of the Seller in and to any condemnation or other awards which may be payable to the Seller on account of such taking or condemnation.

        B.     If prior to the Final Closing, any taking or condemnation of a portion of any Property shall occur or be threatened, which is not material to the use thereof as determined by Purchaser in its sole and reasonable opinion, then, in any such event, the Purchaser shall have no right to terminate this Agreement, but there shall be assigned to the Purchaser at Final Closing all interest of the Seller in and to any condemnation or other awards which may be payable to the Seller on account of any taking or condemnation.

## 21. TAX-DEFERRED EXCHANGE.

        A.     Purchaser shall have the right to consummate the transaction contemplated by this Agreement in a manner which qualifies as a tax-deferred exchange, in whole or in part, under the provisions of Section 1031 of the Internal Revenue Code ("Code"), and the Treasury Regulations thereunder. Seller agrees to cooperate with Purchaser with respect to any tax-deferred exchange pursuant to the provisions of Section 1031 of the Code and the Treasury Regulations thereunder and to execute any and all documents reasonably requested in connection therewith, provided that i) Seller shall not incur additional costs or expenses attributable to the exchange,

and ii) Seller shall not be required to purchase any replacement property in connection with any such deferred exchange (the "Replacement Property"). Such cooperation includes, without limitation, executing such supplemental documents necessary to accomplish a tax-deferred exchange as the Purchaser may reasonably request, including, without limitation, any necessary consents allowing the Purchaser to assign its rights in this Agreement to its qualified intermediary.

B. Purchaser and Seller acknowledge that the Seller shall not be deemed the Purchaser's agent in connection with said exchange. Seller and Purchaser further acknowledge that all agreements in connection with performing the exchange shall be prepared at the Purchaser's expense. Without limiting the foregoing, Purchaser shall have the right to transfer all or any portion of its rights under the Agreement to a qualified intermediary (the "Intermediary"), an affiliate or parent in accordance with the provisions of Section 1031 of the Code and the Treasury Regulations thereunder (and, as a result of the transfer, an Intermediary, affiliate or parent would acquire an equitable interest in the title to the Property), provided, however, in no event shall Seller be required to obtain title to any property without its consent as part of such tax deferred exchange. The provisions of this section will survive the Final Closing and delivery of the Deed or the termination of this Agreement.

C. To exercise any rights under this section, Purchaser shall notify Seller of its intent to enter into an exchange at least fifteen (15) days prior to the Final Closing. Should this Agreement become part of a 1031 transaction, Purchaser hereby agrees that the Seller may enforce any and all representations, warranties, covenants and other obligations of the exchanger under this Agreement directly against Purchaser, and Seller agrees that Purchaser may enforce any and all representations, warranties, covenants and other obligations of the Seller directly against the Seller.

## 22. TIME OF ESSENCE.

Time is of the essence in connection with this Agreement and the performance of obligations under it. If the final day of any time period or any date of performance under this Agreement falls on a Saturday, Sunday or U.S. bank holiday, then the final day of said period or the date of performance shall be extended to the next business day thereafter.

## 23. ENTIRE AGREEMENT; NO FURTHER WARRANTIES.

This instrument constitutes the entire agreement between Seller and Purchaser, and all prior agreements and undertakings, both written and oral, are merged in it. **Neither party is bound by any prior representations, warranties, promises or assurances whatsoever and by whomsoever made, if any, other than those representations, warranties, promises or assurances expressly set forth in this Agreement.** This Agreement may not be changed or modified except by an agreement in writing executed by the parties. **Furthermore, except for representations and warranties expressly set forth herein, no other warranties or**

representations, express or implied, are made or extended by either Seller or Purchaser.

### 24.    RECORDING.

This Agreement may not be recorded in the real property records of Harris County, Texas or any other county. If either party records this Agreement or any memorandum of it without the prior written consent of the other party, the other party (the non-recording party) may terminate this Agreement by filing an affidavit of termination in the real property records and notifying the recording party of termination.

### 25.    BINDING EFFECT AND ASSIGNMENT.

This Agreement will bind and inure to the benefit of the parties and their respective successors and assigns; however, this Agreement may not be assigned by Purchaser, except to an affiliate of Purchaser or to an Intermediary as provided in Section 21, without Seller's prior written consent, which consent shall not be unreasonably withheld. Except for an assignment to Purchaser's affiliate or to an Intermediary as provided in Section 21, any assignment without Seller's written consent will be void.

### 26.    CONSTRUCTION; CAPTIONS AND TERMINOLOGY.

The rule of construction that ambiguities in a document will be construed against the party who drafted it will not be applied in construing or interpreting this Agreement. The heading, caption and numbering of any particular provision of this Agreement are for the purpose of convenience only and shall not be construed as having any substantive effect on the terms of this Agreement and will not limit, enlarge, modify, or otherwise affect this Agreement. Wherever required by the context, any one gender will include all other genders, the singular will include the plural, and the plural will include the singular.

### 27.    PERFORMANCE AND VENUE AND CHOICE OF LAW.

The place of performance of this Agreement is Harris County, Texas and venue for any action brought under this Agreement will be in Harris County, Texas. This Agreement shall be governed by, interpreted and construed in accordance with the laws of the State of Texas, without regard to, or effect of, any choice or conflict of law principles or rules.

