MULLIN HOARD & BROWN, L.L.P.
David R. Langston, SBN: 11923800
P. O. Box 2585
Lubbock, Texas 79408
Telephone: 806/765-7491
Facsimile: 806/765-0553
***Attorneys for Official Committee of Unsecured Creditors***

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE NORTHERN DISTRICT OF TEXAS**

**AMARILLO DIVISION**

| | | |
|---|---|---|
| **In Re:** | § | |
| | § | |
| | § | |
| | § | |
| **AMERICAN HOUSING FOUNDATION** | § | **Case No. 09-20232-RLJ-11** |
| | § | |
| **Debtor.** | § | |
| | § | |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS'**
**FIRST AMENDED PLAN OF REORGANIZATION AND ACCOMPANYING**
**DISCLOSURE STATEMENT**

TO THE HONORABLE ROBERT L. JONES, U.S. Bankruptcy Judge, and All Creditors and Parties in Interest:

NOW COMES, the Official Committee of Unsecured Creditors, and files this its First Amended Plan of Reorganization ("Plan") along with the Accompanying Disclosure Statement ("Disclosure Statement") which provides for a reorganization of the Debtor that affords treatment of the claims of all Creditors. The Disclosure Statement information that is included in this document is intended to solicit the acceptance of the Plan by persons who are entitled to vote on confirmation or rejection of the Plan of Reorganization.

## TABLE OF CONTENTS

ARTICLE I      INTRODUCTION TO THE AMENDED PLAN              Page

A. The Debtor in the Bankruptcy Case ................................................... 1
B. Explanation of Chapter 11 .............................................................. 3
C. Plan and Accompanying Disclosure Statement ................................ 4
D. Summary of the Plan ..................................................................... 4
E. Balloting, Voting Deadline, and General Information
   About Claims and The Plan Confirmation Process ........................ 11

ARTICLE II     THE AMENDED PLAN OF REORGANIZATION ......................... 15

A. Definitions .................................................................................... 15
   1.1 through 1.61 ............................................................................ 15
B. Explanation of Insiders and Related Entities ................................. 21
   2.1 - Relationship of Debtor ........................................................... 21
      2.1.1- Insiders ........................................................................... 21
   2.2 - Treatment of Interest and Penalties Under the
   Plan and Preservation of the Rights of
   the Debtor to Contest Claims and Interests ............................... 22
      2.2.1 - No Interest to Accrue on Unsecured Claims ............... 22
      2.2.2 – Reservation of Rights to Contest Validity of Security
         Interests or Claims ................................................................ 23
      2.2.3 – No Penalties on Unsecured or Priority Tax Claims. .. 23

ARTICLE III    CLASSIFICATION OF CLAIMS AND INTERESTS
               UNDER THE AMENDED PLAN OF REORGANIZATION ............ 23

   3.1 Class 1 - Allowed Administrative Expense Claims ................. 23
      3.1.1 – Subclass 1.1 – Costs and Expenses of
         Administration ...................................................................... 23
      3.1.2 – Subclass 1.2 – Post-Petition Administrative Expense
         Claims .................................................................................. 24
   3.2 Class 2 – Allowed Priority Tax Claims .................................... 24
   3.3 Class 3 – Allowed Secured Claims of Creditors Holding Liens
         Against Assets Owned by Debtor ........................................... 24
      3.3.1 - Subclass 3.1 – Claims of Texas Capital Bank ............ 24
         Subclass 3.1(A) – Claims of TCB Secured
            by Real Property to be
            Demolished ....................................................................... 24
         Subclass 3.1(B) – Unsecured Deficiency Claims of
            TCB Which Exceed Value of
            Collateral .......................................................................... 24
      3.3.2 – Subclass 3.2 – Secured Claims of Creditors Against
            Real Property Located in Lakewood
            Terrace, Baytown, Harris County,
            Texas ................................................................................. 24
         Subclass 3.2(A) – Claims of BAC Home Loan
            Servicing, L.P. .................................................................. 25
         Subclass 3.2(B) – Claims of Graham Financial .......... 25
         Subclass 3.2(C) – Claims of Gary Graham Self-

Directed IRA ................................... 25
Subclass 3.2(D) – Claims of Cenlar ......................... 25
Subclass 3.2(E) – Claims of Griffiths, Sammarco,
    Pierre and Sullivan ........................ 25
3.3.3 Subclass 3.3 – Claims of Wells Fargo Bank, N.A. ........ 25
Subclass 3.3(A) – Claims of Wells Fargo Secured
    Secured by Asserted Setoff Rights
    Against Deposits of the Debtor ...... 25
Subclass 3.3(B) – Unsecured Deficiency Claims of
    Wells Fargo Which Exceed Value
    of Collateral ................................. 25
3.3.4 Subclass 3.4 – Claims of Happy State Bank ................. 25
Subclass 3.4(A) – Claims of HSB Secured by a
    Disputed Assignment of Certificates
    of Deposit Held in the Names of
    Various Related Entities ............... 26
Subclass 3.4(B) – Unsecured Deficiency Claims of
    HSB Which Exceed Value of
    Collateral ...................................... 26
3.3.5 Subclass 3.5 – Secured Claims of Capital One N.A. ..... 26
Subclass 3.5(A) – Claims of Capital One, N.A.
    Secured by 635 Phillips ................ 26
Subclass 3.5(B) – Claims of Capital One, N.A.
    which are the subject of
    Guaranties Executed by Multi-Family
    Rehab Partners ............................. 26
Subclass 3.5(C) – Unsecured Deficiency Claims of
    Capital One, N.A. Secured by
    DCTIRZ ....................................... 26
Subclass 3.5(D) –  Unsecured Deficiency Claims of
    Capital One which Exceed
    Value of Collateral ...................... 26
3.3.6 Subclass 3.6 – Secured Claims of Local Tax
    Authorities ............................................ 26
3.3.7 Subclass 3.7 –  Secured Claims of BAC Loans
    Servicing, LP ......................................... 27
Subclass 3.7(A) – Claims of BAC Loans Servicing
    Secured by Real Property in
    Houston ......................................... 27
3.4  Class 4 – Administrative Convenience Class ........................... 27
3.5  Class 5 – Allowed Claims of Unsecured Creditors ......................... 27
3.6  Class 6 – Contingent, Unliquidated and Disputed Claims .............. 28
3.7  Class 7 –  Subordinated Unsecured Claims of Insiders ................. 28

ARTICLE IV    SATISFACTION AND TREATMENT OF CLAIMS
    AND INTERESTS ....................................................... 29

4.1  Class 1 - Allowed Administrative Expense Claims ....................... 29
    4.1.1    Subclass 1.1 – Costs and Expenses of
    of Administration .................................. 29
    4.1.2    Subclass 1.2 – Post-Petition Administrative
    Expense Claims ................................... 30

4.2  Class 2 - Allowed Priority Tax Claims ........................................... 30
4.3  Class 3 - Allowed Secured Claims of Creditors Holding Liens
       Against Assets Owned by Debtor ................................. 31
       4.3.1   Subclass 3.1 – Claims of Texas Capital Bank............. 31
                 Subclass 3.1(A) – Claims of TCB Secured
                    by Real Property to be
                    Demolished................................. 32
                 Subclass 3.1(B) – Unsecured Deficiency Claims of
                    TCB Which Exceed Value of
                    Collateral ................................... 32
       4.3.2   Subclass 3.2 – Secured Claims of Creditors Against
                    Real Property Located in Lakewood
                    Terrace, Baytown, Harris County,
                    Texas ........................................ 32
                 Subclass 3.2(A) – Claims of BAC Home Loan
                    Servicing.................................... 32
                 Subclass 3.2(B) –  Claims of Graham Financial ...... 32
                 Subclass 3.2(C) –  Claims of Gary Graham Self-
                    Directed IRA ............................. 33
                 Subclass 3.2(D) –  Claims of Cenlar ...................... 33
                 Subclass 3.2(E) –  Claims of Griffiths, Sammarco,
                    Pierre and Sullivan ................... 33
       4.3.3   Subclass 3.3 – Claims of Wells Fargo Bank, N.A. ....... 34
                 Subclass 3.3(A) –  Claims of Wells Fargo Bank
                    Secured by Asserted Setoff
                    Rights Against Deposits of the
                    Debtor........................................ 34
                 Subclass 3.3(B) –  Unsecured Deficiency Claims of
                    Wells Fargo Which Exceed
                    Value of Collateral .................. 34
       4.3.4   Subclass 3.4 – Claims of Happy State Bank ............... 34
                 Subclass 3.4(A) –  Claims of HSB Secured by a
                    Disputed Assignment of
                    Certificates of Deposit Held in
                    the Names of Various Related
                    Entities...................................... 34
                 Subclass 3.4(B) –  Unsecured Deficiency Claims of
                    HSB and THFC Which Exceed
                    Value of Collateral .................... 35
       4.3.5   Subclass 3.5 – Secured Claims of Capital One N.A. ... 35
                 Subclass 3.5(A) –  Claims of Capital One, N.A.
                    Secured by ............................... 35
                 Subclass 3.5(B) –  Claims of Capital One, N.A.
                    Secured by................................ 35
                 Subclass 3.5(C) –  Unsecured Deficiency Claims
                    of Capital One, N.A. Which
                    Exceed Value of Collateral ....... 36
       4.3.6   Subclass 3.6 – Secured Claims of Local Tax
                    Authorities............................................... 36
                 Subclass 3.6(A) Secured Claims of Harris County,
                    Texas ......................................... 36
       4.3.7   Subclass 3.7 –  Secured Claims of BAC Loans

Servicing, LP ........................................ 36

Subclass 3.7(A) Claims of BAC Loans Servicing
Secured by 635 Phillips ............... 36
Subclass 3.7(B) Claims of BAC Loans Servicing
Secured by Alliance .................. 36
Subclass 3.7(C) –Claims of BAC Loans Servicing
Secured by DCTIRZ .................. 37
4.4 Class 4 – Administrative Convenience Class ................................ 37
4.5 Class 5 – Allowed Claims of General Unsecured Creditors ......... 38
4.6 Class 6 – Contingent, Unliquidated and Disputed Claims ............ 39
4.7 Class 7 – Subordinated Unsecured Claims of Insiders ................. 40

ARTICLE V        ADMINISTRATION   OF   THE   ESTATE   AND   MEANS   OF
IMPLEMENTATION OF THE PLAN .................................... 41

A.      Information Concerning the Debtor.

5.1 History of the Debtor and Events That Caused the
Bankruptcies. ...................................................................... 41
5.2 Current Status of the Bankruptcy Proceedings and the Debtor-
in-Possession ...................................................................... 42
B.      Implementation of the Plan ........................................ 50

5.3 The Continued Operations of Debtor .................................... 50
5.4 Status of Litigation of Claims Funding the Liquidating Trust ...... 52
5.5 Disclosure of Possible Recovery of Development Fees ............... 55
5.6 Financial Projections ....................................................... 55
5.7 Retention by Debtor of Property of the Estate ............................ 55
5.8 The Liquidating Trust ...................................................... 56
5.8.1 Authorization ........................................................ 57
5.8.2 Powers of the Liquidating Trustee .................................. 59

ARTICLE VI       EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............ 61

6.1 Executory Contracts and Unexpired Leases ................................ 61
6.2 Executory Contracts to be Rejected Under the Plan .................... 62
6.3 Bar to Rejection Damages ................................................ 62

ARTICLE VII      PREFERENCES AND FRAUDULENT CONVEYANCES ............. 62

7.1 Preferences and Fraudulent Conveyances ................................... 62

ARTICLE VIII     INFORMATION ON THE FEASIBILITY OF THE
PLAN OF REORGANIZATION ......................................... 62

8.1 Collateral and Liquidation Analysis .................................... 62
8.2 Summary of Past Operations ................................................ 63
8.3 Assumptions and Contingencies ............................................. 63

8.4     Schedule of Financial Projections and Assumptions .................. 63
8.5     Statement of Feasibility of the Plan ............................................. 63

ARTICLE IX        CONTESTED CLAIMS   ................................................................ 64

9.1  Objection to Claims and Interests .................................................. 64
9.2  Referral of Certain Claims to Special Conflicts Counsel.............. 64

ARTICLE X         FUTURE MANAGEMENT,  FINANCIAL ACCOUNTING AND
                  CAPITAL REQUIREMENTS OF THE DEBTOR  ............................ 64

10.1  Future Management.................................................................... 64
10.2  Future Financial Accounting ..................................................... 64
10.3  Anticipated Future Capital Requirements of the Debtor............. 65

ARTICLE XI        MODIFICATION ............................................................................ 65

11.1   Modifications Prior to Substantial Consummation ..................... 65

ARTICLE XII       PROVISIONS FOR THE ASSIGNMENT,
                  ENFORCEMENT, SETTLEMENT OR ADJUSTMENT
                  OF CLAIMS BELONGING TO THE DEBTOR  ................................ 65

12.1   Claims to Be Transferred to the Liquidating Trust ..................... 65

ARTICLE XIII      REPORTING REQUIREMENT AND OBLIGATION
                  OF THE REORGANIZED DEBTOR TO PAY EXCESS
                  REVENUES TO LIQUIDATING TRUST............................................ 65

13.1   Discharge, Reporting and Payment of Excess Revenues
       To Liquidating Trust ............................................................... 65
13.2   Reporting and Payment of Excess Revenues to Liquidating
       Trust ......................................................................................... 66

ARTICLE XIV       RETENTION OF JURISDICTION  ................................................ 67

14.1   Implementation of Plan .............................................................. 67
14.2   Causes of Action ........................................................................ 67
14.3   Claims Determinations................................................................ 67
14.4   Property Determinations............................................................. 67
14.5   Other Post-Confirmation Matters............................................... 68

ARTICLE XV        MISCELLANEOUS PROVISIONS ................................................ 69

15.1   Cramdown ................................................................................... 69
15.2   Headings ..................................................................................... 69
15.3   Due Authorization by Creditors ................................................. 69
15.4   Entire Agreement ....................................................................... 69
15.5   Class Acceptance ....................................................................... 69
15.6   Objections to Claims. ................................................................. 69

ARTICLE XVI       PLAN CONTINGENCIES ............................................................. 69

16.1  Future Contracts and Business of Debtor...................................... 69

ARTICLE XVII   EFFECTIVE DATE ................................................................... 70

16.1  This Plan takes effect on the Effective Date .............................. 70


ARTICLE XVIII  OBLIGATIONS TO THE U.S. TRUSTEE ......................................... 70

18.1  Compliance with Regulations and Payment of Fees Due
the Office U.S. Trustee ................................................................ 70

# ARTICLE I

## INTRODUCTION TO THE AMENDED PLAN

### A.  The Debtor in the Bankruptcy Case.

American Housing Foundation, Inc. ("AHF" or "Debtor"), the Debtor in the above referenced bankruptcy proceeding, filed for voluntary relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court ("Bankruptcy Court") for the Northern District of Texas, Amarillo Division, on June 11, 2009.

On April 21, 2009 (the "Petition Date"), certain petitioning creditors filed an involuntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court ("Bankruptcy Court") for the Northern District of Texas, Amarillo Division, (Case No. 09-20232, the "Involuntary Proceedings").  On June 11, 2009, American Housing Foundation filed a voluntary petition (the "Petition") for relief under Chapter 11 of the Bankruptcy Code initiating Case No. 09-20373 (the "Voluntary Proceeding").  The Involuntary Proceeding and Voluntary Proceeding were consolidated by order of the Court on July 17, 2009, and the Debtor's bankruptcy case is now pending under Case No. 09-02032. An Official Committee of Unsecured Creditors (the "Committee") was appointed on July, 10, 2009. Since the Petition Date, the Debtor has operated its business as a Debtor-in-Possession pursuant to 11 U.S.C. §§1107 and 1108.

AHF is a non-profit corporation created in 1989 as a non-profit corporation under the laws of the State of Texas and received its tax exempt status under Section 501(c)(3) of the Internal Revenue Code that same year.  On the Petition Date, the Debtor owned and operated sixty-six (66) affordable housing apartment communities representing 13,417 units through affiliated entities in the following states:

- Arizona
- Florida
- Georgia
- Kentucky
- Mississippi
- North Carolina
- Oklahoma
- South Carolina
- Texas.

The development of affordable housing is a long term process that requires a long term business plan. Former AHF management focused on short term benefits and rewards without directing attention to the long term responsibilities and the eventual benefits that could be realized through a continued effort to provide safe and affordable housing to working families. Under the new management team, AHF is focused on the long term goals that will benefit not only the mission of the organization, but also the creditors.

The Committee has worked to develop this First Amended Plan of Reorganization ("Plan") with the dual goals of maintaining AHF as an ongoing business while at the same time

creating a fund through the creation of a Liquidating Trust that will enable holders of Allowed Unsecured Claims to be paid dividends on a timely basis. The Plan is premised on the concept that allowing AHF to continue in business will result in reduced claims against the Debtor by avoiding liability on some of its contingent claims connected with its execution of guarantees associated with properties it owns or manages, and increase the likelihood that it can realize payment on some accounts receivable owed to it from its affiliates as well as enhance the chances of its collecting accrued development fees from affiliates.

It also creates a Liquidating Trust where funds realized from the collection of $24 million in life insurance proceeds will be held and can serve as a means to pay administrative claims and then allow the Liquidating Trustee to make pro rata distributions to the holders of Allowed Unsecured Claims. The Liquidating Trust can also pursue the collection of funds through the prosecution of other causes of action owned by the AHF bankruptcy estate, and, only as necessary and prudent, for the sole purpose of avoiding the creation of additional Allowed Unsecured Claims that would dilute the dividends paid to the beneficiaries of the Liquidating Trust, make loans to AHF to address particular cash flow problems connected with the housing complexes it owns or controls. These loans would be extended for the purpose of maintaining the contractual relationships AHF has in certain limited partnerships where the housing complexes have a realistic prospect of performing and ultimately collecting development fees or other assets that would assist the Liquidating Trust in paying larger dividends to its beneficiaries. The members of the Committee believe such an approach is in the interest of all creditors of the Bankruptcy Case – both the holders of contingent as well as non-contingent claims.

There will be continual effort to comply with the terms and provisions of the contractual agreements associated with the various properties for which AHF is responsible – regardless of the particular financing method used by the Debtor to finance the acquisition and ownership of the particular affordable housing properties affected by such agreements. The Plan is designed to allow AHF to fulfill its responsibilities to lenders, bondholders, tax credit investors and units of government with which it has existing relationships. While these duties are substantial, if AHF is successful in fulfilling these responsibilities, the result will be a larger return to all creditors than would be realized in the event of an immediate liquidation.

If AHF fails either because its Bankruptcy Case is converted to a Chapter 7 liquidation, or if the proposed Plan is not confirmed and a Chapter 11 Trustee is appointed, both the Committee and the Debtor believe its responsibilities under the written agreements will not be fulfilled, and, as a result, an entire new set of contingent liabilities will ripen and become an additional burden on the estate.

Additionally, there is a real benefit to AHF completing its ownership of the affordable housing communities through their useful service life as defined in the various government regulations and financing agreements. Presently, AHF carries multiple notes receivable from many of its properties on its books. The eventual refinance or sale of these properties at the end of the statutory service life provides it with at the very least an opportunity to collect on these

notes.  According to the accountants hired by the Debtor in this proceeding, these notes have a face value of in excess of $6 million, and while the collection of the total sum is remote, the realization of even a small percentage of this sum would have a significant positive impact on its creditors.

Likewise, there are significant deferred developer fees on the balance sheets of many of these properties. Once again, according to the accountants hired in the Bankruptcy Case, the amount of the developer fees on the books of the various properties totals in excess of $20 million. While no one can predict the amount of developer fees that can or will be collected at the end of the service life on the properties, even the realization of a fraction of this amount would be to the benefit of the Debtor and its creditors.

Of course, in both of the situations referenced here, neither the notes receivable nor the developer fees will be collected if AHF is liquidated and not a functioning entity. On the contrary, the proponents predict that additional liabilities in excess of $100 million would become burdens on the estate if AHF stops operations entirely and no other eligible entities pick up the obligations for which the Debtor is responsible under the existing agreements.

Thus, this proposed Plan is designed to keep AHF as an operating entity that can fulfill its contracts, as modified in the Plan or pursuant to separate negotiations outside the Bankruptcy Case, and repay its creditors the maximum amount possible under the circumstances. Since the new management of AHF has stopped the practice of its former management of taking funds from the properties to support extravagant expenditures,  funds are now available to be used by management to make needed repairs and improvements to the properties that will result in improved occupancy and increased rental income. These more prudent and efficient management practices in turn increase the funds available to make payments on the outstanding receivables that are due it from the various properties, enhance the value of each of the properties, and will ultimately result in surplus cash flow that will benefit all creditors of the bankruptcy estate.

As further explained in the Plan, its provisions provide that to the extent AHF collects the notes receivable, realizes upon the developer fees, or generates revenues in excess of those necessary to fulfill its obligations to contingent creditors, the surplus funds will be paid over to the Liquidating Trustee and used to make distributions to the Unsecured Creditors who qualify for treatment as beneficiaries of the Liquidating Trust. The Claims of Unsecured Creditors will not be discharged until they are paid in full.

## B.  Explanation of Chapter 11.

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  Under Chapter 11, an attempt is made to restructure the Debtor's finances so that the Debtor may both continue to operate their business and repay their creditors.  Alternatively, the Chapter 11 Plan may provide for the liquidation of the Debtor's assets, with the properties subject to security interests going to the respective secured creditors and all remaining property satisfying, first,

administrative claims and, secondly, general unsecured claims.   Formulation of a Plan of Reorganization is the primary purpose of a reorganization proceeding under Chapter 11.

The Chapter 11 Plan sets forth and governs the treatment and rights to be afforded to creditors, other claimants, and equity interest holders with respect to their claims against, and interests in the Debtor's assets.  According to Section 1125 of the Bankruptcy Code, acceptances of a Chapter 11 Plan may be solicited only after a written Disclosure Statement approved by the Bankruptcy Court as containing adequate information has been provided to each creditor or equity interest holder.  This Disclosure Statement is presented to creditors and interest holders to satisfy the disclosure requirements contained in Section 1125 of the Bankruptcy Code.

### C.  Plan and Accompanying Disclosure Statement.

This document is being filed to serve the dual purpose of a Plan of Reorganization, setting forth the treatment to be afforded all Claims of the Debtor, and a Disclosure Statement to give Creditors sufficient information about the future management and operations of the Debtor to allow them to make an intelligent decision about voting for or against confirmation of the Plan.

The purpose of a Disclosure Statement is to provide the Creditors and parties in interest adequate information to make an informed judgment about the Debtor's Plan. Generally, this information includes, among other matters, a brief history of the Debtor, a history of the Chapter 11 case, a description of the remaining assets and liabilities of the Debtor, an explanation of how the Plan will function and an explanation of why the reorganization of the Debtor under the proposed Plan should result in a greater benefit to the Creditors than if the Chapter 11 case was converted to a Chapter 7 case and a Chapter 7 Trustee was appointed.

A summary of the Plan being proposed appears below. This summary is intended to set forth in a simplified form the manner in which the Debtor will be reorganized if the Plan is approved by the Bankruptcy Court. The summary is also intended to inform each Creditor of the Debtor the way their particular Claims are to be paid under the terms of the Plan. A reading of the summary will provide you with general information about the Plan and its proposed treatment of all Creditors. However, to make a fully informed judgment about the Plan, you are urged to read the entire Disclosure Statement and Plan.

### D.  Summary of the Plan.

The Plan is being proposed by the Official Committee of Unsecured Creditors appointed on July 10, 2009, by the United States Trustee for the U.S. Bankruptcy Court for the Northern District of Texas. The members who currently serve on the Committee are as follows:

1.    Rainier American Investors (I, II, and III)
      Tim Nichols
      13760 Noel Road Suite 800
      Dallas, Texas 75240

2.    Robert Templeton
      320 South Polk, Suite 1000
      P.O. Box 15010

Amarillo, Texas 79105

3.  Terrill F. Horton
    1330 North White Chapel Boulevard, Suite 300
    Southlake, Texas 76092

4.  Herring Bank
    Campbell Burgess
    P.O. Box 9900
    Amarillo, Texas 79105

5.  Attebury Family Partnership
    Ed Attebury
    P.O. Box 7446
    Amarillo, Texas 79114

The members of the Committee are the holders of the largest Unsecured Claims in the bankruptcy case. The Unsecured Claims of the members of the Committee consist of investments, the performance or repayment of which were guaranteed by AHF, or loans which the entities or individuals on the Committee made to AHF.

The Committee elected Robert Templeton to serve as the Chairman of the Committee, and sought and received authority from the Bankruptcy Court to hire Mullin, Hoard & Brown, which has offices in Amarillo, and Lubbock, Texas, to represent it as its counsel in the Bankruptcy Case.

