R. BYRN BASS, JR. LAW OFFICES
R. Byrn Bass, Jr., SBN: 01889500
4716 4th Street, Suite 100
Lubbock, Texas 79416
Telephone: 806/785-1250
Facsimile: 806/771-1260

And

LYNCH, HANNA AND BOYD, PLLC
John Thomas Boyd, Jr. SBN: 02772300
500 South Taylor, LB 267
Amarillo, Texas 79101
Telephone: 806/379-6416
Facsimile: 806/379-8504
Attorneys for American Housing Foundation, Debtor

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| | § | |
| AMERICAN HOUSING FOUNDATION | § | Case No. 09-20232-RLJ-11 |
| | § | |
| Debtor. | § | |
| | § | |

**AMERICAN HOUSING FOUNDATION'S**
**DISCLOSURE STATEMENT TO ITS CHAPTER 11 PLAN OF REORGANIZATION**

## Table of Contents

**ARTICLE I     INTRODUCTION**

    A.  Definitions                                                                                      5
    B.  The Debtor in the Bankruptcy Case                                              13
    C.  History of the Debtor and the Events that Caused the Bankruptcy     13
    D.  Previous and Current Board and Management of American Housing
        Foundation                                                                                14
    E.  Summary of AHF's Current Operations and Goals                        15
    F.  AHF's Operations as a Debtor in Possession                              17

**ARTICLE II     EXPLANATION OF CHAPTER 11**

    A.  Overview of Chapter 11                                                          24
    B.  Plan and Accompanying Disclosure Statement                         24

**ARTICLE III     SUMMARY OF THE PLAN**

    A.  Overview                                                                              26
    B.  Summary of the Plan                                                              26
    C.  The Relationship Between AHF and Entities Owning Property It Operates or
        Manages                                                                            27
    D.  Assumption or Rejection of Executory Contracts, Including Limited Partnership
        Agreements                                                                        30
    E.  Treatment of Secured Claims Under the Plan                            31
    F.  Treatment of Unsecured Claims                                              34
    G.  Treatment of Interest and Penalties Under the Plan and Preservation of the Rights of
        the Debtor to Contest Claims and Interests                            35

**ARTICLE IV     CLASSIFICATION AND DESCRIPTION OF CLAIMS**

    A.  Class 1- Allowed Administrative Expense Claims                    36
    B.  Class 2- Allowed Priority Tax Claims                                      37
    C.  Class 3- Allowed Secured Claims of Creditors Holding Liens Against Assets Owned
        by Debtor                                                                          37
    D.  Class 4- Administrative Convenience Class                              41
    E.  Class 5- Allowed Claims of Unsecured Creditors                      41
    F.  Class 6- Unsecured Claims of Limited Partners for Amounts Necessary to Cure
        Defaults Under Limited Partnership Agreements                    42
    G.  Class 7- Contingent, Unliquidated and Disputed Claims            42
    H.  Class 8- Subordinated or Disallowed Unsecured Claims of Insiders    43

**ARTICLE V     IMPLEMENTATION OF THE PLAN**

    A.  The Continued Operations of American Housing Foundation      43
    B.  Status of Litigation of Claims Funding the Liquidating Trust     45
    C.  Disclosure of Possible Recovery of Developer's Fees              47

| | | |
|---|---|---|
| D. | Financial Projections | 48 |
| E. | Retention by Debtor of Property of the Estate | 48 |
| F. | The Liquidating Trust | 48 |
| G. | Authorization | 50 |
| H. | Powers of the Liquidating Trustee | 52 |
| I. | Preferences and Fraudulent Conveyances | 54 |
| J. | Payment of Excess Revenues to the Liquidating Trust | 54 |
| K. | Retained Causes of Action | 55 |

**ARTICLE VI  THE LIQUIDATION ANALYSIS AND INFORMATION ON THE FEASIBILITY OF THE PLAN OF REORGANIZATION**

| | | |
|---|---|---|
| A. | Liquidation Analysis | 56 |
| B. | Summary of Past Operations | 56 |
| C. | Assumptions and Contingencies | 57 |
| D. | Schedule of Financial Projections and Assumptions | 57 |
| E. | Statement on Feasibility of the Plan | 57 |

**ARTICLE VII CONFIRMATION OF THE PLAN**

| | | |
|---|---|---|
| A. | General Instructions Pertaining to Voting | 57 |
| B. | Creditors Entitled to Vote | 58 |
| C. | Definition of Impairment | 59 |
| D. | Classes Impaired | 60 |
| E. | Votes Required for Class Acceptance | 60 |
| F. | Hearing on Confirmation | 60 |
| G. | Confirmation Without the Acceptance of a Class | 60 |
| H. | Effect of Confirmation | 60 |
| I. | Discharge | 61 |
| J. | Limitation of Liability in Connection with this Plan, Disclosure Statement, and Related Documents | 61 |

**ARTICLE VIII CONTESTED CLAIMS**

| | | |
|---|---|---|
| A. | Objection to Claims and Interests | 63 |
| B. | Referral of Certain Claims to Conflicts Counsel | 63 |

**ARTICLE IX  FUTURE MANAGEMENT, FINANCIAL ACCOUNTING, AND CAPITAL REQUIREMENTS OF AHF**

| | | |
|---|---|---|
| A. | Future Management | 64 |
| B. | Future Financial Accounting | 64 |
| C. | Anticipated Future Capital Requirements of the Debtor | 64 |

**ARTICLE X   MODIFICATION**

| | | |
|---|---|---|
| A. | Modifications Prior to Approval | 64 |

**ARTICLE XI  MISCELLANEOUS PROVISIONS**

| | | |
|---|---|---|
| A. | Retention of Jurisdiction | 65 |

B.   Causes of Action                                    65
C.   Claims Determinations                               65
D.   Property Determinations                             65
E.   Other Post-Confirmation Matters                     65
F.   Cramdown                                            67
G.   Headings                                            67
H.   Due Authorization by Creditors                      67
I.   Entire Agreement                                    67
J.   Class Acceptance                                    67
K.   Objections to Claims                                67
L.   Tax Consequences                                    68

**ARTICLE XII PLAN CONTINGENCIES**

A.   Future Contracts and Business of Debtor             68

**ARTICLE XIII EFFECTIVE DATE**                          68

**ARTICLE XIV  COMPLIANCE WITH REGULATIONS AND PAYMENT OF FEES DUE TO
              THE U.S. TRUSTEE**                         68

# ARTICLE I

## Introduction

### A.      Definitions

If any definition of any term used in this Plan and Disclosure Statement is not referenced in the following Definitions section, then the Bankruptcy Code shall be controlling as to the meaning of the word.  However, if the term is not defined in the Bankruptcy Code, then the plain meaning of the word is intended to be used.

Unless the context otherwise requires, the following terms used in the Plan shall have the following meanings.  Any term used in this Plan that is not defined below but that is defined in Title 11 of the United States Code, as amended, shall have the meaning assigned to such term therein.

1.      **Administrative Claim** shall mean any Claim in respect of costs or expenses of administration for the Proceeding that is allowed under Sections 503 and 507(a) of the Bankruptcy Code.

2.      **Affiliates** shall mean all persons or entities affiliated with the AHF pursuant to Section 101(2) of the Bankruptcy Code, and in the bankruptcy case of American Housing Foundation, specifically include the entities reflected in Exhibits "M" and "N" attached to this Disclosure Statement.

3.      **Allowed or Allowed Amount** shall mean the amount of any Allowed Claim.

4.      **Allowed Claim** shall mean a Claim against the Debtor that (i) is allowed by an Order which is not stayed on appeal, (ii) is scheduled as liquidated, undisputed and non-contingent by the Debtor in their schedules filed with the Bankruptcy Court as they may be amended or supplemented (collectively the "Schedules"), (iii) is timely filed with the Clerk of the Bankruptcy Court and no objection has been made to the allowance thereof, (iv) any reconciled contested claim that has been negotiated to an agreed amount or established by Court Order, or (v) is provided to be allowed by the terms of this Plan.

5.      **Allowed Administrative Claim** shall mean an Allowed Claim which a Claimant asserts is an Administrative Claim and is determined to be entitled to priority pursuant to Sections 503 and 507(a)(1) of the Bankruptcy Code.

6.     **Allowed Priority Claim** shall mean an Allowed Claim which a Claimant asserts is an Administrative Claim and is determined to be entitled to priority under Section 507 of the Bankruptcy Code.

7.     **Allowed Secured Claim** shall mean an Allowed Claim for which a Claimant asserts and is determined by an Order not stayed on appeal to hold a valid, perfected and enforceable lien, security interest or other interest in or encumbrance on property in which the Debtor has an interest to the extent of the value, determined in accordance with Section 506(a) of the Bankruptcy Code, of the Claimant's interest in the Debtor's interest in the property.

8.     **Allowed Unsecured Claim** shall mean an Allowed Claim for which the Claimant has not asserted or is determined by an Order not stayed on appeal to hold a valid, perfected and enforceable lien, security interest or other interest in or encumbrance against property of the Debtor or right to setoff to secure the payment of such Claim to which an objection has not been filed or if an objection to such claim has been filed, the Bankruptcy Court has entered an order which has become final allowing such claim.

9.     **Allowed Unsecured Subordinated Claims of Insiders** shall mean all Unsecured Claims of Insiders which the Court determines should be subordinated under the provisions of 11 U.S.C. Section 510(c) or disallowed under Section 502(d) and are classified in Class 8 of the Plan. American Housing Foundation ("AHF") asserts that the holders of the Claims in this Class engaged in inequitable conduct prior to the Petition Date which caused injury to other creditors or conferred an unfair advantage for themselves, and that the equitable subordination of such claims is entirely consistent with other provisions of the Bankruptcy Code. In the alternative, AHF asserts that such claims should be disallowed because the holders of such claims are transferees of transfers that are avoidable under Section 502(d) of the Code.

10.     **American Housing Foundation Case** shall mean the bankruptcy proceeding of AHF which was initiated on April 21, 2009, by the filing of an Involuntary Chapter 11 Bankruptcy Petition, and ultimately consolidated with the voluntary case filed by AHF on June 21, 2009, under Case No. 092320 now pending in the U.S. Bankruptcy Court for the Northern District of Texas, Amarillo Division.

11.     **Ballot** shall mean the ballot to be delivered with the Disclosure Statement to holders of Claims and Interests on which such holder will be able to vote to accept or reject the Plan.  The Ballot may be different for holders of the various Claims and Interests.

12.     **Bankruptcy Code** shall mean the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. and all amendments thereto.

13.     **Bankruptcy Court** shall mean the United States Bankruptcy Court for the Northern District of Texas - Amarillo Division.

14.     **Bankruptcy Clerk** shall mean the Clerk of the Bankruptcy Court located at 624 South Polk Street, Room 100, Amarillo, Texas 79101-2319.

15.     **Bankruptcy Rules** shall mean the Federal Rules of Bankruptcy Procedure and all relevant local rules of the Bankruptcy Court.

16.     **Bar Date** shall mean October 7, 2009, being the deadline ordered by the Bankruptcy Court for Claimants to file Proofs of Claim in the bankruptcy case of AHF.

17.     **Beneficiary or Beneficiaries** shall mean all beneficiaries of the Liquidating Trust, specifically being all of the Unsecured Creditors which hold Allowed Unsecured Claims, the validity and amount of which have been established by the Bankruptcy Court, and which for purposes of the Plan have been classified in Class Five of the Plan.

18.     **Claim** shall mean (i) a right to payment from the Debtor, whether or not such right is reduced to a judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtor, whether or not such right to an equitable remedy has produced a judgment, or is fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

19.     **Claimant** shall mean the holder of a Claim.

20.     **Class** shall mean a category designated in the Plan of holders or owners of Claims or Interests that are substantially similar pursuant to Section 1122 of the Bankruptcy Code.

21.     **Confirmation Date** shall mean the date of Confirmation.

22.     **Confirmation Hearing** shall mean the hearing that will be held before the Bankruptcy Court in which the Debtor will seek Confirmation of the Plan pursuant to Section 1128 of the Bankruptcy Code.

23.     **Confirmation Order** shall mean the Order of the Bankruptcy Court confirming the Plan.

24. **Conflicts Counsel** shall mean counsel serving for the purpose of examining, and where appropriate, objecting to the allowance of the Proofs of Claim filed by Creditors who were previously represented by the law firm of Mullin Hoard & Brown, L.L.P., or who have a representative that serves on the Committee, and, as a result of which, Mullin Hoard & Brown, L.L.P., which serves as counsel for the Committee, has a conflict of interest which prevents it from examining and objecting to the claims of such Creditors. Conflicts Counsel shall also be authorized to assert any and all claims or counterclaims against such creditors including all causes of action which are authorized under Chapter 5 of the Bankruptcy Code. AHF reserves the right to object to any such claims or assert all claims or causes of action authorized under Chapter 5 of the Bankruptcy Code that it deems necessary or appropriate, notwithstanding the determination of Conflicts Counsel to the contrary.

25. **Contested Claims** shall mean all Claims to which objections are filed.

26. **Creditor** shall have the meaning set forth in Section 101(10) of the Bankruptcy Code.

27. **Debtor or Debtor-in-Possession** shall mean American Housing Foundation (also referred to as "AHF" or the "Foundation").

28. **DIP Accounts** shall mean the Debtor-in-Possession bank accounts maintained by the Debtor as of the Effective Date.

29. **Disclosure Statement** shall mean the Disclosure Statement prepared and submitted by the Debtor with respect to the Plan, including all exhibits attached thereto, and prepared pursuant to the Bankruptcy Court's Orders and Section 1125 of the Bankruptcy Code and, if applicable, Bankruptcy Rule 3018(b) for the Solicitation of Ballots, and all supplements and amendments thereto.

30. **Distribution Date** shall mean the date when the Liquidating Trustee makes distributions from proceeds contained in the Liquidating Trust.

31. **Effective Date** shall mean the thirtieth (30th) day following the date when the Confirmation Order becomes final, if the Confirmation Order has not been stayed on appeal, or if such a stay has issued, immediately after such stay is dissolved by Final Order.

32. **Excess Revenues** shall mean annual net income of AHF calculated for each fiscal year pursuant to generally accepted accounting principles, as determined by a third-party Auditor hired by AHF less any payments on existing loans on such properties it owns or manages, less operating expenses and capital expenditures, plus any net revenues derived from the

sale or refinancing of such properties, and the repayment or collection of any outstanding notes receivable or development fees which AHF receives.

33.     **Estate** shall mean the bankruptcy estate created by Section 541 of the Bankruptcy Code upon commencement of the case under Chapter 11 of the Bankruptcy Code.

34.     **Executory Contract or Unexpired Lease** shall mean an executory contract or unexpired lease within the meaning of Section 365 of the Bankruptcy Code, in effect between or among the Debtor and any other Person or Persons as of the Petition Date.

35.     **Filed** shall mean filed with the Clerk of the Bankruptcy Court.

36.     **Final Order** shall mean an order of the Bankruptcy Court or any appellate court thereof that has not been reversed, modified, amended or stayed, and the time for appeal or to seek review or certiorari or rehearing thereof has expired and as to which no appeal, review or rehearing is pending, and has become conclusive of all matters adjudicated thereby and is in full force and effect.

37.     **Insider** shall mean the various persons and entities listed under section 101(B) of the Bankruptcy Code, as well as any other person or entity determined by the Bankruptcy Court to has such unique knowledge of the operations of the Debtor or such a unique relationship with AHF so as to qualify that person or entity as having insider status as contemplated by section 101(31) of the Bankruptcy Code.

38.     **Life Insurance Proceeds** shall mean, unless otherwise apparent from the context, the $24,000,000.00 in proceeds from life insurance policies on the life of Steve Sterquell recovered by the Estate as a result of the adversary proceedings filed by the Petitioning Creditors and AHF.

39.     **Liquidating Trust** shall mean the trust executed pursuant to the terms of this Plan which will (i) receive from the Debtor all Trust Assets transferred pursuant to the Plan, (ii) hold the Trust Assets (except as may otherwise be provided under the Plan) in trust for the benefit of all Beneficiaries (iii) investigate and prosecute any claim transferred to the trust pursuant to this Plan as the Trustee in his sole discretion shall see fit in order to increase the value of the Trust Assets, and (iv) oversee and direct the liquidation of the Trust Assets held by it for the benefit of the Beneficiaries of the Liquidating Trust pursuant to the terms of the Plan. AHF reserves the right to prosecute any claim; not withstanding the determination of the Liquidating Trustee to the contrary.

40. **Liquidating Trustee** shall mean a person or persons appointed by the Court for the purpose of administrating the assets which shall flow into the Liquidating Trust and be distributed according to the Plan.

41. **New Loan Documents** shall mean the various promissory notes, loan agreements, security documents and all other attending documents and instruments to be entered into by and between AHF and Secured Creditors to document the treatment to be afforded their claims pursuant to the Plan.

42. **Objection Date** shall mean the date immediately preceding the last day for filing written acceptances or rejections of the Plan.

43. **Old Loan Documents** shall mean the various original promissory notes, loan agreements, security documents and all other attending documents and instruments, originally entered into between the Debtor and a Secured Creditor.

44. **Person** shall mean an individual, corporation, partnership, limited liability company, association, joint-stock company, joint venture, estate, trust, unincorporated organization, governmental unit or any political subdivision thereof.

45. **Petition Date** shall mean the date on which the Involuntary Petition was filed against the AHF, which was April 21, 2009.

46. **Plan** shall mean this Plan of Reorganization, as it may be amended, modified and/or supplemented from time to time pursuant to the Bankruptcy Code.

47. **Preference** shall mean any transfer of an interest of the Debtor assets that is avoidable under section 547 of the Bankruptcy Code.

48. **Priority Claim** shall mean any Claim, to the extent entitled to priority in payment under Section 507(a) of the Bankruptcy Code, other than an Administrative Claim, that (1) has not been barred by the Plan and (2) has not been disallowed by a Final Order.

49. **Priority Tax Claim** shall mean the allowed claims of governmental taxing authorities that are entitled to priority claims under section 507(a)(8) of the Bankruptcy Code or tax claims as otherwise specified herein. The term "allowed" shall include the definition of "deemed allowed," as set forth in 11 U.S.C. § 502(a), when no objection has been filed to a claim of the Internal Revenue Service.

50. **Proceeding** shall mean the case for reorganization of the Debtor pending before the Bankruptcy Court.

51.   **Proof of Claim** shall mean a proof of claim conforming to Bankruptcy Official Form 10.

52.   **Recapitalization Assets** shall mean those assets designated in the Plan as necessary for the recapitalization of AHF in an amount necessary to insure its future operations and to meet its net worth requirements under the terms of the limited partnership agreements in which AHF, or a wholly-owned affiliated organization of AHF, serves as the general partner, and which AHF has assumed under the Plan.

53.   **Reorganized Debtor** shall mean AHF after it is reconstituted as contemplated by the terms and provisions of the Plan following the Effective Date.