### 28.    SEVERABILITY.

The provisions of this Agreement are severable. If a court of competent jurisdiction finds that any provision of this Agreement is unenforceable, the remaining provisions will remain in effect without the unenforceable parts.

**29.    NOTICE.**

Any notice or communication required or permitted under this Agreement must be in writing and may be made by electronic mail, facsimile (with confirmation of receipt), nationally recognized overnight carrier such as Federal Express or UPS that requires receipt of delivery, personal delivery, or registered or certified mail, postage prepaid, return receipt requested.   Said notice or communication shall be deemed received on the earlier of:  a) the date of actual receipt of the notice or communication by the intended recipient, or b) the third business day after the date mailed.  Notices or communications received or delivered after 5:00 p.m. Central Time on a given day will be deemed received on the next following day.   In order for any notice or communication sent by electronic mail or facsimile to be effective, said notice or communication must also be provided concurrently by one of the other methods described in this paragraph.   Notices or communications must be addressed as provided below, but each party may change its address by notice in accordance with this section.

To Seller:          American Housing Foundation
                    Attention: Mr. Steve W. Sterquell
                    1800 S. Washington Street #311
                    Amarillo, Texas 79102
                    Fax:  806.372.7508
                    Email:  steve@americanhousing.org
                    American Housing Foundation

With copy to:       Claire Palmer
                    General Counsel
                    American Housing Foundation
                    2214 N. Akard, Suite 550
                    Dallas, Texas 75201
                    Fax:  (214) 979-0088
                    Email:  claire@americanhousing.org

To Purchaser:       ExxonMobil Baytown Chemical Plant
                    Attention:  Real Estate Office, CAB, Rm E143
                    5000 Bayway Drive
                    Baytown, Texas 77520
                    Fax:  (281) 834-1017
                    Email:  marcelo.marroquin@exxonmobil.com

| With copy to: | Exxon Mobil Corporation |
| | Attention: Vernon A. Sevier, Jr., Counsel |
| | 16825 Northchase Drive, Suite 220 |
| | Houston, Texas 77060 |
| | Fax: (281) 654-7171 |
| | Email: vernon.a.sevier@exxonmobil.com |
| | |
| To Title Company: | First American Title Insurance Company |
| | Attention: Ms. Elvira Fuentes |
| | 24 Greenway Plaza, Suite 850 |
| | Houston, Texas 77046 |
| | Fax: (713) 850-0456 |
| | Email: efuentes@firstam.com |

## 30. SURVIVAL.

The obligations of this Agreement that cannot be performed before termination or Final Closing, as applicable, will survive termination or Final Closing, and the legal doctrine of merger will not apply to these matters. If there is any conflict between the closing documents and this Agreement, the closing documents will control.

## 31. EXHIBITS.

All exhibits attached to this Agreement are incorporated herein by reference.

**EXECUTED IN TRIPLICATE ORIGINALS** on the dates shown by the signatures below, to be effective on the date of the signature on behalf of Purchaser, which will be the effective date ("Effective Date") of this Agreement.

*[Signature page follows.]*

SELLER:
AMERICAN HOUSING FOUNDATION

By: _____
Name: _____
Its: _C EO_

Date: _March 10,_ , 2009


PURCHASER:
EXXON MOBIL CORPORATION

By: _____
Name: _Feb Nash_
      Agent and Attorney-in-Fact

Date: _3/12/09_ , 2009
      (Effective Date)

The Title Company executes this Agreement to acknowledge and evidence its agreement to a) handle and dispose of the Earnest Money Deposit, the Initial Purchase Payment, the Remaining Purchase Payment, the Abatement, Demolition and Removal Expense and any other funds escrowed with Title Company under this Agreement, and b) perform the duties of the Title Company, both in accordance with the terms of this Agreement.

TITLE COMPANY:
FIRST AMERICAN TITLE INSURANCE COMPANY

By: _____
Name: _ELVIRA FUENTES_
Title: _VP / SENIOR ESCROW OFFICER_

Date: _March 13th_ , 2009

## EXHIBIT "A"

To Sale and Purchase Agreement between
**AMERICAN HOUSING FOUNDATION,** Seller, and
**EXXON MOBIL CORPORATION,** Purchaser

## PROPERTY DESCRIPTION

*[To be inserted once Survey and Title Commitment have been obtained.]*

## EXHIBIT "B"

To Sale and Purchase Agreement between
**AMERICAN HOUSING FOUNDATION**, Seller, and
**EXXON MOBIL CORPORATION**, Purchaser

## PROMISSORY NOTE

Date: _____

<u>Maker</u>: American Housing Foundation, a Texas nonprofit corporation

Maker's Mailing Address: American Housing Foundation, Attention: Steve W. Sterquell, 1800 S. Washington Street #311, Amarillo, Potter County, Texas 79102

<u>Payee</u>: Exxon Mobil Corporation, a New Jersey corporation

<u>Place for Payment</u>: ExxonMobil Global Real Estate and Facilities, Attention Mr. Ronald M. Smith, 16825 Northchase, Suite 200, Houston, Harris County, Texas 77060, or other place that Payee may designate by notice to Borrower.