The Committee authorized its counsel to prepare and file this First Amended Plan. It is a multifaceted plan. In summary, the Plan provides for the following:

An operating plan that provides for the restructuring of the outstanding Secured Claims of AHF that will enable the Debtor to continue its business of owning and operating affordable housing complexes, along with a Liquidating Trust that provides for the payment of the Allowed Unsecured Claims out of the proceeds from the recovery of certain life insurance proceeds, bankruptcy actions and third party actions along with provisions which allow the Liquidating Trustee the authority to provide necessary operating loans to AHF, and, in turn, for AHF to pay over to the Liquidating trust annually its Excess Revenues. There is on deposit with the United States District Court $27 million worth of life insurance proceeds, plus interest. It is believed there will be a minimum of $24,000,000.00, plus accrued interest, in initial funding paid over to the Liquidating Trust.

The Debtor has been authorized by the Court to delegate to the Creditor's Committee the pursuit through suit or compromise a number of claims. All net proceeds from claims will be placed in the Liquidating Trust. These claims include present suits against Bank of America Securities; present negotiations against prior Directors of AHF; and a number of claims for preferences, fraudulent conveyances, or other similar causes of actions against individuals or entities who the Debtor asserts are obligated to AHF.

The Plan is premised on the dramatic reduction of overhead and expenses in operations by the officers and employees of AHF at the principal office in Amarillo, Texas. The Plan provides

for the eventual liquidation and payment of all approved claims against AHF and ultimately the survival and successful reemergence of AHF from bankruptcy.

### *The Relationship Between AHF and Entities Owning Property It Operates or Manages:*

*AHF Bond Financed Properties:* In 1998, AHF began utilizing tax exempt multifamily revenue bonds to finance apartment complexes. AHF utilized affiliated limited liability companies to acquire financing for the properties. These limited liability companies own and operate the apartment complexes. The tax exempt bonds were issued by state and local regulatory bodies which have legislated jurisdiction to issue tax exempt financing. The tax exempt bonds were sold to investors and the proceeds were used to finance the acquisition of the properties. The bonds are payable solely from revenues generated by the operations of the properties. The portion of the debt attributed to the real estate is secured by a mortgage on the property. However, the bonds are non-recourse debt and in the event the gross revenues are insufficient to pay the principal and interest on the bonds, neither the borrower nor AHF is obligated to make available any of its other revenues or assets to make up any shortfall. Thus, all of these obligations are classified in Class Six of the Joint Plan and characterized for notice purposes only as potential claims that are contingent, unliquidated and disputed. Since AHF does not believe it has any liability to the holders of the bonds, any claims filed by the bond holders will be subject to objection and the proponents will ask the Court to estimate the claims at zero for Plan confirmation purposes. A complete listing of these properties along with their locations, the name of the entity than owns them, the details relating to the financing, and the Debtor's projections with respect to their disposition is reflected on the attached Exhibit "A."

Generally, however, in order to address the debts owing to the bondholders and financial institutions holding liens against these properties, the Plan provides for the renegotiation of existing agreements with lenders, limited partners and bondholders on properties where AHF is a general partner or sole owner of the entity which is the general partner. The goal of the reorganization is to address problems which may exist in any of the management agreements or partnership documents such that AHF can continue to manage the properties that are profitable, dispose of properties which cannot support the payment of operating expenses and debt service, and thereby stabilize the financial operations of the Debtor.

The Plan contemplates the allocation of income from the apartment properties such that necessary improvements and repairs to the properties can be conducted thereby resulting in the improvement in occupancy rates and income so that the vast majority of the properties will be self-sustaining.

For those properties which for some reason cannot become self-sustaining under the existing agreements, AHF will undertake negotiations with the lenders, limited partners or bondholders so the amount of net revenues produced will match the required debt service under

modified agreements. In instances where AHF is unable to negotiate a moratorium of debt payments, or a reduction of the mortgage debt, it will relinquish its interests in the property and allow the lenders or bondholders to exercise their remedies under the existing contractual arrangements between the parties.

Under the terms of the Plan which are set forth in more detail below, Debtor will remain the managing entity of all properties until such time as the terms of new agreements with the interested parties are completed. Once agreements are reached they will be noticed to creditors and submitted to the Bankruptcy Court for approval. The Debtor will continue to maintain its capacity as owner of the affiliated entities until decisions related to the ultimate disposition of the properties are made by management, and prior to seeking approval of the Court for the ultimate disposition of the property.

***AHF Conventionally Financed Properties:***  A summary of the properties where AHF is the sole member of the Limited Liability Company which manages the low income housing units that are conventionally financed is also included in Exhibit "A." This summary reflects the names of the particular properties, the name of the LLC that holds title to them, and the current status of the operations of the properties as well as the Debtor's intentions with respect to each property.

The Plan proposes for the Debtor to remain the managing entity of all these properties. The Debtor will continue to maintain its capacity as owner of the affiliated entities until decisions related to the ultimate disposition of the properties are made by management following confirmation of the Plan.

Unlike the bond financed properties, AHF believes that as a result of its execution of pre-petition guarantee agreements, it has potential liability on these conventionally financed units. Presently, all of these propertiesns are performing and servicing the debt of the Secured Creditors which hold liens against the properties which are financed. Consequently, all of these Claims are classified in Class Six of the Joint Plan and characterized as potential claims that are contingent, unliquidated and disputed. Since AHF does not believe it currently is in default on the servicing of any of the debts to the financial institutions that hold liens against the real estate, any claims filed by the financial institutions will also be subject to objection and the proponents will ask the Court to estimate their claims at zero for Plan confirmation purposes.

***AHF Tax Credit Properties:***  There are estimated potential liabilities associated with properties where AHF or its affiliates sold federal tax credits of almost $92 million. In each instance, AHF executed a guarantee of performance. The guarantee of performance provides that in the event that the properties do not fulfill the requirements for the holders of the tax credits to realize the full value of such credits that the Debtor will stand good for any such shortfalls.

A summary of the properties, their locations, the ownership entities, the details of the financing and the applicable compliance periods, along with the Debtor's plans for the disposition of these assets and an estimate of the amounts of potential exposure is set forth in Exhibit "A" to the Plan.

The Plan proposes for the Debtor to maintain control of the entities that own the affected properties and work to restructure the debts associated with each property. The goal is to maintain the properties under the existing arrangements, or enter into workout agreements with

the holders of the claims against the properties such that the contingent liabilities do not mature and the holders of the tax credits receive the full, bargained for value.

These obligations are classified in Class Six of the Joint Plan as potential claims that are contingent, unliquidated and disputed. The Debtor will object to these claims and ask that they be estimated for Plan confirmation purposes. Any claims of holders of tax credits that are estimated by the Bankruptcy Court and allowed will be treated equally with the holders of Unsecured General Claims under Class Five of the Joint Plan. Thus, if these claims are allowed they will be beneficiaries of the Liquidating Trust.

*Treatment of Lakewood Terrace Townhomes:* The real property of AHF, known as Lakewood Terrace Townhomes, located in Baytown, Texas, consists of 166 attached townhomes. These townhomes are encumbered by four (4) separate lenders; the first being Bank of America dba Countywide Home Loans, ("BAC"), has a security interest which encumbers 104 townhomes, with a total indebtedness of approximately $3,700,000. The second lender, being Graham Financial, has a security interest in 30 townhomes, with a total indebtedness of approximately $750,000. The third lender is Gary Graham, IRA, with a security interest in 20 townhomes, with a total indebtedness of approximately $500,000. The fourth lender is Cenlar, which has a security interest in a single townhome with a total indebtedness of approximately $37,000.

AHF has executed a Purchase and Sale Agreement ("PSA") with Exxon Mobil Corporation ("EMC") for the purchase of the entire community which consists of 166 townhomes on approximately 15 acres. EMC has agreed to purchase the property for approximately $7,995,555. According to the PSA, AHF is responsible for the demolition of the townhomes at a maximum cost of $1,395,000, of which EMC is paying. The abandonment of the streets, alleyways and right-of-ways by the City of Baytown is also a condition of the PSA; the cost for such conveyance is $76,000, per the appraisal of the unimproved property.

After the demolition is complete and the abandonment of the streets, alleyways and right-of-ways has been conveyed to AHF by the City of Baytown, AHF will complete the process of the selling the property to EMC and the liens mentioned above will be satisfied. The Debtor estimates that it will realize $1 million from this transaction. The Plan contemplates that the Debtor will use these funds in its ongoing operations to maintain its headquarters and make necessary expenditures on other properties in which it holds an ownership interest.

*Treatment of Brandywood Property:* Additionally, as of the Petition Date, Texas Capital Bank ("TCB") holds claims against the Debtor and its assets, as defined in Section 101 of the Bankruptcy Code, in the total aggregate approximate amount of $9,635,115.13 in unpaid principal and accrued interest, plus any and all fees, and any and all other obligations and liabilities of the Debtor to TCB according to the pre-petition loan and collateral documents, or otherwise including, interest, reasonable costs, attorney's fees, and any and all other amounts to the extent permitted by the Bankruptcy Code and applicable law. On June 26, 2009, TCB filed its proof of Claim (Claim No. 4 in the Claim Register) reflecting the amounts it claims were owed to TCB as of the Petition Date.

The aforementioned debt stems from a working capital loan to AHF in the amount of approximately $2,500,000, and a first lien mortgage to Brandywood Housing, Ltd. ("Brandywood") located in Pasadena, Texas, (the "Property") in the amount of approximately

$7,500,000, which has a current balance of approximately $7,100,000. Texas Capital Bank claims that these loans are cross-collateralized and cross-defaulted obligations secured by Brandywood. In addition Texas Capital Bank claims that all cash equivalents, whether in the form of cash, negotiable instruments, documents of title, securities, deposit accounts, or in any other form, which represent income, proceeds, products, rents or profits of the Collateral that are now in the Debtor's (or entities or persons in privity with the Debtor) possession, custody or control, or in which the Debtor will obtain an interest during the pendency of the bankruptcy Case (collectively, the "Cash Collateral"), are the Cash Collateral of TCB. The Creditor's Committee, acting on behalf of AHF, disputes the scope and extent of the above claims of TCB. Also, the Creditor's Committee disputes the claim of TCB that it is secured in any way as to the life insurance proceeds of $27,000,000 that are deposited in the registry of the United States District Court for the Northern District of Texas.

At the present time, the Debtor is operating under agreed orders for the continued use of cash collateral which have been entered by the United States Bankruptcy Judge.

A portion of the Property, 17 buildings representing 258 units, was approved by FEMA as eligible for its Severe Repetitive Loss Program (the "SRLP"). The SRLP endeavors to mitigate the effects of repeated losses to residents and property owners in flood prone areas. This designation allows the State of Texas, through the Texas Water Development Board ("TWDB"), to provide a grant to the City to acquire the portion of the Property which has become subject to increasingly repetitive flood loss claims. The Severe Repetitive Loss Grant (the "Grant") for the Property was approved on May 27, 2008. The City will acquire 17 apartment buildings, representing 258 units of the Property's 698 units that will leave 440 units of residential housing for the Property. The Grant provides for demolition, asbestos abatement, relocation expenses for current residents, and the creation of a city park/open green space area (the "Open Space") to help mitigate the cost of future flood damages. This Open Space will be subject to a Lease between the City as Lessor, and Brandywood as Lessee (the "Lease"), a requirement of the City that will restrict the use of the Open Space.

Once all required demolition is complete, the City will purchase the Open Space with the Grant funds. The Grant funds will be used to pay costs associated with the transaction by Brandywood, and to pay down a portion of the existing first lien debt on the Property in the approximate amount of $2,200,000.

Currently, the Property has an "As-Is" Appraisal of $8,335,000, and an "After-Stabilized/Repaired" Appraisal of approximately $16,000,000. The Plan provides for the $2.2 million of net funds resulting from the Grant to be paid over to Texas Capital Bank ("TCB") to reduce the debt and then the balance of the Brandywood property remaining – valued at the $8.3 million -- will be conveyed over to TCB and the remaining balance of the loan will be deemed paid in full as the indubitable equivalent of TCB's interest in the property.

### *Treatment of Other Secured and Unsecured Claims:*

**Secured Claims:** AHF has already allowed, or will allow, the automatic stay to be lifted against some assets claimed to be secured by liens or security interests in favor of Secured Creditors. The proceeds collected from the foreclosures will go to each Secured Creditor for credit to the Debtor's indebtedness to each. If there are Unsecured Deficiency Claims of Secured Creditors, whose claims exceed the value of the property securing each lien, their approved claims will be paid either as Class Four or Class Five creditors depending upon the value of their

deficiency claim, and whether they choose the treatment afforded the claims of the Administrative Convenience Class in Class Four.

To the extent that Secured Claims are in the process of litigation involving a determination by the Bankruptcy Court as to the extent, nature or validity of their respective liens or security interests, the Plan either provides for the satisfaction of the debts by the treatment afforded the Secured Claims in the Plan by payment or conveyance of assets that are the indubitable equivalent of the Secured Claims, or by the ultimate resolution of the litigation which involves the particular Secured Claim and an allowance of an Unsecured Deficiency Claim to the extent the debt is not fully satisfied.

**Unsecured Claims:**  The Plan provides that upon confirmation, or as soon as sufficient funds are available, the Debtor will pay holders of Allowed Administrative Claims (Class 1) in full.  Additionally, all Priority Claims and Priority Tax Claims (Class 2) either will be paid in full on the Effective Date of the Plan, or will be paid in full by the receipt of annual payments with interest at the statutory rate within 5 years from the Petition Date as required by the provisions for confirmation set forth in Section 1129 of the Code.

The Debtor will make a lump sum payment to a class of unsecured Administrative Convenience Class Creditors (Class 4) holding claims of less than $50,000.00 in a one-time twenty-five percent (25%) dividend for satisfaction of their claims in full.  Creditors may choose to opt-in or opt-out of the Administrative Convenience Class if they hold claims of $50,000.00 or less. The claims placed in Class 4 are generally trade vendors or service providers which have outstanding invoices related to the operation and maintenance of the various housing units for which AHF is liable since it directly purchased the products or contracted for the services – or, it is the general partner of the limited partnership which holds title to the property.

The Plan provides that holders of Allowed Unsecured Claims (Class 5), which includes all unsecured claims of creditors in excess of $50,000.00, will paid through distribution from the Liquidating Trust as set forth in more detail below.  The Liquidating Trust will make an initial distribution from the net proceeds from the life insurance recovery, after the payment of Classes 1, 2 and 4, as soon as the Plan is approved and all claims objections have been determined by the Bankruptcy Court. Additional distributions from the Liquidating Trust will be made upon the collection of funds from the recovery of other lawsuits that are currently being investigated and prosecuted by counsel for the Committee. Finally, the Plan includes a provision where AHF will annually pay over to the Liquidating Trust Excess Revenues over and above those necessary to fund its operations and maintain its obligations to other creditors to which it is liable under existing contractual agreements relating to the properties it owns or manages.

While all of the claims have not been reconciled – and there are many duplicate claims filed as a result of the fact that many creditors filed proofs of claim in both the voluntary and involuntary bankruptcy cases – at present the Committee estimates total Allowed Claims in Class 5 in the range of $70 to $100 million. The lower figure is premised on the eventual subordination or disallowance of the claims categorized in Class 7 – Subordinated Unsecured Claims of Insiders. The higher figure is premised on the failure to subordinate or disallow such claims. Therefore, based upon the funds currently available through recovery of life insurance proceeds, the total available funds after the payment of Administrative and Priority Claims is estimated at $20 million. Using these figures, the Committee estimates the resulting initial dividend to Allowed Unsecured Claims to be in the range of twenty to thirty percent (20% to 30%).

The Plan includes a class of Contingent, Unliquidated and Disputed Claims (Class 6) totaling approximately $118.5 million where the Committee asserts that the Debtor has grounds to dispute the validity of the claim or the amount of such claim. The claims in this classification are all associated with housing complexes that are owned by limited partnerships in which AHF serves as the general partner or owns all of the interests of the limited liability companies which serve as the general partners. The claims placed in Class 6 arise as a result of guarantees executed by AHF. However, the goal of the reorganization is for the Debtor to be able to come into compliance under the provisions of the existing agreements between the parties and ultimately recover management or development fees after it has performed all of its obligations. The Committee intends to object to the claims in Class 6 and through the claims reconciliation process assist the Debtor in negotiating arrangements whereby it can either perform its duties under the partnership and financial agreements, or orderly dispose of the properties in a manner that avoids or limits the liability of the AHF bankruptcy estate. The Plan anticipates that some of these claims will eventually become Allowed Unsecured Claims and placed in Class 5 to share in the dividends paid from the Liquidating Trust, however, the objective is to minimize those total claims by reaching agreements with the claimants.

The final class is the Subordinated Unsecured Claims of Insiders (Class 7) and totals approximately $37 million of claims. All of the claims placed in Class 7 are held by former directors, attorneys or other "insiders" who had close affiliations with AHF. The Committee will seek to equitably subordinate these claims under the provisions of Section 510(c) of the Bankruptcy Code or disallow them under the provisions of Section 502(d) or other provisions of the Code. The basis for such equitable subordination or disallowance stems from either 1) pre-petition actions taken by the claimants which resulted in injury to other creditors of the estate or conferred an unfair advantage on the claimants; or 2) because such claimants are transferees of transfers avoidable under the Bankruptcy Code. Since these claims will not be paid anything under the Plan until the claims in Class 5 are paid in full, it is not anticipated that these claimants will receive dividends under the Plan. However, if such claims are allowed by the Court, or not subordinated, the Plan provides for the holders of such Allowed Unsecured Claims to participate in the dividends paid to creditors from the Liquidating Trust.

### E.    Balloting, Voting Deadline, and General Information About Claims and The Plan Confirmation Process.

**General Instructions Pertaining to Voting**. The holder of a claim or interest allowed under Section 502 of the Code or allowed by the Court may vote on whether to accept or reject the Plan. The Court will issue an Order setting forth instructions for voting for the filed Plan. The Order will require that all votes for the acceptance or rejection of the Plan be received prior to the hearing before the Bankruptcy Court on approval of such Plan or at such other time as the Bankruptcy Court may set. The time and date of the hearing will be set forth in a notice to all creditors and parties-in-interest. Voting may be on the ballot that will be provided with this Disclosure Statement or in any other written manner. An Unsecured Creditor may choose treatment under Class 4 – Administrative Convenience Class on the ballot. Your ballot should be sent to:

David R. Langston
MULLIN HOARD & BROWN, L.L.P.
P. O. Box 2585

Lubbock, Texas 79408

Please mail or deliver your ballots so that all copies will reach the above address before the deadline set by the Court. A vote received after that time will not be counted.

Whether a Creditor votes on the Plan or not, each Creditor will be bound by the terms and treatments set forth in the confirmed Plan that is accepted by the requisite majorities of Creditors and is confirmed by the Court, or as confirmed by the Court pursuant to the provisions of 11 U.S.C. § 1129(b). Absent some affirmative act constituting a vote, a Creditor not voting on the Plan will not be included in the tally. Allowance of a claim for voting purposes does not necessarily mean that all or a portion of the claim will be allowed for distribution purposes.

You are urged to fill-in, date, sign and properly mail in duplicate the enclosed ballot, which has been provided. Be sure to properly complete and legibly identify the name of the Creditor, the class in which you believe the claim is treated in the Plan, the amount of the claim, and indicate whether you are voting for or against confirmation of the Plan, and if your claim is eligible for treat as a member of the Administrative Convenience Class whether you choose to be treated in the class. Representatives of the Committee of the Debtor may solicit your vote. The cost of any solicitation by the Committee will be borne by the Debtor.

No representations concerning the Plan of the Committee are authorized by the Committee other than as set forth in this Disclosure Statement. Any representations or inducements by any persons to secure your vote other than those contained in this Disclosure Statement should not be relied upon, and such representations of inducements should be reported to counsel for the Committee who shall then deliver such information to the Bankruptcy Court for appropriate action.

**Creditors Entitled to Vote.** Any Creditor whose claim is impaired under the Plan is entitled to vote, if either  i) its claim has been scheduled by the Debtor and such claim is not scheduled as disputed, contingent, or unliquidated, or ii) it has filed a proof of claim on or before the last date set by the Bankruptcy Court for such filings. Any claim as to which an objection has been filed and such objection is still pending is not entitled to vote, unless the Bankruptcy Court temporarily allowed the claim in an amount which it deems proper for the purpose of accepting or rejecting the Plan upon application by the creditor. Such application must be heard and determined by the Bankruptcy Court at such time as specified by the Bankruptcy Court. A creditor's vote may be disregarded if the Bankruptcy Court determines that the creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Court.

**Definition of Impairment.** Under Section 1124 of the Bankruptcy Code, a class of claims or equity security interests is impaired under a Chapter 11 Plan unless, with respect to each claim or interest of such class, the Plan:

a. Leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or equity security interest; or

b. Notwithstanding any contractual provision or applicable law that entitled the holder of a claim or equity security interests to receive accelerated payment of his claim or equity security interests after the occurrence of a default:

1. Cures any such default that occurred before or after the commencement

of the case under the Bankruptcy Code, other than a default that consists of a breach of any provisions relating to the insolvency or financial condition of the Debtor at any time before the closing of the case, the commencement of a case under the Bankruptcy Code, or the appointment of or taking possession by a trustee in a case under the Bankruptcy Code;

2.   Reinstates the maturity of such claim or equity security interest as it existed before the default;

3.   Compensates the holder of such claim or equity security interest for damages incurred as a result of reasonable reliance on such contractual provisions or applicable law; and

4.   Does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity security interest entitles the holder of such claim or equity security interest; or

c.   Provides that, on the Effective Date of the Plan of Reorganization, the holder of such claim or equity security interest receives on account of such claims or equity security interest, cash equal to:

1.   With respect to a claim, the allowed amount of such claim

2.   With respect to any equity security interest, if applicable, the greater of:

i.   Any applicable fixed liquidation preference; or

ii.   Any fixed price at which the Debtor, under the terms of the security, may redeem the security.

**Classes Impaired.**   Classes 3, 4, 5, 6, and 7 are all impaired under the treatment afforded the Creditors in these classes under the provisions of the Plan.

**Votes Required for Class Acceptance.**   The Bankruptcy Code defines acceptance of a Plan by a class of creditors or equity security interests holders as acceptance by holders of two-thirds in dollar amount and a majority in number of the claims or equity security interests of that class which actually cast ballots for acceptance or rejection of the Plan; i.e., acceptance takes place only if sixty-six and two-thirds percent (66 2/3%) in amount of claims and equity security interests in each class and more than fifty percent (50%) of claims or equity security interests voting in each class cast their ballots in favor of acceptance.

## <u>NOTICE OF HEARING ON CONFIRMATION</u>

**NOTICE IS HEREBY GIVEN THAT THE COURT HAS SCHEDULED A HEARING TO DETERMINE WHETHER OR NOT THE PLAN SHOULD BE CONFIRMED ON THE _____ DAY OF _____, 2010, AT _____ .M., IN THE UNITED STATES BANKRUPTCY COURTROOM, 624 SOUTH POLK STREET, ROOM 100, AMARILLO, TEXAS 79101.   YOU HAVE A RIGHT TO ATTEND**

**THE HEARING AND PRESENT TO THE COURT YOUR ARGUMENTS EITHER IN FAVOR OF OR IN OPPOSITION TO CONFIRMATION OF THE PLAN.**

**NOTICE OF THE FIXING OF A BAR DATE AND THE REQUIREMENTS FOR FILING AND ALLOWANCE OF CLAIMS**

NOTICE IS HEREBY GIVEN that the Court set **October 7, 2009**, as the last day upon which proofs of claim or interests can be filed with the Court for the case of American Housing Foundation. The Debtor listed certain the claims reflected on its Schedules of Liabilities as "contingent, unliquidated, and disputed," and, as a consequence these creditors were required to file a "Proof of Claim" in order to be eligible for the payment of any distributions under the Plan.

Only the claims listed on the attached Exhibit "B" were not required to file a Proof of Claim because the Debtor did not list such claims as "contingent, unliquidated, and disputed." The proponents of the Plan nevertheless reserve the right to object to such claims if facts come to their attention that such debts are not legitimate claims against the Bankruptcy estate of AHF.

If you are required to file a Proof of Claim because your debt was listed as either "Contingent, Unliquidated or Disputed on the Debtor's schedules, and your "Proof of Claim" was not filed by the October 7, 2009, deadline, then, unless an order is entered by the Bankruptcy Court to the contrary, your claim will not be allowed and cannot be counted as a valid vote for or against confirmation of the Plan.