54.   **Representative** shall mean any Affiliate, Person, agent, insider (as defined in Section 101(31) of the Bankruptcy Code), attorney, accountant, fiduciary, heir, guardian, surety, corporate parent or subsidiary (whether direct or indirect), and other entity having a legal or equitable relationship with another entity whatsoever.

55.   **Retained Causes of Action** shall mean, in particular, that suit filed by Sam Boyd & Associates on behalf of AHF, originally filed in the 95th Judicial District Court in and for Dallas County, Texas, bearing Cause No. 09-14410, styled American Housing Foundation, AHF Arizona, LLC, AHF Florida, LLC, AHF Tulsa, LLC, DHEOP, LLC, THEOP, LLC, and WHEOP, LLC v. Banc of America Securities, LLC, Bank of America, NA, Bank of America Corporation, Sondra E. Teilborg, and Tanya McCorquodale, which suit was subsequently removed to the United States District Court for the Northern District of Texas – Dallas Division, bearing Civil Action No. 3:09-CV-02251-D, and, in general, any claim or cause of action not expressly assigned in the Plan to the Liquidating Trust.

56.   **Section 502(c)(1) Valuation** shall mean in the case of contingent, unliquidated claims the value of the creditor's claim as estimated by the Bankruptcy Court.

57.   **Section 506 Valuation** shall mean the value of collateral as established by the Bankruptcy Court after a hearing held pursuant to Bankruptcy Rule 3012 and in accordance with Section 506 of the Bankruptcy Code, or made part of a Final Order of Bankruptcy Court.

58.   **Secured Claim** shall mean any Claim that is considered secured under Section 506(a) of the Bankruptcy Code.

59.    **Secured Creditors** shall mean all Creditors who hold a lien, secured interest, or other encumbrance that has been properly perfected as required by law with respect to property owned by the Debtor.

60.    **Trust Assets** shall mean those assets of the Liquidating Trust as set forth in Article V of this Disclosure Statement and include (1) proceeds realized by the pursuit of causes of actions delegated to the Liquidating Trust by Order of the Bankruptcy Court; (2) all Class 7 claims of Contested Creditors, to which the Debtor possess a counterclaim or an offset or otherwise contest the validity of the claim amount; and (3) all claims of the bankruptcy estate for bankruptcy related causes of action including preference claims pursuant to Section 547 of the Bankruptcy Code, all fraudulent transfer claims pursuant to Section 548 of the Bankruptcy Code, all claims relating to post-petition transactions under Section 549 of the Bankruptcy Code, all claims recoverable under Section 550 of the Bankruptcy Code, claims against any third party on account of an indebtedness or any other claim owed to or in favor of the Debtor, which are not settled prior to or as part of this Plan which are to be transferred and assigned to the Liquidating Trust pursuant to this Plan as well as all Excess Revenues paid over from the Reorganized Debtor to the Liquidating Trust. Trust Assets shall not include those assets of the Estate, from whatever source, designated in the Plan as Recapitalization Assets of AHF.

61.    **Unsecured Claims** shall mean all Claims not secured by a lien in or other encumbrance upon the property interests of the Debtor.

62.    **Unsecured Creditors** shall mean any and all Creditors having Unsecured Claims, including but not limited to Claimants holding Unsecured Deficiency Claims.

63.    **Unsecured Deficiency Claims** shall mean all Allowed Claims of creditors that are deemed to be unsecured following valuation of the Debtor's property as a result of either a Section 506 Valuation hearing, the Bankruptcy Court or the District Court's order determining the nature, extent or validity of a creditor's lien on the Debtor's property that is not stayed on appeal, or the agreement of the parties, due to the fact that the value of the collateral securing repayment of a claim against property of the Estate is less than the amount of such allowed claim as determined by the provisions of Section 506 of the Bankruptcy Code.

64.    **Other Terms**. Any term that is used in the Plan and not defined herein, but that is defined in the Bankruptcy Code, shall have the meaning set forth in the Bankruptcy Code. The words "herein", "hereof", "hereto", "hereunder", and other words of similar import refer to the Modified Plan

as a whole and not to any particular section, subsection, or clause contained in the Plan.

### B.      The Debtor in the Bankruptcy Case

The debtor in this case is American Housing Foundation (also referred to as "AHF" or "the Foundation").  On April 21, 2009, certain creditors of AHF (the "Petitioning Creditors") filed an involuntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, Amarillo Division (the "Bankruptcy Court"), in Case No. 09-20232, (the "Involuntary Proceedings").  On June 11, 2009, AHF filed a voluntary petition for relief (the "Petition") under Chapter 11 of the Bankruptcy Code initiating Case No. 09-20373 (the "Voluntary Proceeding").  The Involuntary Proceeding and the Voluntary Proceeding were consolidated by order of the Court on July 17, 2009, and AHF's bankruptcy case is now pending under Case No. 09-02032.  Since the Petition Date, the Debtor has operated its business as a Debtor-in-Possession pursuant to 11 U.S.C. §§1107 and 1108.  An Official Committee of Unsecured Creditors (the "Committee") was appointed by the U. S. Trustee on July, 10, 2009.

### C.      History of the Debtor and the Events that Caused the Bankruptcy

AHF was established in 1989 as a non-profit corporation chartered under the laws of the State of Texas, and received its tax exempt status under Section 501(c)(3) of the Internal Revenue Code that same year.  Its purpose was, and is, to create affordable housing for working families and individuals.  As of the Petition Date, AHF owned and operated, through affiliated entities, sixty-six (66) affordable housing apartment communities containing 13,417 units in Arizona, Florida, Georgia, Kentucky, Mississippi, North Carolina, Oklahoma, South Carolina, and Texas.

Under the direction of Steve Sterquell, its founder, AHF pursued an aggressive course of heavily leveraged acquisitions of properties across the nation. As many as 200 satellite entities were created to facilitate multiple investments in low income housing tax credit properties. During this time, AHF was focused almost exclusively on deals. There was no focus on managing the properties acquired.  Over the course of time, due, in part, to tightening financial markets and the inability to obtain tax credit allocations, it became more and more difficult for Sterquell to obtain sufficient cash from lenders or investors to fund all of the various obligations of AHF.  As a result, cash was taken from properties and used to pay obligations of AHF and its related entities, which, in turn, resulted in a further deterioration in the condition of the properties since no funds were then available for basic upkeep. It was only after Sterquell and his family were no longer a part of the Foundation that the full extent of the serious financial problems caused by Sterquell's over-leveraged financing and neglect of property management became apparent.

Steve Sterquell died unexpectedly in an automobile crash on April 1, 2009.  Upon his death, his son, Steve Sterquell, Jr. took over the management and control of AHF.  AHF operated under Steve Sterquell, Jr.'s direction until May 29, 2009, when he and several other officers and

employees of AHF resigned.  During this period one-half of AHF's board of directors also resigned.

During the weeks after Sterquell's death, certain creditors and investors of AHF attempted to investigate the activities of Sterquell and AHF prior to Sterquell's death and to obtain information from AHF regarding such activities.  However, the management at that time refused to cooperate in such an investigation.  Historically, Sterquell had used a complex web of interrelated entities to take funds from AHF, its affiliated entities, and its investors and to transfer funds to other individuals, investors, and affiliated entities. Evidence uncovered by the creditors and investors indicated that funds were not always deposited by Sterquell into the appropriate accounts, that Sterquell failed to make proper disclosure of material facts to limited partners concerning the status of the partnerships and their financial operations, and that funds were diverted by Sterquell for his own use and benefit.  Based upon their investigation, on April 21, 2009, certain petitioning creditors filed an involuntary petition for relief under 11 U.S.C. §303 in Case No. 09-20232-11 in the United States Bankruptcy Court for the Northern District of Texas, Amarillo Division.

The investigation into Sterquell's activities also revealed that just weeks before his death he transferred approximately $24,000,000.00 in key man life insurance on his life from AHF, as the owner and beneficiary of such policies, to various trusts controlled by or for the benefit of the Sterquell family.  In order to contest the validity of these transfers, and to try to recover the policy proceeds for the Estate of AHF, the creditors and investors, on May 18, 2009, filed an adversary proceeding bearing Cause No. 09-02005 in the United States Bankruptcy Court for the Northern District of Texas – Amarillo Division, styled Robert L. Templeton, et al v. American Housing Federation, et al.

On June 1, 2009, after the resignation of Steve Sterquell, Jr. and other officers and employees of AHF, the board of directors of AHF was reconstituted.  As the new board began its own investigation into the operations and financial condition of AHF, it discovered that for months prior to Sterquell's death, AHF had been in dire financial straits and owed creditors and investors over $26,000,000.00 in connection with transactions and investments involving entities affiliated with AHF.  AHF's new board and officers have since discovered more loans and obligations owed by AHF.

On June 11, 2009, in order to preserve its tax-exempt status, avoid liquidation, and resolve its liabilities in an orderly manner, AHF filed a voluntary Chapter 11 bankruptcy petition seeking reorganization under Chapter 11 of the Bankruptcy Code.  The voluntary case was also filed in the United States Bankruptcy Court for the Northern District of Texas – Amarillo Division, and was assigned Case No. 09-20373-11.  On July 17, 2009, the Bankruptcy Court consolidated the involuntary and voluntary cases under Case No. 09-20232-11.

### D.   Previous and Current Board and Management of American Housing Foundation

1.   **Previous Officers and Board**.  Prior to the filing of the bankruptcy petition, the following individuals served as officers and directors of AHF:

Officers of AHF (One-year prior to filing):

Steve W. Sterquell, President and Executive Director
Rick Crawford, Executive Vice President and Chief Operating Officer,
Jeff Richards, Executive Vice President and Chief Financial Officer,
Pam McDonald, Senior Vice President,
Steve W. Sterquell, II, Senior Vice President,
Jack Traeger, Senior Vice President,
Michelle Abdoo, Treasurer, and
Lana Dempsey, Secretary.

Board of Directors of AHF (One-year prior to filing):

J.I. Fletcher, Chairman,
Peggy Lawless, Director (Resident of Low Income Neighborhood and Community),
Steve Hoggard, Director (Resident of Low Income Neighborhood and Community),
Scott Rice, Director
Randy Sharp, Director, and
Betty Sterquell, Director.

2.     **Current Officers and Board**.  The following individuals currently serve as officers and directors of AHF:

Officers of AHF (Current)

Alvin Johnson, Vice President of Operations,
Gene Morrison, Vice President of Government Affairs,
Michelle Abdoo, Treasurer, and
Glenda David, Secretary.

Board of Directors of AHF (Current)

Tom Boyd, Chairman,
Carroll M. Forrester, Director,
Alvin Johnson, Director,
Peggy Lawless, Director (Resident of Low Income Neighborhood and Community), and
Steve Hoggard, Director (Resident of Low Income Neighborhood and Community).

**E.     Summary of AHF's Current Operations and Goals**

The development of affordable housing is a long term process that requires a long term business plan. Former AHF management focused on short term benefits and rewards without directing attention to the long term responsibilities and the eventual benefits that could be realized through a continued effort to provide safe and affordable housing to working families and individuals.  Under its new management, AHF is now focused on the long term goals that will benefit not only the mission of the organization, but also the creditors.

The goal of AHF is to reorganize as an ongoing business that is able to effectively carry out its charitable purpose while still paying its creditors in a fair and equitable manner.  Its plan of reorganization is premised on the concept that allowing AHF to continue in business will 1) reduce claims against AHF by avoiding significant additional liabilities resulting from contingent claims connected with its execution of guarantees associated with properties it owns or manages, 2) increase the likelihood that it can realize payment on accounts receivable owed to it by its affiliates, and 3) enhance the chances of its collecting accrued developer's fees from affiliated entities.  AHF believes that such an approach is in the best interests of all creditors in its bankruptcy case, including the holders of both contingent and non-contingent claims.

AHF is continuing its efforts to comply with its contractual obligations to the limited partners, bondholders, and lenders associated with the various properties with which it is affiliated. Its plan of reorganization is designed to allow it to fulfill its responsibilities, as far as is reasonably possible, to its lenders, bondholders, tax credit investors, and units of government with which it has existing relationships. While these duties are substantial, if AHF is successful in fulfilling its responsibilities, the result will be a much larger return to all creditors than would be realized in the event of an immediate liquidation.

AHF recognizes that if it ceases its operations, either because its bankruptcy case is converted to a Chapter 7 liquidation case or because its Plan is not confirmed and a Chapter 11 trustee is appointed, its contractual obligations under written agreements with limited partners, bondholders, and lenders will not be fulfilled, and an entire new set of contingent liabilities will ripen and become a substantial additional burden on the Estate.

There is a real benefit to AHF if it is able to retain its ownership interest in the affordable housing communities through their useful service life, as defined in the various government regulations and financing agreements relating to such properties.  Presently, AHF carries multiple notes receivable from many of its affiliated properties. The eventual refinance or sale of these properties at the end of the statutory service life, or the efficient operations of the communities will provide AHF with an opportunity to collect on these notes, which have a face value of in excess of $6 million. AHF believes that the collection of these obligations would have a significant positive impact on its ability to pay creditors.

In addition, AHF has significant rights to deferred developer's fees owed to it by many of its affiliated entities.  The total face value of these fees is more than $20 million.  While AHF cannot predict the total amount of developer's fees that can or will be collected at the end of the service life on the properties, or through efficient operations, even the realization of a fraction of this amount would be a substantial benefit to it and its creditors.

Of course, neither the notes receivable nor the developer fees will be collected if AHF is liquidated or ceases to operate.  Furthermore, AHF has guarantees in place for each tax credit partnership that obligates it to pay limited partners for any loss of tax credits or liabilities for tax credit recapture in the event that such the properties no longer qualify for such tax credits.. In addition, AHF has operating deficit guarantees in each limited partnership agreement in which it, or one of its wholly-owned subsidiaries, is the general partner.  AHF has also guaranteed payment of the conventional loans used to finance the properties in its portfolios.  If AHF is liquidated or ceases to operate, whether due to the appointment of a Trustee,  confirmation of a competing liquidation Plan, or undercapitalization coming out of bankruptcy, it is likely that additional liabilities, possibly in excess of $100 million, would be triggered and become claims against the Estate.

Since AHF's new management has ended former management's practice of taking funds from its affiliated properties to support extravagant expenditures, more funds are now available to make needed repairs and improvements to its properties which, in turn, will result in improved occupancy and increased rental income. These more prudent and efficient management practices will increase the funds available to AHF's affiliated entities to make necessary payments on the outstanding receivables that are due from the various properties.  AHF expects that current management, operating under its plan of reorganization, will be able to enhance the value of its affiliated properties, which will ultimately result in surplus cash flow from the properties to AHF that will benefit all creditors of the bankruptcy estate.  In addition, the proceeds from the key man life insurance policies, currently held in the registry of the Bankruptcy Court, will provide the necessary funds for AHF to recapitalize, make immediate payment to critical vendors, and provide a source of capital expenditures for the properties.  These payments to vendors and capital expenditures will extend the effective life of the properties, thus increasing the probability and collection of the aforementioned notes and deferred developer fees.

AHF believes that its continuation as an operating entity can cure defaults and fulfill its contractual obligations, either as modified by its plan of reorganization or pursuant to separate negotiations outside of its bankruptcy case, results in a real benefit to its creditors and the working families and individuals that it serves.

F.      **AHF's Operations as a Debtor in Possession**

AHF has been operating as a Debtor-in-Possession since the filing of the voluntary petition on June 11, 2009.  Prior to June 1, 2009, while AHF was under the direction of Steve Sterquell, and, later, under Steve Sterquell, Jr., AHF had multiple offices and many highly compensated executives at remote locations.  Today, AHF operates efficiently from its corporate office in Amarillo, Texas, with a centralized staff that is performance and goal oriented.  The annual payroll of AHF has been reduced from approximately $4,300,000.00 to approximately $700,000.00.  Similar reductions in costs have been replicated across AHF's budget.  For example, under Sterquell's leadership, AHF paid for the operation of three private aircraft, including one corporate jet.  Today, AHF has no such expense.

Even though AHF operates today at a drastically reduced level of expenditure, both the amount and quality of its work have increased. AHF is now focused on the daily responsibility of

achieving its charitable purpose, which is to provide safe, decent, and affordable housing to working families and individuals. The operations of AHF are now open, forthright, transparent, and available for examination by its creditors, investors, and business partners.

For several months prior to the death of Steve Sterquell, AHF's relationships with its lenders, bondholders, and investors had been steadily worsening. One of the top priorities of AHF's new management has been to repair, and even enhance, these relationships. Toward that end, AHF's new management has made a concerted effort to stay in regular contact with lenders, bond counsel, and investors, and to give them regular updates on its activities. Since its bankruptcy filing, AHF has also been able to maintain and strengthen its relationship with the Department of Housing and Urban Development – a relationship that is vital to the continuation of its mission to provide affordable housing for working families and individuals. Because of these efforts, AHF is now in a much better position to obtain future financing or refinancing, if advisable, to help restructure and, possibly, lower the debt load on the properties in its portfolio which, in turn, would enhance its ability to reorganize and fulfill its mission.

## The Unsecured Creditors Committee

On July 10, 2009, the U. S. Trustee for the Northern District of Texas appointed an unsecured creditors committee consisting of Robert Templeton, Chair, Tim Nichols (Ranier American Investors (I, II, and III)), Terrill F. Horton, and Campbell Burgess (Herring Bank). The Trustee later added Ed Attebury as a member of the committee. AHF continues to work with the committee to locate and preserve assets of the bankruptcy estate, to pursue and recover preferential and fraudulent transfers of property of the Estate, to examine and determine the validity or non-validity of claims filed in the bankruptcy cause, and to work toward the successful reorganization of the Foundation.

## Cash Collateral

AHF's largest secured, non-contingent creditor is Texas Capital Bank ("TCB"). TCB claims first priority liens and security interests in a substantial portion of AHF's personal property, including, but not limited to, cash and rights to payment needed by AHF to pay its operating expenses. For that reason, AHF filed a Motion for Interim and Final Order to Use Cash Collateral on July 10, 2009. Since the filing of the motion, AHF and TCB have agreed to successive 30-day interim orders permitting AHF to use cash collateral, subject to the terms and restrictions contained in the orders. The Debtor is seeking a long-term, permanent use of cash collateral prior to the confirmation of this Plan. To date, AHF has made the following adequate protection payments to TCB:

| Date of Payment | Amount of Payment |
|---|---|
| August 10, 2009 | $62,621.77 |
| September 9, 2009 | $40,000.00 |
| October 14, 2009 | $15,000.00 |
| November 9, 2009 | $15,000.00 |
| February 1, 2010 | $7,000.00 |
| February 11, 2010 | $7,000.00 |
| March 15, 2010 | $7,000.00 |

<u>Sale of Lakewood Terrace Townhomes</u>

Prior to the filing of its bankruptcy case, AHF had entered into negotiations with Exxon Mobil Corporation to sell a group of properties in its portfolio consisting of 166 townhomes contained in 20 different buildings on approximately 13 acres of land located at 6900 Bayway Drive, Baytown, Texas, known as the Lakewood Terrace Townhomes, for a total consideration of $7,553,000.00. The purchase was subject to certain conditions which provided for the acquisition of certain townhomes at Lakewood Terrace; the sale of all of the townhomes to Exxon Mobil Corporation; the payoff of the existing liens on all of the townhomes; the demolition of the townhomes, removal of the debris, and the abatement of any hazardous materials; and the creation of a "green space" where the townhouses were previously located. Payment of the purchase price was to be made in stages in accordance with the phases of demolition and remediation, provided for in the sales contract, with the final payment of any equity to AHF upon completion of the demolition, removal and abatement and final releases of any remaining outstanding debt instruments of any kind secured by the Property. Upon closing, Exxon-Mobil would receive the property free and clear of all liens and encumbrances. The consummation of the sale would be of substantial benefit to AHF, its bankruptcy estate, and creditors by: (i) paying off secured debt claims of Bank of America f/k/a Countrywide Mortgage, U.S. Bank, and other secured claims, and (ii) realizing the value of AHF's equity in Lakewood Terrace Townhomes.