<u>Principal Amount</u>: *(Amount equal to the Initial Purchase Payment)*

<u>Annual Interest Rate</u>: *(Rate to be Prime + 2%, per Annum, using the Prime rate as quoted in the Wall Street Journal as of the day prior to the Interim Closing)*

<u>Maturity Date</u>: The date which is the earlier of: (1) the date of the Final Closing as that term is defined in that certain Sale and Purchase Agreement between Maker, as Seller, and Payee, as Purchaser, regarding the Property (hereinafter defined) and dated *[state date of the Sale and Purchase Agreement]* (the "<u>Purchase Agreement</u>") or (2) **Date** *(Date to be the date one (1) year from the date of the Interim Closing, or if a Saturday or Sunday or a federal holiday, the next business day)*

<u>Annual Interest Rate on Matured, Unpaid Amounts</u>: *(To be the Annual Interest Rate plus 5%)*

<u>Terms of Payment</u> (principal and interest): All advanced and unpaid principal together with accrued and unpaid interest thereon will be due and payable on the Maturity Date. Payments will be applied first to accrued interest and the remainder to reduction of the Principal Amount.

<u>Security for Payment</u>: This note is secured by a deed of trust dated *(same date as above)* from Maker, as Grantor, to Vernon A. Sevier, Jr., Trustee, (the "<u>Deed of Trust</u>") which covers the following real property:

That certain real property known as Lakewood Terrace Townhomes, a 166 Unit Townhouse Development, being a 13-acre tract of land, more or less, out of the William Hilibus Survey, A-336, in Baytown, Harris County, Texas as described in Attachment "A" to this Note, attached hereto and made a part hereof for all purposes (the "Property")

Maker promises to pay to the order of Payee the Principal Amount plus interest at the Annual Interest Rate. This note is payable at the Place for Payment and according to the Terms of Payment. All unpaid amounts are due by the Maturity Date. After maturity, Maker promises to pay any unpaid principal balance plus interest at the Annual Interest Rate on Matured, Unpaid Amounts.

If Maker defaults in the payment of this note or in the performance of any obligation under this note, the Purchase Agreement or the Deed of Trust, Payee may (1) declare the unpaid principal balance, earned interest, and any other amounts owed on the note immediately due, (2) foreclose all liens securing the payment of this note, or any part thereof, (3) offset against this note any sum or sums owed by Payee to Maker, and (4) pursue any and all other rights and remedies available to Payee at law or equity, all at the option of Payee, with all such all rights and remedies being cumulative and not exclusive. The failure of Payee to exercise any right or remedy granted in this note upon any default shall not constitute a waiver of the right to exercise such right or remedy in the event of any subsequent default, or otherwise afforded by applicable law.

Notwithstanding any other provision of this note, in the event of a default, before exercising any of Payee's remedies under this note or the Deed of Trust, Payee will first give Maker written notice of default and Maker will have ten (10) days after notice is received in which to cure the default. If the default is not cured ten days after receipt of notice, Maker and each surety, endorser, and guarantor waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

Maker also promises to pay reasonable attorney's fees and court and other costs if this note is placed in the hands of an attorney to collect or enforce the note. These expenses will bear interest from the date of advance at the Annual Interest Rate on Matured, Unpaid Amounts. Maker will pay Payee these expenses and interest on demand at the Place for Payment. These expenses and interest will become part of the debt evidenced by the note and will be secured by any security for payment.

Maker may not make any prepayments without the prior written consent of Payee.

Interest on the debt evidenced by this note will not exceed the maximum rate or amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the Principal Amount or, if the Principal Amount has been paid, refunded. On any

acceleration or required or permitted prepayment, any excess interest will be canceled automatically as of the acceleration or prepayment or, if the excess interest has already been paid, credited on the Principal Amount or, if the Principal Amount has been paid, refunded. This provision overrides any conflicting provisions in this note and all other instruments concerning the debt.

A default exists under this note if (1) (a) Maker or (b) any other person liable on any part of this note or who grants a lien or security interest on any property as security for any part of this note (an "Other Obligated Party") fails to timely pay or perform any obligation or covenant in (a) this note, the Purchase Agreement or the Deed of Trust, or (b) any other written agreement that relates to the Property between Payee and Maker or any Other Obligated Party; (2) any warranty, covenant, or representation in (a) this note or any deed of trust securing payment of this note, or (b) any other written agreement that relates to the Property between Payee and Maker or any Other Obligated Party, is materially false when made; (3) a receiver is appointed for Maker, any Other Obligated Party, or any property on which a lien or security interest is created as security (the "Collateral Security") for any part of this note; (4) any Collateral Security is assigned for the benefit of creditors; (5) a bankruptcy or insolvency proceeding is commenced by Maker, a partnership of which Maker is a general partner, or an Other Obligated Party; (6) (a) a bankruptcy or insolvency proceeding is commenced against Maker, a partnership of which Maker is a general partner, or an Other Obligated Party and (b) the proceeding continues without dismissal for sixty days, the party against whom the proceeding is commenced admits the material allegations of the petition against it, or an order for relief is entered; (7) any of the following parties is dissolved, begins to wind up its affairs, is authorized to dissolve or wind up its affairs by its governing body or persons, or any event occurs or condition exists that permits the dissolution or winding up of the affairs of any of the following parties: Maker, a partnership of which Maker is a general partner, or an Other Obligated Party; or (8) any Collateral Security is impaired by loss, theft, damage, levy and execution, issuance of an official writ or order of seizure, or destruction, unless it is promptly replaced with collateral security of like kind and quality or restored to its former condition.