**DISCLOSURE OF EFFECT OF COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT AND OF THE ACCURACY OF THE REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT**

COURT APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT OF ANY OF THE REPRESENTATIONS CONTAINED IN EITHER THE DISCLOSURE STATEMENT OR THE PLAN, NOR DOES COURT APPROVAL OF THE DISCLOSURE STATEMENT CONSTITUTE AN ENDORSEMENT OF THE PLAN ITSELF. APPROVAL OF THE DISCLOSURE STATEMENT BY THE COURT REPRESENTS A DETERMINATION THAT THE DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS REQUIRED BY 11 U.S.C. SECTION 1125 AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTOR AND THE CONDITION OF THE DEBTOR'S BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.

THE DEBTOR AND THE COMMITTEE SEEK AN AFFIRMATIVE VOTE FROM EACH CLASS AND EACH HOLDER OF A CLAIM IN THIS BANKRUPTCY PROCEEDING. THE BALLOT THAT YOU WILL RECEIVE PERMITS YOU TO ACCEPT OR REJECT THE PLAN.

EXCEPT WHERE SPECIFICALLY STATED OTHERWISE, ALL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTOR OR OBTAINED FROM ITS RECORDS AND FILES. THE PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE BASED UPON THE BEST INFORMATION AVAILABLE TO THE DEBTOR AT THE TIME THAT THE DISCLOSURE STATEMENT WAS PREPARED.

THE DEBTOR AND THE COMMITTEE FAVOR ACCEPTANCE OF THE PLAN AND BELIEVES THAT CONFIRMATION OF THE PLAN WOULD REALIZE PAYMENT OF LARGER DIVIDENDS TO CREDITORS THAN COULD BE OBTAINED THROUGH A CHAPTER 7 LIQUIDATION.  SUCH CONCLUSION IS BASED ON INFORMATION IN THE POSSESSION OF THE DEBTOR AT THE TIME THE DISCLOSURE STATEMENT AND PLAN WAS PREPARED.

WHILE THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED OR VERIFIED EXCEPT WHERE SPECIFICALLY STATED, AND THE RECORDS KEPT BY THE DEBTOR ARE NOT REPRESENTED TO BE WITHOUT ANY INACCURACY OR OMISSION, THE DEBTOR FIRMLY BELIEVE THAT EVERY EFFORT HAS BEEN MADE TO BE ACCURATE AND COMPLETE.

**CRAMDOWN:**

In the event that any impaired class of claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, as to each impaired class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."  A Plan of Reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims or equity security interests.  "Fair and equitable" has different meanings for secured claims and unsecured claims.

With respect to a secured claim, "fair and equitable" means either:  i) the impaired secured creditor retains its liens to the extent of its allowed claim and receives deferred cash payments at least equal to the allowed amount of its claim with a present value on the effective date of the Plan at least equal to the value of such secured creditor's interest in the property securing its liens; or ii) property subject to the lien of the impaired secured creditors is sold free and clear of that lien, with that lien attaching to the proceeds of the sale, and such lien proceeds must be treated in accordance with clauses (i) and (iii) hereof; or iii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the Plan.

With respect to an unsecured claim, "fair and equitable" means either i) each impaired unsecured creditor receives or retains property of a value equal to the amount of its allowed claim; or ii) the holders of the claims and equity security interests that are junior to the claims of the dissenting class will not receive any property under the Plan.

In the event one or more classes of impaired claims rejects the Plan, the Bankruptcy Court will determine at the hearing for confirmation of the Plan whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of claims. If the Bankruptcy Court determines that the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of claims, the Bankruptcy Court can confirm the Plan over the objection of any impaired class.

## ARTICLE II

## <u>THE PLAN OF REORGANIZATION</u>

### A.   Definitions.

If any definition of any term used in this Plan and Disclosure Statement is not referenced in the following Definitions section, then the Bankruptcy Code shall be controlling as to the meaning of the word. However, if the term is not defined in the Bankruptcy Code, then the plain meaning of the word is intended to be used.

Unless the context otherwise requires, the following terms used in the Plan shall have the following meanings. Any term used in this Plan that is not defined below but that is defined in Title 11 of the United States Code, as amended, shall have the meaning assigned to such term therein.

**1.1    Administrative Claim** shall mean any Claim in respect of costs or expenses of administration for the Proceeding that is allowed under Sections 503 and 507(a) of the Bankruptcy Code.

**1.2    Affiliates** shall mean all persons or entities affiliated with the Debtor pursuant to Section 101(2) of the Bankruptcy Code.

**1.3    Allowed or Allowed Amount** shall mean the amount of any Allowed Claim.

**1.4    Allowed Claim** shall mean a Claim against the Debtor that (i) is allowed by an Order which is not stayed on appeal, (ii) is scheduled as liquidated, undisputed and non-contingent by the Debtor in their schedules filed with the Bankruptcy Court as they may be amended or supplemented (collectively the "Schedules"), (iii) is timely filed with the Clerk of the Bankruptcy Court and no objection has been made to the allowance thereof, (iv) any reconciled contested claim that has been negotiated to an agreed amount or established by Court Order, or (v) is provided to be allowed by the terms of this Plan.

**1.5    Allowed Administrative Claim** shall mean an Allowed Claim which a Claimant asserts is an Administrative Claim and is determined to be entitled to priority pursuant to Sections 503 and 507(a)(1) of the Bankruptcy Code.

**1.6    Allowed Priority Claim** shall mean an Allowed Claim which a Claimant asserts is an Administrative Claim and is determined to be entitled to priority under Section 507 of the Bankruptcy Code.

**1.7    Allowed Secured Claim** shall mean an Allowed Claim for which a Claimant asserts and is determined by an Order not stayed on appeal to hold a valid, perfected and enforceable lien, security interest or other interest in or encumbrance on property in which the Debtor have an interest to the extent of the value, determined in accordance with Section 506(a) of the Bankruptcy Code, of the Claimant's interest in the Debtor's interest in the property.

**1.8    Allowed Unsecured Claim** shall mean an Allowed Claim for which the Claimant has not asserted or is determined by an Order not stayed on appeal that the Claimant does not hold a valid, perfected and enforceable lien, security interest or other interest in or encumbrance against property of the Debtor or right to setoff to secure the payment of such Claim to which an objection has not been filed or if an objection to such claim has been filed, the Bankruptcy Court has entered an order which has become final allowing such claim.

**1.9    Allowed Unsecured Subordinated Claims of Insiders** shall mean all Unsecured

Claims of Insiders which the Debtor and the Committee seek to subordinate under the provisions of 11 U.S.C. Section 510(c), or disallow under the provisions of 11 U.S.C. Section 502(d) or other such applicable provisions of the Bankruptcy Code. The Debtor and Committee assert that the holders of the Claims in this Class engaged in inequitable conduct prior to the Petition Date which caused injury to other creditors or conferred an unfair advantage for themselves, and that the equitable subordination of such claims is entirely consistent with other provisions of the Bankruptcy Code. Alternatively, the Debtor and the Committee assert that such claims should be disallowed because the holders of such claims are transferees of a transfer that is avoidable under applicable provisions of the Bankruptcy Code as set forth in Section 502(d) of the Code. Alternatively, the committee asserts that such claims should not be allowed because AHF has no liability to the holders of such claims.

     **1.10**    **American Housing Foundation Case** shall mean the bankruptcy proceeding of American Housing Foundation which was initiated on April 21, 2009, by the filing of an Involuntary Chapter 11 Bankruptcy Petition, and ultimately consolidated with the voluntary case filed by American Housing Foundation on June 21, 2009, under Case No. 092032 now pending in the U.S. Bankruptcy Court for the Northern District of Texas, Amarillo Division.

     **1.11**   **Ballot** shall mean the ballot to be delivered with the Disclosure Statement to holders of Claims and Interests on which such holder will be able to vote to accept or reject the Plan. The Ballot may be different for holders of the various Claims and Interests.

     **1.12**   **Bankruptcy Code** shall mean the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* and all amendments thereto.

     **1.13**   **Bankruptcy Court** shall mean the United States Bankruptcy Court for the Northern District of Texas, Amarillo Division.

     **1.14**   **Bankruptcy Clerk** shall mean the Clerk of the Bankruptcy Court located at 624 South Polk Street, Room 100, Amarillo, Texas 79101-2319.

     **1.15**   **Bankruptcy Rules** shall mean the Federal Rules of Bankruptcy Procedure and all relevant local rules of the Bankruptcy Court.

     **1.16**   **Bar Date** shall mean October 7, 2009, being the deadline ordered by the Bankruptcy Court for Claimants to file Proofs of Claim in the bankruptcy case of American Housing Foundation.

     **1.17**   **Beneficiary or Beneficiaries** shall mean all beneficiaries of the Liquidating Trust, specifically being all of the Unsecured Creditors which hold Allowed Unsecured Claims, the validity and amount of which have been established by the Bankruptcy Court, and which for purposes of the Plan have been classified in Classes Five, Six or Seven of the Plan.

     **1.18**   **Claim** shall mean (i) a right to payment from the Debtor, whether or not such right is reduced to a judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtor,

whether or not such right to an equitable remedy has produced a judgment, or is fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

**1.19  Claimant** shall mean the holder of a Claim.

**1.20  Class** shall mean a category designated in the Plan of holders or owners of Claims or Interests that are substantially similar pursuant to Section 1122 of the Bankruptcy Code.

**1.21  Confirmation Date** shall mean the date of Confirmation.

**1.22  Confirmation Hearing** shall mean the hearing that will be held before the Bankruptcy Court in which the Debtor will seek Confirmation of the Plan pursuant to Section 1128 of the Bankruptcy Code.

**1.23  Confirmation Order** shall mean the Order of the Bankruptcy Court confirming the Plan.

**1.24  Conflicts Counsel** shall mean the the attorney or law firm whose employment by the Estate will seek to be approved by the Bankruptcy Court so that he may serve as Special Counsel to the Official Committee of Unsecured Creditors for the purpose of examining, and where appropriate, objecting to the allowance of the Proofs of Claim filed by Creditors who were previously represented by the law firm of Mullin Hoard & Brown, L.L.P., or who have a representative that serves on the Committee, and, as a result of which, Mullin Hoard & Brown, L.L.P., which serves as counsel for the Committee, has a conflict of interest which prevents it from examining and objecting to the claims of such Creditors. In addition to reviewing, and, if appropriate, objecting to these Proofs of Claim, Conflicts Counsel shall pursue any and all counterclaims of the bankruptcy estate which it may have against these individuals and entities, including, but not limited to, proceedings to determine, avoid, or recover preferences or fraudulent conveyances.

**1.25  Contested Claims** shall mean all Claims to which objections are filed.

**1.26  Creditor** shall have the meaning set forth in Section 101(10) of the Bankruptcy Code.

**1.27  Debtor or Debtor-in-Possession** shall mean American Housing Foundation.

**1.28  DIP Accounts** shall mean the Debtor-in-Possession bank accounts maintained by the Debtor as of the Effective Date.

**1.29  Disclosure Statement** shall mean the Disclosure Statement prepared and submitted by the Debtor and the Committee with respect to the Plan, including all exhibits attached thereto, and prepared pursuant to the Bankruptcy Court's Orders and Section 1125 of the Bankruptcy Code and, if applicable, Bankruptcy Rule 3018(b) for the Solicitation of Ballots, and all supplements and amendments thereto.

**1.30  Effective Date** shall mean the thirtieth (30th) day following the date when the

Confirmation Order becomes final, if the Confirmation Order has not been stayed on appeal, or if such a stay has issued, immediately after such stay is dissolved by Final Order.

**1.31 Excess Revenues** shall mean Annual income of the Reorganized Debtor and its affiliated entities calculated for each fiscal year pursuant to generally accepted accounting principles, including any gains or losses from the liquidation of any of the housing units it owns or manages, less any payments on existing loans on such properties, less any capital expenditures in accordance with the approved budget for that fiscal year, plus any net revenues derived from the sale or refinancing of such properties, including the repayment or collection of any outstanding notes receivable or development fees to which AHF is entitled, equals Excess Revenues.

**1.32 Estate** shall mean the estate of Debtor created by Section 541 of the Bankruptcy Code upon commencement of the case under Chapter 11 of the Bankruptcy Code.

**1.33 Executory Contract or Unexpired Lease** shall mean an executory contract or unexpired lease within the meaning of Section 365 of the Bankruptcy Code, in effect between or among the Debtor and any other Person or Persons as of the Petition Date.

**1.34 Filed** shall mean filed with the Clerk of the Bankruptcy Court.

**1.35 Final Order** shall mean an order of the Bankruptcy Court or any appellate court thereof that has not been reversed, modified, amended or stayed, and the time for appeal or to seek review or certiorari or rehearing thereof has expired and as to which no appeal, review or rehearing is pending, and has become conclusive of all matters adjudicated thereby and is in full force and effect.

**1.36 Insider** shall mean the various persons and entities listed under Section 101(31)(B) of the Bankruptcy Code who constitute "per se" insiders under the statutory definition of insiders for a corporation, as well as any other person or entity determined by the Bankruptcy Court to have such unique knowledge of the operations of, or control over, the Debtor or who have a sufficiently close relationship with the Debtor to be determined to be "non-statutory" insiders as contemplated by the non-exclusive definition contained in Section 101(31)(B) of the Bankruptcy Code.

**1.37 Liquidating Trust** shall mean the trust executed pursuant to the terms of this Plan which will (i) receive from the Debtor all Trust Assets transferred pursuant to the Plan, (ii) hold the Trust Assets (except as may otherwise be provided under the Plan) in trust for the benefit of all Beneficiaries (iii) investigate and prosecute any claim transferred to the trust pursuant to this Plan as the Trustee in his sole discretion shall see fit in order to increase the value of the Trust Assets, and (iv) oversee and direct the liquidation of the Trust Assets held by it for the benefit of the Beneficiaries of the Liquidating Trust pursuant to the terms of the Plan. The net proceeds from such trust shall be distributed to the Allowed Unsecured claims in accordance with the provisions and treatments described in the Plan.

**1.38 Liquidating Trustee** shall mean Robert L. Templeton of Amarillo, Texas, who currently serves as the Chairman of the Official Committee of Unsecured Creditors, or if Mr. Templeton is not able to serve as the Liquidating Trustee, an individual to be

designated on or before the date of the Confirmation Hearing, in writing, by the Official Committee of Unsecured Creditors.  When named, the Liquidating Trustee will act as Trustee of the Liquidating Trust.

**1.39   New Loan Documents** shall mean the various promissory notes, loan agreements, security documents and all other attending documents and instruments to be entered into by and between Debtor and the Secured Creditors to document the treatment to be afforded their claims pursuant to the Plan.

**1.40   Objection Date** shall mean the date immediately preceding the last day for filing written acceptances or rejections of the Plan.

**1.41   Old Loan Documents** shall mean the various original promissory notes, loan agreements, security documents and all other attending documents and instruments, originally entered into between the Debtor and a Secured Creditor.

**1.42   Person** shall mean an individual, corporation, partnership, limited liability company, association, joint-stock company, joint venture, estate, trust, unincorporated organization, governmental unit or any political subdivision thereof.

**1.43   Petition Date** shall mean the date on which the Involuntary Petition was filed against the American Housing Foundation, which was April 21, 2009.

**1.44   Plan** shall mean this Plan of Reorganization, as it may be amended, modified and/or supplemented from time to time pursuant to the Bankruptcy Code.

**1.45   Preference** shall mean any transfer of an interest of the Debtor assets that is avoidable under section 547 of the Bankruptcy Code.

**1.46   Priority Claim** shall mean any Claim, to the extent entitled to priority in payment under Section 507(a) of the Bankruptcy Code, other than an Administrative Claim, that (1) has not been barred by the Plan and (2) has not been disallowed by a Final Order.

**1.47   Priority Tax Claim** shall mean the allowed claims of governmental taxing authorities that are entitled to priority claims under section 507(a)(8) of the Bankruptcy Code or tax claims as otherwise specified herein.  The term "allowed" shall include the definition of "deemed allowed," as set forth in 11 U.S.C. § 502(a), when no objection has been filed to a claim of the Internal Revenue Service.

**1.48   Proceeding** shall mean the case for reorganization of the Debtor pending before the Bankruptcy Court.

**1.49   Proof of Claim** shall mean a proof of claim conforming to Bankruptcy Official Form 10.

**1.50   Reorganized Debtor** shall mean American Housing Foundation after it is reconstituted as contemplated by the terms and provisions of the Plan following the Effective Date.

**1.51  Representative** shall mean any Affiliate, Person, agent, insider (as defined in Section 101(31) of the Bankruptcy Code), attorney, accountant, fiduciary, heir, guardian, surety, corporate parent or subsidiary (whether direct or indirect), and other entity having a legal or equitable relationship with another entity whatsoever.

**1.52   Section 502(c)(1) Valuation** shall mean in the case of contingent, unliquidated claims the value of the creditor's claim as estimated by the Bankruptcy Court.

**1.53  Section 506 Valuation** shall mean the value of collateral as established by the Bankruptcy Court after a hearing held pursuant to Bankruptcy Rule 3012 and in accordance with Section 506 of the Bankruptcy Code, or made part of a Final Order of Bankruptcy Court.

**1.54  Secured Claim** shall mean any Claim that is considered secured under Section 506(a) of the Bankruptcy Code.

**1.55  Secured Creditors** shall mean all Creditors who hold a lien, secured interest, or other encumbrance that has been properly perfected as required by law with respect to property owned by the Debtor.

**1.56   Trust Assets** shall mean: (1) proceeds realized by the pursuit of causes of actions delegated to the Committee by Order of the Bankruptcy Court; (2) all Class 6 or Class 7 claims of Contested Creditors, to which the Debtor possess a counterclaim or an offset or otherwise contest the validity of the claim amount; and (3) all claims of the bankruptcy estate for bankruptcy related causes of action including preference claims pursuant to Section 547 of the Bankruptcy Code, all fraudulent transfer claims pursuant to Section 548 of the Bankruptcy Code, all claims relating to post-petition transactions under Section 549 of the Bankruptcy Code, all claims recoverable under Section 550 of the Bankruptcy Code, claims against any third party on account of an indebtedness or any other claim owed to or in favor of the Debtor, which are not settled prior to or as part of this Plan which are to be transferred and assigned to the Liquidating Trust pursuant to this Plan as well as all Excess Revenues paid over from the Reorganized Debtor to the Liquidating Trust.

**1.57  Unsecured Claims** shall mean all Claims not secured by a lien in or other encumbrance upon the property interests of the Debtor.

**1.58  Unsecured Creditors** shall mean any and all Creditors having Unsecured Claims, including but not limited to Claimants holding Unsecured Deficiency Claims.

**1.59  Unsecured Deficiency Claims** shall mean all Allowed Claims of creditors that are deemed to be unsecured following valuation of the Debtor's property as a result of either a Section 506 Valuation hearing, the Bankruptcy Court or the District Court's order determining the nature, extent or validity of a creditor's lien on the Debtor's property that is not stayed on appeal, or the agreement of the parties, due to the fact that the value of the collateral securing repayment of a claim against property of the estate is less than the amount of such allowed claim as determined by the provisions of Section 506 of the Bankruptcy Code.

**1.60  Other Terms**. Any term that is used in the Plan and not defined herein, but that is defined in the Bankruptcy Code, shall have the meaning set forth in the Bankruptcy Code. The

words "herein", "hereof", "hereto", "hereunder", and other words of similar import refer to the Modified Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.

**B.      Explanation of Insiders and Related Entities.**

    **2.1.   Relationship of Debtor.**

        **2.1.1 Insiders.** Section 101(31)(B) of the Bankruptcy Code lists certain specific non-exclusive categories of persons or entities that are statutorily defined as insiders of a corporation. These categories of persons or entities are known as "per se" insiders and consist of the corporation's officers and directors, a person in control of the debtor, a partnership in which the debtor is a general partner, the general partner of the debtor, or a relative of a general partner, director, officer, or person in control of the debtor.

        Since the statutory definition is non-exclusive there are also persons or entities who have a sufficiently close relationship with the debtor to be considered insiders. Generally, these persons or entities are known as "non-statutory" insiders. Courts have sometimes focused on the closeness of the parties and the degree to which the transferee is able to exert control or influence over the debtor to determine if they should be deemed insiders.

        The Committee discloses that prior to the filing of the bankruptcy petition, the following individuals served as officers and directors of AHF:

        <u>Officers of American Housing Foundation</u> (One-year prior to filing)
        Steve W. Sterquell, President and Executive Director,
        Rick Crawford, Executive Vice President and Chief Operating Officer,
        Jeff Richards, Executive Vice President and Chief Financial Officer,
        Pam McDonald, Senior Vice President,
        Steve W. Sterquell, II, Senior Vice President,
        Jack Traeger, Senior Vice President,
        Michelle Abdoo, Treasurer, and
        Lana Dempsey, Secretary.

        <u>Board of Directors of AHF</u> (One-year prior to filing)
        J.I. Fletcher, Chairman,
        Peggy Lawless, Director (Resident of Low Income Neighborhood and Community),
        Steve Hoggard, Director (Resident of Low Income Neighborhood and Community),
        Scott Rice, Director (Resident of US Department of Housing and Urban Development Qualified Census Tract),
        Randy Sharp, Director, and
        Betty Sterquell, Director.

    The present officers and directors of AHF are as follows:

<u>Officers of American Housing Foundation</u> (Current)
Alvin Johnson, Vice President of Operations,
Gene Morrison, Vice President of Government Affairs,
Michelle Abdoo, Treasurer, and
Glenda David, Secretary.

<u>Board of Directors of American Housing Foundation</u> (Current)
Tom Boyd, Chairman,
Carroll M. Forrester, Director,
Alvin Johnson, Director,
Peggy Lawless, Director (Resident of Low Income Neighborhood and
Community), and
Steve Hoggard, Director (Resident of Low Income Neighborhood and
Community).

A listing of the entities wholly owned and operated by American Housing
Foundation or in which it holds an interest or on behalf of which it serves as the
general partner or manager of the general partner are reflected on Exhibit "C"
attached to the Plan.

A listing of all persons or entities holding Unsecured Claims against the Debtor who
are deemed insiders for purposes of this Plan are reflected on the listing attached to
the Plan as Exhibit "D."

**2.2.    Treatment of Interest and Penalties Under the Plan and Preservation of the
Rights of the Committee to Contest Claims and Interests.**

**2.2.1 No Interest to Accrue on Unsecured Claims.** The Plan provides for no
interest or penalties to accrue or be assessed after the Petition Date on any Claims
except those Claims that are clearly secured. If the agreement between a Debtor and
a Creditor so provides, a Creditor may accrue interest on its claim at the contract rate
through the Petition Date. However, unless specifically provided for under the terms
of the Plan, no Creditor shall accrue interest on its claim after the Petition Date

**2.2.2 Reservation of Rights to Contest Validity of Security Interests or Claims.**
For a period of 90 days, the Committee specifically reserves the right to contest the
validity of any asserted security interests or deeds of trust or mortgages which are
not properly perfected in the event that facts should be disclosed or developed which
indicate that there are valid grounds for contesting the validity of such security
interest or real estate liens. The Committee also reserves the right to object to any
Proofs of Claim filed in the case or to assert that certain claims are barred due to the
failure of the Creditor to timely file a Proof of Claim. Thus, all rights of the
Committee to reconcile claims and seek determinations as to the nature, extent and
validity of liens are preserved.

**2.2.3 No Penalties on Unsecured or Priority Tax Claims.** Penalties will only be
paid when Creditors are fully secured, and only if such penalties are directly related
to pecuniary loss. The Debtor and the Committee reserve the right to object to the
payment of penalties, including any interest accruing at default rates, unless such
penalties are allowed under the provisions of the Bankruptcy Code or the specific

terms of the Plan.

## ARTICLE III

## <u>CLASSIFICATION OF CLAIMS AND INTERESTS</u><br><u>UNDER THE PLAN OF REORGANIZATION</u>

All Claims against and Interests in the Debtor of whatever nature, whether or not scheduled, liquidated or unliquidated, absolute or contingent, including all Claims arising from transactions of the Debtor or rejection of Executory Contracts and/or Unexpired Leases, whether resulting in an Allowed Claim or not, shall be bound by the provisions of the Plan. The Claims and Interests are classified in the Plan as follows:

**3.1    Class 1 - Allowed Administrative Expense Claims.**  Class 1 is comprised of the Debtor's Allowed Administrative Expense Claims approved by order of the Bankruptcy Court under Section 503(b) of the Bankruptcy Code and Bankruptcy Rules 2014, 2016 and 2017.