The negotiations on the sale of Lakewood Terrace were successfully completed after the filing of the bankruptcy case. On October 30, 2009, AHF filed its Motion to Sell Property pursuant to Section 363(b) of the Bankruptcy Code seeking approval of the proposed sale from the Bankruptcy Court. On November 24, 2009, after a hearing on the motion, the Bankruptcy Court entered its order approving the sale. AHF and Exxon Mobil are working together to fulfill the terms of their contract and complete the sale. AHF estimates that after completion of the demolition, abatement, and remediation required to develop the green space, and the payment of the indebtedness secured by the Lakewood Terrace townhomes, it could realize as much as $1,000,000 in net equity from the sale. The Plan contemplates that AHF will use these funds in its ongoing operations to maintain its corporate office and make necessary expenditures on other properties in which it holds an ownership interest.

## The Brandywood/FEMA Grant

AHF's portfolio of properties also includes an apartment housing project located in Pasadena, Texas, owned by Brandywood Housing, Ltd., a limited partnership in which AHF is the sole owner of the general partner, Brandywood Apartments, Inc.  Several of the apartment buildings on the Brandywood Property are located in an area that is susceptible to repetitive flooding.  Prior to the filing of AHF's bankruptcy case, the City of Pasadena applied through the Texas Water Development Board for a Federal Emergency Management Administration ("FEMA") project grant under the Severe Repetitive Loss ("SRL") program to mitigate certain repetitive flood problems with 17 buildings at the Brandywood Property.  Pursuant to the FEMA SRL program, FEMA, through the Texas Water Development Board, agreed to provide a grant to fund substantially all of the costs of the remediation project. Under the proposed FEMA Transaction, the 17 Brandywood buildings in the repetitive flood zone would be demolished and the land used as a green space to avoid flood damage in the future.  After the completion of the demolition and rehabilitation work, the parcel where the repetitive flooding occurred would be conveyed to the City of Pasadena. Upon completion of the FEMA Transaction, Brandywood Housing, Ltd. would retain ownership of its remaining property, consisting of 440 apartment units in 34 buildings.

On December 31, 2004, Texas Capital Bank made a loan to Brandywood Housing, Ltd. in the original principal amount of $9,500,000.00 for the refinancing of, and other costs and expenses related to, the Brandywood Property.  This loan was secured by a Deed of Trust granting Texas Capital Bank a lien on the Brandywood property.  Prior to the Brandywood loan, on or about June 25, 2004, Texas Capital Bank had made a loan on the amount of $3,000,000.00 to AHF, secured by a lien on assets of AHF, generally described as accounts, chattel paper, cash, and rights to payment.  On December 30, 2004, AHF and Texas Capital Bank executed an Amended and Restated Pledge and Security Agreement that, among other things, extended Texas Capital Bank's security interest in AHF assets to secure the Brandywood loan in addition to the loan to AHF.  Both loans matured on April 30, 2009.  As of the date of the filing of AHF's bankruptcy petition, the balance owed to Texas Capital Bank on both loans was approximately $9,700,000.00.

It is anticipated that at the closing of the FEMA Transaction, Brandywood Housing, Ltd. will receive $5,298,012.93 as the purchase price for the portion of the Brandywood property being conveyed to the City of Pasadena.  From these proceeds, Brandywood Housing, Ltd. must make payments to various entities for low income housing tax credit recapture, pay Harris County property taxes, pay City of Pasadena property taxes, pay outstanding payable and non-mortgage liens due, and pay estimated closing costs and escrow fees.  After these payments are made, it is estimated that approximately $2,000,000.00 in net proceeds will be available to Brandywood Housing, Ltd.  Brandywood Housing, Ltd. had initially proposed to use these funds to pay down the indebtedness owed to Texas Capital Bank, which claims a security interest in the funds by virtue of the deed of trust lien granted to it by Brandywood Housing, Ltd. However, the U. S. Department of Housing and Urban Development has challenged the validity of Texas Capital Bank's claim to the funds and, instead, asserts that the funds should be used to benefit the apartment units remaining on the Brandywood property.  These matters are awaiting resolution, either through settlement or by court decision.  In either event, the completion of the

FEMA grant will provide a substantial benefit to AHF, its Estate, and creditors by: (i) significantly reducing Texas Capital's aggregate claim secured by assets of AHF; and/or (ii) enhancing the value of AHF's interest in Brandywood Housing, Ltd. by reducing the indebtedness secured by the Brandywood property and potentially increasing the value of Brandywood Housing, Ltd.'s remaining apartment units.

On September 9, 2009, AHF filed its Motion for Approval of Brandywood Housing Ltd./FEMA Transactions with the Bankruptcy Court.  An objection to the motion was filed by HUD on September 29, 2009.  After negotiations between AHF, Brandywood Housing, Ltd. and HUD, an agreement was reached and an Order Allowing Debtor to Execute and Perform, as Limited, its Obligations Under the Brandywood Housing, Ltd./FEMA Transactions was entered by the Bankruptcy Court on January 20, 2010.  Under the terms of the order, AHF was given authority to execute the documents that it is required to sign in order to complete the FEMA Grant.  All parties reserved their rights with respect to the Brandywood property and the grant proceeds for adjudication at a later date.  Based upon the order, AHF and Brandywood Housing, Ltd. are proceeding with their respective duties and obligations necessary to complete the grant requirements.

### Delegation of Litigation to the Unsecured Creditors' Committee

Since filing its bankruptcy petition, AHF, through its attorneys, management, and board of directors, has uncovered numerous transactions that appear to be the subject of fraudulent conveyances, preferences, or the basis of other bankruptcy-related claims against third parties. In addition, AHF has become aware of actions taken by previous officers and directors that might give rise to causes of action against them. Such actions hold the potential of significant recoveries for AHF, its bankruptcy estate, and its creditors.  AHF is aware of its fiduciary obligations to investigate and pursue these claims against officers, directors, and other third parties.  AHF also recognizes that with respect to claims against officers and directors who were employed or in office prior to the filing of its bankruptcy, or, perhaps, against related third parties, there could exist conflicts of interest.

AHF also recognizes that it does not have sufficient resources to investigate and prosecute the claims and still operate its business in a reasonable and prudent manner.  In addition to its own internal operations, AHF has numerous affiliated entities which own and maintain properties located throughout the southern United States and, as the general partner or manager of these entities, it is responsible for their day to day operations.  Consequently, AHF made the determination that it was in the best interest of the bankruptcy estate and its creditors to delegate authority to pursue certain claims to the Unsecured Creditors' Committee. AHF, therefore, filed a Motion to Delegate Authority to Pursue Certain Actions on Behalf of the bankruptcy estate on October 14, 2009.  Objections to the motion were filed by creditors Attebury Family Partnership, LP and Texas Capital Bank. After negotiation, an agreed order was entered by the Bankruptcy Court on January 26, 2010, delegating certain matters, more fully described in Article V below, to be investigated and prosecuted by the creditor's committee.

The Creditor's Committee will no longer exist after confirmation of the Plan.   Any litigation being pursued by counsel for the Creditor's Committee as of the confirmation date shall be transferred to the Liquidation Trust.

<u>Status of Life Insurance Litigation</u>

On May 18, 2009, certain petitioning creditors and investors of AHF filed an adversary proceeding attempting to recover proceeds from life insurance policies on the life of Steve Sterquell totaling $27,000,000.00, for the bankruptcy estate of AHF.   On June 11, 2009, AHF also filed its own adversary proceeding in Cause No. 09-20373, styled American Housing Foundation v. Sterquell Irrevocable Life Insurance Trust, et al, alleging claims and seeking relief similar to that requested in the petitioning creditors' adversary proceeding.   On September 25, 2009, using the style and cause number of the proceeding filed by the petitioning creditors, the Bankruptcy Court signed an order consolidating the two adversary proceedings.   On the same day, the United States District Court for the Northern District of Texas withdrew the reference with respect to both adversary proceedings. The consolidated adversary proceedings are now pending in the court in Cause No. 2:09-CV-231-C.

On December 14, 2009, the United States District Court entered an order finding that AHF was entitled to the proceeds of certain key man policies, totaling $21,000,000.00.   Then, on February 11, 2010, the court entered a final judgment in favor of AHF awarding it recovery of these proceeds.

Prior to and after the District Court's order awarding the $21,000,000.00 in insurance proceeds to AHF, the Sterquell family, the Creditors' Committee, and AHF engaged in negotiations to settle the parties' respective claims to the remaining $6,000,000.00 insurance proceeds.   After these lengthy and difficult negotiations were completed, the parties arrived at a settlement under which AHF would recover an additional $3,000,000.00 in life insurance proceeds plus certain other property in which the Sterquell family had previously claimed an interest.   On or about March 5, 2010, an agreement was signed by all parties setting forth the terms of the settlement.   A motion to approve the settlement is currently pending before the Bankruptcy Court.

The recovery of $24,000,000.00 in proceeds from the life insurance policies on the life of Steve Sterquell of immense value to AHF, its creditors, and the bankruptcy estate.   The recovery provides a source of distribution to creditors and a source of funds to assist AHF in recapitalizing and meeting immediate financial needs necessary for a successful reorganization and reemergence from bankruptcy.

### Relationship between AHF and AHF Development, Ltd. and Pending Motions Relating to the Bankruptcy of AHF Development

On October 19, 2009, AHF Development, Ltd. filed for relief under Chapter 11 of the U.S. Bankruptcy Code under Case No. 09-20703-11 in the U.S. Bankruptcy Court for the Northern District of Texas, Amarillo Division.

On January 4, 2010, the U.S. Trustee filed her Motion to Dismiss or Convert Case to Chapter 7 in the AHF Development, Ltd. case. This Motion is currently pending before the Bankruptcy Court and in response to such motion both AHF and the Creditors' Committee filed their objections to the conversion or dismissal of the AHF Development, Ltd. case and also requested the Court to substantively consolidate the AHF Development, Ltd. case with the AHF bankruptcy.

Although organized as a limited partnership in which AHF was the general partner, AHF Development was nothing more than a bank account used by Steve Sterquell as a clearing house for depositing funds taken from various entities, investors, and creditors and then transferring them to other persons and entities for a variety of purposes, including distributions to himself and related entities. The only asset appearing on the books of AHF Development, Ltd. is an account receivable in the amount of $16,080,449.00 purportedly owed to it by AHF. AHF disputes the validity of the receivable, which it contends was created by Sterquell to cover transfers of funds from the AHF Development bank account for improper purposes. The AHF Development, Ltd. account has been dormant since shortly after Sterquell's death.

Prior to the AHF Development bankruptcy filing, the Attebury Family Partnership, LP, filed a lawsuit against AHF Development, Ltd. in a state district court in Amarillo, Texas, to recover on a promissory note executed by AHF Development, Ltd. This promissory note was guaranteed by AHF and Sterquell and forms the basis of the Attebury Family Partnership's claim in the AHF bankruptcy proceeding. Numerous investors and creditors intervened in the Attebury Family Partnership action seeking to recover funds that had been misappropriated by Sterquell and deposited into the AHF Development, Ltd. account. AHF Development has no funds to defend this litigation. AHF believed there was a real danger, if the AHF litigation was allowed to proceed in State Court, that one or more of the Creditors would obtain a judgment against AHF Development, and attempt to gain a preference in the AHF bankruptcy by executing on the AHF Development receivable, acquiring it for pennies on the dollar, and then filing a claim in the AHF bankruptcy case for the full $16,084,449.00. If the AHF Development claim were allowed in the AHF bankruptcy, these creditors might in fact obtain a very substantial additional payment from the Bankruptcy Court in preference to other AHF creditors.

In their motions for substantive consolidation, AHF and the Creditors' Committee have requested the Bankruptcy Court to exercise its equitable powers to substantively consolidate the bankruptcy estates of AHF Development, Ltd. and American Housing Foundation for all purposes, including the filing, solicitation, and acceptance of a Plan of Reorganization that treats the assets and liabilities of both entities and provides for distributions to creditors of both entities.

Both AHF and the Creditors' Committee believe that facts of this case warrant substantive consolidation. There exist a number of factors which weigh heavily in favor of substantive consolidation. First, there is a unity of ownership. AHF, as the general partner of AHF Development had the power to manage the affairs of AHF Development and is liable for its debts. Until his death, Steve Sterquell managed both entities. Funds were commingled to the extent that Sterquell operated the AHF Development account as merely another bank account for the benefit of AHF. The payables and receivables between AHF and AHF Development were

indistinguishable. Money was frequently paid out by AHF Development for the benefit of AHF, its related entities, its investors, and Sterquell Family entities. Joint control, commingling of assets, joint payables and receivables, and disregard for the distinction of the corporate entities have often been used by courts when finding a substantial identity between debtors justifying substantive consolidation

Both AHF and the Committee believe that substantive consolidation would avoid harm to creditors of the respective bankruptcy estates and provide a significant benefit by providing for the equitable treatment of all creditors. Consolidation would avoid unequal treatment among similarly situated creditors, and would allow the proceeds from unencumbered assets and any recovery from litigation to be shared among all of the creditors of both estates.

Substantive consolidation would also extinguish the intercompany payables and avoid the need to reconcile significant claims between AHF and AHF Development, Ltd. The creditors of AHF and AHF Development as a whole are not prejudiced by substantive consolidation, and any prejudice or harm that might be shown by individual creditors of either bankruptcy estate is significantly outweighed by the benefits to the creditor pool as a whole.

## ARTICLE II

## Explanation of Chapter 11

### A.    Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, an attempt is made to restructure the Debtor's finances so that the Debtor may both continue to operate their business and repay their creditors. Alternatively, the Chapter 11 Plan may provide for the liquidation of the Debtor's assets, with the properties subject to security interests going to the respective secured creditors, and all remaining property satisfying, first, administrative claims and, secondly, general unsecured claims. Formulation of a Plan of Reorganization is the primary purpose of a reorganization proceeding under Chapter 11.

The Chapter 11 Plan sets forth and governs the treatment and rights to be afforded to creditors, other claimants, and equity interest holders with respect to their claims against, and interests in the Debtor's assets. According to Section 1125 of the Bankruptcy Code, acceptances of a Chapter 11 Plan may be solicited only after a written Disclosure Statement approved by the Bankruptcy Court as containing adequate information has been provided to each creditor or equity interest holder. This Disclosure Statement is presented to creditors and interest holders to satisfy the disclosure requirements contained in Section 1125 of the Bankruptcy Code.

### B.   Plan and Accompanying Disclosure Statement

The purpose of a Disclosure Statement is to provide the Creditors and parties in interest adequate information to make an informed judgment about the Debtor's Plan. Generally, this information includes, among other matters, a brief history of the Debtor, a history of the Chapter 11 case, a description of the remaining assets and liabilities of the Debtor, an explanation of how

the Plan will function and an explanation of why the reorganization of the Debtor under the proposed Plan should result in a greater benefit to the Creditors than if the Chapter 11 case was converted to a Chapter 7 case and a Chapter 7 Trustee was appointed. The Disclosure Statement must contain adequate information, and in sufficient detail, to enable a hypothetical reasonable investor, typical of the claims or interests in the classes entitled to vote on a plan, to make an informed judgment about the plan. The Disclosure Statement must be approved by the Bankruptcy Court before it is sent out to creditors and interested parties.

The Bankruptcy Code does not require that each creditor vote in favor of a proposed plan in order for the Bankruptcy Court to confirm it. At a minimum, though, a plan must be accepted by a majority in number and two-thirds in amount of those claims actually voting in at least one class of impaired claims under a plan. Creditors who fail to vote will not be counted as either accepting or rejecting the plan. Even if all classes of claims accept a plan, the Bankruptcy Court must still make certain findings before it can confirm the plan.

To be confirmed, a plan must, among other things, comply with the requirements of Chapter 11 of the Bankruptcy Code, be proposed in good faith, be in the "best interests" of creditors and equity holders, and be feasible. The "best interests of creditors" test generally requires that the value of the consideration to be distributed to the creditors under a plan must not be less than the creditors would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. To satisfy the "feasibility" requirement, the Bankruptcy Court must find that there is a reasonable probability that the Debtor will be able to perform the obligations incurred under the plan and that the Debtors will be able to continue operations without the need for further financial reorganization, unless such liquidation or further reorganization is proposed in the plan itself.

In the event that any impaired class of claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, as to each impaired class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." A Plan of Reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims or equity security interests. "Fair and equitable" has different meanings for secured claims and unsecured claims.

With respect to a secured claim, "fair and equitable" means either: i) the impaired secured creditor retains its liens to the extent of its allowed claim and receives deferred cash payments at least equal to the allowed amount of its claim with a present value on the effective date of the Plan at least equal to the value of such secured creditor's interest in the property securing its liens; or ii) property subject to the lien of the impaired secured creditors is sold free and clear of the lien, with the lien attaching to the proceeds of the sale, and such lien on the proceeds must then be treated in accordance with clauses (i) or (iii) of this paragraph; or iii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the Plan.

With respect to an unsecured claim, "fair and equitable" means either i) each impaired unsecured creditor receives or retains property of a value equal to the amount of its allowed

claim; or ii) the holders of the claims and equity security interests that are junior to the claims of the dissenting class will not receive any property under the Plan.

In the event one or more classes of impaired claims rejects the Plan, the Bankruptcy Court will determine at the hearing for confirmation of the Plan whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of claims. If the Bankruptcy Court determines that the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of claims, the Bankruptcy Court can confirm the Plan over the objection of any impaired class.

Classes of claims and interests that do not receive or retain any property under a plan on account of such claims and interests are deemed to have rejected the plan and are not entitled to vote, and classes of claims and interests that are not impaired under a plan are deemed to have accepted the plan and are not entitled to vote. Therefore, acceptances of the plan are being solicited only from those creditors who hold impaired claims that may be receiving a distribution under the plan.