This note will be construed under the laws of the state of Texas, without regard to choice-of-law rules of any jurisdiction.

Any notice or communication required or permitted under this note must be in writing and may be made by facsimile (with confirmation of receipt), nationally recognized overnight carrier, such as Federal Express or UPS, that requires receipt of delivery, personal delivery, or registered or certified mail, postage prepaid, return receipt requested. Said notice or communication shall be deemed received on the earlier of: (a) the date of actual receipt of the notice or communication by the intended recipient, or (b) the third business day after the date mailed. Notices or communications received or delivered after 5:00 p.m. Central Time on a given day will be deemed received on the next following day. In order for any notice or communication sent by facsimile to be effective said notice or communication must also be provided concurrently by one of the other methods described in this paragraph. Notices or communications must be

addressed as provided below, but each party may change its address by notice in accordance with this section.

| | |
|---|---|
| To Maker: | American Housing Foundation<br>Attention: Mr. Steve W. Sterquell<br>1800 S. Washington Street #311<br>Amarillo, Texas 79102<br>Fax: (806) 372-7508 |
| With copy to: | Claire Palmer<br>General Counsel<br>American Housing Foundation<br>2214 N. Akard, Suite 550<br>Dallas, Texas 75201<br>Fax: (214) 979-0088 |
| To Payee: | ExxonMobil Baytown Chemical Plant<br>Attention: Real Estate Office, CAB, Rm E143<br>5000 Bayway Drive<br>Baytown, Texas 77520<br>Fax: (281) 834-1017 |
| With copy to: | Exxon Mobil Corporation<br>Attention: Vernon A. Sevier, Jr., Counsel<br>16825 Northchase Drive, Suite 220<br>Houston, Texas 77060<br>Fax: (281) 654-7171 |

Payee may transfer or assign this note, and the rights and privileges of Payee under this note shall inure to the benefit of Payee's successors and assigns.

When the context requires, singular nouns and pronouns include the plural.

If any provision of this note shall, for any reason and to any extent, be invalid or unenforceable, then the remainder of this note and any other provisions hereof shall not be affected, but instead shall be fully enforceable in accordance with their respective terms to the maximum extent permitted by law.

This note may not be amended, revised or otherwise modified except by a written instrument executed by the party against which enforcement is asserted. There are no unwritten oral agreements between the parties relating to this note.

Maker warrants and represents that i) it has full right, power and authority to execute and deliver this note without obtaining any further consents or approvals, and ii) this note creates valid, legally binding obligations that are enforceable against Seller in accordance with their terms.

**MAKER:**
**AMERICAN HOUSING FOUNDATION**


By:_____

Name:_____

Its:_____

Date:_____

## ATTACHMENT "A"

To Promissory Note
**AMERICAN HOUSING FOUNDATION**, Maker, and
**EXXON MOBIL CORPORATION**, Payee

## PROPERTY DESCRIPTION

*[To be inserted once Survey and Title Commitment have been obtained.]*

## EXHIBIT "C"

To Sale and Purchase Agreement between
**AMERICAN HOUSING FOUNDATION**, Seller, and
**EXXON MOBIL CORPORATION**, Purchaser

## DEED OF TRUST

**Notice of confidentiality rights: If you are a natural person, you may remove or strike any or all of the following information from this instrument before it is filed for record in the public records: your Social Security number or your driver's license number.**

**Terms**

Date: *(Same date as Promissory Note, Exhibit B to Sales and Purchase Agreement)*

Grantor: American Housing Foundation, a Texas nonprofit corporation

Grantor's Mailing Address: American Housing Foundation, Attention: Steve W. Sterquell, 1800 S. Washington Street #311, Amarillo, Potter County, Texas 79102

Trustee: Vernon A. Sevier, Jr.

Trustee's Mailing Address: Exxon Mobil Corporation, 16825 Northchase Drive, Suite 220, Houston, Harris County, Texas 77060

Lender: Exxon Mobil Corporation, a New Jersey corporation

Lender's Mailing Address: ExxonMobil Global Real Estate and Facilities, Attention Mr. Ronald M. Smith, 16825 Northchase, Suite 200, Houston, Harris County, Texas 77060

Obligation

    Note

        Date: *(Same date as above)*

        Original principal amount: *(Per Promissory Note, Exhibit B to Sales and Purchase Agreement)*

        Maker: American Housing Foundation, a Texas nonprofit corporation

        Payee: Exxon Mobil Corporation, a New Jersey corporation

Maturity date: *(Per Promissory Note, Exhibit B to Sales and Purchase Agreement)*

Other Debt: This deed of trust, to the extent permitted by law, also secures payment of all other present and future debts, obligations, and liabilities owed to Lender, as Purchaser, by Grantor, as Seller, under that certain Sale and Purchase Agreement between Grantor and Lender regarding the Property (hereinafter defined) and dated *[state date of Sale and Purchase Agreement]* (the "Purchase Agreement").