   **3.1.1    Subclass 1.1 - Costs and Expenses of Administration.**  Subclass 1.1 includes all Allowed Administrative Expense Claims entitled to priority in accordance with section 507(a) of the Bankruptcy Code, as scheduled or filed, which includes Claims arising after the Debtor's Petition Date.  The class includes any unpaid fees of the U.S. Trustee's Office in accordance with Section 507(a)(1) of the Bankruptcy Code. It also includes any unpaid Claims for professional fees and expenses allowed in accordance with 507(a)(1) and 503(b) of the Bankruptcy Code, including the following:  (1) Robert Yaquinto of the law firm of Sherman and Yaquinto, Dallas, Texas, R. Byrn Bass Law Firm, Lubbock, Texas, Lynch, Hanna and Boyd, PLLC, attorneys for the Debtor (2) Mullin Hoard & Brown, L.L.P., Amarillo, Texas, attorneys for the Committee; (3) Brown Graham & Company, Amarillo, Texas, accountants for the Debtor (3) Magic Media Company, Amarillo, Texas, Computer Consultant employed by the Debtor, (4) , Special Conflicts Counsel for the Official Committee of Unsecured Creditors, (5) Harry Potter, CPA, Tulsa, Oklahoma, (6) Boyd & Associates, Dallas, Texas, Special Counsel for the Debtor, and (7) any other Persons entitled to seek allowance of Administrative Claims against the Estate.

   **3.1.2    Subclass 1.2 - Post-Petition Administrative Expense Claims.**  Subclass 1.2 is comprised of all post-petition administrative expense claims arising from the post-petition operations of the Debtor, and generally include non-professional Allowed Administrative Expense Claims, relating to the claims of vendors or employees which may have been incurred after the Petition Date, but for whatever reason have not been paid as a result of a dispute with the Claimant involving the liability or the amount of such Claim.

**3.2    Class 2 - Allowed Priority Tax Claims.**  Class 2 is comprised of all Allowed Priority Tax Claims for pre-petition federal, state and local taxes owing to such taxing authorities and certain other debts owed to governmental units entitled to priority in accordance with Section 507(a)(8) of the Bankruptcy Code.  A listing of the claims which are classified in Class 2 is attached as Exhibit "E-1." These claims total the approximate sum of $106,323.29, and consist primarily of franchise taxes for various limited partnerships for which AHF is the general partner or owns the interests of the entity which serves as the general partner.

**3.3    Class 3 -Allowed Secured Claims of Creditors Holding Liens Against Assets Owned by Debtor.**  Class 3 is comprised of the Allowed Secured Claims of Creditors Holding Liens Against Assets Owned by Debtor and is divided into Subclasses as follows:

**3.3.1    Subclass 3.1 - Claims of Texas Capital Bank.**  Subclass 3.1 includes the claims of Texas Capital Bank ("TCB") in the total aggregate approximate amount of $9,635,115.13 in unpaid principal and accrued interest, plus any and all fees, and any and all other obligations and liabilities of the Debtor to TCB according to the Pre-Petition Indebtedness Documents, or otherwise, including, interest, reasonable costs, attorney's fees, and any and all other amounts to the extent permitted by the Bankruptcy Code and applicable law which are divided into classes as follows:

> **Subclass 3.1(A) – Claims of TCB Secured by Real Property to be Demolished Pursuant to the Severe Repetitive Loss Grant Program Administered by the Texas Water Development Board:** This Subclass consists of the claims of TCB which are secured by a deed of trust and assignment of rents and profits in favor of TCB against 698 housing units known as the Brandywood Apartments in Pasadena, Harris County, Texas, as well as an asserted security interest in accounts, cash, inventory, and general intangibles of the Debtor.

> **Subclass 3.1(B) – Unsecured Deficiency Claims of TCB Which Exceed Value of Collateral:** This Subclass consists of the unsecured deficiency claims of TCB, if any, which exceed the value of its collateral and are therefore unsecured.

**3.3.2 Subclass 3.2 - Secured Claims of Creditors Against Real Property Located in Lakewood Terrace, Baytown, Harris County, Texas.**  Subclass 3.2 includes the claims of Secured Creditors in the total aggregate approximate amount of $3,481,119.09 as of the Petition Date, which are secured by liens against certain real property consisting of houses in a residential housing development known as Lakewood Terrace in the City of Baytown, Harris County, Texas, and are divided into classes as follows:

> **Subclass 3.2(A) – Claims of BAC Home Loan Servicing, L.P.:** This Subclass consists of the claims of BAC which total approximately $7,100,000 and are secured by deeds of trust against 104 housing units in a residential housing development known as Lakewood Terrace in the City of Baytown, Harris County, Texas.

> **Subclass 3.2(B) – Claims of Graham Financial:** This Subclass consists of the claims of Graham Financial which total approximately $750,000 and are secured by deeds of trust against 30 housing units in a residential housing development known as Lakewood Terrace in the City of Baytown, Harris County, Texas.

> **Subclass 3.2(C) – Claims of Gary Graham Self-Directed IRA:** This Subclass consists of the claims of Gary Graham Self-Directed IRA which total approximately $500,000 and are secured by deeds of trust against 20 housing units in a residential housing development known as Lakewood Terrace in the

City of Baytown, Harris County, Texas.

**Subclass 3.2(D) – Claims of Cenlar:** This Subclass consists of the claims of Cenlar which total approximately $35,750 and are secured by a deed of trust against 1 housing unit in a residential housing development known as Lakewood Terrace in the City of Baytown, Harris County, Texas.

**Subclass 3.2(E) – Claims of Griffiths, Sammarco, Pierre and Sullivan:** This Subclass consists of the claims of Griffiths, Sammarco, Pierre and Sullivan which total approximately $434,898 and are secured by deeds of trust against individual housing units in a residential housing development known as Lakewood Terrace in the City of Baytown, Harris County, Texas.

   **3.3.3 Subclass 3.3 - Claims of Wells Fargo Bank, N.A.** Subclass 3.3 includes the claims of Wells Fargo Bank, N.A. ("Wells Fargo") in the total aggregate approximate amount of $1,067,418 which are partially secured by disputed setoff rights which Wells Fargo asserts against deposits in the name of the Debtor totaling $422,146.36 which are divided into classes as follows:

**Subclass 3.3(A) – Claims of Wells Fargo Secured by Asserted Setoff Rights Against Deposits of the Debtor:** This Subclass consists of the claims of Wells Fargo in the approximate amount of $1,067,418 which are partially secured by disputed setoff rights which Wells Fargo asserts against deposits in the name of the Debtor totaling $422,146.36.

**Subclass 3.3(B) – Unsecured Deficiency Claims of Wells Fargo Which Exceed Value of Collateral:** This Subclass consists of the unsecured deficiency claims of Wells Fargo which exceed the value of its collateral and are therefore unsecured.

   **3.3.4 Subclass 3.4 - Claims of the Happy State Bank and Texas Housing Finance Corporation,** Subclass 3.4 includes the claims of the Happy State Bank ("HSB") in the total approximate amount of $8,665,051 and Texas Housing Finance Corporation ("THFC") in the approximate aggregate sum of $819,076.36 which HSB and THFC assert are partially secured by the assignment and pledge by the Debtor of certificates of deposit in the total approximate sum of $1,782,169 held in the name of several of the Debtor's related entities, and which are divided into classes as follows:

**Subclass 3.4(A) – Claims of HSB and THFC Secured by a Disputed Assignment of Certificates of Deposit Held in the Names of Various Related Entities:** This Subclass consists of the claims of HSB and THFC in the total approximate amounts, respectively of $8,665,051 and $819,076.36, which HSB and THFC assert are partially secured by the assignment and pledge by the Debtor of certificates of deposit in the total approximate sum of $1,782,169 held in the name of several of the Debtor's related entities.

**Subclass 3.4(B) – Unsecured Deficiency Claims of HSB and Texas Housing Finance Corporation Which Exceed Value of Collateral:** This Subclass consists of the unsecured deficiency claims of HSB and THFC

which exceed the value of their collateral and are therefore unsecured.

**3.3.5 Subclass 3.5 - Secured Claims of Capital One N.A.** Subclass 3.5 includes the claims of Capital One, N.A. in the total approximate amount of $12,370,816, but which the Committee believes is limited to the amount of $1 million by virtue of a limited guarantee agreement..This class is divided into subclasses as follows:

> **Subclass 3.5(A) – Claims of Capital One, N.A. Secured by 635 Phillips:** Subclass 3.5(A) consists of the claims of Capital One, N.A. in the amount of $8,158,195.51 which was partially secured by AHF's interest in an entity known as 635 Phillips Limited Partnership, and a limited guarantee in the amount of $1 million signed in favor of Capital One.

> **Subclass 3.5(B) – Claims of Capital One, N.A. Which are the Subject of Guaranties Executed by Multi-Family Rehab Partners and Steve Sterquell:** Subclass 3.5(B) consists of the claims of Capital One, N.A. in the amount of $1,510,372.51 which was guaranteed by AHF pursuant to guarantees signed by Multi-Family Rehab Partners and Steve Sterquell.

> **Subclass 3.5(C) – Claims of Capital One, N. A. Secured by DCTIRZ.** Sub class 3.5(C) consists of the claims of Capital One, N.A. in the amount of $2,702,246.48 secured by real property owned by the limited liability company known as DCTIRZ, LLC. The proponents of the plan assert that the real property is of sufficient value to fully collateralize this debt.

> **Subclass 3.5(D) – Unsecured Deficiency Claims of Capital One, N.A. Which Exceed Value of Collateral:** This Subclass consists of the Unsecured Deficiency Claims of Capital One, N.A., if any, which exceed the value of its collateral and are therefore unsecured.

**3.6 Subclass 3.6 - Secured Claims of Local Tax Authorities.** Subclass 3.6 includes the claims of Local Tax Authorities in the total amount of $3,016,801.31 that are secured by assets of the Debtor.   A listing of the taxing authorities that have filed claims and the amount on their respective claims is set forth on Exhibit "E-2".

**3.7 Subclass 3.7 - Secured Claims of BAC Loans  Servicing, LP** Subclass 3.7 includes the claim of BAC Loans Serving LP in the total approximate amount of $133,587 which are the result of secured loans on individual homes located in Amarillo, Potter County, Texas, and which are divided into classes as follows:

**Subclass 3.7(A) – Claims of BAC Loans Servicing, LP Secured by 635 Phillips:** Subclass 3.7(A) consists Amarillo, Potter County, Texas.

**Subclass 3.7(B) – Claims of BAC Loans Servicing, LP Secured by Alliance:** Subclass 3.7(B) consists of the claims of BAC Loans Servicing, LP in the amount of $26,869.55 secured by real property located in Amarillo, Potter County, Texas.

**Subclass 3.7(C) – Claims of BAC Loans Servicing Secured by DCTIRZ:** Subclass 3.5(C) consists of the claims of BAC Loans Servicing, LP in the amount of $60,831.35 secured

by real property located in Amarillo, Potter County, Texas.

**3.8 Subclass 3.8 – Secured Claim of Gary Graham.**  Subclass 3.8 consists of the claim of Gary Graham in the approximate amount of $364,000 secured by real property located in Potter County, Texas. The automatic stay was lifted against the real property and foreclosed upon by Mr. Graham. The unsecured deficiency balance, if any, will be treated in Class 5 of the Plan.

**3.9 Subclass 3.9 – Secured Claims of Holders of Mechanic's Liens Against Real Property.** Subclass 3.9 consists of the claims of holders of perfected mechanic's lien against tracts of real property owned by AHF. A listing of these asserted mechanic's liens is attached as Exhibit "I." As reflected the total of these asserted liens is approximately $2.4 million. The Committee believes that many of these claims have already been paid, and others will be paid in full when the respective properties are liquidated or refinanced. The Plan proposes for the nature, extent and validity of these liens to be established either through negotiations between the Debtor and the Secured Creditors who are asserting the claims, or by the claims reconciliation process in the Bankruptcy Court.

**3.4 Class 4 – Administrative Convenience Class.**  Class 4 is comprised of those claims of General Unsecured Creditors that choose the treatment under Class 4 on the Plan ballot. These claims are reflected in the amounts listed on Exhibit "F" to the Plan and specifically include all claims after adjustments of less than $50,000.00 which aggregate the total estimated sum of $428,926.38.  These claims are described generally as unsecured trade claims of the Debtor below $50,000.00, but also include any Allowed Deficiency Claims or Allowed Unsecured Claims amounting to less than $50,000.00. The classification of these claims into Class 4 is subject to the Bankruptcy Court's approval, pursuant to Section 1122(b) of the Bankruptcy Code, at the Confirmation Hearing, and the holders of all such claims are free to opt-in or opt-out of the treatment afforded these claims and choose to receive the treatment afforded the holders of claims in Class 5. A listing of the claims Class 4 – Administrative Convenience Class is set out in the attached Exhibit "F" to the Plan.

**3.5    Class 5 – Allowed Claims of Unsecured Creditors.**  Class 5 is comprised of the Allowed Unsecured Claims against the Debtor. This Class will also include the Allowed Deficiency Claims of Secured Creditors as well as the Creditors which choose to opt-out of treatment under Class 4.

The Committee is unable to compile a final reconciliation of the Claims as of the date of the filing of the Joint Plan.  Counsel for the Committee has filed more than eighty (80) objections to Proofs of Claim which have been filed – some objections relate to the timeliness of the claim, some relate to the fact that insufficient documentation was submitted by the Claimant to substantiate the claim, some because the claims appear to be the liability of an affiliate or other entity rather than the Debtor, and some because they consist of claims which are contingent, unliquidated or disputed. Once the claims reconciliation process is completed, the Debtor along with the Committee will be able to provide an estimate of the total of the Allowed Claims as well as an estimate of the dividends that will be paid to holders of such claims. Therefore, all amounts shown in the Plan and Accompanying Disclosure Statement are still subject to the claims reconciliation process, and should not be construed as an admission by the Debtor or the Committee that such amount is recognized as being the proper amount of such claim or that any claim whatsoever should be allowed. The Debtor and the Committee reserve the right to contest

the amount, nature, extent or validity of all Proofs of Claim which have been filed.

A listing of the claims classified in Class 5 – Allowed Claims of Unsecured Creditors is set forth in Exhibit "B" and "G" to the Plan.

**3.6    Class 6 – Contingent, Unliquidated and Disputed Claims.** This class includes Contested Claims to which the Debtor possesses a counterclaim or an offset or otherwise has grounds to contest the validity of the claim or the amount of such claim.  The Contested Claims shall be reconciled through either settlement negotiations, the claims objection process in the Bankruptcy Court or other court action. Once the amount and classification of such claims are determined through negotiations or by Court order, the holders of such claims shall receive the same treatment to be afforded all other Allowed Claims of Unsecured Creditors in Class 4 or Class 5.  On the other hand, if through negotiations or by Court order determines that the net claim of the Creditor is money owed to the Debtor, the Creditor shall pay the determined amount to the Liquidating Trust, which shall distribute said funds in accordance with the provisions of the Liquidating Trust, and the treatment to be afforded the claims in Class 4 and Class 5.

To the extent the fixing or liquidation of any claim in Class 6 would unduly delay the administration of the case, the Court shall estimate for purpose of allowance the value and nature of such claim under the provisions of 11 U.S.C. Section 502(c). Similarly, any right to payment arising from a right to an equitable remedy for breach of performance which falls within Class 6 shall also be estimated by the Court under Section 502(c) of the Bankruptcy Code.

This Class specifically includes, but is not limited to, Claims which are in the process of litigation through a pending adversary proceeding.

This Class also includes contingent claims as the result of guarantees executed by AHF involving tax credit and conventional financed properties. A listing of the Class 6 – Contingent, Unliquidated and Disputed Claims in this particular category is attached as Exhibit "H" to the Plan.

**3.7    Class 7 – Subordinated Unsecured Claims of Insiders.**  This Class includes all Unsecured Claims of Insiders which the Debtor and the Committee seek to subordinate under the provisions of 11 U.S.C. Section 510(c), or to disallow entirely under the provisions of 11 U.S.C. Section 502(d), or through the claims objection and reconciliation process. In this regard, the Debtor and the Committee assert that the holders of the Claims in this Class engaged in inequitable conduct prior to the Petition Date which caused injury to other creditors or conferred an unfair advantage for themselves, and that the equitable subordination of such claims is entirely consistent with other provisions of the Bankruptcy Code. Alternatively, the Debtor and the Committee assert that such claims should be disallowed because the holders of such claims are transferers of a transfer that is available under Section 502(d) of the Code, or otherwise disallowed because they are not legitimate claims against the Debtor due to an offsetting claim or for some other purpose.

The Subordinated Unsecured Claims of Insiders total an estimated $37,133,445.03. A listing of all the Claims placed in this classification is attached as Exhibit "D" to the Plan.

**ARTICLE IV**

Creditors Committee First Amended
Plan of Reorganization and Disclosure Statement – Page 29

## SATISFACTION AND TREATMENT OF CLAIMS AND INTERESTS

The Allowed Claims and Allowed Interests classified in Article III shall be treated pursuant to the Plan in the following manner:

**4.1    Class 1 - Allowed Administrative Expense Claims.** Allowed Administrative Claims are unimpaired and shall be treated as follows:

**4.1.1    Subclass 1.1 - Costs and Expenses of Administration.** Subclass 1.1 Claims (to the extent allowed under the Bankruptcy Code and Bankruptcy Rules and approved by the Bankruptcy Court and to the extent not paid) shall be paid in full by the Debtor on or before the Effective Date of the Plan or as soon as sufficient funds are available. Subsequently allowed, approved and unpaid Allowed Administrative Expense Claims shall be paid by the Debtor immediately following such allowance.

The Committee estimates unpaid Allowed Administrative Claims upon confirmation to be:

| | |
|---|---|
| Mullin Hoard & Brown, L.L.P., Lubbock, Texas, attorneys for the Official Committee of Unsecured Creditors | $    1,150,000 |
| Harry Potter, Oklahoma City, Oklahoma, accountant for the Official Committee of Unsecured Creditors | $    50,000 |
| R. Byrn Bass, Jr. Law Offices, Lubbock, Texas, attorney for Debtor | $    75,000 |
| Lynch, Hanna and Boyd, PLLC, Amarillo, Texas, attorney for Debtor | $    175,000 |
| Charles White, Amarillo, Texas, attorney for the Debtor | $    200,000 |
| Sherman and Yaquinto, Dallas Texas, attorney for the Debtor | $    150,000 |
| Special Conflicts Counsel for the Official Committee of Unsecured Creditors | $    200,000 |
| Boyd & Associates, Special Counsel For the Debtor in the Bank of America Securities Litigation | $    200,000 |

| | | |
|---|---|---|
| Brown Graham & Co., Amarillo, Texas, accountants for Debtor | $ | 100,000 |
| Magic Media, Amarillo, Texas, Computer Consultant for Debtor | $ | 110,000 |
| Reimbursement of Costs Incurred by Petitioning Creditors in the Pursuit of the Involuntary Bankruptcy | $ | 500,000 |
| U. S. Trustee's Fees | $ | 25,000 |
| TOTAL ADMINISTRATIVE EXPENSES: | $ | 2,935,000 |

**Treatment of Claims in Subclass 1.1:** Subclass 1.1 Claims (to the extent allowed under the Bankruptcy Code and Bankruptcy Rules and to the extent not paid) shall be paid in full from funds contained in the Liquidating Trust on or before the Effective Date of the Plan from the life insurance proceeds collected in the litigation referenced in Article 5.4 herein.

**4.1.2 Subclass 1.2 – Post-Petition Administrative Expense Claims.** Class 1.2 Claims, to the extent Allowed under the Bankruptcy Code and Bankruptcy Rules, or approved by the Bankruptcy Court, and to the extent not paid, shall be paid in full by the Debtor in the ordinary course of Debtor's business so long as such claims according to the existing payment terms existing between the Claimant and the Debtor, and, if not current, then in cash on or before the Distribution Date; provided, however that governmental units shall not be required to file a request for payment of an administrative expense as a condition to having an allowed administrative expense for taxes, pursuant to 11 U.S.C. § 503(b)(1)(D).

**Treatment of Claims in Subclass 1.2:** Subclass 1.2 Claims (to the extent allowed under the Bankruptcy Code and Bankruptcy Rules and to the extent not paid) shall be paid in full from operating funds of the Debtor.

**4.2 Class 2 - Allowed Priority Tax Claims.** Class 2 is comprised of all Allowed Priority Tax Claims for pre-petition federal, state and local taxes owing to such taxing authorities and certain other debts owed to governmental units entitled to priority in accordance with Section 507(a)(8) of the Bankruptcy Code. A listing of the claims which are classified in Class 2 is attached as "E-1". These claims total the approximate sum of $106,423.29, and consist primarily of franchise taxes for various limited partnerships for which AHF is the general partner or owns the interests of the entity which serves as the general partner.

**Treatment of Claims in Class 2: Allowed Priority Tax Claims.** Class 2 Claims shall be treated as follows: Allowed Priority Tax Claims shall be repaid in full on the Effective Date, or, if not paid in full, then in equal annual payments with interest at the statutory rate of interest, over a period not exceeding five (5) years from the petition date, and payable in four (4) equal cash payments beginning on the second year anniversary of the Petition Date; provided, however, that each Allowed Priority Tax Claim shall be paid in full no later than five (5) years after the date of the Petition Date. .

**4.3.1     Class 3 -Allowed Secured Claims of Creditors Holding Liens Against Assets Owned by Debtor.**  Class 3 is comprised of the Allowed Secured Claims of Creditors Holding Liens Against Assets Owned by Debtor and is divided into Subclasses as follows:

**4.3.1.1     Subclass 3.1 - Claims of Texas Capital Bank.**  Subclass 3.1 includes the claims of Texas Capital Bank ("TCB") in the total aggregate approximate amount of $9,635,115.13 in unpaid principal and accrued interest, plus any and all fees, and any and all other obligations and liabilities of the Debtor to TCB according to the Pre-Petition Indebtedness Documents, or otherwise, including, interest, reasonable costs, attorney's fees, and any and all other amounts to the extent permitted by the Bankruptcy Code and applicable law which are divided into classes as follows:

**Subclass 3.1(A) – Claims of TCB Secured by Real Property to be Demolished Pursuant to the Severe Repetitive Loss Grant Program Administered by the Texas Water Development Board:** This Subclass consists of the claims of TCB which are secured by a deed of trust and assignment of rents and profits in favor of TCB against 698 housing units known as the Brandywood Apartments in Pasadena, Harris County, Texas, as well as an asserted security interest in accounts, cash, inventory, and general intangibles of the Debtor.

**Treatment of Claims in Subclass 3.1(A):**   A portion of the property consisting of 17 buildings and 258 units has been approved by FEMA as eligible for its Severe Repetitive Loss Program (the "SRLP").  The SRLP endeavors to mitigate the effects of repeated losses to residents and property owners in flood prone areas.  This designation allows the State of Texas, through the Texas Water Development Board ("TWDB"), to provide a grant to the City to acquire the portion of the Property which has become subject to increasingly repetitive flood loss claims.  The Severe Repetitive Loss Grant (the "Grant") for the Property was approved on May 27, 2008.  The City of Pasadena, Texas, ("City") will acquire 17 apartment buildings, representing 258 units of the 698 units comprising the Brandywood complex leaving 440 units of residential housing remaining.  The Grant provides for demolition, asbestos abatement, relocation expenses for current residents, and the creation of a city park/open green space area (the "Open Space") to help mitigate the cost of future flood damages.  This Open Space will be subject to a Lease between the City as Lessor, and Brandywood as Lessee (the "Lease"), a requirement of the City that will be contained in the Lease will restrict the use of the Open Space.

Once all required demolition is complete, the City will purchase the Open Space with the Grant funds resulting in the Debtor receiving net funds from the transaction of approximately $2.2 million.  The Plan provides that the net funds will be used to pay costs associated with the transaction, any outstanding ad valorem taxes owing against the property, and upon approval from the Department of Housing and Urban Development, the remaining balance will be applied to the existing first lien indebtedness owing Texas Capital Bank, leaving an estimated remaining balance of $7.6 million.

Upon the completion of the demolition of the 258 units using the fund from the Grant, the Debtor has obtained an appraisal stating that the "as-is" value of the remaining 440 Brandywood units will be $8,335,000. The Plan proposes to convey the remaining units of the Brandywood Apartment Complex to Texas Capital Bank in full and complete extinguishment of the balance of its indebtedness as such conveyance provides for the indubitable equivalent of its claims. Thus, upon the conveyance by the Debtor of the remaining units to Texas Capital Bank the remaining liens, pledges, and security agreements belonging to Texas Capital Bank, will be fully extinguished and discharged.

**Subclass 3.1(B) – Unsecured Deficiency Claims of TCB Which Exceed Value of Collateral:** This Subclass consists of the Unsecured Deficiency Claims of TCB, if any, which exceed the value of its collateral and are therefore unsecured.