## **ARTICLE III**

### **Summary of the Plan**

#### A.    **Overview**

The following is an overview of certain material provisions of the Plan that is being filed either simultaneously with this Disclosure Statement or prior to the hearing on approval of the Disclosure Statement.  In the event that there is any discrepancy between the Plan and the provisions of the Disclosure Statement, the provisions of the Plan will control.  The following sections are qualified in their entirety by reference to all the provisions of the Plan, including any and all exhibits thereto, all documents described in the Plan, the definitions contained in the Plan of certain terms used in this Disclosure Statement, and by any and all exhibits to the Disclosure Statement.

The Plan divides Claims and Interests into Classes and sets forth the treatment for each Class.  In accordance with the Bankruptcy Code, each Class contains Claims or Interests that are substantially similar to the other Claims or Interests in the same in such Class.  Under the Plan, each class of Claims and Interests (excluding Administrative and Priority Claims) has determined to be either impaired or unimpaired by the Plan's terms.

The Plan also sets forth information and makes provision for the treatment of certain claims and interests of creditors and holders of interests in limited partnerships and limited liability companies affiliated with AHF, even though such claims are not strictly claims against AHF's bankruptcy estate.  In some cases, AHF has contingent liabilities that could be triggered upon AHF's liquidation or the occurrence of, or failure to cure, defaults in its contractual obligations to such creditors or interest holders.  In other cases, AHF believes that its successful reorganization and continued operation is contingent upon the ability of the limited partnerships

and limited liability companies in which it has an interest to fulfill their contractual and financial obligations.

A summary of the Plan being proposed by AHF appears below. This summary is intended to set forth in a simplified form the manner in which the AHF will be reorganized if the Plan is approved by the Bankruptcy Court. The summary is also intended to inform each Creditor of the way its particular Claim is to be paid under the terms of the Plan. A reading of the summary will provide you with general information about the Plan and its proposed treatment of all Creditors. However, to make a fully informed judgment about the Plan, you are urged to read the entire Disclosure Statement and Plan.

**B.      Summary of the Plan**

The Plan proposed by AHF is a multifaceted plan. The Plan provides for the following:

An operating plan along with a Liquidating Trust that provides for a partial payment to the unsecured creditors from the proceeds from the recovery of certain life insurance proceeds, bankruptcy actions and third party actions, in that regard, there are currently on deposit with the United States District Court life insurance proceeds in the amount of $21,000,000. Additional life insurance proceeds may be recovered. AHF believes that there will be a minimum of $21,000,000.00, plus accrued interest, available for payment of administrative expenses, distribution to AHF, and distributions to creditors through the Liquidating Trust in accordance with the terms and provisions of the Plan.

The Debtor has been authorized by the Court to delegate to the Creditor's Committee the pursuit through suit or compromise a number of claims.  Any such claims which are still pending on the date of Confirmation shall be transferred to the Liquidating Trust.  All net proceeds from these claims, with the exception of the Recapitalization Assets, will be placed in the Liquidating Trust.  These claims include present or anticipated suits against prior Directors and Insiders of AHF; and a number of claims for preferences, fraudulent conveyances, or other similar causes of actions against individuals or entities who AHF asserts are obligated to it.

The reorganization portion of the Plan is premised on the dramatic reduction of overhead and expenses in operations by the officers and employees of AHF at the principal office in Amarillo, Texas. The Plan provides for the payment of excess revenues by AHF to the Liquidating Trust on an annual basis for a period of ten (10) years after the Effective Date, and for distribution for such funds by the trust to pay to creditors holding approved unsecured claims. By continuing its operations in an economical and responsible manner AHF anticipates that it will be able to avoid the triggering of multiple millions of dollars of contingent liabilities, generate additional funds to pay to creditors, and upgrade its affiliated properties so that they are able to generate the cash flow needed to fund AHF's operations, preserve its rights to receive future developer's fees and notes receivable, and to pay, over the term of the Plan, a significantly greater amount to its creditors.

The Plan also provides for the allocation to AHF, from the Life Insurance Proceeds, of the amount of $5,289,387.03 as Recapitalization Assets, which AHF calculates is the amount

necessary to meet its capitalization obligations under the limited partnership agreements in which it is, or controls, the general partner, and to give adequate assurance to its limited partners that it will have sufficient capital to continue to fulfill its duties as the general partner in the future. AHF's fulfillment of its duties and obligations as a general partner is vital to its successful reorganization and to the avoidance of the contingent liabilities described above. AHF's continuing as the general partner in these partnerships is also necessary for it to receive future developer's fees and payments on notes receivable that will be paid over to creditors through the Liquidating Trust.

    **C.**    **The Relationship Between AHF and Entities Owning Property It Operates or Manages**

    1.    **AHF Bond Financed Properties.**  In 1998, AHF began utilizing tax exempt multifamily revenue bonds to finance apartment complexes. AHF created affiliated limited liability companies to obtain financing for the properties. These limited liability companies, which are not in bankruptcy, own and operate the apartment complexes. The tax exempt bonds used to finance the acquisition of the properties were issued by state and local regulatory bodies which have legislated jurisdiction to issue tax exempt financing. These tax exempt bonds were sold to investors and the proceeds were then used to finance the acquisition of the properties. The bonds are payable solely from revenues generated by the operations of the properties. The portion of the debt attributed to the real estate is secured by a mortgage on the property owned by the limited liability company. However, the bonds are non-recourse debt and, in the event that the gross revenues from the properties are insufficient to pay the principal and interest on the bonds, neither the borrower nor AHF is obligated to make available any of its other revenues or assets to make up any shortfall. Since AHF does not believe it has any liability to the holders of these tax exempt bonds, it will file objections to all such claims and will ask the Court to estimate the claims at zero value for Plan confirmation purposes. A complete listing of these properties along with their locations, the name of the entity that owns them, the details relating to the financing, and the Debtor's projections with respect to their disposition is reflected on the attached Exhibit "A."

The Plan contemplates the allocation of income from the bond-financed properties for the purpose of making repairs and capital improvements to the properties necessary to increase occupancy rates and income to the extent required to make the properties self-sustaining.

Under the terms of the Plan, AHF will remain the managing entity of all bond-financed properties. AHF will continue to own the affiliated limited liability companies until decisions related to the ultimate disposition of the properties are made by management following confirmation of the Plan.

2.      **AHF Conventionally Financed Properties:** AHF is the sole member of a number of limited liability companies that manage low income housing units that are conventionally financed.  A summary of these companies is also included in Exhibit "A." This summary reflects the names of the particular properties, the name of the LLC that holds title to them, the current status of the operations of the properties, and AHF's intentions with respect to each property.

The conventionally-financed properties are not in bankruptcy and are a significant source of revenue for AHF.  The Plan proposes for the AHF affiliated entity to remain as the managing entity of all conventionally-financed properties.  AHF will continue to maintain its capacity as owner of its affiliated entities.  Presently, all of these properties have short-term conventional financing. AHF is in the process of applying for and negotiating long-term permanent financing which will make these properties more stable and better equipped to be self-supporting and furnish a revenue stream to AHF in future years.

Unlike the bond-financed properties, AHF has contingent liability to the conventional lenders in the event that the loans go into default. Presently, all of these properties are performing and servicing the debt against them and the loans are not in default. Consequently, all of the claims of these conventional lenders are included in Class Seven of the Plan, and are characterized as potential claims that are contingent, unliquidated and disputed. Since none of these loans are in default, AHF has, or will, object to the allowance of the claims of these conventional lenders and will ask the Court to estimate their claims at zero for Plan confirmation purposes.

3.      AHF Tax Credit Properties: AHF, either directly or through limited partnerships in which it is the general partner, owns interests in properties with respect to which it or its affiliates sold federal tax credits totaling almost $92 million. In each instance, AHF executed a guarantee of performance. The guarantee of performance provides that in the event the properties do not fulfill the requirements for the holders of the tax credits to realize the full value of such credits over the applicable compliance period, AHF will stand good for the resulting losses incurred by such holders.

A summary of the properties, their locations, the ownership entities, the details of the financing and the applicable compliance periods, AHF's plans for the handling of these assets, and an estimate of the amounts of AHF's potential exposure is set forth in Exhibit "A" to the Plan.

The Plan proposes that AHF will assume the limited partnership agreements and remain as the general partner of the entities that own the affected tax credit properties.  The Plan also proposed that AHF will cure its defaults under the terms of the limited partnership agreements

and work to restructure the debts associated with each property. The goal is to maintain the properties under the existing arrangements, and, if necessary, enter into workout agreements with the holders of the claims against the properties so that it can stay in compliance, avoid triggering contingent liabilities, and assure that its limited partners will ultimately receive their full, bargained for, value.

The obligations of AHF necessary to cure its defaults under the limited partnership agreements are classified in Class Six of the Plan. In the event that the amount necessary to cure the defaults with respect to a particular partnership agreement is not known with certainty, and if an agreement cannot be reached with the limited partners as to the amount necessary to cure the default, AHF will ask that such liability be estimated for purposes of voting for or against the Plan.

It should be noted again that in the event AHF defaults on its obligations with respect to these tax credit properties, either due to its failure to comply with the requirements of its limited partnership agreements, the appointment of a Trustee, or the confirmation of a Plan that does not provide adequate funds for recapitalization and the curing of its defaults, the contingent liabilities associated with these properties will, in all likelihood, mature and become claims against AHF's bankruptcy estate, thus greatly reducing the potential recovery of claims by its current Unsecured Creditors.

**D.    Assumption or Rejection of Executory Contracts, Including Limited Partnership Agreements**

1.    **Assumption Generally**

The Confirmation Order, pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, without any additional order, will constitute the Bankruptcy Court's order approving the rejection or assumption of each executory contract and limited partnership agreement as described below and as described in the Plan.  In addition, notwithstanding any provision to the contrary in this Disclosure Statement or the Plan, AHF may assume any executory contract or limited partnership agreement that prior to the Effective Date has not been assumed.

2.    **Cure of Defaults**

With respect to each executory contract and limited partnership agreement assumed by AHF, the Plan will establish the manner in which any existing defaults of AHF will be cured.  In general, as to monetary defaults in which an immediate cure is necessary, the Plan will provide that an amount necessary to cure such defaults will be allocated to AHF from the Life Insurance Proceeds and paid within 180 days of the Effective Date of the Plan.

3.      **Executory Contracts and Limited Partnership Agreements to be Assumed**

The executory contracts and limited partnership agreements which are to be assumed under the Plan, and the manner for curing the defaults, if any, under such contracts and agreements, are set forth in Exhibit B attached to this Disclosure Statement.

4.      **Executory Contracts and Limited Partnership Agreements to be Rejected**

The executory contracts and limited partnership agreements which are to be rejected under the Plan are set forth in Exhibit C attached to this Disclosure Statement.

5.      **Rejection of Unlisted Executory Contracts, Unexpired Leases, and Limited Partnership Agreement and Bar to Rejection Damages**

All other executory contracts, unexpired leases, and limited partnership agreements to which AHF is a party, will be rejected under the Plan unless within sixty (60) days after the Effective Date AHF files an appropriate motion with the Bankruptcy Court to assume a particular contract, lease, or agreement.  If the rejection of an Executory Contract or Unexpired Lease results in damages to the other party or parties to such contracts or leases, a Claim for such damages shall be forever barred and shall not be enforceable against the AHF or its respective properties unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtor within thirty (30) days after entry of the order (which may be the Confirmation Order) allowing rejection of such contract or lease.  Such Claim, if allowed, shall be classified and treated as an Allowed Unsecured Claim for purposes of the Plan.

E.      **Treatment of Secured Claims Under the Plan**

1.      **Sale of Lakewood Terrace Townhomes to Exxon Mobil Corporation and Treatment of Secured Creditors Holding Mortgages on Lakewood Terrace Townhomes**

AHF owns certain real property in Baytown, Texas, consisting of 166 attached townhomes known as the Lakewood Terrace Townhomes.  These townhomes are encumbered by four (4) separate lenders.  Bank of America dba Countywide Home Loans, ("BAC"), has mortgage liens on 104 townhomes, with a total indebtedness of approximately $3,700,000. Graham Financial has a mortgage lien on 30 townhomes, with a total indebtedness of approximately $750,000. Gary Graham, IRA, has a mortgage lien on 20 townhomes, with a total indebtedness of

approximately $500,000.  Cenlar, the fourth lender, has a security interest in a single townhome with a total indebtedness of approximately $37,000.

After the demolition of the townhomes is complete and the abandoned streets, alleyways and right-of-ways have been conveyed to AHF by the City of Baytown, AHF will complete the sale of the property to EMC and the liens mentioned above will be satisfied from the sales proceeds.   AHF estimates that it will realize $1,000,000 from this transaction. The Plan contemplates that AHF will use these funds in its ongoing operations to maintain its corporate office and make necessary expenditures on other properties in which it holds an ownership interest.


2.    **The Brandywood/FEMA Grant and Treatment of Texas Capital Bank's Secured Claim**

As of the Petition Date, Texas Capital Bank ("TCB") holds claims against the AHF and certain of its assets, as defined in Section 101 of the Bankruptcy Code, in the total aggregate approximate amount of $9,635,115.13 in unpaid principal and accrued interest, plus any and all fees, and any and all other obligations and liabilities of AHF to TCB according to the pre-petition loan and collateral documents, or otherwise including, interest, reasonable costs, attorney's fees, and any and all other amounts to the extent permitted by the Bankruptcy Code and applicable law.  On June 26, 2009, TCB filed its proof of Claim (Claim No. 4 in the Claim Register) reflecting the amounts it claims were owed to TCB as of the Petition Date.

The debt owed to TCB stems from a working capital loan to AHF in the amount of approximately $2,500,000.00 and a guaranty of payment of a loan from TCB to Brandywood Housing, Ltd. ("Brandywood") in the original principal amount of approximately $7,500,000.  The TCB loan to Brandywood is secured primarily by the Brandywood Apartments, which is owned by Brandywood and located in Pasadena, Texas (the "Brandywood Property" or the "Property").  As of the petition date, the loan to Brandywood had a balance of approximately $7,100,000.  Texas Capital Bank claims that these loans are cross-collateralized and cross-defaulted obligations secured by cash collateral of AHF described as all cash equivalents, whether in the form of cash, negotiable instruments, documents of title, securities, deposit accounts, or in any other form, which represent income, proceeds, products, rents or profits of the Collateral that are now in AHF's (or entities or persons in privity with the AHF) possession, custody or control, or in which AHF will obtain an interest during the pendency of the bankruptcy case (collectively, the "Cash Collateral").  AHF disputes the scope and extent of its property that

constitutes TCB's cash collateral. AHF, more particularly, disputes the claim of TCB that it has a security interest in any of the life insurance proceeds of $27,000,000 that are deposited in the registry of the United States District Court for the Northern District of Texas.

At the present time, AHF is operating under agreed orders for the continued use of cash collateral which have been entered by the United States Bankruptcy Judge on a 30-day basis. However, AHF is seeking a long-term, permanent use of cash collateral prior to the confirmation of this Plan.

A portion of the Brandywood Property, consisting of 17 buildings representing 258 units, has been approved by FEMA as eligible for its Severe Repetitive Loss Program (the "SRLP"). The SRLP endeavors to mitigate the effects of repeated losses to residents and property owners in flood prone areas. This designation allows the State of Texas, through the Texas Water Development Board ("TWDB"), to provide a grant to the City of Pasadena ("the City") to acquire that portion of the Property that has become subject to increasingly repetitive flood loss claims. The Severe Repetitive Loss Grant (the "Grant") for the Property was approved on May 27, 2008. Under the terms of the Grant, the City will acquire 17 apartment buildings, representing 258 units of the Property's 698 units that will leave 440 units of residential housing for the Property. The Grant provides for demolition, asbestos abatement, relocation expenses for current residents, and the creation of a city park/open green space area (the "Open Space") to help mitigate the cost of future flood damages. This Open Space will be subject to a Lease between the City as Lessor, and Brandywood as Lessee (the "Lease".) A requirement of the SRLP and HUD's Special Warranty Deed state that the land will be restricted to the use of Open Space for perpetuity.

Once all required demolition is complete, the City will purchase the Open Space with the Grant funds. The Grant funds will be used to pay costs associated with the renovation of the property.

According to an appraisal obtained by AHF in October, 2009, the Property has an "As-Is" Appraisal of $8,335,000, and an "After-Stabilized/ Repaired" Appraisal value of approximately $16,000,000. In order to achieve the "after repair" value of $16,000,000 the appraisal states that a minimum of $4,700,000 in renovations is required.

The Plan assumes that $2,200,000 of net funds resulting from the Grant will be used by Brandywood for renovations to stabilize the Property. The Plan allocates $2,500,000 from the Life Insurance Proceeds to be used for the renovations. After renovation and stabilization of the property, the appraisal will then be updated to show an "As-Is" value, which AHF

anticipates will be approximately $16,000,000.00. After the updated Appraisal, AHF believes the property can be marketed and sold for an amount sufficient to pay TCB in full. Any amounts received by Brandywood in excess of the amount necessary to pay TCB in full will be delivered to AHF to be conveyed to the Liquidating Trust.

3.      **Treatment of Other Secured Claims**

AHF will surrender, or has surrendered, the collateral securing the claims of certain Secured Creditors. After these Secured Creditors have foreclosed on the collateral securing their claims and the proceeds received from the foreclosures sales have been applied to each Secured Creditor's claim, any remaining deficiency will be paid either as Class Four or Class Five creditors depending upon the value of their deficiency claim, and whether they choose the treatment afforded the claims of the Administrative Convenience Class in Class Four.

To the extent that Secured Claims are in the process of litigation involving a determination by the Bankruptcy Court as to the extent, nature or validity of their respective liens or security interests, the Plan either provides for the satisfaction of the debts by the treatment afforded the Secured Claims in the Plan by payment or conveyance of assets that are the indubitable equivalent of the Secured Claims, or by the ultimate resolution of the litigation which involves the particular Secured Claim and an allowance of an Unsecured Deficiency Claim to the extent the debt is not fully satisfied.

F.      **Treatment of Unsecured Claims**

1.      **Treatment of Allowed Administrative Claims, Priority Claims, and Priority Tax Claims (Classes 1 and 2)**

The Plan provides that upon confirmation, or as soon as sufficient funds are available, the Debtor will pay holders of Allowed Administrative Claims (Class 1) in full. Additionally, all Priority Claims and Priority Tax Claims (Class 2) either will be paid in full on the Effective Date of the Plan or will be paid in full by the receipt of annual payments with interest at the statutory rate within 5 years from the Petition Date as required by the provisions for confirmation set forth in Section 1129 of the Code.

2.      **Treatment of Administrative Convenience Class Claims (Class 4)**

AHF will make a lump sum payment to a class of unsecured Administrative Convenience Class Creditors (Class 4) holding claims of less than $100,000.00 in a one-time twenty-five percent (25%) dividend for satisfaction of their claims in full.  Creditors may choose to opt-in or

opt-out of the Administrative Convenience Class if they hold claims of $100,000.00 or less.