As used herein, the term "Obligation" includes both the Note and the Other Debt.

Property (including any improvements):

That certain real property known as Lakewood Terrace Townhomes, a 166 Unit Townhouse Development, being a 13-acre tract of land, more or less, out of the William Hilibus Survey, A-336, in Baytown, Harris County, Texas as described in Attachment "A" to this deed of trust, attached hereto and made a part hereof for all purposes.

Prior Lien: None

Other Exceptions to Conveyance and Warranty: None

For value received and to secure payment of the Obligation, Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the Other Exceptions to Conveyance and Warranty. On payment of the Obligation and all other amounts secured by this deed of trust, this deed of trust will have no further effect, and Lender will release it at Grantor's expense.

**Clauses and Covenants**

**A.     Grantor's Obligations**

Grantor agrees to—

1.     keep the Property in good repair and condition, subject to the terms of the Purchase Agreement;

2.     pay all taxes and assessments on the Property before delinquency;

3.     defend title to the Property subject to the Other Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;

4. maintain all insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property that Lender reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to Lender, and deliver evidence of the Required Insurance Coverages in a form acceptable to Lender at least ten days before the expiration of the Required Insurance Coverages, all unless otherwise agreed by Payee in writing;

5. obey all laws, ordinances, and restrictive covenants applicable to the Property;

6. keep any buildings occupied as required by the Required Insurance Coverages, subject to the terms of the Purchase Agreement;

7. if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments; and

8. notify Lender of any change of address.

## B. Lender's Rights

1. Lender may appoint in writing a substitute trustee, succeeding to all rights and responsibilities of Trustee.

2. If the proceeds of the Obligation are used to pay any debt secured by prior liens, Lender is subrogated to all the rights and liens of the holders of any debt so paid.

3. Lender may apply any proceeds received under the property insurance policies covering the Property either to reduce the Obligation, to repair or replace damaged or destroyed improvements covered by the policy or to fulfill any obligation of Grantor under the Purchase Agreement.

4. Notwithstanding the terms of the Note to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor with respect to the Obligation or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender with respect to the Obligation, to be applied to late charges, principal, or interest in the order Lender in its discretion determines.

5. If Grantor fails to perform any of Grantor's obligations, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of

payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

6.    If there is a default on the Obligation or if Grantor fails to perform any of Grantor's obligations under this deed of trust, the Note or the Purchase Agreement and the default continues after any required notice of the default and the time allowed to cure, Lender may—

a.    declare the unpaid principal balance and earned interest on the Obligation immediately due;

b.    direct Trustee to foreclose this lien, in which case Lender or Lender's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

c.    purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Obligation.

7.    Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

C.    Trustee's Rights and Duties

If directed by Lender to foreclose this lien, Trustee will—

1.    either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

2.    sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Lien and to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

3.    from the proceeds of the sale, pay, in this order—

a.    expenses of foreclosure, including a reasonable commission to Trustee;

b.    to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

c.    any amounts required by law to be paid before payment to Grantor; and

d.    to Grantor, any balance; and

4.    be indemnified, held harmless, and defended by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

## D.    General Provisions

1.    If any of the Property is sold under this deed of trust, Grantor must immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor will become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2.    Recitals in any trustee's deed conveying the Property will be presumed to be true.

3.    Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4.    This lien will remain superior to liens later created even if the time of payment of all or part of the Obligation is extended or part of the Property is released.

5.    If any portion of the Obligation cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion.

6.    Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees and court and other costs, Lender will either release any remaining amounts to Grantor or apply such amounts to reduce the Obligation. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

7.    Grantor assigns to Lender absolutely, not only as collateral, all present and future rent and other income and receipts from the Property, as well as any

proceeds from any insurance or bonds required under the Purchase Agreement. Grantor warrants the validity and enforceability of the assignment. Grantor may as Lender's licensee collect rent and other income and receipts as long as Grantor is not in default with respect to the Obligation, the Purchase Agreement or this deed of trust. Grantor will apply all rent and other income and receipts to payment of the Obligation and performance of this deed of trust, but if the rent and other income and receipts exceed the amount due with respect to the Obligation and the deed of trust, Grantor may retain the excess. If Grantor defaults in payment of the Obligation or performance of this deed of trust or the Purchase Agreement, Lender may terminate Grantor's license to collect rent and other income and then as Grantor's agent may rent the Property and collect all rent and other income and receipts. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph without taking possession of the Property. Lender will apply all rent and other income and receipts collected under this paragraph first to expenses incurred in exercising Lender's rights and remedies and then to Grantor's obligations with respect to the Obligation and this deed of trust in the order determined by Lender. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies. If Grantor becomes a voluntary or involuntary debtor in bankruptcy, Lender's filing a proof of claim in bankruptcy will be deemed equivalent to the appointment of a receiver under Texas law.

8.    Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the debt.

9.    In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

10.    Grantor may not sell, transfer, or otherwise dispose of any Property, whether voluntarily or by operation of law, without the prior written consent of Lender. If granted, consent may be conditioned upon (a) the grantee's integrity, reputation, character, creditworthiness, and management ability being satisfactory to Lender; and (b) the grantee's executing, before such sale, transfer, or other disposition, a written assumption agreement containing any terms Lender may require, such as a principal

pay down on the Obligation, an increase in the rate of interest payable with respect to the Obligation, a transfer fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligation.