**Treatment of Claims in Subclass 3.1(B):** In the event the Bankruptcy Court determines after a valuation hearing pursuant to the provisions of Section 506 of the Code that TCB is entitled to an Unsecured Deficiency Claim such claim will be treated equally with the holders of all Allowed Unsecured Claims in Class 5.

**4.3.2 Subclass 3.2 - Secured Claims of Creditors Against Real Property Located in Lakewood Terrace, Baytown, Harris County, Texas.** Subclass 3.2 includes the claims of Secured Creditors in the total aggregate approximate amount of $8,385,750 as of the Petition Date, which are secured by liens against certain real property consisting of houses in a residential housing development known as Lakewood Terrace in the City of Baytown, Harris County, Texas, and are divided into classes as follows:

**Subclass 3.2(A) – Claims of BAC Home Loan Servicing, L.P.:** This Subclass consists of the claims of BAC which total approximately $7,100,000 and are secured by deeds of trust against 104 housing units in a residential housing development known as Lakewood Terrace in the City of Baytown, Harris County, Texas.

**Treatment of Claims in Subclass 3.2(A):** AHF has executed a Purchase and Sale Agreement ("PSA") with Exxon Mobil Corporation ("EMC") which calls for the purchase of the entire housing development including the 104 housing units which secure the repayment of the loans owing to BAC Home Loan Servicing, L.P. Upon the completion and closing of the PSA with EMC, the total of the debt owing to BAC Home Loan Servicing, L.P. will be fully paid and extinguished.

**Subclass 3.2(B) – Claims of Graham Financial:** This Subclass consists of the claims of Graham Financial which total approximately $750,000 and are secured by deeds of trust against 30 housing units in a residential housing development known as Lakewood Terrace in the City of Baytown, Harris County, Texas.

**Treatment of Claims in Subclass 3.2(B):** AHF has executed a Purchase and Sale Agreement ("PSA") with Exxon Mobil Corporation ("EMC") which calls for the purchase of the entire housing development including the 30 housing units which secure the repayment of the loans owing to Graham Financial. Upon the completion and closing of the PSA with EMC, the total of the debt owing to Graham Financial will be fully paid and extinguished.

**Subclass 3.2(C) – Claims of Gary Graham Self-Directed IRA:** This Subclass consists of the claims of Gary Graham Self-Directed IRA which total approximately $500,000 and are secured by deeds of trust against 20 housing units in a residential housing development known as Lakewood Terrace in the City of Baytown, Harris County, Texas.

**Treatment of Claims in Subclass 3.2(C):** AHF has executed a Purchase and Sale Agreement ("PSA") with Exxon Mobil Corporation ("EMC") which calls for the purchase of the entire housing development including the 20 housing units which secure the repayment of the loans owing to Gary Graham Self-Directed IRA. Upon the completion and closing of the PSA with EMC, the total of the debt owing to Gary Graham Self-Directed IRA will be fully paid and extinguished.

**Subclass 3.2(D) – Claims of Cenlar:** This Subclass consists of the claims of Cenlar which total approximately $35,750 and are secured by a deed of trust against 1 housing unit in a residential housing development known as Lakewood Terrace in the City of Baytown, Harris County, Texas.

**Treatment of Claims in Subclass 3.2(D):** AHF has executed a Purchase and Sale Agreement ("PSA") with Exxon Mobil Corporation ("EMC") which calls for the purchase of the entire housing development including the 1 housing unit which secures the repayment of the loan owing to Cenlar. Upon the completion and closing of the PSA with EMC, the total of the debt owing to Cenlar will be fully paid and extinguished.

**Subclass 3.2(E) – Claims of Griffiths, Sammarco, Pierre and Sullivan:** This Subclass consists of the claims of Griffiths, Sammarco, Pierre and Sullivan which total approximately $434,898 and are secured by deeds of trust against individual housing units in a residential housing development known as Lakewood Terrace in the City of Baytown, Harris County, Texas.

**Treatment of Claims in Subclass 3.2(E):** AHF has executed a Purchase and Sale Agreement ("PSA") with Exxon Mobil Corporation ("EMC") which calls for the purchase of the entire housing development including the housing units which secure the repayment of the loans owing to Griffiths, Sammarco, Pierre and Sullivan. The Debtor has already purchased the housing units which secures the repayment of these loans. Thus, upon the closing of the purchases the debts owing to these creditors was fully paid and extinguished.

The Debtor anticipates that upon the completion of the PSA with EMC it will realize net proceeds in the approximate sum of $1million. These revenues will

be used to fund the general operations of AHF.

   **4.3.3   Subclass 3.3 - Claims of Wells Fargo Bank, N.A.** Subclass 3.3 includes the claims of Wells Fargo Bank, N.A. ("Wells Fargo") in the total aggregate approximate amount of $1,067,418 which are partially secured by disputed setoff rights which Wells Fargo asserts against deposits in the name of the Debtor totaling $422,146.36 which are divided into classes as follows:

> **Subclass 3.3(A) – Claims of Wells Fargo Secured by Asserted Setoff Rights Against Deposits of the Debtor:** This Subclass consists of the claims of Wells Fargo in the approximate amount of $1,067,418 which are partially secured by disputed setoff rights which Wells Fargo asserts against deposits in the name of the Debtor totaling $422,146.36.

> **Treatment of Claims in Subclass 3.3(A):** Wells Fargo has asserted setoff rights against depository accounts owned by the Debtor which total the approximate sum of $422,146.36 as well as other depository accounts owned by third parties which total approximately $200,000. The Plan provides that upon the entry of a final order which determines the rights of Wells Fargo to setoff these depository accounts that the amount it is allowed to apply to its indebtedness, if any, will be deducted from its claim.

> **Subclass 3.3(B) – Unsecured Deficiency Claims of Wells Fargo Which Exceed Value of Collateral:** This Subclass consists of the Unsecured Deficiency Claims of Wells Fargo which exceed the value of its collateral and are therefore unsecured.

> **Treatment of Claims in Subclass 3.3(B):** In the event the Bankruptcy Court determines after a hearing on the merits related to the claims of Wells Fargo to setoff the depository accounts referenced in Subclass 3.3(A) to allow the bank to setoff the funds against its indebtedness, then the balance of its unsecured deficiency claim, if any, will be treated equally with the holders of all Allowed Unsecured Claims in Class 5.

   **4.3.4   Subclass 3.4 - Claims of the Happy State Bank and Texas Housing Finance Corporation.** Subclass 3.4 includes the claims of the Happy State Bank ("HSB") in the total approximate amount of $8,665,051 and Texas Housing Finance Corporation ("THFC") in the approximate aggregate sum of $819,076.36 which HSB and THFC assert are partially secured by the assignment and pledge by the Debtor of certificates of deposit in the total approximate sum of $1,782,169 held in the name of several of the Debtor's related entities, and which are divided into classes as follows:

> **Subclass 3.4(A) – Claims of HSB and THFC Secured by a Disputed Assignment of Certificates of Deposit Held in the Names of Various Related Entities:** This Subclass consists of the claims of HSB and THFC in the total approximate amounts respectively of $8,665,051 and $819,076.36, which HSB and THFC assert are partially secured by the assignment and pledge by the Debtor of certificates of deposit in the total approximate sum of $1,782,169 held in the name of several of the Debtor's related entities.

**Treatment of Claims in Subclass 3.4(A):** HSB and THFC have both asserted a pledge and security interest against certain certificates of deposit owned by affiliates of the Debtor which total the approximate sum of $1,200,000. The Plan provides that upon the entry of a final order which determines the rights of HSB and THFC to apply the certificates of deposit against the balance of their respective outstanding notes, then the amount they each are allowed to apply to their indebtedness, if any, will be deducted from their claims. Furthermore, to the extent either has other collateral which secures their debts, the Bankruptcy Court will determine the value of such collateral and apply a credit in favor of the Debtor against the respective secured debts of these Secured Creditors.

**Subclass 3.4(B) – Unsecured Deficiency Claims of HSB and THFC Which Exceed Value of Collateral:** This Subclass consists of the unsecured deficiency claims of HSB and THFC which exceed the value of their collateral and are therefore unsecured.

**Treatment of Claims in Subclass 3.4(B):** In the event the Bankruptcy Court determines after a final hearing related to the certificates of deposit referenced in Subclass 3.4(A) that either HSB or THFC is entitled to apply any of the certificates of deposit to their notes, and after a determination by the Bankruptcy Court of the value of other collateral which secures their respective Secured Claims, the Plan provides that any remaining Unsecured Deficiency Claims will be treated equally with the holders of all Allowed Unsecured Claims in Class 5.

**4.3.5 Subclass 3.5 - Secured Claims of Capital One N.A.** Subclass 3.5 includes the claims of Capital One, N.A. in the total approximate amount of $12,370,816, but which the Committee believes is limited to the amount of $1 million by virtue of a limited guarantee agreement. This class is divided into subclasses as follows:

**Subclass 3.5(A) – Claims of Capital One, N.A. Secured by 635 Phillips:** Subclass 3.5(A) consists of the claims of Capital One, N.A. in the amount of $8,158,195.51 which was partially secured by AHF's interest in an entity known as 635 Phillips Limited Partnership, and a limited guarantee in the amount of $1 million signed in favor of Capital One.

**Treatment of Claims in Subclass 3.5(A):** The claims of Capital One in this Subclass will be treated by the Debtor in Class 5 along with the Allowed General Unsecured Claims following a determination by the Bankruptcy Court, or an agreement of the parties, concerning amount of credit that should be applied to this debt as a result of Capital One's sale of the real estate which acted as collateral on the promissory note signed by 635 Phillips, and the limited guarantee signed by AHF in the amount of $1 million.

**Subclass 3.5(B) – Claims of Capital One, N.A. Which are the Subject of**

**Guaranties Executed by Multi-Family Rehab Partners::** Subclass 3.5(B) consists of the claims of Capital One, N.A. in the amount of $1,510,372.51 which was guaranteed by AHF pursuant to guarantees signed by Multi-Family Rehab Partners and Steve Sterquell .

**Treatment of Claims in Subclass 3.5(B):** The claims of Capital One in this Subclass will be treated by the Debtor in Class 5 along with the Allowed Unsecured Claims once any recoveries that Capital One secures are properly applied to the balance owing.

**Subclass 3.5(C) – Claims of Capital One, N. A. Secured by DCTIRZ.** Subclass 3.5(C) consists of the claims of Capital One, N.A. in the amount of $2,702,246.48 secured by real property owned by the limited liability company known as DCTIRZ, LLC. The proponents of the plan assert that the real property is of sufficient value to fully collateralize this debt.

**Treatment of Claims in Subclass 3.5(C):** The claims in this Subclass will be paid in full in accordance with the existing provisions of the note and collateral documents which created the indebtedness owing from DCTIRZ, LLC to Capital One.

**4.3.6 Subclass 3.6-  Secured Claims of Local Tax Authorities.** Subclass 3.6 includes the claims of Local Tax Authorities in the total amount of $3,016,801.31 that are secured by assets of the Debtor.   A listing of the taxing authorities that have filed claims and the amount of their respective claims is set forth on Exhibit "E-2".

**Treatment of Claims in Subclass 3.6:** The holders of the Secured Claims of Local Taxing Authorities will be paid in full upon the sale or refinancing of the properties against which the holders claim a secured tax lien. The Plan provides that all of the properties which secure the payment of these claims will either be sold or the debts against them restructured such that the tax claims are paid in full.

**4.3.7 Subclass 3.7 - Secured Claims of BAC Loans  Servicing, LP** Subclass 3.7 includes the claims of BAC Loans Serving LP in the total approximate amount of $133,587 which are the result of secured loans on individual homes located in Amarillo, Potter County, Texas, and which are divided into classes as follows:

**Subclass 3.7(A) – Claims of BAC Loans Servicing, LP Secured by 635 Phillips:** Subclass 3.7(A) consists of the claims of BAC Loans Servicing, LP in the amount of $45,886.15 secured by real property located in Amarillo, Potter County, Texas. The proponents of the Plan assert that the real property is of sufficient value to fully collateralize this debt.

**Treatment of Claims in Subclass 3.7(A):** The Plan provides for the Secured Creditor to retain its lien and for the Debtor to continue possession of the real property which secures the repayment of the indebtedness. The Debtor will continue to pay the note in accordance with its original terms and tenor.

**Subclass 3.7(B) – Claims of BAC Loans Servicing, LP Secured by Alliance:** Subclass 3.7(B) consists of the claims of BAC Loans Servicing, LP in the amount of $26,869.55 secured by real property located in Amarillo, Potter County, Texas. The proponents of the Plan assert that the real property is of sufficient value to fully collateralize this debt.

**Treatment of Claims in Subclass 3.7(B):** The Plan provides for the Secured Creditor to retain its lien and for the Debtor to continue possession of the real property which secures the repayment of the indebtedness. The Debtor will continue to pay the note in accordance with its original terms and tenor.

**Subclass 3.7(C) – Claims of BAC Loans Servicing Secured by DCTIRZ**: Subclass 3.5(C) consists of the claims of BAC Loans Servicing, LP in the amount of $60,831.35 secured by real property located in Amarillo, Potter County, Texas. The proponents of this Plan assert that the real property is of sufficient value to fully collateralize this debt.

**Treatment of Claims in Subclass 3.7(C):** The Plan provides for the Secured Creditor to retain its lien and for the Debtor to continue possession of the real property which secures the repayment of the indebtedness. The Debtor will continue to pay the note in accordance with its original terms and tenor.

**4.3.8 Subclass 3.8 - Secured Claim of Gary Graham.** Subclass 3.8 consists of the claim of Gary Graham in the approximate amount of $364,000 secured by real property located in Potter County, Texas.

**Treatment of Claims in Subclass 3.8:** The automatic stay was lifted against the real property and foreclosed upon by Mr. Graham. The unsecured deficiency balance, if any, will be treated in Class 5 of the Plan.

**4,3.9 Subclass 3.9 – Secured Claims of Holders of Mechanic's Liens Against Real Property.**
Subclass 3.9 consists of the claims of holders of perfected mechanic's lien against tracts of real property owned by AHF. A listing of these asserted mechanic's liens is attached as "I" As reflected the total of these asserted liens is approximately $2.4 million.

**Treatment of Claims in Subclass 3.9:** The Committee believes that many of these claims have already been paid, and others will be paid in full when the respective properties are liquidated or refinanced. The Plan proposes for the nature, extent and validity of these liens to be established either through negotiations between the Debtor and the Secured Creditors who are asserting the claims, or by the claims reconciliation process in the Bankruptcy Court.

**4.4    Class 4 – Administrative Convenience Class.** Class 4 is comprised of those claims of General Unsecured Creditors that choose the treatment under Class 4 on the Plan ballot. These claims are reflected in the amounts listed on Exhibit "F" to the Plan and specifically include all claims after adjustments of less than $50,000.00 which aggregate the total estimated sum of $428,926.38. These claims are described generally as unsecured trade claims of the Debtor below $50,000.00, but also include any Allowed Deficiency Claims or Allowed

Unsecured Claims amounting to less than $50,000.00. The classification of these claims into Class 4 is subject to the Bankruptcy Court's approval, pursuant to Section 1122(b) of the Bankruptcy Code, at the Confirmation Hearing, and the holders of all such claims are free to opt-in or opt-out of the treatment afforded these claims and choose to receive the treatment afforded the holders of claims in Class 5. A listing of the claims Class 4 – Administrative Convenience Class is set out in the attached Exhibit "F" to the Plan.

**Treatment of Claims in Class 4:**    All allowed claims in this Administrative Convenience Class shall be paid by the Liquidating Trust a dividend equal to 25% of the allowed amount of their claims in full and complete satisfaction and extinguishment of such claims on the Effective Date from the life insurance proceeds collected from the adversary proceedings referenced in Article 5.4 herein.

**4.5    Class 5 – Allowed Claims of General Unsecured Creditors.**  Class 5 is comprised of the Allowed Unsecured Claims against the Debtor. This Class will also include the Allowed Deficiency Claims of Secured as well as the Creditors which choose to opt-out of treatment under Class 4.

The Debtor and Committee are unable to compile a final reconciliation of the Claims as of the date of the filing of the Joint Plan.  Counsel for the Committee has filed more than eighty (80) objections to Proofs of Claim which have been filed – some objections relate to the timeliness of the claim, some relate to the fact that insufficient documentation was submitted by the Claimant to substantiate the claim, some because the claims appear to be the liability of an affiliate or other entity rather than the Debtor, and some because they consist of claims which are contingent, unliquidated or disputed. Once the claims reconciliation process is completed, the Debtor along with the Committee will be able to provide an estimate of the total of the Allowed Claims as well as an estimate of the dividends that will be paid to holders of such claims. Therefore, all amounts shown in the Plan and Accompanying Disclosure Statement are still subject to the claims reconciliation process, and should not be construed as an admission by the Debtor or the Committee that such amount is recognized as being the proper amount of such claim or that any claim whatsoever should be allowed. The Debtor and the Committee reserve the right to contest the amount, nature, extent or validity of all Proofs of Claim which have been filed.

A listing of the claims classified in Class 5 – Allowed Claims of Unsecured Creditors is set forth in Exhibit "B" and "G" to the Plan.

**Treatment of Claims in Class 5:**  The Allowed Claims of Unsecured Creditors shall receive dividends in the form of pro rata payments from the Liquidating Trust from the assets conveyed into the Liquidating Trust as provided for in the Plan. The Liquidating Trustee shall make the first such distribution no later than the Distribution Date established in the Plan.

In this regard, after the payment of the claims in Subclass 1.1, Class 2 and Class 4, and after reserving sufficient funds for any operational loans to the Debtor as set forth in Article 5.8 herein, the Liquidating Trustee, shall distribute and disburse to all Allowed General Unsecured Claims in this Class, their pro rata share of the remaining funds on hand as well as their respective pro rata shares of any and all sums collected as a result of any recoveries from any bankruptcy or other causes of action which have been conveyed to the Liquidating Trust pursuant to the provisions of Article 5.8 of the Plan.

Furthermore, within sixty (60) days after the close of Reorganized Debtor's fiscal year, Reorganized Debtor shall account to and pay over into the Liquidating Trust, all Excess Revenues received by the Reorganized Debtor during the preceding fiscal year. Those surplus revenues, less the reasonable expenses incurred by the Liquidating Trust, shall then be disbursed by the Liquidating Trustee, pro rata to the Creditors in this Class.

This Plan provision is intended to ensure that any windfalls realized by the Reorganized Debtor due to its successful operations following confirmation of the Plan either in the form of the refinancing or sale of existing properties that involve notes receivable or development fees owed to AHF are paid over to the creditors who are beneficiaries of the Liquidating Trust.

The Plan provides for the creation of an Oversight Committee comprised of the former members of the Official Committee of Unsecured Creditors. The Reorganized Debtor will annually submit no later than thirty (30) days prior to the expiration of each fiscal year following confirmation of the Plan a proposed operational budget to the Oversight Committee that details its expected revenues, expenditures, and investments during the coming fiscal year. The Oversight Committee will then have a period of not more than fourteen (14) days to approve, propose modifications, or reject the proposed operational budget. In the event, the Reorganized Debtor and the Oversight Committee are unable to agree on the operational budget for the next fiscal year, the proposed budget shall then be presented to Harry Potter, CPA, Oklahoma City, Oklahoma, who currently serves as the forensic accountant for the Debtor, and he shall be the final arbiter regarding the operational budget for the next fiscal year.

In addition, not later than forty-five (45) days following the expiration of the Reorganized Debtor's fiscal year, it shall submit to the Oversight Committee an accounting of the financial operations of the Reorganized Debtor for the prior year that contains a comparison between the approved budget for that fiscal year and its actual operations for that fiscal year. Such accounting shall be prepared in accordance with generally accepted accounting principles for non-profit corporations operating within the State of Texas. Such accounting shall contain a calculation disclosing what the Reorganized Debtor submits as being its Excess Revenues derived from the financial operations of AHF during such fiscal year. For purposes of such calculation, Excess Revenues for a given fiscal year shall be calculated as follows:

Annual income of the Reorganized Debtor and its affiliated entities calculated for each fiscal year pursuant to generally accepted accounting principles, including any gains or losses from the liquidation of any of the housing units it owns or manages, less any payments on existing loans on such properties, less any capital expenditures in accordance with the approved budget for that fiscal year, plus any net revenues derived from the sale or refinancing of such properties, including the repayment or collection of any outstanding notes receivable or development fees to which AHF is entitled, equals Excess Revenues.

Upon receipt of the annual accounting from the Reorganized Debtor, the Oversight Committee shall have a period of ten (10) days to dispute such accounting. Any dispute concerning the accuracy of the accounting shall be submitted in writing from the Liquidating Trustee to the then acting Chairman of the Board of Directors of the Reorganized Debtor. In the event the Reorganized Debtor and the Oversight Committee become involved in a dispute over the amount of Excess Revenues to be paid over to the Liquidating Trust, the final arbiter of such dispute shall be Harry Potter, CPA, Oklahoma City, Oklahoma.

**4.6    Class 6 – Contingent, Unliquidated and Disputed Claims.**  This class includes Contested Claims to which the Debtor possesses a counterclaim or an offset or otherwise has grounds to contest the validity of the claim or the amount of such claim.  The Contested Claims shall be reconciled through either settlement negotiations, the claims objection process in the Bankruptcy Court or other court action.  Once the amount and classification of such claims are determined through negotiations or by Court order, the holders of such claims shall receive the same treatment to be afforded all other Allowed Claims of Unsecured Creditors in Class Four or Class Five.  On the other hand, if through negotiations or by Court order determines that the net claim of the Creditor is money owed to the Debtor, the Creditor shall pay the determined amount to the Liquidating Trust, which shall distribute said funds in accordance with the provisions of the Liquidating Trust, and the treatment to be afforded the claims in Class 4 and Class 5.

To the extent the fixing or liquidation of any claim in Class 6 would unduly delay the administration of the case, the Court shall estimate for purpose of allowance the value and nature of such claim under the provisions of 11 U.S.C. Section 502(c). Similarly, any right to payment arising from a right to an equitable remedy for breach of performance which falls within Class 6 shall also be estimated by the Court under Section 502(c) of the Bankruptcy Code.

This Class specifically includes, but is not limited to, Claims which are in the process of litigation through a pending adversary proceeding. A listing of the Class 6 – Contingent, Unliquidated and Disputed Claims is attached as Exhibit "H" to the Plan.

**Treatment of Claims in Class 6:** The claims in this classification are all associated with housing complexes that are owned by limited partnerships in which AHF serves as the general partner or owns all of the interests of the limited liability companies which serve as the general partners. The claims placed in Class 6 arise as a result of guarantees executed by AHF. However, the goal of the reorganization is for the Debtor to be able to come into compliance under the provisions of the existing agreements between the parties and ultimately recover management or development fees after it has performed all of its obligations. The Committee intends to object to the claims in Class 6 and through the claims reconciliation process assist the Debtor in negotiating arrangements whereby it can either perform its duties under the partnership and financial agreements, or orderly dispose of the properties in a manner that avoids or limits the liability of the AHF bankruptcy estate. The Plan anticipates that some of these claims will eventually become Allowed Unsecured Claims and placed in Class 5 to share in the dividends paid from the Liquidating Trust, however, the objective is to minimize those total claims by reaching agreements with the claimants. Once the Bankruptcy Court has entered a final order determining the amount and nature of the claims in Class 6, such Claims shall become Allowed Unsecured Claims and shall be treated equally with the Claims in Class 5.

**4.7    Class 7 – Subordinated Unsecured Claims of Insiders.** This Class includes all Unsecured Claims of Insiders which the Debtor and the Committee seek to subordinate under the provisions of 11 U.S.C. Section 510(c), or to disallow entirely under the provisions of 11 U.S.C. Section 502(d) or through the claims objection and reconciliation process. In this regard, the Debtor and the Committee assert that the holders of the Claims in this Class are insiders who engaged in inequitable conduct prior to the Petition Date which caused injury to other creditors or conferred an unfair advantage for themselves, and that the equitable subordination of such claims is entirely consistent with other provisions of the Bankruptcy Code. Alternatively, the Debtor and the Committee assert that such claims should be disallowed because the holders of

such claims are transferees of a transfer that is avoidable under Section 502(d) of the Code, or otherwise disallowed because they are not legitimate claims against the Debtor due to an offsetting claim or for some other purpose.

     **Treatment of Claims in Class 7:**   The Allowed Claims in Class 7 shall receive distributions from the Liquidating Trust, if, and only if, the Claims of all other creditors in Class 5 have been paid in full. Under the provisions of the Liquidating Trust, this Plan does not anticipate any distributions to holders of claims in Class 7. However, if such claims are allowed by the Court, or not subordinated, and determined to be Allowed Unsecured Claims, the Plan provides for the holders of such Allowed Unsecured Claims to participate in the dividends paid to creditors from the Liquidating Trust in the same manner and on an equal basis of all creditors classified in Class 5.