3.    **Treatment of Allowed Unsecured Claims (Class 5)**

The Plan provides that holders of Allowed Unsecured Claims (Class 5), which includes all unsecured claims of creditors in excess of $100,000.00 and those administrative convenience class claims that have chosen to opt-out of the treatment provided in subparagraph (b) above, will be paid through distributions from the Liquidating Trust as set forth in more detail below.  The Liquidating Trust will make an initial distribution from the net proceeds remaining in the life insurance recovery after the allocation the portion of the recovery to AHF provided for in the Plan and after payment of Classes 1, 2 and 4 claims, as soon as the Plan is confirmed and all claims objections have been determined by the Bankruptcy Court. Additional distributions from the Liquidating Trust will be made upon the collection of funds from the recovery of other lawsuits that are currently being investigated and prosecuted by or on behalf of AHF.  Finally, for a period of ten (10) years after the Effective Date, distributions will be made on an annual basis from the Excess Revenues, if any, as determined in accordance with the terms of the Plan, which are paid to the Liquidating Trust by AHF over the term of the plan.

It is not possible to make an accurate estimate of the total dividend to be paid to Allowed Unsecured Creditors at this time.  First, not all claims objections have yet been determined.  AHF believes that the outcome of these claims objections will significantly affect the number of allowed unsecured claims entitled to receive a dividend.  Second, the total amount of administrative and priority claims has not yet been determined.  Third, the total amount that can be recovered by or on behalf of AHF from pending and future litigation is not yet known.  Finally, the amount of Excess Revenues to be paid to the Liquidating Trust over the term of the Plan cannot be determined.  AHF estimates, however, that the total dividend paid from the Liquidating Trust over the term of the Plan will exceed $30 million.

4.    **Treatment of Unsecured Claims of Limited Partners for Amounts Necessary to Cure Defaults under Limited Partnership Agreements (Class 6)**

The Plan provides that holders of claims in Class 6, which includes the allowed claims of limited partners of the amounts necessary to cure defaults under limited partnership agreements in which AHF is the general partner, will be paid in full on or before 180 days after the Effective Date of the Plan.

G.    **Treatment of Interest and Penalties Under the Plan and Preservation of the Rights of the Debtor to Contest Claims and Interests**

1.    **No Interest to Accrue on Secured or Unsecured Claims**

The Plan provides for no interest or penalties to accrue or be assessed after the Petition Date on any Claims. If the agreement between a Debtor and a Creditor so provides, a Creditor may accrue interest on its claim at the contract rate through the Petition Date. However, unless specifically provided for under the terms of the Plan, no Creditor shall accrue interest on its claim after the Petition Date.

2.    **Reservation of Rights to Contest Validity of Security Interests or Claims**

For a period of 90 days, AHF specifically reserves the right to contest the validity of any asserted security interests or deeds of trust or mortgages which are not properly perfected in the event that facts should be disclosed or developed which indicate that there are valid grounds for contesting the validity of such security interest or real estate liens. AHF Debtor also reserves the right to object to any Proofs of Claim filed in the case or to assert that certain claims are barred due to the failure of the Creditor to timely file a Proof of Claim. Thus, all rights of AHF to reconcile claims and seek determinations as to the nature, extent and validity of liens are preserved.

3.    **No Penalties on Unsecured or Priority Tax Claims**

Penalties will only be paid when Creditors are fully secured, and only if such penalties are directly related to pecuniary loss. AHF reserves the right to object to the payment of penalties, including any interest accruing at default rates, unless such penalties are allowed under the provisions of the Bankruptcy Code or the specific terms of the Plan.

## <u>ARTICLE IV</u>

### Classification and Description of Claims

All Claims against AHF of whatever nature, whether or not scheduled, liquidated or unliquidated, absolute or contingent, including all Claims arising from transactions involving AHF and the rejection by AHF of Executory Contracts and/or Unexpired Leases, whether resulting in an Allowed Claim or not, shall be bound by the provisions of the Plan. The Claims and Interests are classified in the Plan as follows:

A.    **Class 1 - Allowed Administrative Expense Claims**

Class 1 is comprised of the Debtor's Allowed Administrative Expense Claims approved by order of the Bankruptcy Court under Section 503(b) of the Bankruptcy Code and Bankruptcy Rules 2014, 2016 and 2017.

1.    **Subclass 1.1 - Costs and Expenses of Administration**

Subclass 1.1 includes all Allowed Administrative Expense Claims entitled to priority in accordance with section 507(a) of the Bankruptcy Code, as scheduled or filed, which includes Claims arising after the Debtor's Petition Date. The class includes any unpaid fees of the U.S. Trustee's Office in accordance with Section 507(a)(1) of the Bankruptcy Code. It also includes any unpaid Claims for professional fees and expenses allowed in accordance with 507(a)(1) and 503(b) of the Bankruptcy Code, including the following: (1) Robert Yaquinto of the law firm of Sherman and Yaquinto, Dallas, Texas; R. Byrn Bass Law Firm, Lubbock, Texas; Charles G. White, Attorney at Law, Amarillo, Texas; and John Thomas Boyd Jr., Lynch, Hanna and Boyd, PLLC, Amarillo, Texas, attorneys for the Debtor (2) Mullin Hoard & Brown, L.L.P., Amarillo, Texas, attorneys for the Unsecured Creditors' Committee; (3) Brown Graham & Company, Amarillo, Texas, accountants for AHF (3) Magic Media Company, Amarillo, Texas, Computer Consultant employed by AHF, (4) Special Counsel, and (5) any other Persons entitled to seek allowance of Administrative Claims against the Estate.

2.    **Subclass 1.2 - Post-Petition Administrative Expense Claims**

Subclass 1.2 is comprised of all post-petition administrative expense claims arising from the post-petition operations of AHF, and generally includes non-professional Allowed Administrative Expense Claims, relating to the claims of vendors or employees which may have been incurred after the Petition Date, but for whatever reason have not been paid as a result of a dispute with the Claimant involving the liability or the amount of such Claim.

B.    **Class 2 - Allowed Priority Tax Claims**

Class 2 is comprised of all Allowed Priority Tax Claims for pre-petition federal, state and local taxes owing to such taxing authorities and certain other debts owed to governmental units entitled to priority in accordance with Section 507(a)(8) of the Bankruptcy Code. A listing of the claims which have been filed that are classified in Class 2 is attached as Exhibit "D".

C.    **Class 3 -Allowed Secured Claims of Creditors Holding Liens Against Assets Owned by Debtor**

Class 3 is comprised of the Allowed Secured Claims of Creditors Holding Liens against Assets owned by AHF, and is divided into Subclasses as follows:

1. **Subclass 3.1 - Claims of Texas Capital Bank**

Subclass 3.1 includes the claims of Texas Capital Bank ("TCB") in the total aggregate approximate amount of $9,635,115.13 in unpaid principal and accrued interest, plus any and all fees, and any and all other obligations and liabilities owed by AHF to TCB according to the Pre-Petition Indebtedness Documents, and includes interest, reasonable costs, attorney's fees, and any and all other amounts to the extent permitted by the Bankruptcy Code, the Pre-Petition Indebtedness Documents, and applicable law. The claims of TCB are described as follows:

a. *Claim of TCB Primarily Secured by the Brandywood Apartments.*

This claim arises from a promissory note executed by Brandywood Housing, Ltd., in the original principal sum of $8,000,000.00, which is primarily secured by a deed of trust and assignment of rents and profits in favor of TCB against the Brandywood Apartments in Pasadena, Harris County, Texas, owned by Brandywood Housing, Ltd. AHF guaranteed payment of this indebtedness. The guarantee of AHF is secured by a security interest in what is generally described as accounts, cash, inventory, and general intangibles of AHF.

b. *Claim of TCB Secured by AHF's Accounts, Cash, Inventory, and General Intangibles.*

This claim arises from a promissory note executed by AHF in the principal amount of $2,500,000.00, secured by a security interest in what is generally described as accounts, cash, inventory, and general intangibles of AHF.

c. *Unsecured Deficiency Claims of TCB Which Exceed Value of Collateral.*

This claim consists of the unsecured deficiency claims of TCB, if any, which exceed the value of its collateral and are therefore unsecured.

2. **Subclass 3.2 - Secured Claims of Creditors Against Real Property Located in Lakewood Terrace, Baytown, Harris County, Texas**

Subclass 3.2 includes the claims of Secured Creditors in the total aggregate approximate amount of $4,985,750.00 as of the Petition Date, which are secured by liens against certain real property consisting of townhouses in a residential housing development known as Lakewood Terrace Townhomes in the City of Baytown, Harris County, Texas, and are described as follows:

a.      *Claims of BAC Home Loan Servicing, L.P.*

These claims arise from promissory notes given to BAC totaling total approximately $3,700,000.00, which are secured by deeds of trust against 104 townhomes in Lakewood Terrace Townhomes.

b.      *Claims of Graham Financial.*

These claims arise from promissory notes given to Graham Financial, totaling approximately $750,000.00, which are secured by deeds of trust against 30 townhomes in Lakewood Terrace Townhomes.

c.      *Claims of Gary Graham Self-Directed IRA.*

These claims arise from promissory notes given to the Gary Graham Self-Directed IRA, totaling approximately $500,000.00, which are secured by deeds of trust against 20 housing units in Lakewood Terrace Townhomes.

d.      *Claims of Cenlar.*

These claims arise from promissory notes given to Cenlar, totaling approximately $35,750.00, which are secured by a deed of trust against 1 housing unit in Lakewood Terrace Townhomes.

3.      **Subclass 3.3 - Claims of Wells Fargo Bank, N.A.**

Subclass 3.3 includes the claims of Wells Fargo Bank, N.A. ("Wells Fargo") in the total aggregate approximate amount of $1,067,418.00 which are partially secured by disputed setoff rights which Wells Fargo asserts against deposits in the name of the Debtor totaling $422,146.36 which are described as follows.  The amount of the claims that exceeds the value of its setoff rights will be included in Class 5 as an unsecured deficiency claim.

4.      **Subclass 3.4 - Claim of Happy State Bank**

Subclass 3.4 includes the claim of Happy State Bank ("HSB"), in the total approximate amount of $5,550,462.93, which HSB asserts is partially secured by the assignment and pledge by AHF of certificates of deposit in the total approximate sum of $1,782,169.00 held in the name of several of AHF's related entities. Certain of AHF's limited partners (MMA Partners and THFC), together with HUD, and creditors Robert Templeton and Don Storseth, have filed three adversary proceedings in the bankruptcy case asserting that part or all of the funds used to purchase the certificates of deposit pledged to HSB are not owned by AHF and are either subject to restrictions on their ownership and use imposed by applicable statutes, regulations, and the limited partnership agreements, or were fraudulently obtained from investors and are subject to a constructive trust for the benefit of those investors. As a result, MMA Partners, THFC, HUD, Templeton, and Storseth all contend that AHF did not own or have the authority to pledge the certificates of deposit that were used to secure HSB's claim. The determination by the Bankruptcy Court of the issues raised in these adversary proceedings will determine the extent of HSB's secured claim. To the extent that HSB's claim exceeds the value of its collateral, as determined by the Bankruptcy Court, its claim will be included in Class 5 as an unsecured deficiency claim.

5.     **Subclass 3.5 - Secured Claims of Local Tax Authorities**

Subclass 3.5 includes the claims of Local Tax Authorities that are secured by assets of AHF. A listing of the taxing authorities that have filed claims and the amount of their respective claims is set forth on Exhibit "E".

6.     **Subclass 3.6 - Secured Claims of BAC Loans  Servicing, LP.**

Subclass 3.6 includes the claims of BAC Loans Serving LP in the total approximate amount of $72,735.70 which are the result of secured loans on individual homes located in Amarillo, Potter County, Texas, and which are described as follows:

a.     *Claims of BAC Loans Servicing Secured by Real Property in Houston.*

These claims consist of the claims of BAC Loans Servicing, LP in the amount of $60,831.35 secured by real property located in Housing, Harris County, Texas. AHF asserts that the real property securing the claim is of sufficient value to fully collateralize the debt.

b.     *Claims of BAC Loans Servicing Secured by Real Property Located in Amarillo.*

These claims consist of the claims of BAC Loans Servicing, LP in the amount of $26,869.55 secured by real property located in Amarillo, Potter County, Texas. AHF asserts that the real property securing these claims is of sufficient value to fully collateralize this debt.

c.    *Claims of BAC Loans Servicing Secured by Real Property Located in Amarillo*.

These claims consist of the claims of BAC Loans Servicing, LP in the amount of $45,886.15 secured by real property located in Amarillo, Potter County, Texas. AHF asserts that the real property is of sufficient value to fully collateralize this debt.

7.    **Subclass 3.7 – Claims Secured by Mechanics Liens**

Subclass 3.7 consists of the claims asserted against AHF by construction contractors totaling $1,549,723.31 that are secured by mechanic's and materialman's liens filed against properties owned by AHF. These liens will be satisfied by payment from the properties to the extent these properties can pay.  AHF will have no liability.

## D.    Class 4 – Administrative Convenience Class

Class 4 is comprised of those claims of General Unsecured Creditors that choose the treatment under Class 4 on the Plan ballot.  These claims are reflected in the amounts listed on Exhibit "F" to the Plan, and specifically include all claims of less than $100,000.00, after adjustments.  AHF estimates that the total sum of these claims is $547,768.69, and they are described generally as unsecured trade claims of the Debtor below $100,000.00, but also include any Allowed Deficiency Claims or Allowed Unsecured Claims amounting to less than $100,000.00.  The classification of these claims into Class 4 is subject to the Bankruptcy Court's approval, pursuant to Section 1122(b) of the Bankruptcy Code, at the Confirmation Hearing, and the holders of all such claims are free to opt-in or opt-out of the treatment afforded to Class 4 claims.  In the event that a qualifying creditor opts-out, that creditor's claim will receive the treatment afforded the holders of claims in Class 5.  A listing of the claims Class 4 – Administrative Convenience Class is set out in the attached Exhibit "F".

## E.    Class 5 – Allowed Claims of Unsecured Creditors

Class 5 is comprised of the Allowed Unsecured Claims against AHF. This Class will also include the Allowed Deficiency Claims of secured creditors, as well as those creditors which choose to opt-out of treatment under Class 4.  AHF has been unable to compile a final reconciliation of the Claims as of the date of the filing of this Disclosure Statement and Plan. More than eighty (80) objections to Proofs of Claim have been filed and many have yet to be determined.  Some objections relate to the timeliness of the claim, some relate to the fact that

insufficient documentation was submitted by the Claimant to substantiate the claim, some because the claims appear to be the liability of an affiliate or other entity rather than the Debtor, and some because they consist of claims which are contingent, unliquidated or disputed.

In addition, objections to the claims of unsecured creditors have been, and will be, filed alleging that such creditors should be included in Class 8 as insider claims that should be equitably subordinated under 11 U.S.C. §510(d) or disallowed under 11 U.S.C. §502(d).  The determination regarding the status these claims could significantly impact the amount of claims entitled to treatment under Class 5.

Once the claims reconciliation process is completed, AHF will be able to provide an estimate of the total of the Allowed Claims as well as an estimate of the dividends that will be paid to holders of such claims. Therefore, all amounts shown in the Plan and this Disclosure Statement are still subject to the claims reconciliation process, and should not be construed as an admission by AHF that such amount is recognized as being the proper amount of such claim or that any claim whatsoever should be allowed. AHF reserves the right, on its own behalf, to contest the amount, nature, extent or validity of all Proofs of Claim which have been filed.

The claims that will be classified in Class 5 for purposes of voting on the Plan are set forth in Exhibits "B" and "G" to the Plan.

**F.      Class 6 – Unsecured Claims of Limited Partners for Amounts Necessary to Cure Defaults under Limited Partnership Agreements**

Class 6 is comprised of the claims asserted by limited partners in the limited partnerships in which AHF is the general partner for the recovery of amounts owed by AHF as a result of its defaults in various financial obligations that it has under the terms of the limited partnership agreements creating the partnerships.  These limited partnerships own properties that furnish income to AHF and are a necessary component of its successful reorganization.  In addition, the failure of AHF to cure its defaults under these partnership agreements would result in significant additional claims against its bankruptcy estate triggered by its defaults.  AHF estimates that the total amount of claims of Class 6 creditors is $1,056,866.49.  The plan provides for payment of these claims in full within 180 days after confirmation.  A listing of the claims in Class 6 is attached to the Plan as Exhibit "H".

**G.      Class 7 – Contingent, Unliquidated and Disputed Claims**

This class includes Contested Claims which are contingent, or with respect to which AHF possesses a counterclaim or an offset or otherwise has grounds to contest the validity of the claim or the amount of such claim.   The Contested Claims shall be reconciled either through negotiation, settlement, the claims objection process in the Bankruptcy Court, or other court action.   To the extent that the claims are determined to be non-contingent as a result of negotiations, settlement, or by Court order, the holders of such claims shall receive the same treatment to be afforded to the allowed claims of unsecured creditors in Class 4, or Class 5, or Class 6.  On the other hand, if through negotiations or by Court order determines that the net claim of the creditor is money owed to AHF, such Creditor shall pay to the Liquidating Trust the

amount of such claim, as determined by the Court, and the Liquidating Trustee shall distribute said funds in accordance with the provisions of the Liquidating Trust, and the treatment to be afforded the claims in Class 4 and Class 5.

To the extent the fixing or liquidation of any claim in Class 7 would unduly delay the administration of the case, the Court shall estimate for purpose of allowance the value and nature of such claim under the provisions of 11 U.S.C. Section 502(c). Similarly, any right to payment arising from a right to an equitable remedy for breach of performance which falls within Class 7 shall also be estimated by the Court under Section 502(c) of the Bankruptcy Code.

This Class specifically includes, but is not limited to, Claims which are in the process of litigation through a pending adversary proceeding.

This Class also includes contingent claims against AHF as the result of guarantees executed it in connection with tax credit and conventional financed properties. A listing of the claims in Class 7 is attached as Exhibit "I" to the Plan.

### H.      Class 8 – Subordinated or Disallowed Unsecured Claims of Insiders

This Class includes all Unsecured Claims of Insiders which the Court determines should be subordinated under the provisions of 11 U.S.C. Section 510(c), or should be disallowed under the provisions of 11 U.S.C. Section 502(d).  In this regard, AHF asserts that the holders of the Claims in this Class engaged in inequitable conduct prior to the Petition Date which caused injury to other creditors or conferred an unfair advantage for themselves, and that the equitable subordination of such claims is entirely consistent with other provisions of the Bankruptcy Code. Alternatively, AHF asserts that such claims should be disallowed because the holders of such claims are transferees of a transfer that is avoidable under applicable provisions of the Bankruptcy Code as set forth in Section 502(d) of the Code.  However, to the extent that the Court determines that such claims are not insider claims, or that the claims should not be subordinated under 11 U.S.C. §510(c) or should be disallowed under 11 U.S.C. §502(d), they will be treated as Class 5 Creditors.