Grantor may not cause or permit the Property, or any portion thereof, to be encumbered by any liens, security interests, or encumbrances other than the liens securing the Obligation and the liens securing ad valorem taxes not yet due and payable without the prior written consent of Lender. If granted, consent may be conditioned upon Grantor's executing, before granting such lien, a written modification agreement containing any terms Lender may require, such as a principal pay down on the Obligation, an increase in the rate of interest payable with respect to the Obligation, an approval fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligation.

Grantor may not grant any lien, security interest, or other encumbrance (a "Subordinate Instrument") covering the Property that is subordinate to the liens created by this deed of trust without the prior written consent of Lender. If granted, consent may be conditioned upon the Subordinate Instrument's containing express covenants to the effect that—

(a)     the Subordinate Instrument is unconditionally subordinate to this deed of trust;

(b)     if any action is instituted to foreclose or otherwise enforce the Subordinate Instrument, no action may be taken that would terminate any occupancy or tenancy without the prior written consent of Lender, and that consent, if granted, may be conditioned in any manner Lender determines;

(c)     rents, if collected by or for the holder of the Subordinate Instrument, will be applied first to the payment of the Obligation then due and to expenses incurred in the ownership, operation, and maintenance of the Property in any order Lender may determine, before being applied to any indebtedness secured by the Subordinate Instrument;

(d)     written notice of default under the Subordinate Instrument and written notice of the commencement of any action to foreclose or otherwise enforce the Subordinate Instrument must be given to Lender concurrently with or immediately after the occurrence of any such default or commencement; and

(e)     in the event of the bankruptcy of Grantor all amounts due on or with respect to the Obligation and this deed of trust will be payable in full

before any payments on the indebtedness secured by the Subordinate Instrument.

Grantor may not cause or permit any of the following events to occur without the prior written consent of Lender: if Grantor is (a) a corporation, the dissolution of the corporation or the sale, pledge, encumbrance, or assignment of any shares of its stock; (b) a limited liability company, the dissolution of the company or the sale, pledge, encumbrance, or assignment of any of its membership interests; (c) a general partnership or joint venture, the dissolution of the partnership or venture or the sale, pledge, encumbrance, or assignment of any of its partnership or joint venture interests, or the withdrawal from or admission into it of any general partner or joint venturer; or (d) a limited partnership, (1) the dissolution of the partnership, (2) the sale, pledge, encumbrance, or assignment of any of its general partnership interests, or the withdrawal from or admission into it of any general partner, (3) the sale, pledge, encumbrance, or assignment of a controlling portion of its limited partnership interests, or (4) the withdrawal from or admission into it of any controlling limited partner or partners. If granted, consent may be conditioned upon (a) the integrity, reputation, character, creditworthiness, and management ability of the person succeeding to the ownership interest in Grantor (or security interest in such ownership) being satisfactory to Lender; and (b) the execution, before such event, by the person succeeding to the interest of Grantor in the Property or ownership interest in Grantor (or security interest in such ownership) of a written modification or assumption agreement containing such terms as Lender may require, such as a principal pay down on the Obligation, an increase in the rate of interest payable with respect to the Obligation, a transfer fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligation.

11.     When the context requires, singular nouns and pronouns include the plural.

12.     The term *Note* includes all extensions, modifications, and renewals of the Note and all amounts secured by this deed of trust.

13.     This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

14.     Grantor and each surety, endorser, and guarantor of the Obligation **waive** all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

15.     Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if this deed of trust is placed in the hands of an attorney for enforcement.

16.     If any provision of this deed of trust shall, for any reason and to any extent, be invalid or unenforceable, then the remainder of this deed of trust and any other provisions hereof shall not be affected, but instead shall be fully enforceable in accordance with their respective terms to the maximum extent permitted by law.

17.     The term *Lender* includes any mortgage servicer for Lender.

18.     Grantor represents that this deed of trust and the Note are given for the following purposes:

The Note represents [state amount *(Initial Purchase Payment as set forth in the (Per Promissory Note, Exhibit B to Sales and Purchase Agreement)]* DOLLARS ($[amount]) in cash that Lender advanced to Grantor on this day at its request and that it will use to satisfy the obligation of Grantor to discharge all indebtedness secured by deeds of trust, mortgages, liens or other security interests against the Property as specified in the Purchase Agreement.

This deed of trust, to the extent permitted by law, also secures payment of all other present and future debts, obligations, and liabilities owed to Lender by Grantor under the Purchase Agreement, regardless of how the other debts, obligations, and liabilities are incurred and regardless of whether they are evidenced by a note, open account, overdraft, endorsement, surety agreement, guarantee, or other document.

19.     If the Property is transferred by foreclosure, the transferee will acquire title to all insurance policies on the Property, including all paid but unearned premiums.

20.     Grantor agrees to furnish on Lender's request evidence satisfactory to Lender that all taxes and assessments on the Property have been paid when due.