**ARTICLE V**

**<u>ADMINISTRATION OF THE ESTATE AND
MEANS OF IMPLEMENTATION OF THE PLAN</u>**

**A. Information Concerning the Debtor**

**5.1    History of the Debtor and Events That Caused the Bankruptcy**

     American Housing Foundation was founded in 1989. The purpose of the organization was to create affordable housing for working families and individuals. Under the direction of Steve Sterquell, its founder, AHF pursued an aggressive course of heavily leveraged acquisitions of properties across the nation. As many as 200 satellite entities were created to facilitate multiple investments in low income housing tax credit properties. During this time, AHF was focused almost exclusively on deals. There was no focus on managing the properties acquired. Over the course of time, it due, in part, to tightening financial markets and the inability to obtain tax credit allocations, it became more and more difficult for Sterquell to obtain sufficient cash from lenders or investors to fund all of the various obligations of AHF.  As a result, cash was taken from properties and used to pay obligations of AHF and its related entities, which, in turn, resulted in a further deterioration in the condition of the properties since no funds were then available for basic upkeep.  It was only after Sterquell and his family were no longer a part of the Foundation that the full extent of the serious financial problems caused by Sterquell's over-leveraged financing and neglect of property management became apparent.

     Steve Sterquell died unexpectedly in an automobile crash on April 1, 2009.  Upon his death, his son, Steve Sterquell, Jr. (Sterq) took over the management and control of AHF.  AHF operated under Sterq's direction until May 29, 2009, when he and several other officers and employees of AHF resigned.  During this period one-half of AHF's board of directors also resigned.

     During the weeks after Sterquell's death, certain creditors and investors of AHF

attempted to obtain information regarding the activities of Sterquell and AHF prior to Sterquell's death.  The management of AHF at that time refused to cooperate in the investigation.  Based on information gained from their own sources, the creditors and investors concluded that for many months prior to his death, Sterquell had worked with a complex web of interrelated entities that apparently received funds from AHF and investors; that funds invested were not always put in the accounts of the entities in which the funds were invested; that AHF, as one of the general partners of many of the investment partnerships, failed to make proper disclosure of material facts to the limited partners concerning the status of the partnerships; that Steve Sterquell had diverted funds from an entity in which AHF had granted a lender a security interest to Housing for Texans Foundation, another one of the entities he controlled; that AHF may not have been maintaining separate identities between the companies it operated; and that AHF was apparently operating without a functioning board of directors and in contravention of its bylaws.  Based upon these conclusions, on April 21, 2009, certain petitioning creditors filed an involuntary petition for relief under 11 U.S.C. §303 in Case No. 09-20232-11 in the United States Bankruptcy Court for the Northern District of Texas, Amarillo Division

During the course of their investigations, these petitioning creditors and investors also discovered that just weeks before his death, Sterquell transferred approximately $24,000,000.00 in key man life insurance on his life from AHF, as the owner and beneficiary of such policies, to various trusts controlled by or for the benefit of the Sterquell family.  In order to contest the validity of these transfers, and to try to recover the policy proceeds for the estate of AHF, the creditors and investors, on May 18, 2009, filed an adversary proceeding bearing Cause No. 09-02005 in the United States Bankruptcy Court for the Northern District of Texas – Amarillo Division, styled <u>Robert L. Templeton, et al v. American Housing Federation, et al</u>.

On June 1, 2009, after the resignation of Sterq and other officers and employees of AHF, the board of directors of AHF was reconstituted.  As the new board began to investigate the operations and financial condition of AHF, it discovered that for months prior to Sterquell's death, AHF had been in dire financial straits and owed creditors and investors over $26,000,000.00 in connection with transactions and investments involving entities affiliated with AHF.  As their investigation has continued, AHF's new board and officers have discovered more loans and obligations owed by AHF.

On June 11, 2009, in order to preserve its tax-exempt status, avoid liquidation, and resolve its liabilities in an orderly manner, AHF filed a voluntary petition seeking reorganization under Chapter 11 of the Bankruptcy Code in Case No. 09-20373-11, also in the United States Bankruptcy Court for the Northern District of Texas – Amarillo Division.  On July 17, 2009, The two bankruptcy cases were consolidated under Case No. 09-20232-11.

**5.2    Current status of the Bankruptcy Proceedings and the Debtor-in-Possession.**

**<u>Operations of American Housing Foundation since Filing</u>**

AHF has been operating as a Debtor-in-Possession since the filing of the voluntary petition on June 11, 2009. Prior to June 1, 2009, while AHF was under the direction of Steve Sterquell and, later, under Sterq Sterquell, AHF had multiple offices and many highly compensated executives at remote locations. Today, under its new management, as a debtor-in-possession AHF operates efficiently from its home office in Amarillo, Texas, with a centralized staff that is performance and goal oriented. The annual payroll of AHF has been reduced from approximately $4,300,000.00 to approximately $700,000.00. Similar reductions in costs have been replicated across AHF's budget. For example, under Sterquell's leadership AHF paid for the operation of three private aircraft, including one corporate jet. Today, AHF has no such expense.

Even though the Foundation operates today at a drastically reduced level of expenditure, both the volume and the quality of its work have increased. AHF is now focused on the daily responsibility of achieving its non-profit purpose, which is to provide safe, sanitary, and affordable housing to working families and individuals. The operations of AHF are now open, forthright, transparent, and available for examination by its creditors, investors, and business partners.

In addition to the events in its bankruptcy case, outlined below, AHF has been working diligently since the filing of its case to repair and enhance its relationships with the various lending institutions, bondholders, and investors in its portfolio of properties, as well as its relationship with the U. S. Department of Housing and Urban Development. For some time prior to Sterquell's death, and thereafter, AHF's relations with these persons and entities had deteriorated, - sometimes drastically so. AHF management has made a concerted effort to stay in regular contact with lenders, bond counsel, and investors and to give them regular updates on its activities. Management has also been able to maintain and strengthen its relationship with the Department of Housing and Urban Development, which is vital to the continuation of its mission to provide affordable housing for working families and individuals. Because of these efforts, AHF is in a much better position now to obtain future financing or refinancing if advisable, to help restructure and, possibly, lower the debt load on the properties in its portfolio which, in turn, would enhance its ability to reorganize and fulfill its mission.

## Unsecured Creditors Committee

On July 10, 2009, the U. S. Trustee for the Northern District of Texas appointed an unsecured creditors committee consisting of Robert Templeton, Chairman, Tim Nichols (Ranier American Investors (I, II, and III)), Terrill F. Horton, and Campbell Burgess (Herring Bank). The Trustee later added Eddie Attebury as a member of the committee. To the extent possible, AHF has attempted to work with the committee to locate and preserve assets of the bankruptcy estate, to pursue and recover preferential and fraudulent transfers of property of the estate, to examine and determine the validity or non-validity of claims filed in the bankruptcy cause, and generally to work toward the successful reorganization of the Foundation.

## Cash Collateral

American Housing Foundation's largest secured, non-contingent creditor is Texas Capital Bank ("TCB"). TCB claims first priority liens and security interests in a substantial portion of AHF's personal property, including, but not limited to, cash and rights to payment needed by AHF to pay its operating expenses. For that reason, AHF filed a Motion for Interim and Final Order to Use Cash Collateral on July 10, 2009. Since the filing of the motion, AHF and TCB have agreed to successive 30-day interim order permitting AHF to use cash collateral, subject to the terms and restrictions contained in the orders.

## Sale of Lakewood Terrace Townhomes

Prior to the filing of the bankruptcy case, AHF had entered into negotiations with Exxon Mobil Corporation to sell a group of properties in its portfolio consisting of 166 townhomes contained in 20 different buildings on approximately 13 acres of land located at 6900 Bayway Drive, Baytown, Texas, known as the Lakewood Terrace Townhomes, for a total consideration of $7,553,000.00. The purchase was to be subject to certain conditions which generally provided for AHF's acquisition of certain townhomes at Lakewood Terrace Townhomes no already owned by it; the sale of all of the townhomes to Exxon Mobil Corporation; the payoff of the existing liens on all of the townhomes; the demolition of the townhomes, removal of the debris, and the abatement of any hazardous materials; and the creation of a "green space" where the townhouses were previously located. Payment of the purchase price was to be made in stages in accordance with the phases of demolition and remediation, provided for in the sales contract, with the final payment of any equity to AHF upon completion of the demolition, removal and abatement and final releases of any remaining outstanding debt instruments of any kind secured by the Property. Upon closing, Exxon Mobil would receive the property free and clear of all liens and encumbrances. The consummation of the sale would be of substantial benefit to AHF, its bankruptcy estate, and creditors by: (i) paying off secured debt claims of Bank of America f/k/a Countrywide Mortgage, U.S. Bank, and other secured claims, and (ii) realizing the value of AHF's equity in Lakewood Terrace Townhomes.

The negotiations on the sale of Lakewood Terrace were successfully completed after the filing of AHF's bankruptcy case. On October 30, 2009, AHF filed its Motion to Sell Property Under Section 363(b) of the Bankruptcy Code seeking approval of the proposed sale from the bankruptcy court. On November 24, 2009, after a hearing on the motion, the bankruptcy court entered its order approving the sale. AHF and Exxon Mobile are now working together to fulfill the terms of their contract and complete the sale. AHF estimates that after completion of the demolition, abatement, and remediation required to create the green space, and the payment of the indebtedness secured by the Lakewood Terrace townhomes, it could realize as much as $1,100,000.00 in net equity from the sale.

## The Brandywood/FEMA Grant

AHF's portfolio of properties also includes an apartment housing project located in Pasadena, Texas, owned by Brandywood Housing, Ltd., a limited partnership in which AHF is the sole owner of the general partner, Brandywood Apartments, Inc.  Several of the apartment buildings on the Brandywood Property are located in an area that is susceptible to repetitive flooding.  Prior to the filing of AHF's bankruptcy case, the City of Pasadena applied through the Texas Water Development Board for a Federal Emergency Management Administration ("FEMA") project grant under the Severe Repetitive Loss ("SRL") program to mitigate certain repetitive flood problems with 17 buildings at the Brandywood Property.  Pursuant to the FEMA SRL program, FEMA, through the Texas Water Development Board, agreed to provide a grant to fund substantially all of the costs of the remediation project. Under the proposed FEMA Transaction, the 17 Brandywood buildings in the repetitive flood zone would be demolished and the land used as a green space to avoid flood damage in the future.  After the completion of the demolition and rehabilitation work, the parcel where the repetitive flooding occurred would be conveyed to the City. Upon completion of the FEMA Transaction, Brandywood Housing, Ltd. would retain ownership of its remaining property, consisting of 440 apartment units in 34 buildings.

On December 31, 2004, Texas Capital Bank made a loan to Brandywood Housing, Ltd. in the original principal amount of $9,500,000.00 for the refinancing of, and other costs and expenses related to, the Brandywood Property.  This loan was secured by a Deed of Trust granting Texas Capital Bank a lien on the Brandywood property.  Prior to the Brandywood loan, on or about June 25, 2004, Texas Capital Bank had made a loan on the amount of $3,000,000.00 to AHF, secured by a lien on assets of AHF, generally described as accounts, chattel paper, cash, and rights to payment.  On December 30, 2004, AHF and Texas Capital Bank executed an Amended and Restated Pledge and Security Agreement that, among other things, extended Texas Capital Bank's security interest in AHF assets to secure the Brandywood loan as well as the loan to AHF.  Both loans matured on April 39, 2009.  As of the date of the filing of AHF's bankruptcy petition, the balance owed to Texas Capital Bank on both loans was approximately $9,600,000.00.

It is anticipated that at the closing of the FEMA Transaction, Brandywood will receive $5,298,012.93 as the purchase price for the Brandywood property being conveyed to the City of Pasadena.  From these proceeds, Brandywood Housing, Ltd. must make payments to various entities for low income housing tax credit recapture; payment of Harris County property taxes; payment of City of Pasadena property taxes; payment of outstanding payable and non-mortgage liens due; and estimated closing costs and escrow fees.  After these payments are made, it is estimated that $2,142,012.93 in net proceeds will be available to Brandywood Housing, Ltd. Brandywood had initially proposed to utilized these funds to pay down the indebtedness owed to Texas Capital Bank, which claims a security interest in the funds.  However, the U. S. Department of Housing and Urban Development has challenged the validity of Texas Capital Bank's claim to the funds and, instead asserts that the funds should be used to benefit the apartment units remaining on the Brandywood property.  These matters are awaiting resolution, either through settlement or by court decision.  In either event, the completion of the FEMA

grant will provide a substantial benefit to AHF, its estate, and creditors by: (i) significantly reducing Texas Capital's aggregate secured debt claim; and/or (ii) enhancing the value of AHF's interest in Brandywood by reducing Brandywood's secured indebtedness and improving the condition and potentially increasing the value of Brandywood's remaining property.

On September 9, 2009, AHF filed its Motion for Approval of Brandywood Housing Ltd./FEMA Transactions with the bankruptcy court. An objection to the motion was filed by HUD on September 29, 2009. After negotiations between AHF, Brandywood Housing, Ltd. and HUD, an agreement was reached and an Order Allowing Debtor to Execute and Perform, as Limited, its Obligations Under the Brandywood Housing, Ltd./FEMA Transactions was entered by the bankruptcy court on January 20, 2010. Under the terms of the order, AHF was given authority to executed the documents that it is required to executed in order to complete the Brandywood Housing, Ltd./FEMA grant, and all parties reserved their rights with respect to the Brandywood property and the grant proceeds for adjudication at a later date. Based upon the order, AHF and Brandywood Housing, Ltd. are proceeding with their respective duties and obligations necessary to complete the grant requirements.

## Delegation of Litigation to the Unsecured Creditors' Committee

Since filing its bankruptcy petition, AHF, through its attorneys and Board of Directors, has uncovered numerous transactions that appear to be the subject of fraudulent conveyances, preferences, or the basis of other bankruptcy-related claims against third parties. In addition, AHF has become aware of actions taken by previous officers and directors that might give rise to causes of action against them and that hold the potential of significant recoveries for AHF, its estate, and its creditors. AHF is aware of its fiduciary obligations to investigate and pursue these claims against officers, directors, and other third parties. Further, AHF is aware that many of the avoidance actions are time sensitive and may involve situations where the third party defendants are taking actions to hide or remove assets from the reach of AHF and its creditors. AHF also recognizes that with respect to claims against officers and directors who were employed or in office prior to the filing of its bankruptcy, or, perhaps, against related third parties, there could exist conflicts of interest which, in some instances, would necessitate the delegation to the creditors' committee certain related tasks, including, in particular, the investigation and prosecution of these types of claims.

In its present circumstances, AHF recognizes that it does not have sufficient resources to investigate and prosecute the claims described above and still operate its business in a reasonable and prudent manner. In addition to its own internal operations, AHF has numerous affiliated entities which own and maintain properties located throughout the southern United States and, as the general partner or manager of these entities, it is responsible for their day to day operation. Consequently, AHF made a determination that it was in the best interest of the bankruptcy estate and its creditors to delegate authority to pursue certain claims to the unsecured creditors' committee. AHF, therefore, filed a Motion to Delegate Authority to Pursue Certain Actions on Behalf of the Bankruptcy Estate on October 14, 2009. Objections to the motion were filed by

creditors Attebury Family Partnership, LP and Texas Capital Bank, but, after negotiation, an agreed order was entered by the bankruptcy court on January 26, 2010 delegating certain matters, described more fully in Section 5.8 of this Article, to be investigated and prosecuted by the creditor's committee.

## Status of Life Insurance Litigation

As mentioned above, on May 18, 2009, certain petitioning creditors and investors of AHF filed their adversary proceeding attempting to recover for the estate of AHF the proceeds from the key man life insurance policies on the life of Steve Sterquell. On June 11, 2009, AHF also filed an adversary proceeding in cause no. 09-20373, styled American Housing Foundation v. Sterquell Irrevocable Life Insurance Trust, et al, alleging claims and seeking relief similar to that requested in the petitioning creditors' adversary proceeding. On September 25, 2009, the bankruptcy court signed an order consolidating the two adversary proceedings under the style and cause number of the proceeding filed by the petitioning creditors. On the same day, the United States District Court for the Northern District of Texas withdrew the reference with respect to both adversary proceedings, and the consolidated adversary proceedings are now pending in that court in cause no. 2:09-CV-231-C.

On December 14, 2009, the United States District Court entered its order granting AHF's Motion for Summary Judgment and declared that AHF was entitled to the proceeds of certain of the key man policies, totaling $21,000,000.00. The recovery of these proceeds is of immense value to AHF, its creditors, and the bankruptcy estate in that it provides a source of distribution to creditors and, potentially, a source of funds to assist AHF in meeting immediate financial needs necessary for a successful reorganization. A more detailed accounting of the status of the life insurance litigation is included in section 5.4 of this Article.

Additionally, the Committee has now filed its motion to compromise and settle with the Sterquell family and their related entities in order to fully settle the litigation over the life insurance proceeds as well as certain other causes of action asserted against these defendants. This motion is now pending before the Court pursuant to the requirements of Bankruptcy Rule 9019, and if ultimately approved by the Bankruptcy Court will result in an additional $3 million plus accumulated interest coming into the Debtor's estate and available for distribution under the provisions of the Liquidating Trust.

## Relationship between AHF and AHF Development, Ltd. and Pending Motions Relating to the Bankruptcy of AHF Development

On October 19, 2009, AHF Development, Ltd. filed for relief under Chapter 11 of the U.S. Bankruptcy Code under Case No. 09-20703-11 in the U.S. Bankruptcy Court for the Northern District of Texas, Amarillo Division.

On January 4, 2010, the U.S. Trustee filed her Motion to Dismiss or Convert Case to

Chapter 7 in the AHF Development, Ltd. case. This Motion is currently pending before the Bankruptcy Court and in response to such motion the Committee filed its objection to the conversion or dismissal of the AHF Development, Ltd. case and also requested the Court to substantively consolidate the AHF Development, Ltd. case with the AHF bankruptcy.

The Committee believes that AHF Development was a sham to perpetrate fraud, used by Steve W. Sterquell to misappropriate fiduciary funds from trusts, partnerships, and 1031 exchange clients. Additionally, AHF Development really had no separate existence from AHF and was always an alter ego of AHF. All assets purported to be in the name of AHF Development either belonged to third parties from whom they had been misappropriated or to AHF. Although AHF Development, Ltd., purported to be a limited partnership in which members of the Schooler family were limited partners. However, the Schoolers claim to have had no knowledge of its existence or their involvement as limited partners. The Schoolers simply signed certain documents that Sterquell delivered to them, which occasionally included documents relating to AHF.

The investigation by Committee counsel has revealed that AHF Development, Ltd. had no business operations, nor did it have any officers or employees. The sole indicium of its existence was a bank account bearing the name AHF Development, Ltd. The sole signatories on the bank account were employees of American Housing Foundation.

It also appears that virtually all funds ever deposited into the AHF Development Ltd. bank account were misappropriated from other business entities controlled by AHF or Sterquell or investors of those entities. Creditors or investors loaned funds to or invested funds with these satellite entities subject to written restrictions on their use—usually the use of the funds was restricted to expenses relating to specific low income apartment projects. AHF and Steve W. Sterquell, individually, guaranteed repayment of the funds plus a return on the funds to Creditors and Investors of the other entities within one year of the date of the loan or investment.

Sterquell misappropriated fiduciary funds from their intended purpose and transferred them to AHF Development, Ltd.'s account. Sterquell then transferred the misappropriated fiduciary funds from the AHF Development, Ltd. account to pay the expenses of AHF, either directly out of the AHF Development account or indirectly, by transferring the fiduciary funds to AHF's accounts, and then paying the expenses. Sterquell also skimmed a portion of the misappropriated funds for himself and his entities. After Sterquell committed suicide, the fraudulent sources of funds flowing into AHF Development, Ltd. were cut off.

Additionally, Sterquell misappropriated funds from the Scott Rice Trust, of which Sterquell was a trustee, deposited those funds into the AHF Development, Ltd. account and then used the funds to pay expenses of AHF. Sterquell also took funds that were held in trust for 1031 exchange clients of AHF, placed those funds into AHF Development, and then used the funds to pay expenses of AHF. Sterquell also skimmed funds for his personal benefit from these other trust funds sources of AHF Development funds. The AHF Development, Ltd. account has

been dormant since shortly after Sterquell's death because without Sterquell to misappropriate funds, AHF Development, Ltd. had no source of funds – and no real reason to exist. AHF's schedules in bankruptcy list an account payable to AHF Development for $16,080,449.00, representing the funds misappropriated from the satellite entities, the trusts and the 1031 exchange client that were used by AHF Development, Ltd. to pay expenses of AHF. Attebury Family Partnership filed an action against AHF Development, Ltd. in a state district court in Amarillo, Texas, to recover on a promissory note executed by AHF Development, Ltd. The promissory note was guaranteed by AHF and Sterquell and forms the basis of the Attebury Family Partnership's claim in the AHF bankruptcy proceeding. Numerous creditors intervened in the Attebury Family Partnership action seeking to recover the funds that had been misappropriated from the satellite entities, placed in the AHF Development, Ltd. account, and used to pay AHF expenses. All of the creditors in question have identical claims against AHF. AHF has no funds to defend this litigation. AHF believes that there is a real danger, if litigation is allowed to proceed in State Court, that one or more of the Creditors will obtain a judgment against AHF Development, and gain a preference in the AHF bankruptcy by executing on the AHF Development claim in the AHF bankruptcy for pennies on the dollar. If the AHF Development claim were allowed in the AHF bankruptcy, these creditors might in fact obtain a very substantial additional payment from the bankruptcy court in preference to other AHF creditors.

In its Motion for Substantive Consolidation, the Committee has requested the Bankruptcy Court to exercise its equitable powers to substantively consolidate the bankruptcy estates of AHF Development, Ltd. and American Housing Foundation for all purposes, including in connection with the solicitation and acceptance of a Plan of Reorganization to treat the assets and liabilities of both entities and also with respect to distributions to creditors under the Plan.

The equitable doctrine of substantive consolidation allows a bankruptcy court to consolidate the assets and liabilities of separate legal entities, and to treat those assets and liabilities as held and incurred by a single entity. The current legal tests for substantive consolidation involve an analysis by the bankruptcy court entertaining such a motion to consolidate separate bankruptcy estates if it concludes that the entities (1) disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (2) post-petition, their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors; and (3) where a balancing of the benefits of consolidation against the harms that result from consolidation tilts toward consolidation.

The Committee asserts in its motion that the facts of this case warrant substantive consolidation. There exist numerous factors which weigh in favor of substantive consolidation. First, there is common ownership ─ both AHF and AHF Development were controlled and used primarily for the benefit of Steve Sterquell. Similarly, Sterquell managed both entities. There was commingling of funds to such an extent to conclude that AHF Development operated merely as another bank account for the benefit of AHF. The payables and receivables between AHF and

AHF Development were indistinguishable; the money paid by AHF Development was exclusively for the benefit of AHF and other Sterquell Family entitites; and the joint control, commingling of assets, joint payables and receivables, and disregard for the distinction of the corporate entities have often been used by courts when finding a substantial identity between debtors justifying substantive consolidation

Both the Debtor and the Committee believe that substantive consolidation allows the estates to avoid harm to creditors of the respective bankruptcy estates and also provides a significant benefit by providing for the equitable treatment of all creditors. Consolidation would avoid unequal treatment among similarly situated creditors, and will allow the proceeds from unencumbered assets and any recovery from litigation to be shared among all of the creditors of both estates.

Substantive consolidation also would extinguish the intercompany payables and avoids the need to reconcile significant claims between AHF and AHF Development, Ltd. The Committee argues that the creditors as a whole are not prejudiced by substantive consolidation, and that any prejudice or harm that might be shown by individual creditors of the various bankruptcy estates is significantly outweighed by the benefits to the creditor pool as a whole.

## B.    Implementation of the Plan

5.3   The Continued Operations of Debtor.

Prior to the death of Steve Sterquell, AHF was essentially a "deal driven" organization. Too often, more attention was paid to generating cash flow through the acquisition of new properties or the refinancing of existing properties. During the years immediately prior to filing the bankruptcy case, funds were taken from the properties themselves to fund the extravagant operating expenses of AHF and to meet existing debt repayment obligations. As a result, the condition of many of the properties in AHF's portfolios deteriorated, rental income decreased because fewer units could be leased, and AHF's cash flow problems increased.

Soon after taking over the operations of AHF, its new board and management made the decision that, notwithstanding the abuses of the past, the foundation had a worthy mission and that every effort should be made to reorganize around that mission. Consequently, AHF's focus since June, 2009, has been to fulfill its stated goal of providing quality affordable housing to working families and individuals.