AHF anticipates that Special Counsel or the Liquidation Trustee will investigate and file objections to insider claims in the cases in which either of them determines that such claims should be subordinated or disallowed and thereby classified as Class 8 claims.
Until the Court has made a determination of the claims to be included in Class 8, AHF will not be able to identify such claims or assess their value.  AHF estimates that the value of claims subject to subordination or disallowance could total in excess of $50,000,000.00.

### <u>ARTICLE V</u>

### Implementation of the Plan

### A.      The Continued Operations of American Housing Foundation

Under the terms of the Plan, AHF will reorganize its operations, retain its relationships with most of its related entities, and continue to operate as a charitable foundation offering affordable housing to working families and individual.

Prior to the death of Steve Sterquell, AHF was essentially a "deal driven" organization. Too often, more attention was paid to generating cash flow through the acquisition of new properties or the refinancing of existing properties. During the years immediately prior to filing the bankruptcy case, funds were taken from the properties themselves to fund the extravagant operating expenses of AHF and to meet existing debt repayment obligations. As a result, the condition of many of the properties in AHF's portfolios deteriorated, rental income decreased because fewer units could be leased, and AHF's cash flow problems increased.

Soon after taking over the operations of AHF, its new board and management made the decision that, notwithstanding the abuses of the past, the foundation had a worthy mission and that every effort should be made to reorganize around that mission. Consequently, AHF's focus since June, 2009, has been to fulfill its stated goal of providing quality affordable housing to working families and individuals.

With respect to its reorganization efforts, AHF has three goals: (1) to reduce its operational overhead and run more efficiently by eliminating unnecessary expenses, (2) to pay its unsecured and secured creditors, (3) to maintain and operate the properties in its portfolios in a manner that assures that its residents have clean, decent, affordable housing. AHF has already reduced its operational overhead significantly by cutting down on the number of staff it formerly employed, closing its Dallas operations and bringing all operations to its Amarillo office, reducing its overhead by moving to a smaller office suite at its current location at 1800 S. Washington, and eliminating unnecessary and extravagant expenses such as maintaining three aircraft for use by AHF officers. It will continue to look at other ways to reduce expenses while still maintaining the staff and resources necessary to successfully fulfill its non-profit purpose.

In its plan of reorganization, AHF also proposes to create a Liquidating Trust that will receive or recover those assets designated in the plan for the purpose of making distributions to unsecured creditors. To the extent that the claims of unsecured creditors are not paid through distributions from those assets, AHF proposes to make payments from its Excess Operating Revenues (as that term is defined in the Plan) for a period of ten (10) years to fund additional distributions to unsecured creditors who have allowed unsecured claims. AHF believes that unsecured creditors will benefit more, by far, if it reorganizes and continues its operations than if it liquidates, not only because of opportunity to make additional distributions to unsecured creditors out of Excess Operating Revenues, but also because of the potential contingent liabilities that may be asserted against the assets of AHF if it ceases to operate and defaults on its guarantees and obligations to its limited partners and certain creditors of its subsidiary organizations.

In order to maintain and operate the properties in its existing portfolios, AHF must achieve three goals. First, it must identify those properties that, in all reasonable probability, cannot be rehabilitated and/or refinanced so that they can generate sufficient revenue to meet their debt service and operational demands. With respect to those properties that cannot be

rehabilitated and/or refinanced, AHF proposes to take whatever action is necessary and expedient under the circumstances to dispose of the properties, either by sale or surrender to creditors.

Second, with respect to the remaining properties, AHF must take steps to repair and rehabilitate the properties so that they can produce the optimum amount of rental income. This will involve both paying or settling outstanding payables and funding desperately needed repairs and rehabilitation to the properties so that occupancy and cash flow can be increased. Since the filing of the bankruptcy case, AHF has attempted to settle payables and perform repairs and rehabilitation to the properties to that extent that funds are available from the properties to do so. However, in order to complete the work of repair and rehabilitation, AHF must be able to utilize funds from the proceeds of the key man life insurance or other available funds in its bankruptcy estate.

Third, it is critical for the future operations of AHF that it repair and maintain its relationships with the lenders, bondholders, and investors who have provided capital and funding for the acquisition of the properties in its portfolios. Since taking control in June, 2009, the current management of AHF has made a concentrated effort to re-open lines of communication with the lenders, bondholders, and investors through regular conference calls, personal visits, and correspondence. Of particularly importance was the need to repair AHF's relationship with the U. S. Department of Housing and Urban Development, especially with respect to those multi-family housing units that qualify for HUD approved rental assistance. AHF management has made it a priority to reopen communication with HUD regarding its plans, activities, problems, and successes. In turn, HUD has worked with AHF management in a very positive fashion to maintain its qualification as an approved provider of affordable housing.

AHF management has engaged in regular conference calls with bond counsel for its bond financed portfolio properties, and has been able to work with bond counsel and the bondholders to allow it to continue to maintain and operate the bond financed properties with a view toward refinancing the properties at such time as such refinancing is feasible. AHF management has also been working closely with JP Morgan Chase Bank with respect to the conventionally financed properties in its portfolio. AHF-related entities recently entered into an extension and modification agreement with JP Morgan Chase to extend the due dates on the indebtedness secured by the properties in its AIMCO portfolio to the end of April, 2010, so that the AHF can continue its negotiations to refinance the AIMCO properties and lessen the debt load on the properties.

As AHF continues operating, pays or settles the payables owed by the properties in its portfolio that are, or can be, self-supporting, repairs and rehabilitates such properties, and improves the debt obligations of its subsidiaries through strategic refinancing and curing of defaults, cash flow from the properties will inevitably increase. AHF has significant rights to deferred developer fees, management fees, and other sources of income that it is not presently receiving because the properties simply to do not have the available cash to make such payments. As occupancy increases, cash flow will increase, and AHF should see significant improvement in its income from payment of these fees. In addition, as AHF continues to operate and the compliance periods expire on the tax credit financed properties in its portfolio, ownership of

those properties will revert to AHF in full fee simple and largely debt-free, thus providing it with valuable assets that will help to insure its future viability.

**B.      Status of Litigation of Claims Funding the Liquidating Trust**

The following is a brief summary of the claims owned by AHF which are being prosecuted by counsel for the Creditors' Committee, and which will be conveyed into and administered as an asset of the Liquidating Trust:

Lawsuit to Collect Life Insurance Proceeds: On May 18, 2009 the petitioning creditors filed Adversary Proceeding, No. 09-2005-rlj, in the AHF involuntary case asserting that $24,000,000.00 in life insurance proceeds on the life of Steve W. Sterquell, deceased was property of AHF.

On June 11, 2009, AHF also filed Adversary Proceeding, No. 09-20373, in its voluntary bankruptcy case alleging claims similar to those raised in the petitioning creditors' adversary proceeding in the involuntary case.

On June 11, 2009, a hearing was set on the Plaintiffs' Motion for a Preliminary Injunction in Adversary Proceeding No. 09-2005-rlj. The Plaintiffs, AHF, Housing for Texans Charitable Trust and the Sterquells announced to the Court that they had reached an agreement with respect to the Plaintiffs' Motion for Temporary Injunction, and recited the agreement into the record in open court relating to approximately $27,000,000.00 in insurance policies on the life of Steve W. Sterquell, described more fully in the agreement as Category I policies ($21,000,000.00), Category II policies ($3,000,000.00), and Category III policies ($3,000,000.00) plus an Administaff Group Insurance Plan Policy).

On July 13, 2009, based on the June 11, 2009 agreement, the Court signed an Agreed Order on Plaintiffs' Motion for a Preliminary Injunction in Adversary Proceeding No. 09-02005-rlj, which provided that the proceeds of the Category I, Category II, and Category III policies would be deposited into the Registry of the Court, pending further order of the Court, except that the proceeds of the Administaff Group Insurance Plan Policy and $75,000.00 from the proceeds of one of the Category III policies would be distributed to Marshallette Sterquell. Pursuant to the Agreed Order, $26,925,000.00 in life insurance proceeds have been deposited into the Registry of the Court, and the proceeds of the Administaff Group Insurance Plan Policy and $75,000.00 from the proceeds of the one of the Category III policies were distributed to Marshallette Sterquell.

On July 17, 2009, the United States Bankruptcy Court for the Northern District of Texas entered an order consolidating the voluntary petition for relief, Case No. 09-20373, into the AHF involuntary petition for relief, Case No. 09-20232-11, and the consolidated AHF bankruptcy proceedings continued under Case No. 09-20232.

On or about September 25, 2009, the United States District Court for the Northern District of Texas entered an order consolidating Adversary Proceeding No. 09-20373 into Adversary Proceeding No. 09-2005-rlj.

On September 25, 2009, the United States District Court withdrew the reference with respect to both such adversary proceedings, which consolidated adversary proceedings are currently pending in the United States District Court for the Northern District of Texas in Civil Action No. 2:09-CV-231-C ("the Life Insurance Action").

On December 14, 2009, the United States District Court in the Life Insurance Action granted AHF's Motion of Summary Judgment and declared that AHF was entitled to the proceeds of the Category I policies ($21,000,000.00).

Counsel for AHF and the Unsecured Creditors Committee have now obtained a final judgment which will order release of the $21,000,000.00 to AHF, and have also entered into a compromise and settlement agreement with the Sterquell family and their related entities which, if approved by the Bankruptcy Court in accordance with Bankruptcy Rule 9019, will result in an additional $3,000,000.00 plus accumulated interest becoming property of the bankruptcy estate and will result in the release of claims that the Estate has against the Sterquell Family.

Texas Capital Bank has asserted a lien on the proceeds of the life insurance and filed a motion for summary judgment seeking to establish the validity of the lien. AHF and the Official Unsecured Creditors Committee have opposed such motion. AHF anticipates that the validity of the lien asserted by Texas Capital Bank will be determined by the Court prior to the confirmation of its Plan.

Complaint Against Former AHF Directors: Counsel for the Unsecured Creditors Committee has prepared a Complaint against former directors of AHF including Randy Sharp, Scott Rice, and James Fletcher to recover $50,000,000.00 damages for gross negligence in the management of AHF. The draft complaint has been sent to counsel for the defendants, with a demand for payment of the $2,000,000.00 policy limits on the AHF D&O policy, and a response to this demand was due by January 31, 2010. If the demand is not accepted, counsel estimates the value of the claim at $2,000,000.00 plus the recoverable personal assets of the defendants which are as yet unknown and estimates the time for recovery to be between 12 and 24 months.

AHF action against Bank of America Securities ("BOA"): AHF filed suit in the District Court of Dallas County, Texas on November 16, 2009. The action was removed to the United States District Court for the Northern District of Texas, Dallas Division. AHF has filed a motion for remand. AHF alleges misrepresentation by BOA that auction rate securities would have liquidity and that BOA would maintain a market in such securities. The auction rate securities were a mode of financing for the purchase of Walden II properties which were acquired in December 2003—18 properties in four states. The market for auction rate securities failed and AHF had considerable losses, interest costs and other damages as a result of the failure of BOA to maintain liquidity and marketability. Estimated time for recovery will be 12 to 36 months.

Preference Claims: Counsel for the Official Unsecured Creditors' Committee is recommending suit on two preference claims: One would be against former AHF director Scott Rice to recover $600,000.00 in preferential payments made to him in the one year before bankruptcy. Two would be against former AHF director Randy Sharp or the Mays Trust to

recover $500,000.00 in preferences paid to one or both of them.  Both Special Counsel and Counsel for the Unsecured Creditors' Committee will continue to research additional potential preferential payments.

<u>Claims Against AHF Auditors</u>:  Counsel for the Official Unsecured Creditors Committee continues to investigate, with the assistance of Harry Potter, C.P.A., whether AHF has a valid claim against AHF's auditors.   No decision has yet been reached on that issue.

### C.    Disclosure of Possible Recovery of Developer's Fees

AHF has an ownership interest in nine properties which accrue developer's fees that AHF is entitled to collect upon the conclusion of certain compliance periods.  AHF calculates that the accrual of these development fees is $5,150,497.69.  AHF can only realize these developer's fees if it retains an ownership interest in the properties, successfully services the associated indebtedness with each property and then successfully refinances or markets the properties.

### D.    Financial Projections

AHF has prepared cash flow projections for each of the calendar years of 2010, 2011, and 2012.  These cash flow projections are attached as Exhibit "J".  As shown on the cash flow projection for 2010, the Debtor anticipates a net operating profit for 2010 of $1,381,721.00.  The cash flow for 2011 projects a net operating profit for 2011 of $2,964,064.00, and a net operating profit for 2012 of $3,089,944.00.

Based upon these cash flow projections, AHF believes that its Plan of Reorganization provides the means for it to generate sufficient funds for it to recapitalize and continue to operate successfully in the future. These case flow projections, together with the other opportunities that AHF has to recover property and cash as it continues to operate, demonstrate the feasibility of the Plan.

### E.    Retention by Debtor of Property of the Estate

Save and except for the assets designated by the Plan to be administered or collected by the Liquidating Trust in Article 5(F) below, AHF shall retain ownership and control of all of its property and property of the Estate, including, but not limited to all income generated and received by it in the ordinary course of its business, and all interests owned it in any other property or business entity, including partnerships, limited partnerships, limited liability companies, and corporations.

AHF shall, in the ordinary course of business, have the authority to incur post-petition debt, and shall, in the ordinary course of its business, and as the cash flow of its operations may allow, pay all post-petition debt without further order or authorization from the Bankruptcy Court.

### F.    The Liquidating Trust

The Liquidating Trust will be created under the terms of the Plan for the benefit of the Class 5 claimants. The Liquidating Trustee shall not be an insider of AHF, an insider of an affiliate of AHF, any entity who has a claim against AHF or against whom AHF has a claim or counterclaim. The identity of the Liquidating Trustee will be disclosed prior to the deadline for voting on the Plan. The Liquidating Trustee shall be appointed upon Confirmation of the Plan for the purpose of receiving all of the Trust Assets designated by the Plan to be administered or collected by the Liquidating Trust and to carry out the purposes of the Liquidating Trust, including, but not limited to, the following:

1.   To investigate the financial affairs of AHF over the past five (5) years to determine if there are claims or causes of action that could result in the recovery of assets for the bankruptcy estate to be used for the payment of claims of creditors;

2.   To prosecute on behalf of AHF the adversary proceeding filed by American Housing Foundation bearing Adversary No. 09-2007,    styled American Housing Foundation v. Sterquell Irrevocable Life Insurance Trust, et. al., the reference for which was withdrawn and is now pending before the U.S. District Court for the Northern District of Texas, Amarillo Division, under Civil Action No. 2:09-CV-231-C, provided, however, that any settlement of such causes of action must be approved by the Bankruptcy Court after appropriate notice and opportunity for hearing as specified in Bankruptcy Rule 9019;

3.   To prosecute on behalf of AHF any claims and potential causes of action against Housing for Texans Charitable Trust, the 2001 Scott Rice Trust, Sterquell Family Irrevocable Life Insurance Trust, the Steve W. Sterquell, C.P.A. Profit Sharing Plan, Credit Realty Investments, Inc., and other Sterquell-related entities, and the Sterquells individually, for recovery of the St. George Partners Ltd. partnership interest, the San Patricio County property, and other moneys or assets of AHF misappropriated, embezzled or fraudulently transferred to these persons and entities, including without limitation actions for equitable tracing or constructive trusts;

4.   To investigate any and all financial transactions, and, if appropriate, to pursue causes of action or claims owned by AHF where the facts and law support intentional tort and negligence-based causes of action, or any other claims against AHF's directors, officers, attorneys, and accountants who acted on behalf of AHF prior to AHF's bankruptcy; and to also investigate and pursue other potential causes of action against third parties who may have received transfers of assets of AHF that constitute preferences or fraudulent conveyances. However, prior to the Liquidating Trust actually filing complaints against third parties who are not former officers, directors or employees of AHF, counsel for the Liquidating Trust shall provide notice to AHF, all parties who have filed notices of appearance in the AHF bankruptcy case, and the twenty largest unsecured

Case 09-20232-rlj11    Doc 941    Filed 03/29/10    Entered 03/29/10 22:59:23    Desc
Main Document    Page 50 of 69

creditors in the AHF bankruptcy case, of their intent to file such complaints providing a description in such notice of the nature of the causes of action to be asserted, the particular defendants which are contemplated to be named in the lawsuits, and any other pertinent information that will enable the creditors and parties in interest to analyze the validity and value of the litigation. The notice shall provide negative notice language that specifies that unless a creditor or party in interest files an objection with the Bankruptcy Court within fifteen days of receipt of the notice that counsel for the Liquidating Trust will proceed to file the complaints initiating the lawsuits. In the event, a creditor or party in interest files an objection, the Court shall then set a hearing to consider the objection with notice of the setting being given to all creditors and parties in interest who received the initial notice from counsel for the Liquidating Trust. At the hearing on any such objection the Court will entertain evidence and argument relating to the merits of the Liquidating Trust filing the complaints and pursuing the causes of action;

5.    To prosecute claims of the bankruptcy estate for bankruptcy related causes of action including all causes of action authorized by Chapter 5 of the Bankruptcy Code, claims which may be brought by the Debtor under Section 544, preference claims of Debtor pursuant to Section 547 of the Bankruptcy Code, all fraudulent transfer claims pursuant to Section 548 of the Bankruptcy Code, all claims relating to post-petition transactions under Section 549 of the Bankruptcy Code, all claims recoverable under Section 550 of the Bankruptcy Code, claims against any party, including Insiders and Affiliates, on account of an indebtedness or any other claim owed to or in favor of the Debtor, which are not settled prior to or as part of this Plan.