21.     Grantor agrees to allow Lender or Lender's agents to enter the Property at reasonable times and inspect it and any personal property in which Lender is granted a security interest by this deed of trust.

22.     Grantor agrees to execute, acknowledge, and deliver to Lender any document requested by Lender, at Lender's request from time to time, to (a) correct any defect, error, omission, or ambiguity in this deed of trust or in any other document executed in connection with the Note or this deed of trust; (b) comply with Grantor's obligations under this deed of trust and other documents; (c) subject to and perfect the liens and security interests of this deed of trust and other documents any property intended to be covered thereby; and (d) protect, perfect, or preserve the liens and the

security interests of this deed of trust and other documents against third persons or make any recordings, file any notices, or obtain any consents requested by Lender in connection therewith. Grantor agrees to pay all costs of the foregoing.

23.     Grantor represents to Lender that no part of the Property is exempt as homestead from forced sale under the Texas Constitution or other laws

24.     This deed of trust may not be amended, revised or otherwise modified except by a written instrument executed by the party against which enforcement is asserted. There are no unwritten oral agreements between the parties relating to this deed of trust

25.     Grantor warrants and represents that i) it has full right, power and authority to execute and deliver this deed of trust without obtaining any further consents or approvals, and ii) this deed of trust creates valid, legally binding obligations that are enforceable against Seller in accordance with their terms.

*[Signature page follows.]*

**GRANTOR:**
**AMERICAN HOUSING FOUNDATION**

By:_____

Name:_____

Its:_____

ACKNOWLEDGMENT-----------------------------

STATE OF TEXAS      §
                    §
COUNTY OF HARRIS    §

    I, the undersigned notary public do hereby certify that _____ as _____ of American Housing Foundation, a Texas non profit corporation, personally appeared before me this day and acknowledged the due execution of the foregoing instrument on behalf of the corporation.

    Witness my hand and official seal this the _____ day of _____, 2009.

_____(SEAL)
Notary Public for Texas
My commission expires:_____

## ATTACHMENT "A"

To Deed of Trust
**AMERICAN HOUSING FOUNDATION**, Grantor, and
**VERNON A. SEVIER, JR.**, Trustee

## PROPERTY DESCRIPTION

*[To be inserted once Survey and Title Commitment have been obtained.]*

## EXHIBIT "D"

To Sale and Purchase Agreement between
**AMERICAN HOUSING FOUNDATION**, Seller, and
**EXXON MOBIL CORPORATION**, Purchaser

## DRAW SCHEDULE

*[To be mutually agreed upon by Purchaser and Seller]*

EXHIBIT B

**FACSIMILE**

TO: _Rick Crawford_

COMPANY: _American Housing Foundation_

FAX NO.: _806-372-7508_

TELEPHONE NO.: _____

DATE: _6/10/09_

FROM:  MARCELO MARROQUIN, III        FAX:   (281) 834-1017
       EXXONMOBIL GLOBAL REAL ESTATE  PHONE: (281) 834-5533
       P. O. BOX 4004
       BAYTOWN, TX 77522-4004

No. of pages (including cover sheet): _3_

COMMENTS:

_Second Amendment to Sale and_
_Purchase Agreement, signed on_
_behalf of Exxon Mobil Corporation_
_for signature on behalf of_
_American Housing Foundation._
_(Originals to be sent by overnight mail today)_

_Thanks, Marcelo Marroquin_

THIS TRANSMITTAL IS INTENDED FOR THE USE OF THE INDIVIDUAL TO
WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS
CONFIDENTIAL. ANY DISSEMINATION, DISTRIBUTION OR COPYING OF
THIS COMMUNICATION BY ANYONE OTHER THAN THE INTENDED
RECIPIENT, HIS AGENT OR ASSIGNEE IS STRICTLY PROHIBITED. IF YOU
HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY THE
ABOVE SENDER IMMEDIATELY BY TELEPHONE. THANK YOU.

## SECOND AMENDMENT TO SALE AND PURCHASE AGREEMENT

This **SECOND AMENDMENT TO SALE AND PURCHASE AGREEMENT** ("Second Amendment") is effective as of June 10, 2009, by and between **AMERICAN HOUSING FOUNDATION**, a Texas nonprofit corporation ("Seller"); and **EXXON MOBIL CORPORATION**, a New Jersey corporation ("Purchaser").

### R E C I T A L S:

**WHEREAS**, Seller and Purchaser entered into a Sale and Purchase Agreement dated effective March 12, 2009 (the "Agreement") for the sale and purchase of certain Property located in Baytown, Texas, as more particularly described therein;

**WHEREAS**, Seller and Purchaser previously amended the Agreement on April 22, 2009 in order to increase the amount of the Initial Purchase Payment from Five Million and no/100 Dollars ($5,000,000.00) to Five Million Five Hundred Fifty-five Thousand and no/100 Dollars ($5,555,000.00). As used herein, the term "Amended Agreement" shall mean the Agreement, as amended by the First Amendment;

**WHEREAS**, the time for the Feasibility Period for Purchaser to determine the suitability of the Property for Purchaser's intended use has ended and Purchaser determined that the Property is suitable for its purposes.

**WHEREAS**, Seller and Purchaser have entered the period of time provided by Section 10 of the Amended Agreement for title objections by Purchaser and cure by Seller.