With respect to its reorganization efforts, the Committee in cooperation with the Board of AHF has three goals: (1) to reduce its operational overhead and run more efficiently by eliminating cutting unnecessary expenses, (2) to pay its unsecured and secured creditors, (3) to maintain and operate the properties in its portfolios in a manner that assures that its residents have clean, decent, affordable housing. AHF has already reduced its operational overhead significantly by cutting down on the number of staff it formerly employed, closing its Dallas

operations and bringing all operations to its Amarillo office, reducing its overhead by moving to a smaller office suite at its current location at 1800 S. Washington, and eliminating unnecessary and extravagant expenses such as maintaining three aircraft for use by AHF officers. It will continue to look at other ways to reduce expenses while still maintaining the staff and resources necessary to successfully fulfill its non-profit purpose.

In its plan of reorganization, the Committee proposes to create a Liquidating Trust that will receive or recover those assets designated in the plan for the purpose of making distributions to unsecured creditors. To the extent that the claims of unsecured creditors are not paid through distributions from those assets, the Committee proposes to make payments from any excess operating revenues realized from AHBover the term of the plan to pay the remainder of the Allowed Unsecured Claims. The Committee believes that unsecured creditors will benefit more, by far, if AHF reorganizes and continues its operations than if it liquidates, not only because of opportunity to make additional distributions to unsecured creditors out of excess operating revenues, but also because of the potential contingent liabilities that may be asserted against the assets of AHF if it ceased to operate and defaults on its guarantees to certain creditors of its subsidiary organizations.

In order to maintain and operate the properties in its existing portfolios, AHF must achieve three goals. First, it must identify those properties that, in all reasonable probability, cannot be rehabilitated and/or refinanced so that they can generate sufficient revenue to meet their debt service and operational demands. With respect to those properties that cannot be rehabilitated and/or refinanced, AHF proposes to take whatever action is necessary and expedient under the circumstances to dispose of the properties, either by sale or surrender to creditors.

Second, with respect to the remaining properties, AHF must take steps to repair and rehabilitate the properties so that they can produce the optimum amount of rental income. This will involve both paying or settling outstanding payables and funding desperately needed repairs and rehabilitation to the properties so that occupancy, and cash flow, can be increased. Since the filing of the bankruptcy case, AHF has attempted to settle payables and perform repairs and rehabilitation to the properties to that extent that funds are available from the properties to do so. However, in order to complete the work of repair and rehabilitation, AHF must be able to access funds from the proceeds of the key man life insurance or other available funds in its bankruptcy estate. The provisions of the Liquidating Truste provides the discretion to the Liquidating Trustee and the Creditors' Committee to extend loans to AHF and therby provide operating capital as may be necessary and appropriate in its operations.

Third, it is critical for the future operations of AHF that it repair and maintain its relationships with the lenders, bondholders, and investors who have provided capital and funding for the acquisition of the properties in its portfolios. Since taking control in June, 2009, the current management of AHF has made a concentrated effort to re-open lines of communication with the lenders, bondholders, and investors through regular conference calls, personal visits, and

correspondence.  Of particular importance was the need to repair AHF's relationship with the U. S. Department of Housing and Urban Development, especially with respect to those multi-family housing units that qualify for HUD approved rental assistance.  AHF management has made it a priority to reopen communication with HUD regarding its plans, activities, problems, and successes.  In turn, HUD has worked with AHF management in a very positive fashion to maintain its qualification as an approved provider of affordable housing.

AHF management has engaged in regular conference calls with bond counsel for its bond financed portfolio properties, and has been able to work with bond counsel and the bondholders to allow it to continue to maintain and operate the bond financed properties with a view toward refinancing the properties at such time as such refinancing is feasible.  AHF management has also been working closely with JP Morgan Chase Bank with respect to the conventionally financed properties in its portfolio.  AHF-related entities recently entered into an extension and modification agreement with JP Morgan Chase to extend the due dates on the indebtedness secured by the properties in its AIMCO portfolio to the end of April, 2010, so that the AHF can continue its negotiations to refinance the AIMCO properties and lessen the debt load on the properties.

As AHF continues operating, pays or settles the payables owed by the properties in its portfolio that are, or can be, self-supporting, repairs and rehabilitates such properties, and improves the debt obligations of its subsidiaries through strategic refinancing and curing of defaults, cash flow from the properties will inevitably increase.  AHF has significant rights to deferred developer fees, management fees, and other sources of income that it is not presently receiving because the properties simply to do not have the available cash to make such payments.  As occupancy increases, cash flow will increase, and AHF should see significant improvement in its income from payment of these fees.  In addition, as AHF continues to operate and the compliance periods expire on the tax credit financed properties in its portfolio, ownership of those properties will revert to AHF in full fee simple and largely debt-free, thus providing it with valuable assets that will help to insure its future viability.

### Status of Litigation of Claims Funding the Liquidating Trust

The following is a brief summary of the claims owned by AHF which are being prosecuted by counsel for the Committee, and which will be conveyed into and administered as an asset of the Liquidating Trust:

***Lawsuit to Collect Life Insurance Proceeds:*** On May 18, 2009 the petitioning creditors filed Adversary Proceeding, No. 09-2005-rlj, in the AHF involuntary case asserting that $24 million in life insurance proceeds on the life of Steve W. Sterquell, deceased was property of AHF.

On June 11, 2009, AHF also filed Adversary Proceeding, No. 09-20373, in its voluntary bankruptcy case alleging claims similar to those raised in the petitioning creditors' adversary proceeding in the involuntary case.

On June 11, 2009, a hearing was set on the Plaintiffs' Motion for a Preliminary Injunction in Adversary Proceeding No. 09-2005-rlj. The Plaintiffs, AHF, Housing for Texans Charitable Trust and the Sterquells announced to the Court that they had reached an agreement with respect to the Plaintiffs' Motion for Temporary Injunction, and recited the agreement into the record in open court relating to approximately $27 million in insurance policies on the life of Steve W. Sterquell, described more fully on Exhibit A to this settlement agreement as Category I policies ($21 million), Category II policies ($3 million), and Category III policies ($3 million plus an Administaff Group Insurance Plan Policy).

On July 13, 2009, based on the June 11, 2009 agreement, the Court signed an Agreed Order on Plaintiffs' Motion for a Preliminary Injunction in Adversary Proceeding No. 09-02005-rlj, which provided that the proceeds of the Category I, Category II, and Category III policies would be deposited into the Registry of the Court, pending further order of the Court, except that the proceeds of the Administaff Group Insurance Plan Policy and $75,000 from the proceeds of one of the Category III policies would be distributed to Marshallette Sterquell. Pursuant to the Agreed Order, $26,925,000 in life insurance proceeds have been deposited into the Registry of the Court, and the proceeds of the Administaff Group Insurance Plan Policy and $75,000 from the proceeds of the one of the Category III policies were distributed to Marshallette Sterquell.

On July 17, 2009, the United States Bankruptcy Court for the Northern District of Texas entered an order consolidating the voluntary petition for relief, Case No. 09-20373, into the AHF involuntary petition for relief, Case No. 09-20232-11, and the consolidated AHF bankruptcy proceedings continued under Case No. 09-20232.

On or about September 25, 2009, the United States District Court for the Northern District of Texas entered an order consolidating Adversary Proceeding No. 09-20373 into Adversary Proceeding No. 09-2005-rlj.

On September 25, 2009, the United States District Court withdrew the reference with respect to both such adversary proceedings, which consolidated adversary proceedings are currently pending in the United States District Court for the Northern District of Texas in Civil Action No. 2:09-CV-231-C ("the Life Insurance Action").

On December 14, 2009, the United States District Court in the Life Insurance Action granted AHF's Motion of Summary Judgment and declared that AHF was entitled to the proceeds of the Category I policies ($21 million).

Counsel for AHF and the Official Unsecured Creditors Committee have now obtained a final judgment which will order release of the $21 million to AHF, and have also entered into a

compromise and settlement agreement with the Sterquell family and their related entities which, if approved by the Bankruptcy Court in accordance with Bankruptcy Rule 9019, will result in an additional $3 million plus accumulated interest becoming property of the bankruptcy estate.

Texas Capital Bank has asserted a lien on the proceeds of the life insurance and filed a motion for summary judgment seeking to establish the validity of the lien.  AHF and the Official Unsecured Creditors Committee have opposed such motion.

**Complaint Against Former AHF Directors:**  Counsel for the Unsecured Creditors Committee has prepared a Complaint   against former directors of AHF including Randy Sharp, Scott Rice, and James Fletcher to recover $50 million damages for gross negligence in the management of AHF.   The draft complaint has been sent to counsel for the defendants, with a demand for payment of the $2 million policy limits on the AHF D&O policy, and a response to this demand is due by January 31, 2010.   If the demand is not accepted, counsel estimates the value of the claim at $2 million plus the recoverable personal assets of the defendants which are as yet unknown and estimates the time for recovery to be between 12 and 24 months.

**AHF action against Bank of America Securities ("BOA"):**   AHF filed suit in the District Court of Dallas County, Texas on November 16, 2009.  The action was removed to the United States District Court for the Northern District of Texas, Dallas Division.  AHF has filed a motion for remand.  AHF alleges misrepresentation by BOA that auction rate securities would have liquidity and that BOA would maintain a market in such securities.   The auction rate securities were a mode of financing for the purchase of Walden II properties which were acquired in December 2008—18 properties in four states. The market for auction rate securities failed and AHF had considerable losses, interest costs and other damages as a result of the failure of BOA to maintain liquidity and marketability.  Estimated time for recovery will be 12 to 36 months.

**Preference Claims:**   Counsel for the Official Unsecured Creditors Committee is recommending suit on two preference claims:  One would be against former AHF director Scott Rice to recover $600,000 in preferential payments made to him in the one year before bankruptcy.  Two would be against former AHF director Randy Sharp or the Mays Trust to recover $500,000 in preferences paid to one or both of them.  Counsel continues to research additional potential preferential payments.

**Other Claims:**   Counsel for the Official Unsecured Creditors Committee continues to evaluate whether AHF has other claims, tortious, contractual or statutory against creditors or alleged creditors of AHF, or against other persons who did business with AHF.  All such claims, as well as all claims discussed in Section 5.4 for the plan are expressly preserved and reserved to the Liquidating Trustee under this plan.

**Other Claims Against Sterquell Family and Sterquell Entities:**    Counsel    for    the

Official Unsecured Creditors Committee has prepared a draft complaint against the Sterquell Family and various Sterquell Entities seeking to recover damages for breach of fiduciary duties and fraud by Steve W. Sterquell and various Sterquell related entities including the Steve W. Sterquell, C.P.A. Profit Sharing Plan, Credit Realty Investments, Inc., and the Sterquell Family Life Insurance Trust.

On or about December 9, 2009, counsel for the UCC provided counsel for the Sterquells and certain of the Sterquell Entities a draft Complaint For Damages For Fraud, Breach Of Fiduciary Duty, Aiding And Abetting Breach Of Fiduciary Duty, And Aiding And Abetting Fraud On Creditors, And For Recovery Of Property Fraudulently Conveyed, And For A Declaratory Judgment To Determine The Nature And Extent Of Ownership Interests In Life Insurance Policies, And For The Imposition Of Constructive Trusts And Other Equitable Relief which asserted claims against the Category III policies, the Sterquell Entities and Steve W. Sterquell II ("the Draft Complaint").  The Draft Complaint was provided to counsel for the Sterquells and their entities and settlement negotiations ensued which resulted in a compromise and settlement agreement being entered into between AHF and the Sterquell Family and Sterquell Entities.  This settlement agreement which provides for an additional $3 million to be paid to the estate has been noticed to creditors in the AHF bankruptcy and is awaiting approval by the Bankruptcy Court.

***Claims Against AHF Auditors:***    Counsel for the Official Unsecured Creditors Committee continues to investigate, with the assistance of Harry Potter, C.P.A., whether AHF has a valid claim against AHF's auditors.   No decision has yet been reached on that issue.

### 5.5    Disclosure of Possible Recovery of Development Fees.

AHF has an ownership interest in nine properties which accrue development fees from which the Debtor is entitled to be paid such fees upon the conclusion of certain compliance periods.  The accrual of these development fees annualized over the period between 2011 and 2012 is $5,149,036.00.  The Debtor can only realize these development fees if it retains an ownership interest in the property, successfully services the associated indebtedness with each property and then successfully refinances or markets the properties.

These properties are:

- Astoria Park             $687,536.00
- Bellaire/Fairway         $122,273.00
- Green Acres              $540,201.00
- Greentree Village        $439,551.00
- Park Place               $910,589.00
- Parkside Village         $774,041.00
- Robinson Garden          $635,842.00
- Southgate Village        $489,772.00
- Sea Greens               $549,131.00

Total                                    $5,149,036.00.

### 5.6    Financial Projections

The Debtor has prepared cash flow projections for each of the calendar years of 2010, 2011, and 2012. These cash flow projections are attached as Exhibit "J". As shown on the cash flow projection for 2010, the Debtor anticipates a net operating profit for 2010 of $1,381,721.00. The cash flow for 2011 projects a net operating profit for 2011 of $2,964,064.00, and a net operating profit for 2012 of $3,089,944.00.

Thus, the Committee asserts that based upon these cash flow projections the Plan of Reorganization will result in the profitable operation of the Reorganized Debtor and argues that the cash flow projections demonstrate the feasibility of the Plan.

### 5.7    Retention by Debtor of Property of the Estate.

Save and except for the assets designated by the Plan to be administered or collected by the Liquidating Trust in Article 5.8 below, the Debtor shall retain ownership and control of all of its property and property of the estate, including, but not limited to:

- All income generated and received by the Debtor in the ordinary course of its business; and
- All interests owned by the Debtor in any other property or business entity, including partnerships, limited partnerships, limited liability companies, and corporations.

The Debtor shall, in the ordinary course of business, have the authority to incur post-petition debt, and shall in the ordinary course of its business, and as the cash flow of its operations may allow, pay all post-petition debt without further order or authorization from the Bankruptcy Court.

### 5.8    The Liquidating Trust.

The Liquidating Trust is hereby created under the Plan for the benefit of the Class 5 claimants. The Liquidating Trustee shall be appointed upon Confirmation of the Plan for the purpose of receiving all of the Trust Assets designated by the Plan to be administered or collected by the Liquidating Trust and carry out the purposes of the Liquidating Trust, including, but not limited to, the following:

1. To investigate the financial affairs of AHF over the past five (5) years to determine if there are claims or causes of action that could result in the recovery of assets for the bankruptcy estate to be used for the payment of claims of creditors;

2. To prosecute on behalf of AHF the adversary proceeding filed by American Housing Foundation being Adversary No. 09-2007, styled American Housing Foundation v.

Sterquell Irrevocable Life Insurance Trust, et. al., which said lawsuit having now been withdrawn and currently pending before the U.S. District Court for the Northern District of Texas, Amarillo Division, under Civil Action No. 2:09-CV-231-C, provided, however, that any settlement of such causes of action must be approved by the Bankruptcy Court after appropriate notice and opportunity for hearing as specified in Bankruptcy Rule 9019;

3.   To prosecute on behalf of AHF any claims and potential causes of action against Housing for Texans Charitable Trust, the 2001 Scott Rice Trust, Sterquell Family Irrevocable Life Insurance Trust, the Steve W. Sterquell, C.P.A. Profit Sharing Plan, Credit Realty Investments, Inc., other Sterquell-related entities, and the Sterquells individually, for recovery of the St. George Partners Ltd. partnership interest, the San Patricio County property, and other moneys or assets of American Housing Foundation misappropriated, embezzled or fraudulently transferred  to these persons and entities, including without limitation actions for equitable tracing or constructive trusts;

4.   To investigate any and all financial transactions, and, if appropriate, to pursue causes of action or claims owned by AHF where the facts and law support intentional tort and negligence-based, or any other claims against AHF's directors, officers, attorneys, and accountants who acted on behalf of AHF prior to AHF's bankruptcy; and to also investigate and pursue other potential causes of action against third parties who may have received transfers of assets of AHF that constitute preferences or fraudulent conveyances. However, prior to the Committee actually filing complaints against third parties who are not former officers, directors or employees of AHF, counsel for the Committee shall provide notice to the Debtor, all parties who have filed notices of appearance in the AHF bankruptcy case, and the twenty largest unsecured creditors in the AHF bankruptcy case, of their intent to file such complaints providing a description in such notice of the nature of the causes of action to be asserted, the particular defendants which are contemplated to be named in the lawsuits, and any other pertinent information that will enable the creditors and parties in interest to analyze the validity and value of the litigation. The notice shall provide negative notice language that specifies that unless a creditor or party in interest files an objection with the Bankruptcy Court within fifteen days of receipt of the notice that counsel for the Committee will proceed to file the complaints initiating the lawsuits. In the event, a creditor or party in interest files an objection, the Court shall then set a hearing to consider the objection with notice of the setting being given to all creditors and parties in interest who received the initial notice from counsel for the Committee. At the hearing on any such objection the Court will entertain evidence and argument relating to the merits of the Committee filing the complaints and pursuing the causes of action.

5.   The Debtor shall cooperate and provide requested information and documents to the Committee to assist it in its investigation and pursuit of the various claims or causes of action owned by AHF, and the Debtor shall have the right, but not the obligation, to

participate in all aspects of the Committee's investigation of potential causes of action including, but not limited to, the formulation of discovery requests, receipt and review of documents produced by non-Debtor parties, and participation in any examinations under Federal Rule of Bankruptcy Procedure 2004, and formal and informal discovery and depositions. Counsel for the Committee and the Debtor shall use their best efforts to avoid duplication of efforts and reduce expenses in the investigation and pursuit of the claims and causes of action;

6. Any settlements of litigation prosecuted by the Committee on behalf of the Debtor or its estate must be approved by the Bankruptcy Court after appropriate notice and opportunity for hearing as specified in Bankruptcy Rule of Procedure 9019;

7. All claims of Contested Creditors, to which the Debtor possess a counterclaim or an offset or otherwise contests the validity of the claim amount, except for those claims of contested creditors which are referred to Special Conflicts Counsel for the Committee and are listed on the attached Exhibit "K" and which shall be investigated and contested by Special Conflicts Copunsel as described in Section 9.2; and

8. All claims of the bankruptcy estate for bankruptcy related causes of action including all preference claims of Debtor pursuant to Section 547 of the Bankruptcy Code, all fraudulent transfer claims pursuant to Section 548 of the Bankruptcy Code, all claims relating to post-petition transactions under Section 549 of the Bankruptcy Code, all claims recoverable under Section 550 of the Bankruptcy Code, claims against any third party on account of an indebtedness or any other claim owed to or in favor of the Debtor, which are not settled prior to or as part of this Plan.

**5.8.1  Authorization.**  Pursuant to authorization and direction to the Liquidating Trust established in writing pursuant to the terms of this Plan, the Liquidating Trustee shall have the power and authority to perform the following acts:

1. Perfect and secure such Liquidating Trustee's right, title and interest to the properties conveyed to the Liquidating Trustee;

2. Reduce all of said Trust Assets to cash, a payment arrangement or a judgment;

3. Sell the Trust Assets for cash or other consideration and convert the Trust Assets and their proceeds to cash and distribute the net proceeds as specified herein;

4. Manage and protect the Trust Assets and distribute the net proceeds as specified in the trust agreement;

5. Release, convey or assign any right, title or interest to the Trust Assets;

6.     Engage and compensate attorneys, accountants or other professionals, pay and discharge any costs, expenses, Liquidating Trustee's fees and expense reimbursements, or any obligations deemed necessary by the Liquidating Trustee to preserve the Trust Assets and/or to pursue any claims which are considered Trust Assets;

7.     Deposit trust funds and draw checks and make disbursements thereof;

8.     Employ and pay such attorneys, accountants, engineers, agents, tax specialists and clerical and stenographic assistance as may be deemed necessary;

9.     Pay all costs necessarily incurred by the Liquidating Trust including any and all tax liabilities, if any, of the Liquidating Trust;

10.    Waive or release rights of any kind;

11.    Appoint, remove and act through agents, managers and employees and confer upon them such power and authority as may be necessary or advisable;

12.    Institute, maintain and prosecute on behalf of the Liquidating Trust all claims and causes of actions which have been conveyed to the Liquidating Trust pursuant to Debtor's Plan, and prosecute or defend all legal proceedings and appeals concerning Trust Assets on behalf of the Debtor;

13.    In general, without in any manner limiting any of the foregoing, deal with the Trust Assets or any part or parts thereof in all other ways as would be lawful for any person owning the same to deal therewith, whether similar to or different from the ways above specified, at any time or times hereafter;

14.    Make distributions from the Liquidating Trust of all net proceeds on a pro rata basis to holders of allowed Class 5 – General Unsecured Claims;

15.    Determine that all claims have been exhausted or the costs of pursuing recovery of additional amounts outweighs the potential for recovery, such that the Liquidating Trustee may declare a final distribution to the Beneficiaries on a pro-rata basis and the Trust shall terminate;

16.    When the Liquidating Trustee deems appropriate, and upon the written request of the Board of Directors of AHF as constituted following confirmation of the Plan, loan funds from the Liquidating Trust, conditioned upon such repayment provisions and other terms as in the judgment of the Liquidating Trustee is in the best interest of the Creditors who are to receive distributions from the Liquidating Trust as its beneficiaries. Provided, however, that any such loans proposed to be

extended by the Liquidating Trustee to AHF shall be first noticed to the "Committee," which shall be comprised of the current members of the Official Committee of Unsecured Creditors, and upon the presentation of the terms and provisions of the proposed lending relationship to the members of the Committee, a vote by the Committee either in favor of or against the making of the loan to AHF shall be binding upon the Liquidating Trustee.

**5.8.2   Powers of the Liquidating Trustee.**  The Plan hereby confers full and complete authority upon the Liquidating Trustee to do and perform all acts, execute all documents and to make all payments and disbursements of funds directed to be done, executed, performed, paid and disbursed by or under the provisions of the Trust.

The Liquidating Trustee shall have the power to invest funds of the Liquidating Trust in demand and time deposits in any national bank, which is an authorized depository for bankruptcy funds in the Northern District of Texas or to make temporary investments such as short-term certificates of deposit in such banks or Treasury bills.

In no case shall any party dealing with the Liquidating Trustee in any manner whatsoever in relation to the trust property or to any part(s) thereof or interest(s) therein, including but not limited to any party to whom trust property or any part thereof shall be conveyed or contracted to be sold by the Liquidating Trustee, be obligated to see to the application of any money or proceeds borrowed or advanced on said properties or be obligated to see that the provisions of the Plan or the terms of the Debtor's Liquidating Trust have been complied with, or be obligated or privileged to inquire into the necessity or expediency of any act of the Liquidating Trustee, or to inquire into any other limitation or restriction of the power and authority of the Liquidating Trustee, but as to any party dealing with the Liquidating Trustee in any manner whatsoever in relation to the Trust Assets, the power of the Liquidating Trustee to act or otherwise deal with said properties shall be absolute.

All costs, expenses and obligations incurred by the Liquidating Trustee, or any agent thereof, in administering the Liquidating Trust or in any manner connected, incidental or related thereto shall be a charge against the property in the Liquidating Trust.  The Liquidating Trustee will be paid a fee for his services at the hourly rate of $250, and shall be entitled to be reimbursed the reasonable and necessary costs associated with the accounting, maintenance and other costs associated with keeping appropriate records of the assets and liabilities of the Liquidating Trust, and making distributions from the Liquidating Trust. The Liquidating Trustee shall keep complete and accurate records describing the work performed and the time expended in performing his duties, and for which he seeks compensation or reimbursement. Fee statements accounting for such fees and expenses shall be submitted to the Committee each calendar quarter for their review and approval prior to payment.

The Liquidating Trustee shall keep an accounting of all receipts and disbursements, and

such accounting shall be available for inspection by any beneficiary of the Trust upon reasonable notice and request to do so.

No recourse shall ever be had, directly or indirectly, against the Liquidating Trustee personally or against any employee of the Liquidating Trustee by legal or equitable proceedings or by virtue of any statute or otherwise, or by any person employed by the Liquidating Trustee, or by reason of the creation of any indebtedness by the Liquidating Trustee. It being expressly understood and agreed that all such liabilities, covenants and agreements of the Liquidating Trustee or any such employee, whether in writing or otherwise, under the Liquidating Trust shall be enforceable only against and be satisfied only out of the Trust Property or such part(s) thereof or interest(s) therein as shall under the terms of any such agreement be liable therefore or shall be evidenced only by a right of payment out of the income, proceeds and avails of the property in the Liquidating Trust. Every undertaking, contract, covenant or agreement entered into in writing by the Liquidating Trustee shall provide expressly against the personal liability of the Liquidating Trustee.