AHF will cooperate and provide requested information and documents to the Liquidating Trust to assist it in its investigation and in pursuit of the various claims or causes of action owned by it, and AHF shall have the right, but not the obligation, to participate in all aspects of the Liquidating Trust's investigation of potential causes of action including, but not limited to, the formulation of discovery requests, receipt and review of documents produced by non-Debtor parties, and participation in any examinations under Federal Rule of Bankruptcy Procedure 2004, and formal and informal discovery and depositions. Counsel for the Liquidating Trust and AHF shall use their best efforts to avoid duplication of efforts and reduce expenses in the investigation and pursuit of the claims and causes of action;

Any settlements of litigation prosecuted by the Liquidating Trust on behalf of AHF or its Estate must be approved by the Bankruptcy Court after appropriate notice and opportunity for hearing as specified in Bankruptcy Rule of Procedure 9019;

G.    **Authorization**

Pursuant to authorization and direction to the Liquidating Trust established in writing pursuant to the terms of this Plan, the Liquidating Trustee shall have the power and authority to perform the following acts:

1.  Perfect and secure such Liquidating Trustee's right, title and interest to the properties conveyed to the Liquidating Trustee;

2.  Reduce all of said Trust Assets to cash, a payment arrangement or a judgment;

3.  Sell the Trust Assets for cash or other consideration and convert the Trust Assets and their proceeds to cash and distribute the net proceeds as specified herein;

4.  Manage and protect the Trust Assets and distribute the net proceeds as specified in the trust agreement;

5.  Release, convey or assign any right, title or interest to the Trust Assets;

6.  Engage and compensate attorneys, accountants or other professionals, pay and discharge any costs, expenses, Liquidating Trustee's fees and expense reimbursements, or any obligations deemed necessary by the Liquidating Trustee to preserve the Trust Assets and/or to pursue any claims which are considered Trust Assets;

7.  Deposit trust funds and draw checks and make disbursements thereof;

8.  Employ and pay such attorneys, accountants, engineers, agents, tax specialists and clerical and stenographic assistance as may be deemed necessary;

9.  Pay all costs necessarily incurred by the Liquidating Trust, including any and all tax liabilities, if any, of the Liquidating Trust;

10.  Waive or release rights of any kind;

11.  Appoint, remove and act through agents, managers and employees and confer upon them such power and authority as may be necessary or advisable;

12.  Institute, maintain and prosecute on behalf of the Liquidating Trust all claims and causes of actions which have been conveyed to the Liquidating Trust pursuant to the Plan, and prosecute or defend all legal proceedings and appeals concerning Trust Assets on behalf of AHF;

13.    In general, without in any manner limiting any of the foregoing, deal with the Trust Assets or any part or parts thereof in all other ways as would be lawful for any person owning the same to deal therewith, whether similar to or different from the ways above specified, at any time or times hereafter;

14.    Make distributions from the Liquidating Trust of all net proceeds on a pro rata basis to holders of allowed Class 5 – General Unsecured Claims;

15.    Determine that all claims have been exhausted or the costs of pursuing recovery of additional amounts outweighs the potential for recovery, such that the Liquidating Trustee may declare a final distribution to the Beneficiaries on a pro-rata basis and the Trust shall terminate;

16.    When the Liquidating Trustee deems appropriate, and upon the written request of the Board of Directors of AHF as constituted following confirmation of the Plan, loan funds from the Liquidating Trust, conditioned upon such repayment provisions and other terms as in the judgment of the Liquidating Trustee is in the best interest of the Creditors who are to receive distributions from the Liquidating Trust as its beneficiaries.

## H.    Powers of the Liquidating Trustee

The Plan hereby confers full and complete authority upon the Liquidating Trustee to do and perform all acts, execute all documents and to make all payments and disbursements of funds directed to be done, executed, performed, paid and disbursed by or under the provisions of the Trust.

All claims, counter-claims, causes of action and rights to recovery owned by the Debtor, including those causes of action which have been pursued by the Creditors Committee or Conflicts Counsel, will be fully and unequivocally assigned to the Liquidating Trust, except for those claims, causes of action, and rights to recovery included as a part of the Retained Causes of Action, provided, however, that with respect to any cause of action which under applicable non-bankruptcy law cannot be assigned, the Liquidating Trustee is designated as the representative of the Debtor and is authorized to bring such cause of action on Debtor's behalf. The Liquidating Trustee shall be substituted as party to any litigation being pursued by the Creditors Committee or the Conflicts Counsel as of the date of Confirmation.

The Liquidating Trustee shall have the power to invest funds of the Liquidating Trust in demand and time deposits in any national bank, which is an authorized depository for bankruptcy funds in the Northern District of Texas or to make temporary investments such as short-term certificates of deposit in such banks or Treasury bills.

In no case shall any party dealing with the Liquidating Trustee in any manner whatsoever in relation to the trust property or to any part(s) thereof or interest(s) therein, including but not

limited to any party to whom trust property or any part thereof shall be conveyed or contracted to be sold by the Liquidating Trustee, be obligated to see to the application of any money or proceeds borrowed or advanced on said properties or be obligated to see that the provisions of the Plan or the terms of the Liquidating Trust have been complied with, or be obligated or privileged to inquire into the necessity or expediency of any act of the Liquidating Trustee, or to inquire into any other limitation or restriction of the power and authority of the Liquidating Trustee, but as to any party dealing with the Liquidating Trustee in any manner whatsoever in relation to the Trust Assets, the power of the Liquidating Trustee to act or otherwise deal with said properties shall be absolute.

All costs, expenses and obligations incurred by the Liquidating Trustee, or any agent thereof, in administering the Liquidating Trust or in any manner connected, incidental or related thereto shall be a charge against the property in the Liquidating Trust. The Liquidating Trustee will be paid a fee for his services consistent with the compensation that is paid a Chapter 7 or Chapter 11 Trustee as provided in Section 326(a) of the Code, and shall be entitled to be reimbursed the reasonable and necessary costs associated with the accounting, maintenance and other costs associated with keeping appropriate records of the assets and liabilities of the Liquidating Trust, and making distributions from the Liquidating Trust.

The Liquidating Trustee shall keep an accounting of receipts and disbursements, and such accounting shall be available for inspection by any beneficiary of the Trust upon reasonable notice and request to do so.

No recourse shall ever be had, directly or indirectly, against the Liquidating Trustee personally in connection with his administration of the assets of the Liquidating Trust, or against any employee of the Liquidating Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, or by any person employed by the Liquidating Trustee, or by reason of the creation of any indebtedness by the Liquidating Trustee. It being expressly understood and agreed that all such liabilities, covenants and agreements of the Liquidating Trustee or any such employee, whether in writing or otherwise, under the Liquidating Trust shall be enforceable only against and be satisfied only out of the Trust Property or such part(s) thereof or interest(s) therein as shall under the terms of any such agreement be liable therefore or shall be evidenced only by a right of payment out of the income, proceeds and avails of the property in the Liquidating Trust. Every undertaking, contract, covenant or agreement entered into in writing by the Liquidating Trustee shall provide expressly against the personal liability of the Liquidating Trustee.

The Liquidating Trustee shall not be liable for any act he or she may do or omit to do as Liquidating Trustee hereunder while acting in good faith and in the exercise of his or her best judgment, and the fact that such act or omission was advised, directed or approved by an attorney acting as attorney for the Liquidating Trust, shall be conclusive evidence of such good faith and best judgment; nor shall the Liquidating Trustee be liable in any event except of his or her own gross negligence or willful default or misconduct.

The Liquidating Trustee may resign at any time by giving written notice to the Debtor, Debtor's Counsel, the Court, the U. S. Trustee for the Northern District of Texas, and all Creditors which are beneficiaries of the Liquidating Trust provided for in the Plan and such

resignation shall be effective upon the date provided in such notice, upon resignation or termination as set forth below, the Liquidating Trustee shall determine the amount of unpaid compensation and reimbursements owing to the Liquidating Trustee and that Liquidating Trustee shall be paid.

The Liquidating Trustee, in exercising the powers granted to him or her under the Plan, shall execute or otherwise carry out any act or deal in respect to the Trust Assets as the Liquidating Trustee may direct, said Liquidating Trustee being authorized and empowered to direct and control the acts in all things relating to the Trust Assets. The Liquidating Trustee may establish such rules and regulations as he or she may deem appropriate with regard to the deposit of Trust funds, the drawing of checks and the making of disbursements by the Liquidating Trustee.

Other provisions and terms of the Liquidating Trust shall be included in a written trust document creating the Liquidating Trust and conveying the Trust Assets to the Liquidating Trustee to be executed upon the Effective Date of the Plan.

## I.        Preferences and Fraudulent Conveyances

The Plan provides that AHF's causes of action for Preferences and Fraudulent Conveyances shall be conveyed into the Liquidating Trust, that the Liquidating Trustee shall have the right to pursue these causes of action, and that the Liquidating Trustee shall distribute all proceeds obtained from such causes of action, if any, on a pro-rata basis to the Class 5 General Unsecured Creditors.

## J.        Payment of Excess Revenues to the Liquidating Trust

The Plan provides that, for a period of Ten (10) years after the Effective Date, unless a dispute exits, AHF shall pay into the Liquidating Trust, within sixty (60) days after its receipt of its annual outside audit report, all Excess Revenues received by the Reorganized Debtor during the preceding fiscal year. Those Excess Revenues, less the reasonable expenses incurred by the Liquidating Trust, shall then be disbursed by the Liquidating Trustee, pro rata to the Creditors in Class 5. However, in the event that a dispute regarding the amount of Excess Revenues exits, payment of the Excess Revenues shall be made to the Liquidating Trustee within ten (10) days following the resolution of the dispute in the matter provided below.

The Plan provides that not later than forty-five (45) days following the receipt of its annual audit for each fiscal year ending during the term of the Plan, AHF shall submit to the Trustee of the Liquidating Trust an accounting (the "Annual Accounting") of its financial operations for the prior year. Such Annual Accounting shall be prepared in accordance with generally accepted accounting principles for non-profit corporations operating within the State of Texas, and shall also include a calculation disclosing what the Reorganized Debtor submits as being its Excess Revenues. The term "Excess Revenues" as used herein shall mean annual net income of AHF, calculated for each fiscal year pursuant to generally accepted accounting principles as determined by a third-party Auditor hired by AHF, less any payments on existing loans on such properties that it owns or manages, less operating expenses and capital

expenditures, plus any net revenues derived from the sale or refinancing of such properties and the repayment or collection of any outstanding notes receivable or development fees which AHF receives.

Upon receipt of the Annual Accounting, the Trustee of the Liquidating Trust shall have a period of ten (10) days to dispute the accuracy of accounting. Any dispute shall be submitted in writing by the Trustee to the then acting Chairman of the Board of Directors of AHF and shall specify with particularity each portion of the Annual Accounting that is being disputed and the basis of the dispute. In the event that AHF and the Trustee are unable to resolve all stated disputes within twenty (20) days after the date on which the written dispute is submitted to AHF, the unresolved dispute or disputes shall be submitted for resolution to a firm of a qualified certified public accountant appointed by the bankruptcy court, who shall review the Annual Accounting and each unresolved dispute, and shall make its determination of the issues raised by each unresolved dispute within thirty (30) days following its receipt of the Annual Accounting and the written dispute. The decision of such accountant with respect to the resolution of each dispute shall be binding on all parties.

Notwithstanding the above, none of the terms and provisions of the Plan shall be construed in a manner that limits or negates the rights, duties, obligations, and responsibilities of AHF, or its board of directors, to run its affairs in accordance with its charter and bylaws, and in accordance with applicable statutes, regulations, and rules governing its non-profit status, its charitable purpose, and its eligibility for participation in HUD-sponsored programs necessary to its operations as a provider of affordable housing. In addition, no provision in the Plan shall be construed in a manner that would result in AHF's being in violation of its charitable purpose or of any statute, regulation, or rule governing its operations as a non-profit entity providing affordable housing, or of any of its obligations under the limited partnership agreements under the terms of which either AHF or one of its wholly-owned limited liability companies acts as the general partner.

AHF's duty to pay Excess Revenues to the Liquidating trust shall terminate on the end of its fiscal year following the expiration of ten (10) years from the Effective Date. Upon the expiration of such fiscal year, AHF shall furnish a final Annual Accounting and pay over its Excess Revenues in accordance with the terms of this section and, upon completion of such payment of Excess Revenues, its duty to pay Excess Revenues to the Liquidating Trust shall end and the section of the Plan providing for such payment shall have no further force and effect.

### K.    Retained Causes of Action

In accordance with Section 1123(b) of the Bankruptcy Code, (a) AHF will retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action, and (b) the Liquidating Trust may enforce all rights to commence and pursue, as appropriate, any and all claims assigned to the Liquidating Trust, and AHF's rights to commence, prosecute, or settle its Retained Causes of Action will be preserved notwithstanding the occurrence of the Effective Date. AHF may pursue its Retained Causes of Action, as appropriate, in accordance with its best interests. No person or entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any cause of action against them

as any indication that the AHF or the Liquidating Trustee, as applicable, will not pursue any and all available causes of action against them.  AHF expressly reserves all rights to prosecute any and all Retained Causes of Action against any person or entity, except as otherwise expressly provided in the Plan.  Unless any causes of action against a person or entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, AHF or the Liquidating Trustee, as the case may be, expressly reserve all causes of action owned by the Estate for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, will apply to such causes of action upon, after, or as a consequence of the Confirmation Order.  AHF reserves and will retain the Retained Causes of Action notwithstanding the rejection of any executory contract or unexpired lease that occurred during its Chapter 11 case or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any causes of action that a Debtor may hold against any person or entity will vest in AHF or the Liquidating Trustee, as the case may be. AHF will have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VI

### Liquidation Analysis and Information on the
### Feasibility of the Plan of Reorganization

**A.    Liquidation Analysis**

Under a Chapter 7 liquidation analysis of AHF, unsecured and under secured creditors could expect limited or no recovery of their claims. Except for the Life Insurance Proceeds, the Estate's assets are encumbered and leveraged multiple times with liens, and the secured liens far exceed the value of AHF's equity.  A complete liquidation analysis of the bankruptcy estate will be supplied at the Confirmation Hearing. A significant recovery potential and a meaningful distribution to unsecured creditors are only realized if AHF continues to operate in order to attain the full benefits of investments in long term affordable housing ventures. An immediate liquidation will not realize these benefits and, conversely, would result in the triggering of contingent liabilities resulting in additional claims against the Estate which AHF estimates would exceed $50,000,000.00. Consequently, AHF asserts that the treatment afforded the Claims of all Creditors under the terms of the Plan is substantially better than they would receive in a Chapter 7 case.

**B.    Summary of Past Operations**

AHF was founded in 1989 by Steve Sterquell. The purpose of the organization was to create affordable housing for working families and individuals. Under Sterquell's direction, AHF pursued an aggressive course of deals and acquisitions of business across the nation. As many as 200 satellite entities were created to facilitate multiple investments in low income housing tax credit properties. AHF was focused almost exclusively on more and more acquisitions and deals.

Only after Sterquell and his family were no longer a part of the Foundation was the full extent of the serious financial problems of the Foundation made clear. Under Sterquell's direction, the Foundation had multiple offices and employees at remote locations. Today, the Foundation operates efficiently in one office with a centralized staff that is performance and goal oriented. The annual payroll obligation under the Sterquell leadership was over $4,300,000.00. Based on the most recent month, the annual payroll costs are now about $700,000.00. An 85% reduction in cost with many times the efficiency and productivity. Under the Sterquell leadership, the Foundation had to pay for the operation of three private airplanes including one corporate jet. Today, the Foundation has no such expense.

### C.    Assumptions and Contingencies

The Plan contemplates that AHF will continue its new cost efficient and diligent level of operations as a legal entity following confirmation. The Plan assumes that adequate cash resources will be available from the Life Insurance Proceeds to properly recapitalize AHF, address the significant issues of deferred maintenance and past due accounts at the property level, and provide for the curing of AHF's defaults under the limited partnership agreements in which it or its wholly-owned limited liability company will continue to act as the general partner. The ability of AHF to address the previous years of poor management is vital to its continued financial viability. The failure of AHF to recapitalize, pay deferred property maintenance and accounts payable, and cure its defaults under limited partnership agreements would have an insurmountable adverse impact on its ability to meet obligations under the Plan.

### D.    Schedule of Financial Projections and Assumptions

Attached to this Disclosure Statement as Exhibit "J" is a Projected Cash Flow, which AHF offers as evidence of the feasibility of the Plan. These cash flow projections cover the calendar years 2010, 2011, and 2012. The projections assume that the Plan is approved and becomes effective in July of 2010.

### E.    Statement on Feasibility of the Plan

The Financial Projections attached as Exhibit "J" reflect that AHF will be able to continue its operations, meet its obligations and comply with current housing program requirements. This, in turn, will allow AHF's creditors to maximize their opportunity to benefit from the long term investments AHF has in affordable housing properties. The financial projections illustrate that AHF will have the capitalization and available cash necessary to fund its Plan of Reorganization after confirmation and the ability to generate future cash flow sufficient to make the payments called for under the Plan. Other than the variants of general economic conditions, there are no factors which might hinder AHF in accomplishing that which it promises under the terms of the Plan or allow it to continue in business as contemplated under the Plan. Therefore, based upon these Financial Projections, AHF asserts that the Plan is feasible and is not likely to be followed by liquidation or the need for further financial reorganization.

## ARTICLE VII

### Confirmation of the Plan

**A.      General Instructions Pertaining to Voting**

The holder of a claim or interest allowed under Section 502 of the Code or allowed by the Court may vote on whether to accept or reject the Plan.  The Court will issue an order setting forth instructions for voting for the filed Plan.  The Order will require that all votes for the acceptance or rejection of the Plan be received prior to the hearing before the Bankruptcy Court on approval of such Plan or at such other time as the Bankruptcy Court may set.  The time and date of the hearing will be set forth in a notice to all creditors and parties-in-interest.  Voting may be on the ballot that will be provided with this Disclosure Statement or in any other written manner.  An Allowed Unsecured Creditor may choose treatment under Class 4 – Administrative Convenience Class on the ballot.  Your ballot should be sent to:

> R. BYRN BASS, JR. LAW OFFICES
> R. Byrn Bass, Jr.
> 4716 4th Street, Suite 100
> Lubbock, Texas 79416

Please mail or deliver your ballots so that all copies will reach the above address before the deadline set by the Court.  A vote received after that time will not be counted.

Whether a Creditor votes on the Plan or not, each Creditor will be bound by the terms and treatments set forth in the confirmed Plan that is accepted by the requisite majorities of Creditors and is confirmed by the Court, or as confirmed by the Court pursuant to the provisions of 11 U.S.C. § 1129(b).  Absent some affirmative act constituting a vote, a Creditor not voting on the Plan will not be included in the tally.  Allowance of a claim for voting purposes does not necessarily mean that all or a portion of the claim will be allowed for distribution purposes.

You are urged to fill-in, date, sign and properly mail in duplicate the enclosed ballot, which has been provided.  Be sure to properly complete and legibly identify the name of the Creditor, the class in which you believe the claim is treated in the Plan, the amount of the claim, and indicate whether you are voting for or against confirmation of the Plan, and if your claim is eligible for treatment as a member of the Administrative Convenience Class whether you choose to be treated in the class or not.  Representatives of the Debtor may solicit your vote.  The cost of any solicitation by the Debtor will be borne by the Debtor.

No representations concerning the Plan of the Debtor are authorized by the Debtor other than as set forth in this Disclosure Statement.  Any representations or inducements by any persons to secure your vote other than those contained in this Disclosure Statement should not be relied upon, and such representations of inducements should be reported to counsel for the Debtor who shall then deliver such information to the Bankruptcy Court for appropriate action.

**B.      Creditors Entitled to Vote**

Any Creditor whose claim is impaired under the Plan is entitled to vote, if either  i) its claim has been scheduled by the Debtor and such claim is not scheduled as disputed, contingent, or unliquidated, or ii) it has filed a proof of claim on or before the last date set by the Bankruptcy Court for such filings.  Any claim as to which an objection has been filed and such objection is still pending is not entitled to vote, unless the Bankruptcy Court temporarily allowed the claim in an amount which it deems proper for the purpose of accepting or rejecting the Plan upon application by the creditor.  Such application must be heard and determined by the Bankruptcy Court at such time as specified by the Bankruptcy Court.  A creditor's vote may be disregarded if the Bankruptcy Court determines that the creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Court. In calculating the acceptances necessary for a class of claims to have accepted the Plan, the votes of Insiders will not be counted.