**WHEREAS**, Purchaser notified Seller of its Objections on May 14, 2009 and Seller has not yet responded to said Objections.

**WHEREAS**, Due to the unanticipated complexities of the contemplated transaction and numerous unresolved title issues, Seller and Purchaser mutually desire to extend the time periods provided by Section 10 of the Amended Agreement so as to allow Seller and Purchaser more time to identify, review and address the title issues and undertake the obligations of Section 10.

**NOW, THEREFORE**, that for and in consideration of the mutual promises and covenants herein contained, the parties do hereby amend the Amended Agreement as follows:

1.     The third (3rd) sentence of Section 10.A of the Amended Agreement is deleted in its entirety and replaced with the following:

"Purchaser's twenty (20) day review period shall commence upon: a) the date wherein Purchaser has received all of the following documents: i) the Survey, ii)

the Title Commitment, and iii) copies of the instruments affecting title, or b) July 18, 2009, whichever date occurs later in time."

2. Purchaser shall be entitled to revise, as needed, and reissue its Objections letter and notify Purchaser of its Objections in accordance with the revised time period set forth in Section 10.A as revised in paragraph 1, above, of this Second Amendment.

3. All capitalized terms used herein but not defined herein shall have the same meaning as defined in the Amended Agreement.

4. Except as specifically modified pursuant to this Second Amendment, all terms and provisions of the Amended Agreement shall continue in full force and effect.

5. The recitals of this Second Amendment are incorporated herein for all purposes.

6. This Second Amendment may be executed in any number of counterparts, each of which shall be an original and all of which together shall constitute but one and the same original document. The delivery of counterpart signatures by facsimile or email transmission shall have the same force and effect as delivery of a signed hard copy.

**SELLER:**

**AMERICAN HOUSING FOUNDATION**
a Texas non-profit corporation

By:_____

Steve W. Sterquell II
Chief Executive Officer
Date: June ___, 2009

**PURCHASER:**

**EXXON MOBIL CORPORATION**
a New Jersey corporation

By:_____    $\nu\rho\rho$

Zeb Nash
Agent and Attorney-in-Fact
Date: June _10_, 2009

Page 2 of 2

EXHIBIT C

THIRD AMENDMENT TO SALE AND PURCHASE AGREEMENT

This **THIRD** AMENDMENT TO SALE AND PURCHASE AGREEMENT ("Third Amendment") is effective as of September 8, 2009, by and between **AMERICAN HOUSING FOUNDATION**, a Texas nonprofit corporation ("Seller"); and **EXXON MOBIL CORPORATION**, a New Jersey corporation ("Purchaser").

## R E C I T A L S:

**WHEREAS**, Seller and Purchaser entered into a Sale and Purchase Agreement effective March 12, 2009, as amended by that First Amendment to Sale and Purchase Agreement effective April 22, 2009, and further amended by that Second Amendment to Sale and Purchase Agreement effective June 10, 2009 (collectively, the "Agreement"), for the sale and purchase of certain Property located in Baytown, Texas, as more particularly described therein;

**WHEREAS**, Seller has not completed Seller's Pre-Interim Closing Obligation.

**WHEREAS**, Purchaser sent Seller its Objections dated August 7, 2009 and Seller sent Purchaser Seller's Cure Notices dated August 20, 2009 and September 3, 2009.

**WHEREAS**, Seller and Purchaser mutually desire to further amend the Agreement to extend Seller's 180 Day Period and to set the date of Purchaser's notice to Seller responding to Seller's Cure Notices as set forth in Section 10.C.

**NOW, THEREFORE**, that for and in consideration of the mutual promises and covenants herein contained, the parties do hereby agree as follows:

1.	In the first and second lines of Section 4 of the Agreement, the phrase "one hundred eighty (180) days from the Effective Date (hereinafter defined) ("Seller's 180 Day Period")" is deleted and replaced with the phrase "two hundred forty (240) days from the Effective Date (hereinafter defined) ("Seller's 240 Day Period")."  In the twelfth line of Section 4 on Page 3 of the Agreement, the phrase "180 Day Period" is deleted and replaced with the phrase "240 Day Period."

2.	Seller and Purchaser agree that Purchaser's notice pursuant to Section 10.C of the Agreement to respond to Seller's Cure Notice is due by September 14, 2009.

3.	All capitalized terms used herein but not defined herein shall have the same meaning as defined in the Agreement.

4.	Except as specifically modified pursuant to this Third Amendment, all terms and provisions of the Agreement shall continue in full force and effect.

5.  The recitals of this Third Amendment are incorporated herein for all purposes.

6.     This Third Amendment may be executed in any number of counterparts, each of which shall be an original and all of which together shall constitute but one and the same original document.  The delivery of counterpart signatures by facsimile or email transmission shall have the same force and effect as delivery of a signed hard copy.


**SELLER:**

**AMERICAN HOUSING FOUNDATION**
a Texas non-profit corporation


By:_____
        Alvin Johnson
        Vice President
Date:  September ___, 2009


**PURCHASER:**

**EXXON MOBIL CORPORATION**
a New Jersey corporation


By:_____
        Zeb Nash
        Agent and Attorney-in-Fact
Date:  September ___, 2009