The Liquidating Trustee shall not be liable for any act he or she may do or omit to do as Liquidating Trustee hereunder while acting in good faith and in the exercise of his or her best judgment, and the fact that such act or omission was advised, directed or approved by an attorney acting as attorney for the Liquidating Trust, shall be conclusive evidence of such good faith and best judgment; nor shall the Liquidating Trustee be liable in any event except of his or her own gross negligence or willful default or misconduct.

The Liquidating Trustee may resign at any time by giving written notice to the Debtor, Debtor's Counsel, the Court, the U. S. Trustee for the Northern District of Texas, and all Creditors which are beneficiaries of the Liquidating Trust provided for in the Plan and such resignation shall be effective upon the date provided in such notice, upon resignation or termination as set forth below, the Liquidating Trustee shall determine the amount of unpaid compensation and reimbursements owing to the Liquidating Trustee and that Liquidating Trustee shall be paid.

The Liquidating Trustee, in exercising the powers granted to him or her under the Plan, shall execute or otherwise carry out any act or deal in respect to the Trust Assets as the Liquidating Trustee may direct, said Liquidating Trustee being authorized and empowered to direct and control the acts in all things relating to the Trust Assets. The Liquidating Trustee may establish such rules and regulations as he or she may deem appropriate with regard to the deposit of Trust funds, the drawing of checks and the making of disbursements by the Liquidating Trustee.

Other provisions and terms of the Liquidating Trust shall be included in a written trust document creating the Liquidating Trust and conveying the Trust Assets to the Liquidating Trustee to be executed upon the Effective Date of the Plan.

## ARTICLE VI

### EXECUTORY CONTRACTS
### AND UNEXPIRED LEASES

**6.1    Assumption and Rejection of Executory Contracts.**    AHF has, through prior orders of the Bankruptcy Court, assumed an executory contract for the provision of cell phone service for its management and employees with AT&T. However, the Debtor has numerous contractual obligations that exist between it and the limited partners and/or lenders of the Tax Credit and Conventionally Financed Properties. In many instances, the Debtor has executed guarantees of performance in connection with such financial transactions.

In order to address the contingent claims for the guarantees by AHF on the Tax Credit and Conventionally Financed properties, any claims of these creditors have been placed in Class 6. A complete listing of these contingent, unliquidated claims is attached as Exhibit "_," and as shown total approximately $118.5 million. Depending upon the particular nature of the contractual relations between the parties as set forth in the partnership agreements which create the limited partnerships – or as may be described in other financial documents which govern the relationship of the parties – such agreements may or may not constitute executory contracts that are governed by Section 365 of the Bankruptcy Code. Regardless, however, counsel for the Committee and AHF are working together to analyze each of the respective agreements in an effort to determine whether AHF should attempt to continue to operate the properties, and resolve any existing problems with the other parties to the agreements thereby avoiding the contingent liabilities associated with each by preventing them from becoming liquidated claims entitled to treatment under Class 5 of the Plan – or whether, perhaps, it would be more prudent and expedient to let go of the properties and negotiate the amount of the liquidated claim. As these negotiations continue the Committee intends to bring the proposed resolutions to these issues to the attention of the creditors and the Bankruptcy Court through appropriate motions, noticed to creditors and brought before the Court for approval or rejection at a hearing pertaining to the respective agreements. Thus, these contingent and unliquidated claims associated with the agreements pertaining to the Tax Credit and Conventionally Financed properties will be resolved either through the claims reconciliation process or through motions to assume or reject the particular contracts connected with each.

**6.2    Assumption and Rejection of Unexpired Leases.**    AHF has already assumed the real property lease with JSW Properties pertaining to its offices on Washington Street in Amarillo, Texas, and rejected a real property lease that governed the rental of office space in Dallas, Texas, from W&K Akard Plaza, GP, and a personal property lease covering photocopiers from Key Equipment Finance in Cleveland, Ohio. The claims of W&K Akard Plaza, GP, and Key Equipment Finance are currently being resolved through the claims reconciliation process.

**6.3    Bar to Rejection Damages.**    If the rejection of an Executory Contract or Unexpired Lease by the Debtor results in damages to the other party or parties to such contracts or leases, a

Claim for such damages shall be forever barred and shall not be enforceable against the Debtor or its respective properties unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtor within thirty (30) days after entry of the order (which may be the Confirmation Order) allowing rejection of such contract or lease.  Such Claim if allowed shall be classified and treated as an Allowed Unsecured Claim for purposes of the Plan.

## ARTICLE VII

## PREFERENCES AND FRAUDULENT CONVEYANCES

**7.1  Preferences and Fraudulent Conveyances:**  The Plan provides that Debtor's causes of action for Preferences and Fraudulent Conveyances shall be conveyed into the Liquidating Trust, that the Liquidating Trustee shall have the right to pursue these causes of action, and that the Liquidating Trustee shall distribute all proceeds obtained from such causes of action, if any, on a pro-rata basis to the Class 5 General Unsecured Creditors.

## ARTICLE VIII

## INFORMATION ON THE FEASIBILITY
## OF THE PLAN OF REORGANIZATION

**8.1    Collateral and Liquidation Analysis.** Under a Chapter 7 liquidation analysis of the Debtor, unsecured and under secured creditors could expect limited or no recovery of their claims. The Estate's assets are encumbered and leveraged multiple times with liens, and the secured liens far exceed the value of the Debtor's assets. A complete liquidation analysis of the bankruptcy estate will be supplied prior to the hearing on the Disclosure Statement and will be attached as an Exhibit "M" to the Disclosure prior to its approval by the Court.  A significant recovery potential is only realized if AHF continues to operate in order to attain the full benefits of investments in long term affordable housing ventures. An immediate liquidation will not realize these benefits. Consequently, the proponents of the Plan assert that the treatment afforded the Claims of all Creditors under the terms of the Plan is substantially better than they would receive in a chapter 7 case. **FOR ALL OF THE ABOVE REASONS, THE COMMITTEE HEREBY SOLICITS YOUR AFFIRMATIVE VOTE IN FAVOR OF THE PLAN.**

**8.2    Summary of Past Operations.** AHF was founded in 1989 by Steve Sterquell. The purpose of the organization was to create affordable housing for working families and individuals. Under Sterquell's direction, AHF pursued an aggressive course of deals and acquisitions of business across the nation. As many as 200 satellite entities were created to facilitate multiple investments in low income housing tax credit properties. AHF was focused almost exclusively on more and more acquisitions and deals. Only after Sterquell and his family were no longer a part of the Foundation was the full extent of the serious financial problems of the Foundation made clear. Under Sterquell's direction, the Foundation had multiple offices and employees at remote locations. Today, the Foundation operates efficiently in one office with a centralized staff that is performance and goal oriented. The annual payroll obligation under the

Sterquell leadership was over $4.3 million dollars. Based on the most recent month, the annual payroll costs are now about $700,000.00. An 85% reduction in cost with many times the efficiency and productivity. Under the Sterquell leadership, the Foundation had to pay for the operation of three private airplanes including one corporate jet. Today, the Foundation has no such expense.

**8.3    Assumptions and Contingencies.** The Plan involves American Housing Foundation, Inc. continuing this new cost efficient and diligent level of operations as a legal entity following the Chapter 11 bankruptcy case. The Plan assumes that adequate cash resources will be available from the proceeds of the key man life insurance policies to properly capitalize the Corporation and address the significant issues of deferred maintenance and accounts payable due at the property level. The ability of the Debtor to address the previous years of poor management at the Foundation is vital to the continued financial viability of Debtor. If for some reason Debtor is not able to address the deferred property maintenance and accounts payable issues, such circumstances would have a significant adverse impact on the ability of Debtor to complete the payments to creditors as projected in the Plan.

**8.4    Schedule of Financial Projections and Assumptions.** Attached as Exhibit "J" to the Plan and Disclosure Statement is a Projected Cash Flow, which the proponents offer as evidence of the feasibility of the Plan. The financial projections contain cash flow projections for the Reorganized Debtor for the 2010, 2011, and 2012 calendar years. These projections assume that the Plan is approved and becomes effective in July of 2010.

**8.5    Statement on Feasibility of the Plan.** The Financial Projections attached as Exhibit "J" reflect that the Reorganized Debtor will be able to continue operations in compliance with current housing program requirements. Additionally, the Reorganized Corporation will allow the creditors to maximize the opportunity to benefit from the long term investment the Foundation has in affordable housing properties. The financial projections illustrate that the Debtor will have available the necessary cash to fund the Plan of Reorganization after confirmation; has the ability to generate future cash flow sufficient to make the payments called for under the Plan and necessary to continue in business; and other than the variants of general economic conditions there are no factors which might hinder the Debtor in accomplishing that which it promises under the terms of the Plan or allow it to continue in business as contemplated under the Plan. Therefore, based upon these Financial Projections, the Debtor asserts that the Plan is feasible and is not likely to be followed by liquidation or the need for further financial reorganization.

## ARTICLE IX

## <u>CONTESTED CLAIMS</u>

**9.1   Objection to Claims and Interests**. On or before the first Distribution Date, but in no event later than ninety (90) days after the Confirmation Date, objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims ("Contested

Claims") to which objections are made.  The Reorganized Debtor and/or the Liquidating Trustee shall litigate to judgment, settle or withdraw objections to Contested Claims.  Notwithstanding any other provision of the Plan, no payments or distributions shall be made with respect to all or any portion of a Contested Claim unless and until all objections to such Contested Claim have been determined by or settled pursuant to Final Order.

**9.2    Referral of Certain Claims to Special Conflicts Counsel.**    Counsel    for    the Committee has already reviewed and filed objections to the majority of the Proofs of Claim which have been filed in this Bankruptcy Case. However, in those instances where Creditors who were previously represented by the law firm of Mullin Hoard & Brown, L.L.P., or who have a representative that serves on the Committee, have filed a Proof of Claim, the Committee acknowledges that Mullin Hoard & Brown, L.L.P., which serves as counsel for the Committee, has a conflict of interest which prevents it from examining and objecting to the claims of such Creditors. Consequently, to ensure that the Committee fulfills its obligations to review, and where appropriate, object to the Proofs of Claim that fall within these categories, the Committee has determined to seek authority from the Bankruptcy Court to employ Special Conflicts Counsel for the purpose of examining, and where appropriate, objecting to the allowance of these Proofs of Claim. A listing of the Proofs of Claim that will be referred to Special Conflicts Counsel for the Committee is attached as Exhibit "K."

## ARTICLE X

## FUTURE MANAGEMENT,
## FINANCIAL ACCOUNTING, AND CAPITAL REQUIREMENTS OF THE DEBTOR

**10.1    Future Management.** The Reorganized Debtor will be managed by a Management Committee comprised of Alvin Johnson, Vice President of Operations, and Gene V. Morrison, Vice President of Governmental Affairs. This Management Committee reports directly to the Board of Directors of the Debtor. The current compensation of the Management Committee personnel as reflected in the Monthly Operating Reports filed with the U.S. Trustee's Office will not change under the implementation of the Plan.

**10.2    Future Financial Accounting.** The financial books and records of AHF will be maintained by accounting staff located at the office of the Debtor in Amarillo, Texas. Present AHF accounting staff has extensive experience and background in tracking and reporting the financial transactions of the Corporation, and will provide open communication to property management contractors, external financial partners/lenders, and governmental entities. Management will utilize external accounting counsel where needed to supplement Corporation staff to handle all accounting matters in a prudent and businesslike manner.

**10.3    Anticipated Future Capital Requirements of the Debtor.** Management Committee has attempted to estimate the immediate capital needs of AHF over the first year of its operations. A summary of these anticipated capital requirements is attached as Exhibit "L."

## ARTICLE  XI

## MODIFICATION

**11.1    Modifications Prior to Substantial Consummation.**  The Debtor may propose amendments to or modifications of this Plan at any time prior to substantial consummation of the Plan.  After the Effective Date, the Debtor may remedy any defects or omissions or reconcile any inconsistencies in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes and intent of the Plan so long as the interest of Claimants or Interest holders are not materially and adversely affected.

## ARTICLE  XII

### PROVISIONS FOR THE ASSIGNMENT, ENFORCEMENT, SETTLEMENT OR ADJUSTMENT OF CLAIMS BELONGING TO THE DEBTOR

**12.1   Claims to Be Transferred to the Liquidating Trust.**  Except as settled prior to or as a part of the Plan or connected with Proofs of Claims referred to Special Conflicts Counsel, all preference claims pursuant to Section 547 of the Bankruptcy Code, all fraudulent transfer claims pursuant to Section 548 of the Bankruptcy Code, all claims relating to post-petition transactions under Section 549 of the Bankruptcy Code, all claims recoverable under Section 550 of the Bankruptcy Code, claims against any third party on account of an indebtedness or any other claim owed to or in favor of the Debtor, which are not settled prior to or as part of this Plan are hereby preserved and will vest with the Liquidating Trust for enforcement in accordance with the discretion of the Liquidating Trustee subsequent to the Effective Date of this Plan.  The Liquidating Trust in accordance with the discretion of the Liquidating Trustee, without further order of the Bankruptcy Court, shall have the exclusive right to prosecute, settle, withdraw or release any such claim on behalf of the Reorganized Debtor.  Nothing in the provisions of the Plan is intended or should be construed to limit in any manner the delegation of authority to the Committee to prosecute claims owned by the Bankruptcy Estate in any previous orders entered by the Bankruptcy Court.

## ARTICLE  XIII

### REPORTING REQUIREMENTS AND OBLIGATIONS OF THE REORGANIZED DEBTOR TO PAY EXCESS REVENUES TO THE LIQUIDATING TRUST

**13.1 Discharge.**  Consistent with Section 1141(d)(1) of the Bankruptcy Code, and except as otherwise provided in the plan, or in the order confirming the plan, the confirmation of this plan discharges AHF from any debt that is dischargeable under the Bankruptcy Code and that arose before the date of such confirmation, whether or not—

     (i)     a proof of the claim based on such debt is filed or deemed filed under section 501 of the Bankruptcy Code;

     (ii)    such claim is allowed under section 502 of the Bankruptcy Code; or

(iii)    the holder of such claim has accepted the plan.

    **13.2 Reporting and Payment of Excess Revenues to Liquidating Trust.**  The Plan provides that within sixty (60) days after the close of Reorganized Debtor's fiscal year, Reorganized Debtor shall account to and pay over into the Liquidating Trust, all Excess Revenues received by the Reorganized Debtor during the preceding fiscal year. Those surplus revenues, less the reasonable expenses incurred by the Liquidating Trust, shall then be disbursed by the Liquidating Trustee, pro rata to the Creditors in this Class.

    This Plan provision is intended to ensure that any windfalls realized by the Reorganized Debtor due to its successful operations following confirmation of the Plan either in the form of the refinancing or sale of existing properties that involve notes receivable or development fees owed to AHF are paid over to the creditors who are beneficiaries of the Liquidating Trust.

    The Plan provides for the continued existence of the Official Committee of Unsecured Creditors comprised of the current members of the Committee. The Reorganized Debtor will annually submit no later than thirty (30) days prior to the expiration of each fiscal year following confirmation of the Plan a proposed operational budget to the Oversight Committee that details its expected revenues, expenditures, and investments during the coming fiscal year. The Oversight Committee will then have a period of not more than fourteen (14) days to approve, propose modifications, or reject the proposed operational budget. In the event, the Reorganized Debtor and the Committee are unable to agree on the operational budget for the next fiscal year, the proposed budget shall then be presented to Harry Potter, CPA, Tulsa, Oklahoma, who currently serves as the forensic accountant for the Debtor, and he shall be the final arbiter regarding the operational budget for the next fiscal year.

    In addition, not later than forty-five (45) days following the expiration of the Reorganized Debtor's fiscal year, it shall submit to the Committee an accounting of the financial operations of the Reorganized Debtor for the prior year that contains a comparison between the approved budget for that fiscal year and its actual operations for that fiscal year. Such accounting shall be prepared in accordance with generally accepted accounting principles for non-profit corporations operating within the State of Texas. Such accounting shall contain a calculation disclosing what the Reorganized Debtor submits as being its Excess Revenues derived from the financial operations of AHF during such fiscal year. For purposes of such calculation, Excess Revenues for a given fiscal year shall be calculated as follows:

    Annual net income of the Reorganized Debtor and its affiliated entities calculated for each fiscal year pursuant to generally accepted accounting principles, including any gains or losses from the liquidation of any of the housing units it owns or manages, less any payments on existing loans on such properties, less any capital expenditures in accordance with the approved budget for that fiscal year, plus any net revenues derived from the sale or refinancing of such properties, including the repayment or collection of any outstanding notes receivable or development fees to which AHF is entitled, equals Excess Revenues.

    Upon receipt of the annual accounting from the Reorganized Debtor, the Oversight Committee shall have a period of ten (10) days to dispute such accounting. Any dispute concerning the accuracy of the accounting shall be submitted in writing from the Liquidating Trustee to the then acting Chairman of the Board of Directors of the Reorganized Debtor.  In the

event the Reorganized Debtor and the Oversight Committee become involved in a dispute over the amount of Excess Revenues to be paid over to the Liquidating Trust, the final arbiter of such dispute shall be Harry Potter, CPA, Tulsa, Oklahoma, and Mr. Potter shall have a period of thirty (30) days to issue his decision.

# ARTICLE XIV

## RETENTION OF JURISDICTION

**14.1    Implementation of Plan.**  Until this Proceeding is closed, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including that necessary to insure that the purpose and intent of the Plan are carried out and to hear and determine all Claims and Interests set forth in Article III or elsewhere herein that could have been brought before the entry of the Confirmation Order. The Bankruptcy Court shall also retain jurisdiction to try and rule upon lawsuits brought by the Liquidating Trustee.

**14.2    Causes of Action.**  The Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against the Debtor, the Reorganized Debtor, and to enforce all causes of action that may exist on behalf of the Debtor, the Reorganized Debtor and the Liquidating Trustee. Nothing contained herein shall prevent the Reorganized Debtor or the Liquidating Trustee from taking such action as may be necessary in the enforcement of any cause of action which may exist on behalf of the Debtor or the Liquidating Trust and which may not have been enforced or prosecuted, unless satisfied herein.

**14.3    Claims Determinations.**  After the Effective Date, the Bankruptcy Court shall further retain jurisdiction for the purpose of classification of Claims that have been allowed for purposes of voting, and the determination of such objections as may be filed to Claims and Interests.

**14.4    Property Determinations.**  The Bankruptcy Court shall further retain jurisdiction through and after the Effective Date for the purpose of determining all questions and disputes regarding ownership and/or title to the assets of the Estate, or the proceeds thereof, and determination of all causes of action, controversies, disputes concerning the Debtor, the Reorganized Debtor, the Liquidating Trustee and any other party, including, but not limited to any claim or entitlement associated with the Equity Interests of the Debtor or the Reorganized Debtor, any right of the Debtor, the Reorganized Debtor or the Liquidating Trustee to recover assets pursuant to the provisions of the Bankruptcy Code and to adjudicate all Claims or controversies arising out of any purchase, sale or contract made or undertaken by the Debtor or the Debtor corporation with respect to this Proceeding, the terms or actual implementation or enforcement of the Plan.

**14.5    Other Post-Confirmation Matters.**  The Bankruptcy Court shall further retain jurisdiction for the following purposes through and after the Cash Distribution Date:

(a)    To modify the Plan after Confirmation pursuant to the Bankruptcy Rules and the Bankruptcy Code;

(b) To assure the performance by the Reorganized Debtor of its obligations under the Plan;

(c) To enter such orders, including injunctions, as are necessary to enforce the title, rights, and powers of the Reorganized Debtor and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Bankruptcy Court may deem necessary;

(d) To enter an order concluding and terminating this Proceeding;

(e) To correct any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(f) To decide issues and Claims concerning all tax liabilities which arise in connection with or related to the Debtor, this Proceeding or the Plan, including, without limitation, to hear and determine matters concerning state, local and federal taxes pursuant to Sections 346, 505, 506, 507, 523, and 1146 of the Bankruptcy Code;

(g) To hear and determine any action or proceeding brought by the Debtor, Reorganized Debtor or the Liquidating Trustee pursuant Sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code;

(h) To resolve any disputes arising from distributions made pursuant to the Plan, and adjudicate all controversies concerning classification or allowance of any Claim or Interest;

(i) To hear and determine all Claims arising from the rejection of Executory Contracts and Unexpired Leases and to consummate the rejection and termination thereof, and further, to hear and determine all matters relating to the assumption of Executory Contracts and Unexpired Leases;

(j) To liquidate damages or estimate Claims in connection with disputed, contingent or unliquidated Claims;

(k) To hear and determine all actions brought by or against the Debtor, the Reorganized Debtor or the Liquidating Trustee arising in or related to this Proceeding or arising under the Bankruptcy Code;

(l) To hear and determine all requests for compensation and/or reimbursement of expense that may be made after the Confirmation Date.

## ARTICLE  XV

## MISCELLANEOUS PROVISIONS

**15.1     Cramdown**.  In the event any impaired Class shall fail to accept the Plan in accordance with Section 1129(a) of the Bankruptcy Code, Debtor reserve the right to request the Bankruptcy Court to confirm the Plan in accordance with the provisions of Section 1129(b) of the Bankruptcy Code.

**15.2 Headings**. Headings are utilized in this Plan for convenience and reference only and do not constitute a part of this Plan for any other purpose.

**15.3 Due Authorization by Creditors**. Each and every Creditor and Interest Owner who elects to participate in the distributions provided for herein warrants that he is authorized to accept in consideration of his Claim against or Interest in the Debtor the distributions provided for in the Plan and there are not outstanding commitments, agreements, or understandings, expressed or implied, that may or can in any way defeat or modify the rights conveyed or obligations undertaken by him under the Plan.

**15.4 Entire Agreement**. This Plan, as described herein and the exhibits made a part thereof and the Disclosure Statement and exhibits thereto (to the extent applicable to (and only to) and not inconsistent with the Plan), sets forth the entire agreement and understanding among the parties hereto relating to the subject matter hereof and supersedes all prior discussions and documents. No party hereto shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein or as may hereafter be agreed to by the parties in writing. Nothing contained herein shall constitute an admission of any fact of liability by the Debtor, or be admissible in any proceeding involving the Debtor.

**15.5 Class Acceptance**. A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted on the Plan. A Class of Interests shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount of the Allowed Interests of such Class that have voted on the Plan.

**15.6 Objections to Claims.** All amounts shown in the Plan and Accompanying Disclosure Statement are still subject to the claims reconciliation process, as the Debtor reserve the right to object to any claims filed by Creditors with the Bankruptcy Court for all instances in which the claimed amount exceeds the amount shown on the Debtor's records or Plan and Accompanying Disclosure Statement.

## ARTICLE XVI

## PLAN CONTINGENCIES

**16.1 Future Contracts and Business of Debtor.** The Plan of Reorganization makes certain assumptions concerning the operations of the Reorganized Debtor following the implementation of the Plan. It is important that the Reorganized Debtor negotiate restructuring arrangements with creditors for whom it has executed guaranties of performance on the Tax Credit Contingent Claims and the Conventional Financing Contingent Claims. Obtaining new contractual arrangements on these properties bears significantly upon the financial aspects of the Plan of Reorganization. The ability of Reorganized Debtor to accomplish these tasks is an issue which impacts the feasibility of the Plan of Reorganization and will be addressed by the Bankruptcy Court at the Confirmation Hearing.

## ARTICLE XVII

## EFFECTIVE DATE

**17.1 Effective Date of Plan.** This Plan takes effect on the Effective Date.

# ARTICLE XVIII

## OBLIGATION TO THE U.S. TRUSTEE

**18.1  Compliance with Regulations and Payment of Fees Due the Office of the U.S. Trustee**.  During the pendency of this bankruptcy case, the Debtor will comply with all regulations promulgated by the Office of the U.S. Trustee, including remaining current on all quarterly fees assessed against the Estate by the U.S. Trustee.

WHEREFORE, the proponents of the Plan of Reorganization urge all creditors and parties in interest to vote in favor of confirmation of the Plan, and pray that the Bankruptcy Court hold a Confirmation Hearing pursuant to the provisions of the Bankruptcy Rules of Procedure and after considering the terms and provisions of the Plan, and hearing the evidence concerning its preparation and its feasibility, that the Court determine that it meets all the requirements of 11 U.S.C. Section 1129, and enter an appropriate Confirmation Order.

Dated:        March 28, 2010.

Respectfully Submitted,

MULLIN HOARD & BROWN, L.L.P.
P.O. Box 2585
Lubbock, Texas 79408-2585
Telephone: (806)765-7491
Facsimile: (806) 765-0553


By:  /s/ David R. Langston
David R. Langston; SBN 11923800
***Attorneys for the Official Committee of Unsecured Creditors of American Housing Foundation***