**C.      Definition of Impairment**

Under Section 1124 of the Bankruptcy Code, a class of claims or equity security interests is impaired under a Chapter 11 Plan unless, with respect to each claim or interest of such class, the Plan:

1.      Leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or equity security interest; or

2.      Notwithstanding any contractual provision or applicable law that entitled the holder of a claim or equity security interests to receive accelerated payment of his claim or equity security interests after the occurrence of a default:

    a.      Cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default that consists of a breach of any provisions relating to the insolvency or financial condition of the Debtor at any time before the closing of the case, the commencement of a case under the Bankruptcy Code, or the appointment of or taking possession by a trustee in a case under the Bankruptcy Code;

    b.      Reinstates the maturity of such claim or equity security interest as it existed before the default;

    c.      Compensates the holder of such claim or equity security interest for damages incurred as a result of reasonable reliance on such contractual provisions or applicable law; and

d.    Does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity security interest entitles the holder of such claim or equity security interest; or

3.    Provides that, on the Effective Date of the Plan of Reorganization, the holder of such claim or equity security interest receives on account of such claims or equity security interest, cash equal to:

a.    With respect to a claim, the allowed amount of such claim

b.    With respect to any equity security interest, if applicable, the greater of:

i.    Any applicable fixed liquidation preference; or

ii.    Any fixed price at which the Debtor, under the terms of the security, may redeem the security.

## D.    Classes Impaired

Classes 3, 4, 5, 6, and 7 are all impaired under the treatment afforded the Creditors in these classes under the provisions of the Plan.

## E.    Votes Required for Class Acceptance

The Bankruptcy Code defines acceptance of a Plan by a class of creditors or equity security interests holders as acceptance by holders of two-thirds in dollar amount and a majority in number of the claims or equity security interests of that class, not counting the votes of Insiders, which actually cast ballots for acceptance or rejection of the Plan; i.e., acceptance takes place only if sixty-six and two-thirds percent (66 2/3%) in amount of claims and equity security interests in each class and more than fifty percent (50%) of claims or equity security interests voting in each class cast their ballots in favor of acceptance.

## F.    Hearing on Confirmation

Upon approval by the Bankruptcy Court of the Disclosure Statement, a hearing on Confirmation of the Plan will be scheduled at Amarillo, Texas before the Honorable Robert L. Jones, United States Bankruptcy Judge, United States Bankruptcy Court, Room 100, U.S. Courthouse, 624 S. Polk, Amarillo, Texas 79101.

## G.    Confirmation Without the Acceptance of a Class

If all other requirements for confirmation of a Plan are met, the Bankruptcy Court may, at the request of the proponent, confirm the Plan notwithstanding the fact that one or more impaired Classes of Claims or Interests have not accepted the Plan. The Bankruptcy Court may confirm a Plan under these circumstances if the Bankruptcy Court finds that the Plan is fair and equitable

under the provisions of Section 1129(b) of the Bankruptcy Code. The Bankruptcy Code requires the Bankruptcy Court to find that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or Interests that is impaired under the Plan and has not accepted the Plan. Upon such finding, the proponent of the Plan may confirm the Plan over the objections of a dissenting class.

AHF believes that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or Interests that is impaired under the Plan and therefore can be confirmed over the objections of a dissenting Class of Claims or Interests.

**H.    Effect of Confirmation**

The Estate, as conveyed, transferred, and assigned to AHF, will be free and clear of all Claims and Interests of creditors and equity holders except as expressly provided in the confirmed Plan or the order of the Bankruptcy Court confirming the Plan. The provisions of the confirmed Plan will bind AHF and all other parties-in-interest, including any creditors of AHF, whether or not such creditors are impaired under the confirmed Plan and whether or not such creditors voted to accept the confirmed Plan.

**I.    Discharge**

Consistent with Section 1141(d)(1) of the Bankruptcy Code, and except as otherwise provided in the Plan, or in the order confirming the Plan, the confirmation of the Plan discharges AHF from any debt that is dischargeable under the Bankruptcy Code and that arose before the date of such confirmation, whether or not—

1.    a proof of the claim based on such debt is filed or deemed filed under section 501 of the Bankruptcy Code;

2.    such claim is allowed under section 502 of the Bankruptcy Code; or

3.    the holder of such claim has accepted the plan.

**J.    Limitation of Liability in Connection With This Plan, Disclosure Statement, and Related Documents.**

AHF and its counsel shall not incur any liability to any entity, including specifically any Holder of a Claim or Interest, for any act taken or omitted to be taken after the Petition Date in connection with or related to the formulation, preparation, dissemination, implementation, confirmation, or consummation of the Plan, this Disclosure Statement, the Confirmation Order, or any other agreement or document created or entered into, or any other act taken or omitted to be taken in connection with the Plan, this Disclosure Statement, or the Confirmation Order, including solicitation of acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.

[Remainder of Page Intentionally Left Blank]

**DISCLOSURE OF EFFECT OF COURT'S APPROVAL OF THIS DISCLOSURE
STATEMENT AND OF THE ACCURACY OF THE REPRESENTATIONS
CONTAINED IN THIS DISCLOSURE STATEMENT**

COURT APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN
ENDORSEMENT OF ANY OF THE REPRESENTATIONS CONTAINED IN EITHER THE
DISCLOSURE STATEMENT OR THE PLAN, NOR DOES COURT APPROVAL OF THE
DISCLOSURE STATEMENT CONSTITUTE AN ENDORSEMENT OF THE PLAN ITSELF.
APPROVAL OF THE DISCLOSURE STATEMENT BY THE COURT REPRESENTS A
DETERMINATION THAT THE DISCLOSURE STATEMENT CONTAINS "ADEQUATE
INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS REQUIRED BY 11
U.S.C. SECTION 1125 AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE
AND HISTORY OF THE DEBTOR AND THE CONDITION OF THE DEBTOR'S BOOKS
AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE
INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT
CLASS TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.

THE DEBTOR SEEKS AN AFFIRMATIVE VOTE FROM EACH CLASS AND EACH
HOLDER OF A CLAIM IN THIS BANKRUPTCY PROCEEDING.  THE BALLOT THAT
YOU WILL RECEIVE PERMITS YOU TO ACCEPT OR REJECT THE PLAN.

EXCEPT WHERE SPECIFICALLY STATED OTHERWISE, ALL OF THE INFORMATION
CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE
DEBTOR OR OBTAINED FROM ITS RECORDS AND FILES.   THE PROJECTIONS
CONTAINED IN THIS DISCLOSURE STATEMENT ARE BASED UPON THE BEST
INFORMATION AVAILABLE TO THE DEBTOR AT THE TIME THAT THE DISCLOSURE
STATEMENT WAS PREPARED.

THE DEBTOR FAVORS ACCEPTANCE OF THE PLAN AND BELIEVES THAT
CONFIRMATION OF THE PLAN WOULD REALIZE PAYMENT OF A MORE
EQUITABLE DISTRIBUTION OF THE ASSETS TO CREDITORS THAN COULD BE
OBTAINED THROUGH A CHAPTER 7 LIQUIDATION, APPOINTMENT OF A TRUSTEE,

OR CONFIRMATION OF A COMPETING PLAN FILED BY THE UCC. SUCH CONCLUSION IS BASED ON INFORMATION IN THE POSSESSION OF THE DEBTOR AT THE TIME THE DISCLOSURE STATEMENT AND PLAN WAS PREPARED.

WHILE THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED OR VERIFIED EXCEPT WHERE SPECIFICALLY STATED, AND THE RECORDS KEPT BY THE DEBTOR ARE NOT REPRESENTED TO BE WITHOUT ANY INACCURACY OR OMISSION, THE DEBTOR FIRMLY BELIEVES THAT EVERY EFFORT HAS BEEN MADE TO BE ACCURATE AND COMPLETE.

## ARTICLE VIII

### Contested Claims

**A.    Objection to Claims and Interests**

On or before the first Distribution Date, but in no event later than ninety (90) days after the Confirmation Date, objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims ("Contested Claims") to which objections are made. AHF and/or the Liquidating Trustee shall litigate to judgment, settle or withdraw objections to Contested Claims. Notwithstanding any other provision of the Plan, no payments or distributions shall be made with respect to all or any portion of a Contested Claim unless and until all objections to such Contested Claim have been determined by or settled pursuant to Final Order.

**B.    Referral of Certain Claims to Conflicts Counsel**

Counsel for the Unsecured Creditors' Committee has already reviewed and filed objections to many of the Proofs of Claim which have been filed in this bankruptcy case. However, in those instances where Creditors who were previously represented by the law firm of Mullin Hoard & Brown, L.L.P., or who have a representative that serves on the Committee, have filed a Proof of Claim, the Committee acknowledges that Mullin Hoard & Brown, L.L.P., which serves as counsel for the Committee, has a conflict of interest which prevents it from examining and objecting to the claims of such Creditors. Consequently, to ensure that the Committee fulfills its obligations to review, and where appropriate, object to the Proofs of Claim that fall within these categories, the Committee has determined to seek authority from the Bankruptcy Court to employ Conflicts Counsel for the purpose, among other things, of examining, and where appropriate, objecting to the allowance of these Proofs of Claim. Conflicts Counsel shall have authority to object to claims as well as to pursue such claims against the subject claimants as

AHF may have. A listing of the Proofs of Claim that will initially be referred to Conflicts Counsel is attached as Exhibit "L".

## ARTICLE IX

### Future Management, Financial Accounting, and Capital Requirements of AHF

#### A.    Future Management

The business and affairs of AHF will be managed by its Board of Directors as required by applicable statutory and regulatory authority. The Board will appoint corporate officers who will manage AHF's day-to-day operations and will report directly to the Board of Directors.

#### B.    Future Financial Accounting

The financial books and records of AHF will be maintained by accounting staff located at its offices in Amarillo, Texas.  Present AHF accounting staff has extensive experience and background in tracking and reporting its financial transactions and will provide open communication to its limited partners, property management contractors, governmental entities, and other interested parties. AHF will utilize external accounting counsel where needed to supplement its staff to handle all accounting matters in a prudent and businesslike manner.

#### C.    Anticipated Future Capital Requirements of the Debtor

The current management of the Reorganized Debtor has attempted to estimate the immediate capital needs of AHF over the first year of its operations. A summary of these anticipated capital requirements is attached as Exhibit "K".

## ARTICLE  X

### Modification

#### A.    Modifications Prior to Approval

AHF may propose amendments to or modifications of this Disclosure Statement Plan at any time prior to its approval by the Bankruptcy Court.  AHF may remedy any defects or omissions or reconcile any inconsistencies in the Disclosure Statement in such manner as may be necessary to comply with statutory requirements or to resolve objections, if any, of creditors and interested parties.

## ARTICLE  XI

**Miscellaneous Provisions**

### A.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including that necessary to insure that the purpose and intent of the Plan is carried out, to hear and determine all Claims and Interests set forth in the Plan that could have been brought before the entry of the Confirmation Order, and to try and rule upon lawsuits brought by the AHF or the Liquidating Trustee.  In addition, the Court shall retain jurisdiction as follows:

### B.    Causes of Action

The Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against the Debtor, the Reorganized Debtor, and to enforce all causes of action that may exist on behalf of the Debtor, the Reorganized Debtor and the Liquidating Trustee. Nothing contained herein shall prevent the Reorganized Debtor or the Liquidating Trustee from taking such action as may be necessary in the enforcement of any cause of action which may exist on behalf of the Debtor or the Liquidating Trust and which may not have been enforced or prosecuted, unless satisfied herein.

### C.    Claims Determinations

After the Effective Date of the Plan, the Bankruptcy Court shall further retain jurisdiction for the purpose of classification of Claims that have been allowed for purposes of voting, and the determination of such objections as may be filed to Claims and Interests.

### D.    Property Determinations

The Bankruptcy Court shall further retain jurisdiction through and after the Effective Date of the Plan for the purpose of determining all questions and disputes regarding ownership and/or title to the assets of the Estate, or the proceeds thereof, and determination of all causes of action, controversies, disputes concerning the Debtor, the Reorganized Debtor, the Liquidating Trustee and any other party, including, but not limited to any claim or entitlement associated with the Equity Interests of the Debtor or the Reorganized Debtor, any right of the Debtor, the Reorganized Debtor or the Liquidating Trustee to recover assets pursuant to the provisions of the Bankruptcy Code and to adjudicate all Claims or controversies arising out of any purchase, sale or contract made or undertaken by the Debtor or the Debtor corporation with respect to this Proceeding, the terms or actual implementation or enforcement of the Plan.

### E.    Other Post-Confirmation Matters

The Bankruptcy Court shall further retain jurisdiction for the following purposes:

1.      To modify the Plan after Confirmation pursuant to the Bankruptcy Rules and the Bankruptcy Code;

2.      To assure the performance by the Reorganized Debtor of its obligations under the Plan;

3.      To enter such orders, including injunctions, as are necessary to enforce the title, rights, and powers of the Reorganized Debtor and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Bankruptcy Court may deem necessary;

4.      To enter an order concluding and terminating this Proceeding;

5.      To correct any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

6.      To decide issues and Claims concerning all tax liabilities which arise in connection with or related to the Debtor, this Proceeding or the Plan, including, without limitation, to hear and determine matters concerning state, local and federal taxes pursuant to Sections 346, 505, 506, 507, 523, and 1146 of the Bankruptcy Code;

7.      To hear and determine any action or proceeding brought by the Debtor, Reorganized Debtor or the Liquidating Trustee pursuant Sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code;

8.      To resolve any disputes arising from distributions made pursuant to the Plan, and adjudicate all controversies concerning classification or allowance of any Claim or Interest;

9.      To hear and determine all Claims arising from the rejection of Executory Contracts and Unexpired Leases and to consummate the rejection and termination thereof, and further, to hear and determine all matters relating to the assumption of Executory Contracts and Unexpired Leases;

10.     To liquidate damages or estimate Claims in connection with disputed, contingent or unliquidated Claims;

11.     To hear and determine all actions brought by or against the Debtor, the Reorganized Debtor or the Liquidating Trustee arising in or related to this Proceeding or arising under the Bankruptcy Code;

12.     To hear and determine all requests for compensation and/or reimbursement of expense that may be made after the Confirmation Date.

### F.      Cramdown

In the event any impaired Class shall fail to accept the Plan in accordance with Section 1129(a) of the Bankruptcy Code, AHF reserves the right to request the Bankruptcy Court to confirm the Plan in accordance with the provisions of Section 1129(b) of the Bankruptcy Code.

### G.      Headings

Headings are utilized in this Disclosure Statement, and in the Plan, are for convenience and reference only and do not constitute a part of the Disclosure Statement or Plan for any other purpose.

### H.   Due Authorization by Creditors

Each and every Creditor and Interest Owner who elects to participate in the distributions provided for in the Plan warrants that he, she, or it is authorized to accept in consideration of his, her, or its Claim against AHF the distributions provided for in the Plan and that there are no outstanding commitments, agreements, or understandings, expressed or implied, that may or can in any way defeat or modify the rights conveyed or obligations undertaken by him, her, or it under the Plan.

### I.      Entire Agreement

The Plan, as described herein and the exhibits made a part thereof, and the Disclosure Statement and exhibits thereto (to the extent applicable to, and not inconsistent with, the Plan), sets forth the entire agreement and understanding among the parties hereto relating to the subject matter hereof and supersedes all prior discussions and documents.  No party hereto shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein or as may hereafter be agreed to by the parties in writing.  Nothing contained herein shall constitute an admission of any fact of liability by AHF, or be admissible in any proceeding involving AHF.

### J.      Class Acceptance

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted on the Plan.  A Class of Interests shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount of the Allowed Interests of such Class that have voted on the Plan.

### K.      Objections to Claims

All amounts shown in the Plan and Disclosure Statement are still subject to the claims reconciliation process, as AHF reserves the right to object to any claims filed by Creditors with

the Bankruptcy Court for all instances in which the claimed amount exceeds the amount shown on AHF's records or Plan and Disclosure Statement.

### L.      Tax Consequences

AHF has neither obtained a tax opinion nor analyzed the tax consequences of the transactions contemplated by the Plan, and AHF expresses no opinion as to the tax consequences to the holder of any Claim or Interest as a result of the transactions contemplated by the Plan. All parties-in-interest are advised and encouraged to obtain their independent tax counsel to determine the tax consequences of the Plan.

## ARTICLE XII

## Plan Contingencies

### A.      Future Contracts and Business of Debtor

The Plan of Reorganization makes certain assumptions concerning the operations of AHF following the implementation of the Plan.  It is important that AHF negotiate restructuring arrangements with limited partners, lenders, and other creditors for whom it has executed guaranties of performance or payment.  Obtaining refinancing and agreements regarding the curing of defaults and recapitalization with these lenders and limited partners bears significantly upon the financial aspects of the Plan of Reorganization.  AHF's ability to accomplish these tasks is an issue which impacts the feasibility of the Plan of Reorganization and will be addressed by the Bankruptcy Court at the Confirmation Hearing.

## ARTICLE XIII

## Effective Date

This Plan takes effect on the Effective Date as defined in Article I above.

## ARTICLE XIV

## Compliance with Regulations and Payment of Fees Due to the U.S. Trustee

During the pendency of this bankruptcy case, AHF will comply with all regulations promulgated by the Office of the U.S. Trustee, including remaining current on all quarterly fees assessed against the Estate by the U.S. Trustee.

WHEREFORE, the proponents of the Plan of Reorganization urge all creditors and parties in interest to vote in favor of confirmation of the Plan, and pray that the Bankruptcy Court hold a Confirmation Hearing pursuant to the provisions of the Bankruptcy Rules of Procedure and after considering the terms and provisions of the Plan, and hearing the evidence concerning its preparation and its feasibility, that the Court determine that it meets all the requirements of 11 U.S.C. Section 1129, and enter an appropriate Confirmation Order.

Dated: March 29, 2010.

Respectfully submitted,
R. BYRN BASS, JR. LAW OFFICES
R. Byrn Bass, Jr., SBN: 01889500
4716 4th Street, Suite 100
Lubbock, Texas 79416
Telephone: 806/785-1250
Facsimile: 806/771-1260

John Thomas Boyd Jr.
LYNCH, HANNA & BOYD, PLLC
500 South Taylor Street, Lobby Box 267
Amarillo, Texas  79101-2442
Telephone: (806) 379-6416
Facsimile:  (806) 379-8504

ATTORNEYS FOR AMERICAN
HOUSING FOUNDATION


By:  /s/ Tom Boyd_____
      Tom Boyd
      State Bar No. 02772300


CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document was this 29th day of March 2010 served electronically on all appropriate parties through the Court's CM/ECF filing system.


/s/ Tom Boyd_____
Tom Boyd