THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | |
|---|---|
| In re: | § |
| | § |
| | § Chapter 11 |
| AMERICAN HOUSING FOUNDATION, | § |
| | § Case No. 09-20232-RLJ |
| Debtor. | § |
| | § |

---

## DISCLOSURE STATEMENT TO
## JOINT CHAPTER 11 PLAN FILED BY CHAPTER 11 TRUSTEE AND OFFICIAL
## COMMITTEE OF UNSECURED CREDITORS

---

### IMPORTANT DATES

- Voting Record Date: [ , 2010]
- 3018 Motion Deadline: [ , 2010]
- Objection Deadline: [ , 2010] 4:00 p.m. (CDT)
- Voting Deadline: [ , 2010] 4:00 p.m. (CDT)
- Confirmation Hearing: [ , 2010] 4:00 p.m. (CDT)

Dated: October 1, 2010

**WALTER O'CHESKEY, CHAPTER 11 TRUSTEE**

TARBOX LAW, P.C.
Max R. Tarbox (TX 19639950)
2301 Broadway
Lubbock, Texas 79401

GARDERE WYNNE SEWELL LLP
Stephen A. McCartin (TX 13374700)
Marcus A. Helt (TX 24052187)
1601 Elm Street, Suite 3000
Dallas, Texas 75201-4761

COUNSEL FOR WALTER O'CHESKEY, CHAPTER 11 TRUSTEE

**OFFICIAL UNSECURED CREDITORS COMMITTEE**

MULLIN, HOARD & BROWN, L.L.P.
David C. Mullin (TX 14651600)
David R. Langston (TX 11923800)
P.O. Box 2585
Lubbock, Texas 79408

COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

# TABLE OF CONTENTS

**Page**

Article I.      Introduction ............................................................................. 1
     1.01.      Bankruptcy Entry and Exit ................................................. 1
     1.02.      Executive Summary of the Plan ......................................... 2

Article II.      Disclaimer.............................................................................. 10
     2.01.      Considerations in Preparation of the Disclosure Statement and Plan;
         Disclaimers .......................................................................... 13
     2.02.      Disclosure Statement; Construction.................................... 14
     2.03.      Solicitation Package ............................................................ 15
     2.04.      Voting Procedures, Ballots, and Voting Deadline ............. 15
     2.05.      The Confirmation Hearing and Objection Deadline .......... 16

Article III.      General Information Regarding the Debtor.......................... 18
     3.01.      Background............................................................................ 18
     3.02.      AHF Tax-Exempt Bond-Financed Properties .................... 18
     3.03.      AHF Conventionally Financed Properties ......................... 20
     3.04.      AHF Tax-Credit Properties ................................................. 22
     3.05.      Corporate Structure of the Debtor ..................................... 24
     3.06.      Management of the Debtor................................................... 24
     3.07.      Events Leading to Chapter 11 ............................................ 24

Article IV.      Events During the Chapter 11 Case ..................................... 25
     4.01.      Commencement of the Chapter 11 Case.............................. 25
     4.02.      Appointment of the Official Committee of Unsecured Creditors ................. 26
     4.03.      Appointment of Chapter 11 Trustee .................................... 26
     4.04.      Use of Cash Collateral ........................................................ 26
     4.05.      Bankruptcy Schedules and Statements of Financial Affairs .................. 27
     4.06.      Meeting of Creditors ............................................................ 28
     4.07.      Operating Reports ................................................................ 28
     4.08.      Claims Process ..................................................................... 28
     4.09.      Exclusivity............................................................................ 29
     4.10.      Sale of Lakewood Terrace Townhomes.............................. 29
     4.11.      The Brandywood/FEMA Grant ......................................... 30

Article V.      Financial Information of the debtor ..................................... 32
     5.01.      Debtor's Assets..................................................................... 32
     5.02.      Debtor's Liabilities .............................................................. 32

Article VI.      Chapter 11 Bankruptcy and Plan Overview ....................... 33
     6.01.      Introduction to Chapter 11 of the Bankruptcy Code.......... 33
     6.02.      Summary of the Chapter 11 Plan........................................ 34
     6.03.      Summary of Classification of Claims and Interests and Proposed
         Distributions to Same under the Plan.................................. 37
     6.04.      Means for Implementation of the Plan............................... 42

| | | |
|---|---|---|
| 6.05. | Treatment of Executory Contracts and Unexpired Leases | 50 |
| 6.06. | Effects of Confirmation | 51 |
| 6.07. | Retention of Jurisdiction | 52 |
| 6.08. | Procedures for Treating and Resolving Disputed and Contingent Claims | 52 |
| 6.09. | Administrative Expenses, Professional Fee Claims, and Tax Priority Claims | 54 |

**Article VII.** Litigation and Preserved Causes-of-Action Summary ... 55
| 7.01. | Preservation of All Causes of Action Owned by the Estate | 55 |
| 7.02. | Summary of Status of Litigation Funding the Liquidating Trust | 56 |
| 7.03. | Successful Litigation to Collect Life Insurance Proceeds | 61 |
| 7.04. | Litigation Involving Other Claims Against Sterquell Family and Sterquell Entities | 64 |
| 7.05. | Complaint Against Former AHF Directors | 65 |
| 7.06. | AHF action against Bank of America Securities ("BOA") | 65 |
| 7.07. | Fraudulent Transfers and Preference Claims | 65 |
| 7.08. | Other Claims | 66 |
| 7.09. | Claims Against AHF Auditors | 66 |

**Article VIII.** Certain Federal Income-Tax Consequences of the Plan ... 67
| 8.01. | General Information | 67 |
| 8.02. | Potential Tax Consequences to the Debtor | 68 |
| 8.03. | Tax Consequences of the Liquidating Trust | 70 |
| 8.04. | Information Reporting and Backup Withholding | 71 |
| 8.05. | Importance of Obtaining Professional Tax Assistance | 71 |

**Article IX.** The Best-Interests-of-Creditors Test ... 71
| 9.01. | Best-Interests Test | 71 |
| 9.02. | Chapter 7 Liquidation Analysis | 72 |

**Article X.** Alternatives to Confirmation and Consummation of the Plan ... 73
| 10.01. | Alternative Plan(s) | 74 |
| 10.02. | Liquidation Under Chapter 7 | 74 |

**Article XI.** Certain Risk Factors to Be Considered ... 75
| 11.01. | General Risks | 75 |
| 11.02. | Certain Business and Industry Risks Affecting the Debtor, the Reorganized Debtor, or the Liquidating Trustee | 75 |
| 11.03. | Certain Bankruptcy-Law Considerations | 76 |
| 11.04. | Certain Tax Considerations, Risks, and Uncertainties | 77 |

**Article XII.** The Solicitation; Voting Procedures ... 77
| 12.01. | Voting Deadline | 77 |
| 12.02. | Voting Procedures | 77 |
| 12.03. | Miscellaneous | 77 |
| 12.04. | Fiduciaries and Other Representatives | 77 |

12.05.  Parties Entitled to Vote ....................................................................................... 78
12.06.  Agreements upon Submitting Ballots ............................................................ 78
12.07.  Waiver of Defects, Irregularities, Etc. ........................................................... 79
12.08.  Withdrawal of Ballots; Revocation ................................................................ 79
12.09.  Further Information; Additional Copies ........................................................ 80

Article XIII.  Proponents' Recommendation ..................................................................... 80

Exhibits

Exhibit A – Liquidation Analysis
Exhibit B – Operating Budget
Exhibits C-1 and C-2 – Financial Information and Valuation Estimates for Retained Properties
Exhibits D-1 and D-2 – Financial Information and Valuation Estimates for Rejected Properties
Exhibit E – Reserved Causes of Action Assigned to the Liquidating Trust
Exhibit F – List of Affiliates
Exhibit G – Resumes of proposed members of the Reorganized AHF Board

# ARTICLE I.
## INTRODUCTION

Walter O'Cheskey, the duly appointed and acting Chapter 11 Trustee for American Housing Foundation, and the Official Committee of Unsecured Creditors jointly propose this *Disclosure Statement to Joint Chapter 11 Plan filed by Chapter 11 Trustee and Official Committee of Unsecured Creditors* pursuant to section 1125 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"). This Disclosure Statement is provided to the Debtor's known creditors entitled to receive the Disclosure Statement in an attempt to disclose information deemed to be material and necessary for the Debtor's creditors to arrive at a reasonably informed decision in exercising their right to accept or reject the Chapter 11 Plan of Liquidation (the "**Plan**").[1]

Also accompanying the Plan and this Disclosure Statement is a creditor's ballot (the "**Ballot**") for acceptance or rejection of the Plan. The Bankruptcy Court has set [                    2010], at [    :00    .m.] (CDT) as the date for the hearing on confirmation of the Plan (the "**Confirmation Hearing**"). The Confirmation Hearing will be held before the Honorable Robert L. Jones, United States Bankruptcy Judge, 624 South Polk, Room 100, Amarillo, Texas.

The Bankruptcy has fixed [                    , 2010, at    :00    .m.] (CDT) as the deadline by which objections to the Plan must be filed with the Bankruptcy Court and served on the Chapter 11 Trustee, his counsel, the Creditors Committee, and its counsel. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made on the Bankruptcy Court's docket or at the Confirmation Hearing or at any subsequent adjourned date for the Confirmation Hearing.

The Bankruptcy Court has approved this Disclosure Statement as containing information of a kind and in sufficient detail to enable a hypothetical, reasonable investor typical of creditors or interest holders to make an informed decided about whether to accept or reject the Plan. That approval is evidence by this Court's entry of the *Order (I) Approving Joint Disclosure Statement to Joint Chapter 11 Plan of Liquidation; (II) Approving Procedures to Solicit Acceptances of the Plan, (III) Scheduling a Hearing and Establishing Notice and Objection Procedures for Confirmation of the Plan, and (IV) Authorizing Other Relief Related to Plan Solicitation and Confirmation* [Docket No ___]

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE AN ENDORSEMENT OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT OR A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.

## 1.01. Bankruptcy Entry and Exit

On April 21, 2009, certain petitioning creditors filed an involuntary petition for relief against the Debtor under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**").

---

[1] Capitalized terms not defined herein shall be given the meaning ascribed to them in the Plan.

The Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on June 11, 2009. The two cases were consolidated by order of the Bankruptcy Court on July 17, 2009, and the Bankruptcy Case is now pending under Case No. 09-20232. On April 29, 2010, the Bankruptcy Court appointed the Chapter 11 Trustee to administer this Bankruptcy Case. Since then, the Chapter 11 Trustee has managed the day-to-day affairs of the Debtor, and attempted to develop a strategy to maximize value for the Creditors.

As part of that strategy, on October 1, 2010, the Proponents filed the Plan [Docket No. 1660]. As described below, the Plan is a liquidating plan and contemplates the transfer or liquidation of substantially all of the Debtor's assets in an orderly fashion. Proceeds from the liquidation of the assets will be distributed to Creditors according to the terms of the Plan.

This Disclosure Statement describes the Debtor, its business operations, assets and history, certain aspects of the Plan, significant events occurring in the Bankruptcy Case, and related matters. It also contains information about how to vote on the Plan and how Claims are classified and will be treated under the Plan. Attached as Exhibits to this Disclosure Statement are copies of the following documents:

- Exhibit A – Liquidation Analysis

- Exhibit B – Operating Budget

- Exhibits C-1 and C-2 – Financial Information and Valuation Estimates for Retained Properties

- Exhibits D-1 and D-2 – Financial Information and Valuation Estimates for Rejected Properties

- Exhibit E – Reserved Causes of Action Assigned to the Liquidating Trust

- Exhibit F – List of Affiliates

- Exhibit G – Resumes of proposed members of the Reorganized AHF Board

## 1.02. Executive Summary of the Plan

The following is a brief summary of the Plan's general terms and does not form a part of the Plan. This summary is qualified in its entirety by reference to the provisions of the Plan. Capitalized terms used in this summary are defined in Article XIV of the Plan.

AHF directly owns the following assets:

a. Life Insurance Proceeds;

b. Lakewood Terrace Townhomes;

c. Intercompany Receivables;

d.  Causes of Action (including claims against its directors and officers, preference and fraudulent-transfer claims, and other miscellaneous claims); and

e.  Miscellaneous Assets.

In addition, AHF owns an ownership interest, directly or indirectly, in numerous Special Purpose Entities. These Special Purpose Entities are not subject to this bankruptcy case. These Special Purpose Entities currently own and operate approximately 65 affordable-housing apartment communities (containing approximately 13,000 units) located in nine (9) states. These affordable-housing apartment communities were financed in three (3) general ways:

| | | |
|---|---|---|
| 35 | **Tax-Exempt Bond Financing** | |
| | - 11 in the "Walden I" portfolio | |
| | - 17 in the "Walden II" portfolio | |
| | - 4 in the "Simpson" portfolio | |
| | - 3 Other | |
| 17 | **Tax-Credit Equity Financing from Investors** | |
| 13 | **Conventional Financing from JPMorgan Chase, N.A.** (a/k/a the "**AIMCO Portfolio**") | |
| 65 | Total Properties | |

The Plan resolves, settles, and compromises all Claims against AHF or property of AHF of whatever character, whether Disputed, contingent, or unliquidated, or whether Allowed by the Bankruptcy Court pursuant to section 502(a) of the Bankruptcy Code. Pursuant to the terms of the Plan:

•  AHF shall retain its indirect or direct ownership interest in the Special Purpose Entities listed on <u>Exhibit A</u> attached to the Plan and as supplemented in the Plan Supplement, which own and operate 18 apartment communities, (hereinafter referred to as the "**Retained Properties**");[2] and

•  AHF shall terminate/divest/reject its indirect or direct ownership interest in the Special Purpose Entities listed on <u>Exhibit B</u> attached to the Plan or as supplemented in the Plan Supplement, which own and operate 47 apartment

---

[2] The Proponents or the Reorganized Debtor may elect, in their sole and absolute discretion, to add Special Purpose Entities to or remove Special Purpose Entities from <u>Exhibit A</u> at any time prior to the Effective Date. All Special Purpose Entities removed from <u>Exhibit A</u> will, if not otherwise added to <u>Exhibit B</u>, be deemed to be listed on <u>Exhibit B</u>. Nothing in the Plan restricts the Proponents' ability to add or remove a Special Purpose Entity to or from <u>Exhibit A</u> if he determines such an addition or removal is in the best interests of the Estate to maximize the recovery on all Allowed Claims.

communities, as soon as practical after confirmation of the Plan (hereinafter referred to as the "**Rejected Properties**").[3]

- Reorganized AHF shall continue to own and/or operate the Retained Properties pursuant to the Operating Budget attached hereto as <u>Exhibit B</u>. Reorganized AHF shall stabilize the operations of the Retained Properties and use its best efforts to sell its interest in the Retained Properties within twenty-four (24) months after the Effective Date of the Plan, unless the Reorganized AHF, the Liquidating Trustee, and the Trust Oversight Committee agree otherwise. All proceeds, net of operating costs and closing costs of Reorganized AHF, received from the sale or other disposition of the Retained Properties and the other remaining assets of Reorganized AHF shall be transferred by Reorganized AHF to the AHF Liquidating Trust for distribution to creditors pursuant to the Plan.

- AHF shall transfer all of its assets, other than the Rejected Properties, Retained Properties and Operating Fund Reserve, to the AHF Liquidating Trust. The AHF Liquidating Trust shall liquidate the Trust Assets and distribute the net proceeds to creditors holding Allowed Claims pursuant to the terms and provisions of the Plan and Liquidating Trust Agreement, substantially similar to the form attached to the Plan as <u>Exhibit C</u>.

- A detailed list of AHF Liquidating Trust assets, estimated values, projected allowed creditor claims and the projected dividend available to general unsecured creditors is attached hereto as <u>Exhibit A</u> (the "**Liquidation Analysis**"). The Liquidation Analysis contains estimates only. Actual recoveries on assets and actual allowed claims could vary materially from those shown in the analysis.

- Creditors holding Allowed Claims shall receive the following treatment under the Plan:

| CLASS | CLAIMANT | TREATMENT |
|---|---|---|
| 1. | **ALLOWED PRIORITY NON-TAX CLAIMS** <br><br> (Est. Amt. of Claims: $.100) | Shall receive Cash in an amount equal to the Allowed amount of such Priority Non-Tax Claim no later than the Distribution Date. <br><br> (Est. Recovery: 100%) |
| 2. | **ALLOWED SECURED TAX CLAIMS** | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral to the Creditor in full and final satisfaction of the Allowed Class 2 Claim, or (ii) payment of the proceeds upon liquidation of the Collateral, less any |

---

[3] The Proponents or the Reorganized Debtor may elect, in their sole and absolute discretion, to add Special Purpose Entities to or remove Special Purpose Entities from <u>Exhibit B</u> at any time prior to the Effective Date. All Special Purpose Entities removed from <u>Exhibit B</u> will, if not otherwise added to <u>Exhibit A</u>, be deemed to be listed on <u>Exhibit A</u>. Nothing in the Plan restricts the Proponents' ability to add or remove a Special Purpose Entity to or from <u>Exhibit B</u> if he determines such an addition or removal is in the best interests of the Estate to maximize the recovery on all Allowed Claims.

| CLASS | CLAIMANT | TREATMENT |
|-------|----------|-----------|
| | (Est. Amt. of Claims: $.100) | expenses incurred in the liquidation. (Est. Recovery: 100%) |
| 3. | **ALLOWED SECURED CLAIMS OF TEXAS CAPITAL BANK** (Est. Amt. of Claim: $4.5 million) | Pursuant to the TCB Settlement, Texas Capital Bank shall have an Allowed Class 3 Claim in the amount of $4,500,000.00. On account of such Allowed Class 3 Claim, and in full satisfaction, release, and discharge of and exchange for such Claim, and the release of all Liens against Estate assets, and Brandywood, as well as additional consideration identified in Article I of the Plan, Texas Capital Bank shall receive $4,500,000.00 in Cash and the TCB Release on the Effective Date. Texas Capital Bank shall have no Deficiency Claim. (Est. Recovery: 100%) |
| 4. | **ALLOWED SECURED CLAIMS OF BAC HOME LOANS SERVICING L.P.** (Est. Amount of Claim: $3.7 million) | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral in full and final satisfaction of the Allowed Class 4 Claim, or (ii) payment of the net proceeds from the liquidation of the Collateral, after the payment of any senior liens and interests on the Collateral and any expenses incurred in the liquidation thereof. BAC Home Loan Servicing L.P.'s Deficiency Claim shall be treated as a Class 17 General Unsecured Claim. (Est. Recovery: 100%) |
| 5. | **ALLOWED SECURED CLAIMS OF GRAHAM MORTGAGE CORPORATION** (Est. Amount of Claim: $.886) | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral in full and final satisfaction of the Allowed Class 5 Claim, or (ii) payment of the net proceeds from the liquidation of the Collateral, after the payment of any senior liens and interests on the Collateral and any expenses incurred in the liquidation thereof. Graham Mortgage Corporation's Deficiency Claim shall be treated as a Class 17 General Unsecured Claim. (Est. Recovery: 100%) |

| CLASS | CLAIMANT | TREATMENT |
|---|---|---|
| 6. | **ALLOWED SECURED CLAIMS OF GARY GRAHAM IRA**<br><br>(Est. Amount of Claim: $.635) | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral in full and final satisfaction of the Allowed Class 6 Claim, or (ii) payment of the net proceeds from the liquidation of the Collateral, after the payment of any senior liens and interests on the Collateral and any expenses incurred in the liquidation thereof. Gary Graham IRA's Deficiency Claim shall be treated as a Class 17 General Unsecured Claim.<br><br>(Est. Recovery: 100%) |
| 7. | **ALLOWED SECURED CLAIMS OF CENLAR**<br><br>(Est. Amount of Claim: $.037) | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral in full and final satisfaction of the Allowed Class 7 Claim, or (ii) payment of the net proceeds from the liquidation of the Collateral, after the payment of any senior liens and interests on the Collateral and any expenses incurred in the liquidation thereof. Cenlar's Deficiency Claim shall be treated as a Class 17 General Unsecured Claim.<br><br>(Est. Recovery: 100%) |
| 8. | **ALLOWED SECURED CLAIMS OF GRIFFITHS, SAMMARCO, PIERRE AND SULLIVAN**<br><br>(Est. Amount of Claim: $0.434) | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral in full and final satisfaction of the Allowed Class 8 Claim, or (ii) payment of the net proceeds from the liquidation of the Collateral, after the payment of any senior liens and interests on the Collateral and any expenses incurred in the liquidation thereof. Griffiths', Sammarco's, Pierre's, and Sullivan's Deficiency Claim shall be treated as a Class 17 General Unsecured Claim.<br><br>(Est. Recovery: 100%) |
| 9. | **ALLOWED SECURED M&M LIEN CLAIMS**<br><br>(Est. Amt. of Claims: $0.00) | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral to the Creditor in full and final satisfaction of the Allowed Class 9 Claim, or (ii) payment of the net proceeds from the liquidation of their Collateral, after the payment of any senior liens and interests on the Collateral and any expenses incurred in the liquidation thereof. Any Deficiency Claim shall be treated as a Class 17 General Unsecured Claim.<br><br>(Est. Recovery: 100%) |
| 10. | **ALLOWED SECURED CLAIM OF HAPPY STATE BANK** | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral to the Creditor in full and final satisfaction of the Allowed Class 10 Claim, or (ii) payment of the net proceeds from the liquidation of their Collateral, after the payment of any senior liens and interests on the Collateral and any expenses incurred in the liquidation thereof. Any |

| CLASS | CLAIMANT | TREATMENT |
|---|---|---|
| | (Est. Amt. of Claims: $1.786 million) | Deficiency Claim shall be treated as a Class 17 General Unsecured Claim.<br><br>(Est. Recovery: 100%) |
| 11. | **ALLOWED SECURED CLAIM OF WELLS FARGO BANK**<br><br>(Est. Amt. of Claims: $.408) | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral to the Creditor in full and final satisfaction of the Allowed Class 11 Claim, or (ii) payment of the net proceeds from the liquidation of their Collateral, after the payment of any senior liens and interests on the Collateral and any expenses incurred in the liquidation thereof. Any Deficiency Claim shall be treated as a Class 17 General Unsecured Claim.<br><br>(Est. Recovery: 100%) |
| 12. | **ALLOWED SECURED CLAIM OF CAPITAL ONE BANK N.A.**<br><br>(Est. Amt. of Claims: $0.00) | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral to the Creditor in full and final satisfaction of the Allowed Class 12 Claim, or (ii) payment of the net proceeds from the liquidation of their Collateral, after the payment of any senior liens and interests on the Collateral and any expenses incurred in the liquidation thereof. Any Deficiency Claim shall be treated as a Class 17 General Unsecured Claim.<br><br>(Est. Recovery: 0%) |
| 13. | **OTHER SECURED CLAIMS**<br><br>(Est. Amt. of Claims: $0.00) | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral to the Creditor in full and final satisfaction of the Allowed Class 13 Claim, or (ii) payment of the net proceeds from the liquidation of their Collateral, after the payment of any senior liens and interests on the Collateral and any expenses incurred in the liquidation thereof. Any Deficiency Claim shall be treated as a Class 17 General Unsecured Claim.<br><br>(Est. Recovery: 100%) |
| 14. | **ALLOWED CONVENIENCE CLAIMS**<br><br>(Est. Amt. of Claims: $.221) | Shall be satisfied by receipt of twenty-five percent (25%) of Allowed General Unsecured Claim from the Trust Assets within thirty (30) days after the Effective Date in full and final satisfaction of such Allowed Class 14 Claim.<br><br>(Est. Recovery: 25%) |

| CLASS | CLAIMANT | TREATMENT |
|-------|----------|-----------|
| 15. | **ALLOWED SOFT MONEY INVESTOR CLAIMS**<br><br>(Est. Amt. of Claims: $41.3 to $53.2 million) | Allowed Claims in Classes 15, 16, and 17 shall receive a Pro Rata share of Distributions from the Trust Assets after liquidation and payment in full of Claims in Classes 1 through 14.<br><br>(Est. Recovery: 20% to 40%) |
| 16. | **ALLOWED PROJECT PARTNERSHIP-RELATED GUARANTY CLAIMS**<br><br>(Est. Amt. of Claims: $6.3 to $16 million) | Allowed Claims in Classes 15, 16, and 17 receive a Pro Rata share of Distributions from the Trust Assets after liquidation and payment in full of Claims in Classes 1 through 14.<br><br>(Est. Recovery: 20% to 40%) |
| 17. | **ALLOWED GENERAL UNSECURED CLAIMS (Other than those contained in Classes 14, 15, and 16)**<br><br>(Est. Amt. of Claims: $29.3 to $33.9 million) | Allowed Claims in Classes 15, 16, and 17 receive a Pro Rata share of Distributions from the Trust Assets after liquidation and payment in full of Claims in Classes 1 through 14.<br><br>(Est. Recovery: 20% to 40%) |
| 18. | **ALLOWED SUBORDINATED CLAIMS**<br><br>(Est. Amt. of Claims: $0.00 to $8.138 million) | Shall receive a Pro Rata share of Distributions from the Trust Assets after liquidation and payment in full of Claims in Classes 1 through 17.<br><br>(Est. Recovery: 0%) |
| 19. | **ALLOWED INTERESTS IN THE DEBTOR**<br><br>(Est. Amount of Interests: N/A) | The Debtor is a tax-exempt entity under Internal Revenue Code section 501(c)(3). Therefore, there are no Allowed Interests in the Debtor. However, if such Interests exist, holders of such Interests shall receive no Distributions or retain any property under this Plan on account of such Interests. Upon confirmation, all Interests shall be cancelled, terminated, and extinguished.<br><br>(Est. Recovery: N/A) |

The Creditors Committee understands that the Liquidating Trustee intends to make interim distributions as quickly as possible, with a goal of making an interim distribution of as much as possible no later than 90 days after the Effective Date, and believes that the Plan includes certain other highlights such as the following:

a. It appoints the Chapter 11 Trustee to serve as the Liquidating Trustee, whose responsibility will be to (i) take possession and/or control of various assets, including Life Insurance Proceeds, Causes of Action, and Miscellaneous Assets, that fund the Liquidating Trust and (ii) establish the number and amount of claims and then calculate and pay dividends to Creditors.

b. It reconstitutes the board of directors with members who are experienced in running and managing a business similar in size and complexity as the business of the Reorganized Debtor.

c. It appoints the Chapter 11 Trustee to serve as the president and chief executive officer of the Reorganized AHF who along with the reconstituted board of directors will establish and follow a policy designed to maximize value to Creditors.

d. It provides a flexible approach for the Debtor or the Reorganized Debtor to retain or reject properties currently owned or controlled by AHF. This approach is designed to maximize value to the Creditors by (i) maximizing opportunities for the Reorganized Debtor to create excess revenue from the Retained Properties and (ii) focusing on claim avoidance related to tax-credit properties and potential tax-recapture exposure.

e. It provides an option for smaller Creditors – *e.g.,* those holding Claims less than $200,000 – to receive an accelerated one-time payment worth 25% of their Allowed Claim.

f. It provides for the payment in full of all costs of administration, claims of all local and state taxing authorities, and all claims of secured creditors either in accordance with their loan documents, through a restructuring, or settlement agreements negotiated between the parties.

The Creditors Committee also believes the following summarizes the events before and during the Bankruptcy Case: Steve Sterquell, Sr. organized AHF in Amarillo, Texas in 1989, and was its principal manager until his death on April 1, 2009. During the period while Sterquell was in control of AHF, AHF grew into one of the largest affordable-housing entities in the United States owning or controlling sixty-five apartment complexes in nine different states.

The AHF empire that Sterquell created consists of numerous highly-leveraged enterprises financed by funds invested by individuals and financial institutions. The indebtedness against the real estate portfolios includes a combination of conventional-financing arrangements, tax-exempt bonds, tax-credit financing, and individual investors. Almost all of the financial structures associated with the acquisition of the real estate portfolios, with the exception of the properties acquired with tax-exempt bond financing, involve guarantees by AHF.

The death of Sterquell started a chain reaction of events. The circumstances of his death in a fiery automobile crash on an interstate highway outside Amarillo caused local creditors of AHF to become suspicious and begin an investigation into the financial affairs of Sterquell and AHF. These local creditors pooled their resources and hired the law firm of Mullin Hoard & Brown to file an involuntary bankruptcy against AHF. The involuntary petition was filed on April 21, 2009, on behalf of the creditors who signed the petition ("**Petitioning Creditors**").

The investigation revealed that Sterquell had transferred ownership of a number of AHF's assets to family trusts and foundations in the weeks before his death – including the right to receive the proceeds of $21 million worth of key-man life insurance policies. Upon this discovery, on May 18, 2009, the Petitioning Creditors filed a lawsuit to recover these proceeds for the benefit of all AHF creditors. Following weeks of legal maneuvering between the Sterquell family, AHF, and the Petitioning Creditors, certain members of AHF's management was replaced and the non-profit corporation filed a voluntary petition on June 11, 2009. On that same date, a preliminary injunction was entered in favor of the Petitioning Creditors placing $27 million of life insurance proceeds under the jurisdiction and control of the Bankruptcy Court.

After the filing of the involuntary bankruptcy, the Creditors Committee was formed. It consisted of four Petitioning Creditors and a representative from Rainier American. Since its creation, the Creditors Committee has met regularly to map strategy to recover the insurance proceeds and other assets for the AHF estate, and to develop a plan of reorganization that would ensure the largest possible recovery to creditors in the shortest period of time. The Trustee and the Creditors Committee believe that the Plan accomplishes these goals.

The Plan has two different realms that operate together in an effort to maximize the amount of dividends paid to Creditors. First, the Plan creates a Liquidating Trust to take possession of the insurance proceeds and the other liquid assets of AHF in an attempt to preserve as much of these funds as possible for the benefit of the Creditors. Second, it provides for the reorganization of AHF such that it can continue to operate, maintain, and manage certain properties it owns or controls – with the dual objectives of increasing revenues and profits that can be paid over to the Liquidating Trust and eventually paid to creditors, and also to avoid the creation of additional claims against the bankruptcy estate that would dilute the percentage paid to creditors who are the beneficiaries of the Liquidating Trust – for the period of time necessary to maximize value to the Estate.

## ARTICLE II.
## DISCLAIMER

ALL HOLDERS OF CLAIMS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. ALL SUMMARIES OF THE PLAN AND OTHER STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN, ANY SUPPLEMENT TO THE PLAN, AND THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS AS OF THE DATE HEREOF,

UNLESS OTHERWISE STATED HEREIN, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF. MOREOVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. ACCORDINGLY, ALTHOUGH THE PROPONENTS HAVE USED THEIR BEST EFFORTS TO SET FORTH STATEMENTS, INFORMATION, AND DISCLOSURES THAT ARE CORRECT AND COMPLETE, THEY ARE UNABLE TO WARRANT OR REPRESENT THAT THE STATEMENTS, INFORMATION, AND DISCLOSURES ARE ACCURATE AND COMPLETE IN ALL RESPECTS. IN FACT, THERE MAY BE ERRORS IN THE STATEMENTS OR FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS UNDERLYING SUCH STATEMENTS OR FINANCIAL INFORMATION. THE PROPONENTS AND THEIR RESPECTIVE ADVISORS EXPRESSLY DISCLAIM ANY OBLIGATION TO UPDATE OR CORRECT ANY SUCH FINANCIAL INFORMATION OR ASSUMPTIONS.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT AND THE PLAN DESCRIBED HEREIN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS PASSED ON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT AND THE EXHIBITS HERETO DO NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER; RATHER, THEY MUST BE CONSTRUED AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS AND SHALL BE INADMISSIBLE FOR ANY PURPOSE ABSENT THE EXPRESS WRITTEN CONSENT OF THE PROPONENTS AND THE PARTY AGAINST WHOM SUCH INFORMATION IS SOUGHT TO BE ADMITTED.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE PROPONENTS, THE DEBTOR, OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO CONSTITUTE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR.

# DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS

This Disclosure Statement includes information regarding the Reorganized Debtor and certain other "forward-looking statements" within the meaning of Section 27A of the 1933 Act and Section 21E of the Exchange Act, all of which are based on various estimates and assumptions that the Proponents believe to be reasonable as of the date hereof. These statements involve risks and uncertainties that could cause the Reorganized Debtor's actual future outcomes to differ materially from those set forth in this Disclosure Statement. Such risks and uncertainties include, without limitation, the following:

- the Proponents' ability to effect their proposed chapter 11 plan, or any other chapter 11 plan acceptable to the Proponents;

- the Reorganized Debtor's ability to stabilize and operate the Retained Properties pending their ultimate disposition;

- the Reorganized Debtor's ability to sell the Retained Properties within the allotted time period;

- the Liquidating Trustee's ability to liquidate the Trust Assets and prosecute Causes of Action;

- litigation risks and uncertainties;

- general economic and capital-market conditions;

- difficulty in managing the operation of existing entities;

- loss of key personnel;

- distraction of management and costs associated with the restructuring efforts;

- cash-flow estimates;

- future financial performance; and

- planned capital expenditures.

You should understand that the foregoing as well as other risk factors discussed in this Disclosure Statement could cause future outcomes to differ materially from those expressed in such forward-looking statements. Given the uncertainties, you are cautioned not to place undue reliance on any forward-looking statements in determining whether to vote in favor of the Plan or to take any other action. The Proponents undertake no obligation to publicly update or revise information concerning the proposed restructuring efforts, the Chapter 11 Trustee's borrowing availability, or his cash position or any forward-looking statements to reflect events or circumstances that may arise after the date of this Disclosure Statement, except as required by law.

**2.01. Considerations in Preparation of the Disclosure Statement and Plan; Disclaimers**

BECAUSE ACCEPTANCE OF THE PLAN WILL CONSTITUTE ACCEPTANCE OF ALL THE PROVISIONS IN THE PLAN, HOLDERS OF CLAIMS ARE URGED TO CONSIDER CAREFULLY THE INFORMATION REGARDING TREATMENT OF THEIR CLAIM CONTAINED IN THIS DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT. THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS WILL BE SATISFIED.

THE PROPONENTS PRESENTLY INTEND TO SEEK TO CONSUMMATE THE PLAN AND TO CAUSE THE EFFECTIVE DATE TO OCCUR PROMPTLY AFTER CONFIRMATION OF THE PLAN. HOWEVER, THERE CAN BE NO ASSURANCE AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE WILL ACTUALLY OCCUR.

TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED, AND ACTUALLY RECEIVED BY THE VOTING DEADLINE. HOLDERS OF CLAIMS ARE ENCOURAGED TO READ AND CONSIDER CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN.

*****

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, ANTICIPATED EVENTS IN THE BANKRUPTCY CASE, AND FINANCIAL INFORMATION. ALTHOUGH THE PROPONENTS BELIEVE THAT THE SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE PLAN OR CERTAIN DOCUMENTS (AND HOLDERS OF CLAIMS SHOULD REFER TO THE PLAN AND SPECIFIED DOCUMENTS IN THEIR ENTIRETY AS ATTACHED HERETO), STATUTORY PROVISIONS, EVENTS, OR INFORMATION. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. HOLDERS OF CLAIMS ARE URGED TO REVIEW THE ENTIRE PLAN. IN THE EVENT ANY PROVISION OF THIS DISCLOSURE STATEMENT IS FOUND TO BE INCONSISTENT WITH A PROVISION OF THE PLAN, THE PROVISION OF THE PLAN SHALL CONTROL.

IN DETERMINING WHETHER TO VOTE TO ACCEPT THE PLAN, HOLDERS OF CLAIMS MUST RELY ON THEIR OWN EXAMINATION OF THE DEBTOR AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND

TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

*****

EXCEPT AS SET FORTH HEREIN, NO PERSON HAS BEEN AUTHORIZED BY THE PROPONENTS IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN. IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED ON AS HAVING BEEN AUTHORIZED BY THE PROPONENTS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS AS OF THE DATE HEREOF, UNLESS OTHERWISE STATED HEREIN, AND NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR THE DISTRIBUTION OF ANY SECURITIES PURSUANT TO THE PLAN WILL, UNDER ANY CIRCUMSTANCE, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF, OR SUCH OTHER DATE AS DESCRIBED HEREIN. ANY ESTIMATES OF CLAIMS SET FORTH IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE AMOUNTS OF CLAIMS DETERMINED BY THE PROPONENTS OR ULTIMATELY ALLOWED BY THE BANKRUPTCY COURT, AND AN ESTIMATE SHALL NOT BE CONSTRUED AS AN ADMISSION OF THE AMOUNT OF SUCH CLAIM.

INFORMATION INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT SPEAKS AS OF THE DATE OF SUCH INFORMATION OR THE DATE OF THE REPORT OR DOCUMENT IN WHICH SUCH INFORMATION IS CONTAINED OR AS OF A PRIOR DATE AS MAY BE SPECIFIED IN SUCH REPORT OR DOCUMENT. ANY STATEMENT CONTAINED IN A DOCUMENT INCORPORATED BY REFERENCE HEREIN SHALL BE DEEMED TO BE MODIFIED OR SUPERSEDED FOR ALL PURPOSES TO THE EXTENT THAT A STATEMENT CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY OTHER SUBSEQUENTLY FILED DOCUMENT WHICH IS ALSO INCORPORATED OR DEEMED TO BE INCORPORATED BY REFERENCE, MODIFIES OR SUPERSEDES SUCH STATEMENT. ANY STATEMENT SO MODIFIED OR SUPERSEDED SHALL NOT BE DEEMED, EXCEPT AS SO MODIFIED OR SUPERSEDED, TO CONSTITUTE A PART OF THIS DISCLOSURE STATEMENT.

## 2.02.  Disclosure Statement; Construction

This Disclosure Statement has been prepared to comply with section 1125 of the Bankruptcy Code and is hereby transmitted by the Proponents to holders of Claims for use in the solicitation of acceptances of the Plan from such holders.

For purposes of this Disclosure Statement: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural, (b) any reference in this Disclosure Statement to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such agreement or document will be substantially in such form or substantially on such terms and conditions, (c) any reference in this Disclosure Statement to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented, (d) unless otherwise specified, all references in this Disclosure Statement to sections, articles and exhibits are references to sections, articles and exhibits of or to this Disclosure Statement, and (e) the rules of construction enumerated in section 102 of the Bankruptcy Code shall apply to this Disclosure Statement as if fully set forth herein.

The purpose of this Disclosure Statement is to provide "adequate information" to holders of Claims to enable them to make an informed decision before exercising their right to vote to accept or reject the Plan. By the Solicitation Order, this Disclosure Statement was approved and held to contain adequate information.

**THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN. THE MATERIAL CONTAINED HEREIN IS INTENDED SOLELY FOR THE USE BY HOLDERS OF CLAIMS IN EVALUATING THE PLAN AND BY HOLDERS OF CLAIMS IN VOTING TO ACCEPT OR REJECT THE PLAN; ACCORDINGLY, THEY MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN THE DETERMINATION OF HOW TO VOTE ON THE PLAN. THE PLAN IS SUBJECT TO NUMEROUS CONDITIONS AND VARIABLES, AND THERE CAN BE NO ASSURANCE THAT THE PLAN WILL BE EFFECTUATED.**

### 2.03. Solicitation Package

For the purpose of soliciting votes on the Plan, accompanying this Disclosure Statement are copies of (a) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time, and place of the hearing to consider the confirmation of the Plan and related matters, and the time for filing objections to the confirmation of the Plan, and (b) a Ballot or Ballots (and return envelope(s)) that you must use in voting to accept or to reject the Plan, or a notice of non-voting status, as applicable. If you did not receive a Ballot and believe that you should have, please contact Gardere at the address or telephone number set forth below.

### 2.04. Voting Procedures, Ballots, and Voting Deadline

After carefully reviewing the Plan and this Disclosure Statement, and the exhibits thereto, and the detailed instructions accompanying your Ballot, holders of Claims in Classes 3 through 18 should indicate their acceptance or rejection of the Plan by voting for or against the Plan on the enclosed Ballot. Such holders should complete and sign their Ballot and return it in the envelope provided so that it is RECEIVED by the Voting Deadline.

Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

If you have any questions about the procedure for voting your Claim or with respect to the packet of materials that you have received, please contact Gardere (a) telephonically or (b) in writing by (i) hand delivery, (ii) overnight mail or (iii) first-class mail using the information below:

> Gardere Wynne Sewell LLP
> Attn: Mo Alturk
> malturk@gardere.com
> 1601 Elm Street, Suite 3000
> Dallas, Texas 75201-4761
> Telephone: 214.999.3000
> Facsimile: 214.999.4667

**GARDERE MUST RECEIVE ORIGINAL BALLOTS ON OR BEFORE THE VOTING DEADLINE AT THE APPLICABLE ADDRESS ABOVE. EXCEPT TO THE EXTENT ALLOWED BY THE BANKRUPTCY COURT, BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE ACCEPTED OR USED IN CONNECTION WITH THE PROPONENTS' REQUEST FOR CONFIRMATION OF THE PLAN OR ANY MODIFICATION THEREOF.**

The Proponents reserve the right to amend the Plan. Amendments to the Plan that do not materially and adversely affect the treatment of Claims may be approved by the Bankruptcy Court at the Confirmation Hearing without the necessity of re-soliciting votes. If re-solicitation is required, the Proponents will furnish new solicitation packets that will include new ballots to be used to vote to accept or reject the Plan, as amended.

### 2.05. The Confirmation Hearing and Objection Deadline

**THE BANKRUPTCY COURT HAS SET ▓▓▓▓▓▓▓, 2010, AT ▓▓▓▓▓, (CDT) AS THE DATE AND TIME FOR THE HEARING ON CONFIRMATION OF THE PLAN AND TO CONSIDER ANY OBJECTIONS TO THE PLAN. THE CONFIRMATION HEARING WILL BE HELD IN THE COURTROOM OF THE HONORABLE JUDGE ROBERT L. JONES AT THE UNITED STATES BANKRUPTCY COURT, 624 SOUTH POLK, ROOM 100, AMARILLO, TEXAS. THE PROPONENTS WILL REQUEST CONFIRMATION OF THE PLAN AT THE CONFIRMATION HEARING.**

**THE BANKRUPTCY COURT HAS FURTHER FIXED ▓▓▓▓▓▓, 2010, AT ▓▓▓▓▓ (CDT), AS THE DEADLINE TO FILE AN OBJECTION TO CONFIRMATION OF THE PLAN WITH THE BANKRUPTCY COURT. OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE RECEIVED BY THE FOLLOWING PARTIES ON OR BEFORE THE OBJECTION DEADLINE:**

*Counsel to the Chapter 11 Trustee*:

Max R. Tarbox (TX 19639950)
TARBOX LAW, P.C.
2301 Broadway
Lubbock, Texas 79401
Phone: 806.686.4448
Fax: 806.368.9785

Stephen A. McCartin (TX 13374700)
Marcus A. Helt (TX 24052187)
GARDERE WYNNE SEWELL LLP
1601 Elm Street, Suite 3000
Dallas, Texas 75201-4761
Telephone: 214.999.3000
Facsimile: 214.999.4667

*Counsel to the Creditors Committee*:

David C. Mullin (TX 14651600)
David R. Langston (TX 11923800)
MULLIN, HOARD & BROWN, L.L.P.
P.O. Box 2585
Lubbock, Texas 79408
Telephone: 806.765.7491
Facsimile: 806.765.0553

*United States Trustee*:

Mary Frances Durham
1100 Commerce Street, Room 976
Dallas, Texas 75242
Telephone: 214.767.8967

ANY OBJECTION TO CONFIRMATION OF THE PLAN MUST BE IN WRITING AND (A) MUST STATE THE NAME AND ADDRESS OF THE OBJECTING PARTY AND THE AMOUNT OF ITS CLAIM AND (B) MUST STATE WITH PARTICULARITY THE NATURE OF ITS OBJECTION. ANY CONFIRMATION OBJECTION NOT TIMELY FILED AND SERVED AS SET FORTH HEREIN SHALL BE DEEMED WAIVED AND SHALL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## ARTICLE III.
## GENERAL INFORMATION REGARDING THE DEBTOR

### 3.01. Background

The Debtor was established in 1989 by Steve Sterquell as a non-profit corporation chartered under the laws of the State of Texas and received its tax exempt status under section 501(c)(3) of the Internal Revenue Code that same year. The Debtor's purpose was and continues to be to create affordable housing for working families and individuals. The Debtor is dedicated to the promotion, creation, and preservation of quality housing for low to moderate-income families. To that end, the Debtor provides a variety of programs and services for its tenants. As of the Petition Date, the Debtor owned and operated, directly or indirectly, sixty-six (66) affordable housing apartment communities containing 13,417 units in Arizona, Florida, Georgia, Kentucky, Mississippi, North Carolina, Oklahoma, South Carolina, and Texas. Currently, the Debtor owns and operates, directly or indirectly through Special Purpose Entities, sixty-five (65) affordable housing apartment communities. These housing communities were financed in the following three (3) general ways:

| | |
|---|---|
| 35 | **Tax-Exempt Bond Financing** |

- 11 in the "Walden I" portfolio
- 17 in the "Walden II" portfolio
- 4 in the "Simpson" portfolio
- 3 Other

| | |
|---|---|
| 17 | **Tax-Credit Equity Financing from Investors** |
| 13 | **Conventional Financing from JPMorgan Chase, N.A.** (a/k/a the "AIMCO Portfolio") |
| 65 | Total Properties in SPEs |

### 3.02. AHF Tax-Exempt Bond-Financed Properties

AHF utilized tax-exempt multifamily revenue bonds to finance thirty-five (35) apartment complexes. AHF formed wholly owned limited liability companies ("**LLC**") to acquire and finance these properties. These limited liability companies own and operate the apartment complexes. The tax-exempt bonds were issued by state and local regulatory bodies that have legislated jurisdiction to issue tax-exempt financing. The tax-exempt bonds were sold to investors by the issuer, and then the proceeds were loaned to an entity (LLC) to finance the acquisition of the properties. The bonds are payable solely from payments received on the mortgage loans to the LLC. The debt is secured by a mortgage on the property. Currently, all of the bonds associated with the AHF bond financed properties are in default; the cash flow from the properties is being used for the stabilization of the properties, and no payments are being made on debt service. However, the mortgages are non-recourse debt, and if the revenues are insufficient to pay the principal and interest on the mortgages, neither the borrower nor AHF is obligated to make available any of its other revenues or assets to make up any shortfall. Because AHF does not believe it has any liability to the holders of the mortgages, any claims filed by the

mortgage holders will be subject to objection, and the Proponents will ask the Court to estimate the claims at zero for Plan-confirmation purposes.

In addition, UMB Bank, N.A. ("**UMB**"), is the indenture trustee for certain tax-exempt bonds. These bonds are related to certain LLCs - WHEOP, LLC; AHF Tulsa, LLC; DHEOP, LLC; AHF Arizona LLC; AHF Florida, LLC; or Amarillo Affordable Housing, L.L.C. - directly or indirectly, owned or controlled by AHF (collectively, the "**LLCs**"). UMB and the Proponents have finalized a strategy that will allow AHF to dispose of or terminate its interests in the LLCs in the most cost-efficient manner for the bankruptcy estate, while at the same time provide some benefit to UMB. To memorialize that strategy, the following language will be inserted into the Confirmation Order:

> Notwithstanding any other provision of this Plan, if the Reorganized AHF determines to abandon, dispose of, or otherwise transfer all or any portion of the sole membership interest in the LLCs, (a) UMB shall have the right to designate a substitute member for the LLCs, and (b) the Reorganized AHF shall continue and maintain the existing sole membership interests until the earlier of (x) the date a substitute member for the LLCs is designated by UMB and (y) nine (9) months from the Confirmation Date. From the Confirmation Date to the date a substitute member is designated or the date that is nine (9) months after the Confirmation Date, whichever occurs first, UMB shall reimburse the Reorganized AHF for all reasonable costs and expenses (including allocated and out-of-pocket) incurred as a result of its continuance as the extant sole member in the LLCs.

The Proponents believe that the terms of the UMB Settlement are fair and equitable and in the best interests of the Estate. As a result, the UMB Settlement should be approved by the Bankruptcy Court in the Confirmation Order pursuant to Bankruptcy Rule 9019(b).

National Public Finance Guarantee Corporation ("**NPFGC**"), as successor in interest to MBIA Insurance Corporation, is the party in interest relating to and current holder of certain tax-exempt bonds relating to AHF Community Development LLC ("**Walden I LLC**"), whose sole member is AHF. NPFGC and the Proponents have finalized a strategy that will allow AHF to dispose of or terminate its interests in the Walden I LLCs in the most cost-efficient manner for the bankruptcy estate, while at the same time provide some benefit to NPFGC through an orderly and coordinated transfer of the Walden I LLC interests. To memorialize that strategy, the following language will be inserted into the Confirmation Order:

> Notwithstanding any other provision of this Plan, if the Reorganized AHF determines to abandon, dispose of, or otherwise transfer all or any portion of the sole membership interest in the LLCs, (a) NPFGC shall have the right to designate a substitute member for the LLCs, and (b) the Reorganized AHF shall continue and maintain the existing sole membership interests until the earlier of (x) the date a substitute member for the LLCs is

designated by NPFGC and (y) nine (9) months from the Confirmation Date. From the Confirmation Date to the date a substitute member is designated or the date that is nine (9) months after the Confirmation Date, whichever occurs first, NPFGC shall pay Reorganized AHF $11,830.00 per month, which is estimated to reimburse the Reorganized Debtor for all reasonable costs and expenses (including allocated and out-of-pocket) incurred as a result of its continuance as the extant sole member in the Walden I LLCs. Notwithstanding the foregoing, it is acknowledged and agreed that NPFGC is entitled to exercise any and all remedies available to it under the related bond documents regardless of any decision by the Reorganized AHF with respect to the disposition of its sole membership interest in any Walden I LLCs. In connection with any sale by NPFGC to a third party of the tax-exempt bonds relating to Walden I LLC, the Reorganized AHF shall reasonably cooperate to effect the transfer of the membership interest in Walden I LLC to or at the direction of such third party transferee. If the Reorganized AHF is forced to incur costs for such cooperation, NPFGC agrees to reimburse the Reorganized AHF for the such costs.

The Proponents believe that the terms of the National Public Finance Guarantee Corporation Settlement are fair and equitable and in the best interests of the Estate. As a result, the National Public Finance Guarantee Corporation Settlement should be approved by the Bankruptcy Court in the Confirmation Order pursuant to Bankruptcy Rule 9019(b).

### 3.03. AHF Conventionally Financed Properties

AHF formed wholly owned LLCs to acquire thirteen (13) projects (the "**AIMCO Portfolio**") that are conventionally financed by JPMorgan Chase. Since his appointment, the Chapter 11 Trustee has worked hard to negotiate favorable terms on financing related to these 13 properties. Recently, the Chapter 11 Trustee obtained an extension on existing financing with JPMorgan Chase. This extension will allow the Chapter 11 Trustee to fulfill his desire to maximize value of the 13 properties for the Estate's benefit through either a payment on the AIMCO/HUD Note defined below or upstream dividends or distributions paid to the Reorganized Debtor. The Plan calls for the Reorganized AHF to remain the managing entity of all these entities. The Reorganized AHF will continue to maintain its capacity as owner of the affiliated entities until decisions related to the ultimate disposition of the properties are made by or after confirmation of the Plan. Such decisions are expected to be made no later than twenty-four months after the Effective Date of the Plan.

AHF guaranteed these conventionally financed loans. Presently, all of these properties are performing and servicing the mortgage debt against the properties. As such, AHF's liability on those guaranties is estimated at $0.00.

Nothing in the Plan is intended to affect the liens asserted by JPMorgan Chase in the property owned by the AIMCO Portfolio. Instead, the intention is that JPMorgan retain its liens in the AIMCO Portfolio. The intention is that all terms and conditions contained in the respective loan documents applicable to the AIMCO Portfolio – including the promissory notes,

deeds of trust, and AHF's guaranties of those loans – shall continue in full force and effect, following confirmation of the Plan. In the event of a default under any of the applicable loan documents following confirmation of the Plan (other than a default resulting solely from the filing of this Bankruptcy Case), JPMorgan Chase may, subject to any applicable notice provisions, undertake the contractual and/or statutory remedies provided for in those loan documents without having to obtain modification of the automatic stay and without regard to any other provisions of the Plan (including, but not limited to, the injunction provisions in the Plan). Upon a sale or refinancing of any of the AIMCO Portfolio, the amounts secured by the applicable liens in favor of JPMorgan Chase shall be considered part of the "closing costs" and shall paid in full, before any proceeds are distributed to Reorganized AHF or the AHF Liquidating Trust.

As part of the transaction in which AHF's wholly owned LLCs acquired the AIMCO Portfolio, AHF acquired a promissory note from HUD (the "**AIMCO/HUD Note**") that is secured by a second lien and deed of trust in the AIMCO Portfolio. TCB asserts a security interest and lien in AHF's rights, including any distributions related thereto, in the AIMCO/HUD Note. The Proponents dispute TCB's rights in the AIMCO/HUD Note. This dispute is resolved in the TCB Settlement detailed in section 8.03.

AHF scheduled a debt to Gardere of approximately $10,000 on its Schedules. Gardere does not know about the details of that alleged debt. To the extent that debt exists, Gardere waives that receivable. Therefore, Gardere does not believe it was a creditor of AHF as of the Petition Date.

In addition, as disclosed in the *Application for Order Authorizing Employment of Gardere Wynne Sewell LLP as Co-Counsel to Walter O'Cheskey, Chapter 11 Trustee Effective May 7, 2010* [Docket No. 1162] and the exhibits attached thereto, Gardere currently represents JPMorgan Chase Bank on a variety of matters that are unrelated to the Debtor or this Bankruptcy Case. Fee receipts from JPMorgan Chase represented approximately one percent (1%) or less of Gardere's total fee receipts for the year ending March 31, 2010.

Gardere represents JPMorgan Chase in those loan transactions and guaranty related to the AIMCO Portfolio. JPMorgan Chase consented to Gardere's representation of the Chapter 11 Trustee in this Bankruptcy Case if Gardere agreed not to represent the Chapter 11 Trustee on any matter involving JPMorgan Chase. Gardere agreed to the request by JPMorgan Chase. The Chapter 11 Trustee also agreed to use Max Tarbox, his lead counsel, on all dealings with JPMorgan Chase in this Case and related to the AIMCO Portfolio. Gardere will not represent any person or entity other than JPMorgan Chase in a transaction with the Estate that may conflict with its representation of the Chapter 11 Trustee in this Bankruptcy Case. Gardere agreed that attorneys working for the Chapter 11 Trustee (the "**Chapter 11 Trustee Team**"), including lawyers, legal assistants, clerks, secretaries and other personnel, will not be allowed access to any of the files concerning JPMorgan Chase matters. Gardere attorneys performing services for JPMorgan Chase on the AHF-related matters will be prohibited from discussing any aspect of such matters with members of the Chapter 11 Trustee Team or with any other persons who are not under a similar obligation of confidentiality.

The Proponents understand that HUD asserts an interest in the AIMCO Portfolio and, as such, believe any restructure or sale of the AIMCO Portfolio may be subject to HUD's consent because of certain restrictions on the operation and the sale of these properties. Pursuant to the Multifamily Assistance and Housing Reform and Affordability Act of 1997 (42 U.S.C. § 1437f note; 24 C.F.R. parts 401 and 402), HUD asserts that, at a minimum, any sale of the AIMCO/HUD properties must be to a qualified, non-profit entity. The Proponents have not yet finalized their investigation of the allegations made by HUD related to the AIMCO Portfolio. Accordingly, at this time, the Proponents cannot conclusively opine on the validity of such allegations or what effect, if any, the alleged HUD restrictions may have on the sale or sale proceeds of the AIMCO Portfolio.

The Proponents also understand that HUD asserts that any multifamily housing project in which AHF owns a direct or indirect interest and for which HUD insures the mortgage is subject to certain HUD regulations, handbooks, directives, and deed restrictions. HUD also asserts that any disposition of such property must comply with those certain HUD regulations, handbooks, directives, and deed restrictions. HUD asserts that, for AHF to comply with those certain regulations, handbooks, etc., AHF must obtain HUD's written approval of any such property prior to any transfer or change of ownership in any entity that owns such property.

Nothing in the Plan is intended to suggest that AHF or a Special Purpose Entity can or cannot effectuate a transfer of any property subject to HUD regulations, handbooks, etc. The issue of whether such a transfer can or cannot be effectuated with or without HUD's prior written approval will be addressed at a later date. In addition, for the avoidance of doubt, nothing in this Plan is intended to suggest that AHF directly owns an affordable-housing apartment complex other than Lakewood Terrace. Other than Lakewood Terrace, which is owned directly by AHF, no other affordable-housing apartment complex is owned by AHF; instead, they are owned by Special Purpose Entities owned directly or indirectly by AHF.

### 3.04. AHF Tax-Credit Properties

AHF formed limited partnerships. The limited partnerships then issued limited partnership interests and federal tax credits to limited partner investors in exchange for cash investments. AHF normally formed a corporation or LLC to act as general partner. AHF is an administrative general partner in six (6) of these limited partnerships. In addition, AHF often guaranteed one or more of the following to the limited partners:

- they would not lose or be forced to recapture their tax credits,

- the partnership would not lose its real-property tax exemption,

- AHF would make operating deficit advances if needed, but usually up to a capped amount, and

- the general partner would not breach its fiduciary duty to the limited partners.

Financial information concerning AHF's financial condition as of the Petition Date can be found in the Schedules filed with the Bankruptcy Court and herein. Additionally, current

information concerning AHF may be found in the monthly operating reports filed with the Bankruptcy Court.

The Proponents DO NOT represent that the Schedules or Monthly Operating Reports filed prior to the appointment of the Chapter 11 Trustee are accurate or correct.

Certain tax-credit limited partners – MMA Limited Partners – dispute certain contentions made by Focus regarding claims that have been asserted or that could be asserted against AHF related to these tax-credit properties. At this time, the Proponents have not finalized his determination of exactly how to treat every Executory Contract of the Estate – *e.g.*, assumption, rejection, cancellation, termination, etc. – including those related to the tax-credit properties. That determination will be made before the Confirmation Date and the Executory Contracts will be treated pursuant to the Plan.

It should also be noted that MMA is a party to a certain adversary proceeding pending before this Court that is commonly known as the "**Happy State Bank Litigation**." The Happy State Bank Litigation involves ownership claims to approximately $900,000.00 in certificates of deposit. If MMA is successful in the Happy State Bank Litigation and receives a recovery of valuable consideration, the Proponents expect such consideration to be applied against any claim asserted by MMA against the Estate. Nothing in the Plan is intended to impair MMA's rights and claims to the certificates of deposit part of the Happy State Bank Litigation.

The Proponents have communicated to the tax-credit investors that they intend to exit each tax-credit "rejected property" responsibly and cost-efficiently. The Proponents' primary exit goals are (a) to minimize operational disruption at the property level, (b) to minimize any negative tax-recapture implications to the investor limited partners, thereby minimizing claims against the AHF bankruptcy estate, and (c) to work cooperatively with HUD in complying with applicable HUD requirements, while eliminating any ongoing operational and financial risk to Reorganized AHF, and, hence, the Creditors. If immediate divestiture of certain interests is not in the best interests of the bankruptcy estate, the Proponents will not take that approach. At this time, the Proponents do not anticipate selling the properties in which tax-credit limited partners have invested. Rather, the Proponents will consider divesting the general-partner interest in a rejected tax-credit limited partnership on a case-by-case basis. Alternatively, as has been discussed with various limited partners, the Proponents will work with the investor limited partners on a revised structure, such as adding an additional general partner to assume certain operating responsibilities, while maintaining, to the extent allowed by law, the AHF corporate general partner entity and the necessary corporate infrastructure to preserve favorable tax treatment for the tax-credit limited partners. Further, where necessary, the Proponents will attempt to work closely with HUD on HUD-insured properties and AIMCO/HUD properties to assure that any transfers of the property or a general-partnership interest or additions of additional general partners comply any HUD restrictions.

The Proponents will notify MMA and Texas Housing Finance Corp. Special ("**THFC**") seven business days before the deadline to cast a vote or to object to confirmation of the Plan, whichever is later, whether the Proponents intend to reject, cancel, or terminate any partnership agreement to which MMA or THFC is a party.

### 3.05. Corporate Structure of the Debtor

The Debtor was established as a non-profit corporation under the laws of the State of Texas. The Debtor is exempt from taxation under section 501(c)(3) of the Internal Revenue Code. The Debtor owns equity interests in dozens of non-debtor Affiliates, not including the SPEs that own and operate the 65 apartment communities outlined above. A list of all Affiliates is attached hereto as Exhibit F. At this time, the Proponents have no intention to change the business form of the Debtor from a tax-exempt entity under section 501(c)(3) of the Internal Revenue Code.

The Debtor's headquarters is located at 1800 S. Washington, Suite 311, Amarillo, Texas, 79102. At the Debtor's headquarters, the Debtor oversees the operations, finance, payroll, accounting, and tax functions of the Debtor and its non-debtor affiliates.

### 3.06. Management of the Debtor

Current members of Debtor's board of directors are Tom Boyd (Chairman), Carroll M. Forrester, Alvin Johnson, Peggy Lawless, and Steve Hoggard.

The Debtor's current officers are Alvin Johnson (President), Michelle Abdoo (Treasurer), and Glenda David (Secretary).

### 3.07. Events Leading to Chapter 11[4]

Prior to the Petition Date, the Debtor pursued an aggressive strategy of heavily leveraged acquisitions of properties across the nation. As many as 200 satellite entities were created to facilitate multiple investments in low-income housing tax-credit properties. During this time, the Debtor was focused almost exclusively on deals. There was no focus on managing the properties acquired. Over the course of time, because of tightening financial markets and the inability to obtain tax credit allocations, it became more and more difficult for the Debtor to obtain sufficient cash from lenders or investors to fund all of the various obligations of the Debtor. As a result, the Debtor took cash from properties and used that cash to pay obligations of the Debtor and its related entities. This cash drain from the properties resulted in a deterioration in the condition of the properties because no funds were then available for basic upkeep. In addition, the full extent of these financial problems at the non-debtor affiliate level was not discovered until the Debtor's founder, Steve Sterquell, and his family were removed from Debtor's management.

Steve Sterquell died unexpectedly in an automobile crash on April 1, 2009. Upon his death, his son, Steve Sterquell, Jr., took over the management and control of the Debtor. The Debtor operated under Sterquell Jr.'s direction until May 29, 2009, when he and several other officers and employees of the Debtor resigned. During this period, half of the Debtor's board of directors also resigned.

---

[4] The following is alleged by the Creditors Committee. While the Chapter 11 Trustee has no reason to doubt the veracity of these allegations, he has not completed his investigation of the Debtor. So, at this time, the Chapter 11 Trustee cannot confirm or deny the allegations made by the Creditors Committee.

During the weeks after Sterquell's death, certain creditors and investors of the Debtor attempted to obtain information regarding the activities of Sterquell and the Debtor prior to Sterquell's death. At that time, the Debtor's management refused to cooperate in the investigation. Based on information gained from their own sources, creditors and investors concluded that, for many months prior to his death, (a) Sterquell had worked with a complex web of interrelated entities that apparently received funds from the Debtor and investors, (b) funds invested were not always put in the accounts of the entities in which the funds were invested, (c) the Debtor, as one of the general partners of many of the investment partnerships, failed to make proper disclosure of material facts to the limited partners concerning the status of the partnerships, (d) Steve Sterquell had diverted funds from an entity in which the Debtor had granted a lender a security interest to Housing for Texans Foundation, another one of the entities he controlled, (e) the Debtor may not have been maintaining separate identities between the companies it operated, and (f) the Debtor was apparently operating without a functioning board of directors in contravention of its bylaws. Based on these conclusions, on April 21, 2009, certain petitioning creditors filed an involuntary petition for relief under 11 U.S.C. § 303 in Case No. 09-20232-11 in the Bankruptcy Court.

During the course of their investigations, these petitioning creditors and investors also discovered that just weeks before his death, Sterquell transferred approximately $24,000,000.00 in key-man life insurance on his life from the Debtor, as the owner and beneficiary of such policies, to various trusts controlled by or for the benefit of the Sterquell family. To contest the validity of these transfers, and to try to recover the policy proceeds for the Estate, certain creditors and investors filed an adversary proceeding bearing Cause No. 09 02005 in the Bankruptcy Court, styled *Robert L. Templeton, et al v. American Housing Foundation, et al.*, on May 18, 2009.

On June 1, 2009, after the resignation of Sterquell Jr. and other officers and employees of the Debtor, the Debtor's board of directors was reconstituted. As the new board began to investigate the Debtor's operations and financial condition, it discovered that the Debtor had been in dire financial straits for months prior to Sterquell's death and owed creditors and investors over $26,000,000.00 in connection with transactions and investments involving entities affiliated with the Debtor. As its investigation has continued, the Debtor's new board has discovered more loans and obligations owed by the Debtor.

On June 11, 2009, to preserve its tax-exempt status, avoid liquidation, and resolve its liabilities in an orderly manner, the Debtor filed a voluntary petition seeking reorganization under chapter 11 of the Bankruptcy Code in Case No. 09-20373-11, also in the Bankruptcy Court. On July 17, 2009, the Bankruptcy Court consolidated the two cases under Case No. 09-20232-11.

## ARTICLE IV.
## EVENTS DURING THE CHAPTER 11 CASE

### 4.01. Commencement of the Chapter 11 Case

From the Petition Date to April 29, 2010, the Debtor operated its business as a debtor-in-possession. Soon after filing its voluntary petition, the Debtor filed "first-day motions" under

which it sought certain relief from the Bankruptcy Court to ensure that operations continued with little disruption. The Bankruptcy Court heard these "first-day motions" and entered "first-day orders." The first-day orders included an order allowing the Debtor to use cash collateral to pay insurance premiums [Docket No. 50] and an order consolidating the voluntary and involuntary cases into the Bankruptcy Case [Docket No. 91].

## 4.02. Appointment of the Official Committee of Unsecured Creditors

On July 10, 2009, the Office of the U.S. Trustee for the Northern District of Texas (the "UST") appointed the Creditors Committee to represent the interests of the Debtor's unsecured creditors. The Creditors Committee initially consisted of Robert Templeton (Chairman), Tim Nichols (Ranier American Investors (I, II, and III)), Terrill F. Horton, and Campbell Burgess (Herring Bank). The UST later added Eddie Attebury to the Creditors Committee. To the extent possible, it is believed that the Debtor attempted to work with the Creditors Committee to (a) locate and preserve Assets of the Debtor, (b) pursue and recover preferential and fraudulent transfers of Estate property, (c) examine and determine the validity or non-validity of Claims filed in the Bankruptcy Case, and (d) generally to work toward a successful outcome. The Committee retained Mullin, Hoard & Brown, L.L.P. as counsel pursuant to a final order [Docket No. 358] entered by the Bankruptcy Court on October 15, 2009.

On August 31, 2010, the UST reconstituted the Creditors Committee by removing Robert Templeton from the Committee.

## 4.03. Appointment of Chapter 11 Trustee

On January 21, 2010, TCB filed a motion to appoint a chapter 11 trustee [Docket No. 653]. TCB argued that the Debtor's management was incompetent and was grossly mismanaging the Debtor and its Estate. On April 28, 2010, the Bankruptcy Court found that cause existed to appoint a trustee and granted TCB's motion [Docket No. 1096]. Shortly thereafter, the UST appointed Walter O'Cheskey as the chapter 11 trustee for the Debtor's bankruptcy estate (the "Chapter 11 Trustee"). HUD asserts that the Chapter 11 Trustee's authority to act on behalf of the ownership entities of the Retained Properties and the Rejected Properties is limited by partnership or applicable agreements related to the non-debtor entities, as set forth in the *Corrected Order Authorizing the Trustee to Operate Debtor's Business and to Pay Normal Operating Expenses* [Docket No. 1400]. The Chapter 11 Trustee has now taken over management of the Debtor and retained Tarbox Law P.C. and Gardere Wynne Sewell LLP as his counsel. The Bankruptcy Court approved the retention of Tarbox [Docket No. 1213] on a final basis on May 26, 2010, and approved the retention of Gardere on an interim basis [Docket No. 1325] on June 24, 2010.

## 4.04. Use of Cash Collateral

TCB is the Debtor's largest secured, non-contingent Creditor. TCB asserts first-priority liens and security interests in substantially all of the Debtor's personal property, including, without limitation, cash and rights to payment needed by the Debtor to pay its operating expenses. For that reason, the Debtor filed its *Motion for Interim and Final Order to Use Cash Collateral* [Docket No. 97] on July 10, 2009. Since the filing of the motion, TCB and the Debtor

or the Chapter 11 Trustee, as appropriate, have agreed to successive 30-day interim orders permitting the Debtor to use cash collateral, subject to the terms and restrictions contained in the orders. HUD asserts that the Debtor and the Chapter 11 Trustee have agreed, in these successive 30-day interim orders, to the reimbursement of at least $41,614.99 to HUD-insured projects in which the Debtor used funds from these projects as cash collateral, contrary to HUD regulatory agreements.

### 4.05.  Bankruptcy Schedules and Statements of Financial Affairs

On July 7, 2009, the Debtor filed its Schedules and Statements of Financial Affairs ("SOFAs") with the Bankruptcy Court. The Schedules are a detailed listing of all the Debtor's assets and liabilities as of Petition Date. The SOFAs include information, among other things, such as prior income, current or potential litigation, identities of insiders, transfers of property that could be preferential or fraudulent, and location of financial records. The Proponents do not represent the Schedules and the SOFAs are completely accurate. In fact, the Chapter 11 Trustee is currently reviewing the Schedules and the SOFAs and will prepare and file amended Schedules and SOFAs as soon reasonably practicable.

At this point, the Proponents understand that the certain creditors assert Claims against the Estate that are secured by property that was owned by the Debtor on the Petition Date. The following is a list of those creditors and their alleged collateral:

a.  **TCB** – TCB asserts a perfected lien in accounts, cash, inventory, and general intangibles of the Debtor, including its claim to a perfected lien against the proceeds of life insurance policies, and cash equivalents such as the net proceeds related to the sale of Lakewood Terrace. The amount of this alleged secured claim is, pursuant to the proposed TCB Settlement, $4,500,000.00.

b.  **BAC Home Loan Servicing** – BAC Home Loan Servicing L.P. asserts a perfected lien in 104 housing units in Lakewood Terrace. The approximate amount of this alleged secured claim is $3,700,000. BAC Home Loan Servicing L.P. also asserts a perfected lien in individual homes owned by AHF and located in Amarillo, Texas. The approximate amounts of these alleged secured claims are collectively estimated to be 130,000.00.

c.  **Graham Mortgage Corporation** – Graham Mortgage Corporation asserts a perfected lien in 30 housing units in Lakewood Terrace. The approximate amount of this alleged secured claim is estimated to be $886,000.00.

d.  **Gary Graham Self-Directed IRA** – Gary Graham Self-Directed IRA asserts a perfected lien in 20 housing units in Lakewood Terrace. The approximate amount of this alleged secured claim is estimated to be $635,000.00.

e.  **Cenlar** – Cenlar asserts a perfected lien in 1 housing unit in Lakewood Terrace. The approximate amount of this alleged secured claim is estimated to be $37,000.00.

f.    **Griffiths, Sammarco, Pierre, and Sullivan** – Griffiths, Sammarco, Pierre, and Sullivan assert respective perfected liens in individual housing units in Lakewood Terrace. The approximate amount of these alleged secured claims is estimated to be $0.00.

g.    **Mechanic's Liens** – M&M lien creditors assert perfected liens in certain tracts of real property that is believed was owned by AHF. It is not believed that these claims are secured by property owned by AHF. The approximate amount of this alleged secured claim is $0.00.

h.    **Happy State Bank** – Happy State Bank asserts perfected liens against certain certificates of deposit. The approximate amount of this alleged secured claim is estimated to be $1,786,000.00.

i.    **Wells Fargo** – Wells Fargo asserts a perfected lien by virtue of setoff rights in certain deposit accounts in the approximate amount of $408,000.00. The approximate amount of this alleged secured claim is $408,000.00.

j.    **Capital One** – Capital One asserts a perfected lien in certain property that it believed was owned by AHF. It is not believed that these claims are secured by property owned by AHF. The approximate amount of this alleged secured claim is $0.00.

### 4.06.  Meeting of Creditors

On June 15, 2009, the United States Trustee conducted the Debtor's meeting of creditors pursuant to section 341 of the Bankruptcy Code.

### 4.07.  Operating Reports

As required by the United States Trustee, monthly operating reports for the months of June 2009 through August 2010 were filed with the Clerk of the Court. These reports are incorporated herein by reference.

### 4.08.  Claims Process

The Plan sets the deadline for Governmental Entities to file a proof of Claim against the Estate as thirty (30) days after the Effective Date. The deadline for non-Governmental Entities to file a proof of Claim against the Estate was set by the Bankruptcy Court as October 7, 2009. As of July 8, 2010, approximately 180 Proofs of Claim have been filed, asserting $104,654,828.11 against the Debtor. Of that amount, approximately $19,142,010.32 is claimed to be secured, approximately $3,465.00 is claimed to be priority, and approximately $85,030,721.02 is claimed to be unsecured. The Proponents have not completed their analysis of the claims asserted against or by the estate. The Proponents expect that process to be completed after the Confirmation Hearing. The Plan reserves all rights of the Estate's and the Proponents' rights to challenge, dispute, or otherwise object to all claims asserted against the Estate and prosecute claims asserted by the Estate. The Proponents expect that the Claims pool will be reduced based on the review and reconciliation of Claims. The Liquidating Trustee intends to

make interim distributions as quickly as possible, with a goal of making an interim distribution of as much as possible no later than 90 days after the Effective Date.

Proofs of Claim not filed by the deadlines established by the Bankruptcy Court shall be forever barred and unenforceable against the Debtor, the Estate, and properties or agents, successors, or assigns of the same, including the Liquidating Trust.

### 4.09. Exclusivity

Pursuant to section 1121 of the Bankruptcy Code, a chapter 11 debtor has an exclusive right to file a plan for the first 120 days of a bankruptcy case and the exclusive right to solicit acceptances of such plan during the first 180 days of such case unless extended for cause. The Bankruptcy Court extended the Debtor's exclusive period within which it could file a plan [Docket No. 573] through and including January 22, 2010. The Debtor filed a disclosure statement [Docket No. 941] on March 29, 2010, but did not file a plan by January 22, 2010.

### 4.10. Sale of Lakewood Terrace Townhomes

Prior to the filing of the Bankruptcy Case, the Debtor had entered into negotiations with Exxon to sell a group of properties consisting of 166 townhomes contained in 20 different buildings on approximately 13 acres of land located at 6900 Bayway Drive, Baytown, Texas, known as the Lakewood Terrace Townhomes, for a total consideration of $7,553,000.00. Lakewood Terrace is the only project owned directly by the Debtor (all other projects are owned in SPE's in which the Debtor owns an ownership interest). The purchase was to be subject to certain conditions, which generally were (a) the Debtor's acquisition of certain townhomes at Lakewood Terrace Townhomes not already owned by it, (b) the sale of all of the townhomes to Exxon, (c) the payoff of the existing liens on all of the townhomes, (d) the demolition of the townhomes, removal of the debris, and the abatement of any hazardous materials, and (e) the creation of a "green space" where the townhouses were previously located. Payment of the purchase price was to be made in stages in accordance with the phases of demolition and remediation established in the sales contract. Upon closing, Exxon would receive the property free and clear of all liens and encumbrances. The consummation of the sale would provide substantial benefit to the Debtor, the Estate, and creditors thereof by: (a) paying off secured debt claims of Bank of America f/k/a Countrywide Mortgage, U.S. Bank, and other secured claims, and (b) realizing the value of the Debtor's equity in Lakewood Terrace Townhomes.

The negotiations on the sale of Lakewood Terrace were successfully completed after the Petition Date. On October 30, 2009, the Debtor filed its *Motion to Sell Property Under Section 363(b) of the Bankruptcy Code* [Docket No. 399] seeking approval of the proposed sale from the Bankruptcy Court. On December 7, 2009, after a hearing on the motion, the Bankruptcy Court entered its order approving the sale [Docket No. 525]. The Debtor and Exxon are now working together to fulfill the terms of their contract and complete the sale. The Proponents estimate that, after completion of the demolition, abatement, and required remediation, and payment of the indebtedness secured by valid liens in the Lakewood Terrace townhomes, the Estate could realize as much as $970,000.00 - $1,100,000.00 in net equity from the sale.

The Creditors Committee believes that the following creditors hold Claims against the Estate that are secured by Lakewood Terrace: (a) BAC Home Loan Servicing, L.P., (b) Graham Mortgage Corporation, (c) Gary Graham Self-Directed IRA, (d) Cenlar, and (e) Griffiths, Sammarco, Pierre, and Sullivan.

## 4.11. The Brandywood/FEMA Grant

The Debtor's assets include a 100% ownership interest in Brandywood Apartments, Inc. Brandywood Apartments, Inc. is the general partner of Brandywood Housing, Ltd ("**Brandywood**"). Brandywood owns and operates an apartment housing project located in Pasadena, Texas (the "**Brandywood Property**"). Several of the apartment buildings on the Brandywood Property are located in an area that is susceptible to repetitive flooding. Prior to the Petition Date, the City of Pasadena applied through the Texas Water Development Board for a FEMA project grant under the SRL program to mitigate certain repetitive flood problems with 17 buildings at the Brandywood Property. Pursuant to the FEMA SRL program, FEMA agreed to provide a grant to fund substantially all of the costs of the remediation project. HUD believes that, during the pendency of this bankruptcy, the City of Pasadena allegedly assigned its interest in the FEMA Transaction to the Harris County Flood Control District ("**HCFCD**"). HUD also believes that, in August 2010, the Harris County Commissioners approved HCFCD's involvement and HCFCD is currently obtaining an appraisal of the Brandywood Property.

HUD believes that, under the current proposed FEMA Transaction, an additional two buildings have been added and the 19 Brandywood buildings in the repetitive flood zone would be demolished and the land used as a green space to avoid flood damage in the future. Upon completion of the FEMA Transaction, Brandywood would retain ownership of its remaining property, consisting of 32 buildings. HUD asserts that, as of this time, Brandywood has not sought HUD's approval of the demolition of the two buildings or HCFCD's involvement in the FEMA Transaction, as required under that certain HUD Special Warranty Deed.

On December 31, 2004, TCB made a loan to Brandywood Housing, Ltd. in the original principal amount of $9,500,000.00 for the refinancing of, and other costs and expenses related to, the Brandywood Property. This loan was secured by a deed of trust granting TCB a lien on the Brandywood Property. Prior to the Brandywood loan, on or about June 25, 2004, TCB had made a loan on the amount of $3,000,000.00 to the Debtor, secured by a lien on assets of the Debtor, generally described as accounts, chattel paper, cash, and rights to payment. On December 30, 2004, the Debtor and TCB executed an *Amended and Restated Pledge and Security Agreement* that, among other things, extended TCB's security interest in the Debtor's assets to secure the Brandywood loan as well as the loan to the Debtor. HUD asserts that the AHF loan matured pre-petition on December 31, 2008, and the maturity date of the Brandywood loan is uncertain due to the second and third modifications being signed by Brandywood's former general partner, MC CDC-BW, Inc., instead of its current general partner, Brandywood Apartments, Inc. As of the Petition Date, the balance owed to TCB on both loans was approximately $9,600,000.00.

In addition to the TCB deed of trust, a deed of trust from Brandywood and in favor of AHF was filed in Harris County, Texas on April 17, 2008. It has been alleged that this deed of trust secures a $11,637,847.28 promissory note dated April 14, 2008. It has also has been alleged that this deed-of-trust lien is invalid. The Proponents have not yet finalized their analysis

of this deed of trust and, at this time, cannot conclusively opine on such allegations and whether the alleged deed-of-trust lien is valid.

From the proceeds of the FEMA transaction, Brandywood must make payments to various entities for (a) low-income-housing tax-credit recapture, (b) payment of Harris County property taxes, (c) payment of City of Pasadena *ad valorem* property taxes, (d) payment of outstanding payable and non-mortgage liens due, and (e) estimated closing costs and escrow fees. HUD asserts a right to any sale proceeds under its Special Warranty Deed and that Brandywood must obtain HUD's approval to use sale proceeds for the payment of such expenses and costs that are not associated with the FEMA Transaction, which include demolition, relocation, and abatement costs. HUD asserts that any net proceeds that are available to Brandywood will be subject to HUD's asserted right of approval. Brandywood had initially proposed to utilize these funds to pay down the indebtedness owed to TCB, which claims a security interest and lien in these funds. However, pursuant to the TCB Settlement, any such funds would be paid to AHF and not TCB, which, according to HUD, is subject to HUD's asserted right of approval.

Further, HUD has challenged the validity of TCB's claim to the funds, asserting that the funds should be used to benefit the apartment units remaining on the Brandywood Property. These matters are awaiting resolution either through settlement or litigation. In either event, the Proponents are not able to anticipate (with any specificity) if the completion of the FEMA grant will provide a benefit to the Debtor, its Estate, and creditors thereof because of the rights asserted and positions taken by HUD, including a possible reduction of the amount of the FEMA grant as a result of HCFCD's appraisal of the Brandywood Property.

On September 9, 2009, the Debtor filed its *Motion for Approval of Brandywood Housing Ltd./FEMA Transactions* [Docket No. 218] with the Bankruptcy Court. An objection to the motion was filed by HUD [Docket No. 313] on September 29, 2009. On January 26, 2010, the Bankruptcy Court entered an *Order Allowing Debtor to Execute and Perform, as Limited, its Obligations Under the Brandywood Housing, Ltd./FEMA Transactions* [Docket No. 694].

That order authorized the Debtor "to execute and perform its obligations, either in its own capacity or in its capacity as general partner of Brandywood Housing, Ltd. under any and all agreements and transactions necessary to consummate the FEMA transaction, subject to the terms and conditions of this Order." In addition, according to HUD, the order specifically found that Brandywood Property is not property of the bankruptcy estate and the order was not a determination of any parties' rights under the FEMA transaction or related agreements and all rights are reserved, including, without limitation, all rights and claims in and to any sale proceeds from the closing of the FEMA transaction, and the parties understand and acknowledge that such rights may be subsequently determined by agreement or litigation in the appropriate forum. HUD believes that the Chapter 11 Trustee's authority to execute any documents on behalf of Brandywood under this order is "problematic," because the Debtor is not the general partner of Brandywood.

# ARTICLE V.
## FINANCIAL INFORMATION[5] OF THE DEBTOR

### 5.01.  Debtor's Assets

The Debtor's assets as of the Petition Date are set forth in the Schedules and reference should be made thereto for information concerning such assets as of the Petition Date. Generally, the Debtor's assets can be categorized as follows:

- Life Insurance Proceeds;

- Lakewood Terrace Townhomes;

- Intercompany Receivables;

- Causes of Action;

- Non-Debtor related entities; and

- Miscellaneous Assets.

For the Proponents' estimated values for each category of Assets listed above, please see Exhibit A attached.

### 5.02.  Debtor's Liabilities

(a)  **Prepetition Debts.** On the Petition Date, it is alleged that the Debtor had at least nine (9) classes of secured creditors.  The classes of secured creditors were (a) TCB, (b) BAC Home, (c) Graham Mortgage Corporation, (d) Graham IRA, (e) Cenlar, (f) Griffiths, Sammarco, Pierre, and Sullivan, (g) Happy State Bank, (h) Wells Fargo, and (i) Gary Graham.  The Proponents are still investigating those allegations.  However, of those secured creditors, it appears that TCB holds the largest liquidated and non-contingent claims.  For example, TCB holds aggregate Claims against the Debtor in an approximate amount of $9,635,115.13.  TCB asserts that its Claims are secured by first-priority liens and security interests in substantially all of the Debtor's personal property, including, without limitation, cash and rights to payment needed by the Debtor to pay its operating expenses.  For the Proponents' estimate of unpaid secured claims against the Estate on the Effective Date, please see Exhibit A attached.

As of July 8, 2010, approximately 180 proofs of Claim have been filed against the Debtor.  These proofs of Claim seem to assert between $104,654,828.11 and approximately $135,000,000.00 of prepetition debts against the Debtor.  Of that amount, approximately $19,142,010.32 is claimed to be secured, approximately $3,465.00 is claimed to be priority, and

---

[5] The financial information discussed in the Disclosure Statement was prepared by Debtor's management with assistance from Focus Management Group USA, Inc. The financial information was based on the Debtor's books and records. The Debtor maintains its books and records on an accrual method of accounting. Exhibit A contains an explanation of how the information thereon was calculated and the assumptions made with such calculations. Exhibit A also contains reservations and warnings about the use of such information. Exhibit A is incorporated by reference herein as if fully set forth.

approximately $85,030,721.02 is claimed to be unsecured. Many of these proofs of Claim are disputed and have been or will be challenged by the Estate. For the Proponents' estimate of unpaid unsecured claims against the Estate on the Effective Date, including priority claims asserted by employees, please see Exhibit A attached. It has been asserted that Gary Graham's secured claim has now been amended to an unsecured deficiency claim.

(b)    **Postpetition Debts.**  Since the Petition Date, the Debtor and the Chapter 11 Trustee have generally paid undisputed Administrative Claims as they have become due and owing in the ordinary course of its business. They have also paid fees and expenses of Professionals pursuant to various interim orders entered by the Bankruptcy Court. For the Proponents' estimate of unpaid administrative expenses of the Estate on the Effective Date, please see Exhibit A attached.

## ARTICLE VI.
## CHAPTER 11 BANKRUPTCY AND PLAN OVERVIEW

### 6.01.   Introduction to Chapter 11 of the Bankruptcy Code

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor-in-possession or a chapter 11 trustee is authorized to reorganize a business for the benefit of itself, its creditors, and its shareholders. In addition to permitting rehabilitation of the debtor, chapter 11 promotes equality of treatment of creditors who hold substantially similar claims against the debtor and its assets. In furtherance of these two goals, the filing of a petition for relief under chapter 11 creates an estate comprising all the legal and equitable interests of a debtor in property as of the date such petition was filed. Upon the filing of a petition for relief under chapter 11, an automatic stay is imposed stopping substantially all existing acts and preventing future acts the Debtor and its property to collect on claims or enforce liens that arose prior to the commencement of the bankruptcy case.

The formulation and consummation of a chapter 11 plan – liquidating or reorganizing – is typically the principal objective of a chapter 11 case. A chapter 11 sets forth the means for satisfying claims against a debtor. Confirmation of a chapter 11 plan by the bankruptcy court makes the plan binding on the debtor, any entity acquiring property under the plan, and any creditor of the debtor, whether or not such creditor (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date the chapter 11 plan is confirmed, and substitutes therefor the obligations specified under the confirmed plan.

This Disclosure Statement sets forth certain detailed information regarding the Debtor's history and significant events expected to occur during the Bankruptcy Case. This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of confirmation of the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims must follow for their votes to be counted.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE PLAN, AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN. IT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, AS WELL AS THE EXHIBITS ATTACHED THERETO AND DEFINITIONS THEREIN.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST THE DEBTOR UNDER THE PLAN AND WILL, UPON OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING ON ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR, THE ESTATE, THE REORGANIZED DEBTOR, LIQUIDATING TRUSTEE, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES-IN-INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

### 6.02. Summary of the Chapter 11 Plan

The following is a brief summary of the Plan's general terms and does not form a part of the Plan. This summary is qualified in its entirety by reference to the provisions of the Plan. Capitalized terms used in this summary are defined in Article XIV of the Plan. AHF directly owns the following assets:

(a)     Life Insurance Proceeds;

(b)     Lakewood Terrace Townhomes;

(c)     Intercompany Receivables;

(d)     Causes of Action (including claims against its directors and officers, preference and fraudulent-transfer claims, and other miscellaneous claims); and

(e)     Miscellaneous Assets.

In addition, AHF owns an ownership interest, directly or indirectly, in numerous Special Purpose Entities. These Special Purpose Entities are not subject to this bankruptcy case. These Special Purpose Entities currently own and operate approximately 65 affordable-housing apartment communities (containing approximately 13,000 units) located in nine (9) states. These affordable-housing apartment communities were financed in three (3) general ways:

| 35 | **Tax-Exempt Bond Financing** |
| | - 11 in the "Walden I" portfolio |
| | - 17 in the "Walden II" portfolio |
| | - 4 in the "Simpson" portfolio |
| | - 3 Other |

| 17 | **Tax-Credit Equity Financing from Investors** |

| 13 | **Conventional Financing from JPMorgan Chase, N.A.** |
| — | (a/k/a the "AIMCO" Portfolio) |

| 65 | Total Properties |

The Plan resolves, settles, and compromises all Claims against AHF or property of AHF of whatever character, whether Disputed, contingent, or unliquidated, or whether Allowed by the Bankruptcy Court pursuant to section 502(a) of the Bankruptcy Code. Pursuant to the terms of the Plan:

• AHF shall retain its indirect or direct ownership interest in the Special Purpose Entities listed on Exhibit A attached to the Plan and as supplemented in the Plan Supplement, which own and operate 18 apartment communities, (hereinafter referred to as the "**Retained Properties**");[6] and

• AHF shall terminate/divest/reject its indirect or direct ownership interest in the Special Purpose Entities listed on Exhibit B attached to the Plan or as supplemented in the Plan Supplement, which own and operate 47 apartment communities, as soon as practical after confirmation of the Plan (hereinafter referred to as the "**Rejected Properties**").[7]

• Reorganized AHF shall continue to own and/or operate the Retained Properties pursuant to the Operating Budget attached hereto as Exhibit B. Reorganized AHF shall stabilize the operations of the Retained Properties and use its best efforts to sell its interest in the Retained Properties within twenty-four (24) months after the Effective Date of the Plan, unless the Reorganized AHF, the Liquidating Trustee, and the Trust Oversight Committee agree otherwise. All proceeds, net of operating costs and

---

[6] The Proponents or the Reorganized Debtor may elect, in their sole and absolute discretion, to add Special Purpose Entities to or remove Special Purpose Entities from Exhibit A at any time prior to the Effective Date. All Special Purpose Entities removed from Exhibit A will, if not otherwise added to Exhibit B, be deemed to be listed on Exhibit B. Nothing in the Plan restricts the Proponents' ability to add or remove a Special Purpose Entity to or from Exhibit A if he determines such an addition or removal is in the best interests of the Estate to maximize the recovery on all Allowed Claims.

[7] The Proponents or the Reorganized Debtor may elect, in their sole and absolute discretion, to add Special Purpose Entities to or remove Special Purpose Entities from Exhibit B at any time prior to the Effective Date. All Special Purpose Entities removed from Exhibit B will, if not otherwise added to Exhibit A, be deemed to be listed on Exhibit A. Nothing in the Plan restricts the Proponents' ability to add or remove a Special Purpose Entity to or from Exhibit B if he determines such an addition or removal is in the best interests of the Estate to maximize the recovery on all Allowed Claims.

closing costs of Reorganized AHF, received from the sale or other disposition of the Retained Properties and the other remaining assets of Reorganized AHF shall be transferred by Reorganized AHF to the AHF Liquidating Trust for distribution to creditors pursuant to the Plan.

- AHF shall transfer all of its assets, other than the Rejected Properties, Retained Properties and Operating Fund Reserve, to the AHF Liquidating Trust. The AHF Liquidating Trust shall liquidate the Trust Assets and distribute the net proceeds to creditors holding Allowed Claims pursuant to the terms and provisions of the Plan and Liquidating Trust Agreement, substantially similar to the form attached to the Plan as Exhibit C.

- A detailed list of AHF Liquidating Trust assets, estimated values, projected allowed creditor claims and the projected dividend available to general unsecured creditors is attached hereto as Exhibit A (the "**Liquidation Analysis**"). The Liquidation Analysis contains estimates only. Actual recoveries on assets and actual allowed claims could vary materially from those shown in the analysis.

- Exhibits A and B attached to the Plan or as modified in or supplemented by the Plan Supplement were based on information provided by the Debtor's management to Focus Management Group USA, Inc. Focus Management Group USA, Inc. prepared Exhibits A and B after consultation with the Chapter 11 Trustee and his counsel. In preparing Exhibits A and B, Focus Management Group USA, Inc. (a) analyzed the trailing twelve-month balance sheets and income statements for each property, (b) reviewed the proposed capital-expenditure budgets and current capital-expenditure needs for each property, (c) prepared 2010 and 2011 pro-forma balance sheets for each property, (d) analyzed each property's current debt levels and collateral/security pledges, (e) valued each property based on direct capitalization rates,[8] (f) analyzed potential Project Partnership-Related Guaranty Claims on a Special-Purpose-Entity-by-Special-Purpose-Entity Basis; and (g) taking into account the provisions of the individual partnership agreements governing the allocation of proceeds from sale of such entity's property, and the estimated debt for each Special Purpose Entity, analyzed current and potential cash contributions to the Debtor or Reorganized Debtor based on Intercompany Receivables, and the collectability of such receivables, and other potential gains realized by AHF upon a sale or other disposition of each property. From that analysis, Focus Management Group USA, Inc. determined which properties would likely provide value to AHF for its direct and indirect equity interest in the Special Purpose Entity that owns the properties. The properties that would likely provide value to AHF commensurate with the risk of retaining such properties are characterized as Retained Properties in the Disclosure Statement and Plan.

---

[8] Capitalization rates are market-driven investor-desired rates of return

## 6.03. Summary of Classification of Claims and Interests and Proposed Distributions to Same under the Plan

Pursuant to section 1122 of the Bankruptcy Code, below is a designation of classes of Claims against and Interests in the Debtor, and the proposed treatment of such Claims and Interests under the Plan. Except Administrative Claims, Professional Fee Claims, and Priority Tax Claims, all Claims and Interests are placed in the Classes as set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified. This summary is qualified in its entirety by reference to the provisions of the Plan.

| CLASS | CLAIMANT | TREATMENT |
|---|---|---|
| 1. | **ALLOWED PRIORITY NON-TAX CLAIMS**<br><br>(Est. Amt. of Claims: $.100) | Shall receive Cash in an amount equal to the Allowed amount of such Priority Non-Tax Claim no later than the Distribution Date.<br><br>(Est. Recovery: 100%) |
| 2. | **ALLOWED SECURED TAX CLAIMS**<br><br>(Est. Amt. of Claims: $.100) | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral to the Creditor in full and final satisfaction of the Allowed Class 2 Claim, or (ii) payment of the proceeds upon liquidation of the Collateral, less any expenses incurred in the liquidation.<br><br>(Est. Recovery: 100%) |
| 3. | **ALLOWED SECURED CLAIMS OF TEXAS CAPITAL BANK**<br><br>(Est. Amt. of Claim: $4.5 million) | Pursuant to the TCB Settlement, Texas Capital Bank shall have an Allowed Class 3 Claim in the amount of $4,500,000.00. On account of such Allowed Class 3 Claim, and in full satisfaction, release, and discharge of and exchange for such Claim, and the release of all Liens against Estate assets, and Brandywood, as well as additional consideration identified in Article I of the Plan, Texas Capital Bank shall receive $4,500,000.00 in Cash and the TCB Release on the Effective Date. Texas Capital Bank shall have no Deficiency Claim.<br><br>(Est. Recovery: 100%) |

| CLASS | CLAIMANT | TREATMENT |
|---|---|---|
| 4. | **ALLOWED SECURED CLAIMS OF BAC HOME LOANS SERVICING L.P.**<br><br>(Est. Amount of Claim: $3.7 million) | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral in full and final satisfaction of the Allowed Class 4 Claim, or (ii) payment of the net proceeds from the liquidation of the Collateral, after the payment of any senior liens and interests on the Collateral and any expenses incurred in the liquidation thereof. BAC Home Loan Servicing L.P.'s Deficiency Claim shall be treated as a Class 17 General Unsecured Claim.<br><br>(Est. Recovery: 100%) |
| 5. | **ALLOWED SECURED CLAIMS OF GRAHAM MORTGAGE CORPORATION**<br><br>(Est. Amount of Claim: $.886) | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral in full and final satisfaction of the Allowed Class 5 Claim, or (ii) payment of the net proceeds from the liquidation of the Collateral, after the payment of any senior liens and interests on the Collateral and any expenses incurred in the liquidation thereof. Graham Mortgage Corporation's Deficiency Claim shall be treated as a Class 17 General Unsecured Claim.<br><br>(Est. Recovery: 100%) |
| 6. | **ALLOWED SECURED CLAIMS OF GARY GRAHAM IRA**<br><br>(Est. Amount of Claim: $.635) | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral in full and final satisfaction of the Allowed Class 6 Claim, or (ii) payment of the net proceeds from the liquidation of the Collateral, after the payment of any senior liens and interests on the Collateral and any expenses incurred in the liquidation thereof. Gary Graham IRA's Deficiency Claim shall be treated as a Class 17 General Unsecured Claim.<br><br>(Est. Recovery: 100%) |
| 7. | **ALLOWED SECURED CLAIMS OF CENLAR**<br><br>(Est. Amount of Claim: $.037) | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral in full and final satisfaction of the Allowed Class 7 Claim, or (ii) payment of the net proceeds from the liquidation of the Collateral, after the payment of any senior liens and interests on the Collateral and any expenses incurred in the liquidation thereof. Cenlar's Deficiency Claim shall be treated as a Class 17 General Unsecured Claim.<br><br>(Est. Recovery: 100%) |

| CLASS | CLAIMANT | TREATMENT |
|-------|----------|-----------|
| 8. | **ALLOWED SECURED CLAIMS OF GRIFFITHS, SAMMARCO, PIERRE AND SULLIVAN** | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral in full and final satisfaction of the Allowed Class 8 Claim, or (ii) payment of the net proceeds from the liquidation of the Collateral, after the payment of any senior liens and interests on the Collateral and any expenses incurred in the liquidation thereof. Griffiths', Sammarco's, Pierre's, and Sullivan's Deficiency Claim shall be treated as a Class 17 General Unsecured Claim. |
| | (Est. Amount of Claim: $0.434) | (Est. Recovery: 100%) |
| 9. | **ALLOWED SECURED M&M LIEN CLAIMS** | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral to the Creditor in full and final satisfaction of the Allowed Class 9 Claim, or (ii) payment of the net proceeds from the liquidation of their Collateral, after the payment of any senior liens and interests on the Collateral and any expenses incurred in the liquidation thereof. Any Deficiency Claim shall be treated as a Class 17 General Unsecured Claim. |
| | (Est. Amt. of Claims: $0.00) | (Est. Recovery: 100%) |
| 10. | **ALLOWED SECURED CLAIM OF HAPPY STATE BANK** | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral to the Creditor in full and final satisfaction of the Allowed Class 10 Claim, or (ii) payment of the net proceeds from the liquidation of their Collateral, after the payment of any senior liens and interests on the Collateral and any expenses incurred in the liquidation thereof. Any Deficiency Claim shall be treated as a Class 17 General Unsecured Claim. |
| | (Est. Amt. of Claims: $1.786 million) | (Est. Recovery: 100%) |
| 11. | **ALLOWED SECURED CLAIM OF WELLS FARGO BANK** | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral to the Creditor in full and final satisfaction of the Allowed Class 11 Claim, or (ii) payment of the net proceeds from the liquidation of their Collateral, after the payment of any senior liens and interests on the Collateral and any expenses incurred in the liquidation thereof. Any Deficiency Claim shall be treated as a Class 17 General Unsecured Claim. |
| | (Est. Amt. of Claims: $.408) | (Est. Recovery: 100%) |
| 12. | **ALLOWED SECURED CLAIM OF CAPITAL ONE BANK N.A.** | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral to the Creditor in full and final satisfaction of the Allowed Class 12 Claim, or (ii) payment of the net proceeds from the liquidation of their Collateral, after the payment of any senior liens and interests on the Collateral |

| CLASS | CLAIMANT | TREATMENT |
|---|---|---|
| | | and any expenses incurred in the liquidation thereof. Any Deficiency Claim shall be treated as a Class 17 General Unsecured Claim.<br><br>(Est. Amt. of Claims: $0.00) — (Est. Recovery: 0%) |
| 13. | **OTHER SECURED CLAIMS** | Shall be satisfied at the Reorganized Debtor's option by (i) return of the Collateral to the Creditor in full and final satisfaction of the Allowed Class 13 Claim, or (ii) payment of the net proceeds from the liquidation of their Collateral, after the payment of any senior liens and interests on the Collateral and any expenses incurred in the liquidation thereof. Any Deficiency Claim shall be treated as a Class 17 General Unsecured Claim. |
| | (Est. Amt. of Claims: $0.00) | (Est. Recovery: 100%) |
| 14. | **ALLOWED CONVENIENCE CLAIMS** | Shall be satisfied by receipt of twenty-five percent (25%) of Allowed General Unsecured Claim from the Trust Assets within thirty (30) days after the Effective Date in full and final satisfaction of such Allowed Class 14 Claim. |
| | (Est. Amt. of Claims: $.221) | (Est. Recovery: 25%) |
| 15. | **ALLOWED SOFT MONEY INVESTOR CLAIMS** | Allowed Claims in Classes 15, 16, and 17 shall receive a Pro Rata share of Distributions from the Trust Assets after liquidation and payment in full of Claims in Classes 1 through 14. |
| | (Est. Amt. of Claims: $41.3 to $53.2 million) | (Est. Recovery: 20% to 40%) |
| 16. | **ALLOWED PROJECT PARTNERSHIP-RELATED GUARANTY CLAIMS** | Allowed Claims in Classes 15, 16, and 17 shall receive a Pro Rata share of Distributions from the Trust Assets after liquidation and payment in full of Claims in Classes 1 through 14. |
| | (Est. Amt. of Claims: $6.3 to $16 million) | (Est. Recovery: 20% to 40%) |
| 17. | **ALLOWED GENERAL UNSECURED CLAIMS (Other than those contained in Classes 14, 15, and 16)**<br><br>(Est. Amt. of Claims: $29.3 to $33.9 million) | Allowed Claims in Classes 15, 16, and 17 shall receive a Pro Rata share of Distributions from the Trust Assets after liquidation and payment in full of Claims in Classes 1 through 14.<br><br>(Est. Recovery: 20% to 40%) |

| CLASS | CLAIMANT | TREATMENT |
|---|---|---|
| 18. | **ALLOWED SUBORDINATED CLAIMS** <br><br> (Est. Amt. of Claims: $0.00 to $8.138 million) | Shall receive a Pro Rata share of Distributions from the Trust Assets after liquidation and payment in full of Claims in Classes 1 through 17. <br><br> (Est. Recovery: 0%) |
| 19. | **ALLOWED INTERESTS IN THE DEBTOR** <br><br> (Est. Amount of Interests: N/A) | The Debtor is a tax-exempt entity under Internal Revenue Code section 501(c)(3). Therefore, there are no Allowed Interests in the Debtor. However, if such Interests exist, holders of such Interests shall receive no Distributions or retain any property under this Plan on account of such Interests. Upon confirmation, all Interests shall be cancelled, terminated, and extinguished. <br><br> (Est. Recovery: N/A) |

The Chapter 11 Trustee believes that the Plan should classify Soft Money Investor Claims, Project Partnership-Related Guaranty Claims, and General Unsecured Claims separately. Section 1122(a) of the Bankruptcy Code states, in relevant part, that "a plan may place a claim or an interest in a particular class only if such claim or interest is *substantially similar* to the other claims or interests of such class." 11 U.S.C. § 1122(a) (emphasis added). The Chapter 11 Trustee does not believe that the characteristics of the Soft Money Investor Claims, the Project Partnership-Related Guaranty Claims, and the General Unsecured Claims show that such claims are not substantially similar. Accordingly, the Plan classifies them separately in the Plan. Lists showing each Claim classified in Classes 15, 16, and 17 are included in Exhibit A attached hereto. Creditors will also receive Ballots specifically labeled for their respective Class.

The Chapter 11 Trustee believes that, while AHF and its tax-credit limited partners were engaged in the legitimate affordable housing business, Sterquell and certain "soft-money" partners were involved in the illegitimate activity of manufacturing illegitimate tax basis and therefore taking illegitimate tax deductions in return for what were in actuality loans. The following is an example of how the typical "soft-money" investment worked:

> Sterquell would tell his "partners" that if they would "invest" funds in an Affiliate, he would promise to repay the investment within one year, together with 18% per-annum interest, *plus* provide them with tax deductions equal to several times their actual investments (in many instances 4 to 12 times the amount invested), thereby allowing them to recoup their investment many times over in income-tax savings. In order to obtain tax deductions of several times the investment, Sterquell and the soft-money investors manufactured "basis" by executing sham non-recourse notes.

The soft-money structure was designed by Sterquell and participated in by the "soft-money" investors, who knew or should have known that the investment was purely for illegitimate and improper tax purposes. The Chapter 11 Trustee believes that the real purpose was to disguise true loans as equity investments to take tax deductions through falsely manufactured tax basis in amounts several times the actual investment. These soft-money claims relate to money invested in Affiliates listed on Exhibit F attached hereto.

Project Partnership-Related Guaranty Claims are those claims against the Debtor pursuant to a guaranty issued by the Debtor for the benefit of certain related entities. They include the following types of guaranty claims: Tax Recapture Guaranty Claims, Operating Deficit Guaranty Claims, Ad Valorem Tax-Exemption Guaranty Claims, and General-Partner Tort Guaranty Claims.

General Unsecured Claims are unsecured claims that do not exhibit the same discrete legal characteristics as either Soft Money Investor Claims or Project Partnership-Related Guaranty Claims. For this reason, among others, the Proponents do not believe that Soft Money Investor Claims or Project Partnership-Related Guaranty Claims are substantially similar to the General Unsecured Claims.

The Chapter 11 Trustee has filed claims objections and adversary proceedings against certain of the soft-money investors, including Robert Templeton, Terrill J. Horton, David Miller, Cornelia Slemp Trust, and Louise Johnson Thomas Trust. The Chapter 11 Trustee has not yet finalized the claims-investigation and reconciliation process. Based on his initial investigation, the Chapter 11 Trustee expects to file more claims objections to claims filed by certain soft-money investors. However, that process will not likely be completed until after the Confirmation Date. All rights of the Estate to object to, challenge, defend, or prosecute any position of the Estate on claims asserted against or by the Estate are hereby reserved under this Disclosure Statement and the Plan.

If this Plan is approved by the Bankruptcy Court, the Chapter 11 Trustee – as the Liquidating Trustee – intends to make distributions to legitimate creditors as soon as reasonably possible.

Counsel to the Creditors Committee is conflicted from investigating or analyzing claims asserted by so-called "soft-money" investors because such investors were clients of such counsel before this Bankruptcy Case or members of the Creditors Committee during this Bankruptcy Case. As such, the Creditors Committee is unable to take a position on the "soft-money" claims.

### 6.04.  Means for Implementation of the Plan

(a)     **Reorganized Debtor.** From and after the Effective Date, the Reorganized Debtor will exist as a separate corporate entity or other business entity form, with all of the powers of a corporation qualified as a tax-exempt entity under Internal Revenue Code section 501(c)(3), pursuant to the Debtor's certificate of incorporation and bylaws or other organizational documents in effect before the Effective Date, as such documents are amended by or pursuant to this Plan. Notwithstanding anything to the contrary herein, the Reorganized Debtor may change its status of incorporation or alter its corporate structure or business form on or after the Effective

Date as determined by the Reorganized AHF Board. The Reorganized Debtor will not amend its bylaws to disqualify itself under various governmental programs and entitlements unless it determines that such disqualification is in the best interests.

(b) **Purpose of the Reorganized Debtor.** On the Effective Date, as more fully discussed below, all Assets other than Retained Properties, Rejected Properties, and the Operating Fund Reserve will be transferred to the Liquidating Trust. The Liquidating Trust will liquidate all Trust Assets and distribute the proceeds of the Trust Assets to Creditors on account of their Allowed Claims. From and after the Effective Date, the Reorganized Debtor will continue to exist and will terminate/divest its ownership interests in the Rejected Properties, in its sole and absolute discretion, in an organized manner designed to reduce the amount and number of Claims against the Estate. The Reorganized Debtor will continue to stabilize and operate the Retained Properties pursuant to the Budget and use its best efforts to sell the Retained Properties as either a "going-concern" or in various groups within twenty-four (24) months after the Effective Date, unless the Reorganized AHF, the Liquidating Trustee, and the Trust Oversight Committee agree otherwise.

(c) **Plan Funding.** The Cash necessary for general working-capital requirements of the Reorganized Debtor after the Effective Date and until the Retained Properties and the Rejected Properties are liquidated or otherwise administered will equal the Operating Fund Reserve and all proceeds of that liquidation or administration.

(d) **Corporate Governance of the Reorganized Debtor.** On the Effective Date, any remaining officer and director of the Debtor shall be deemed removed from that office. The Reorganized AHF Board is proposed to consist of Jerry Hodge, Dennis Dougherty, Tim Nichols, Carroll Forrester, and two tenants from affordable-housing communities owned by Special Purpose Entities listed as Retained Properties selected pursuant to applicable law and regulations for tax-exempt entities under Internal Revenue Code § 501(c)(3), including regulations imposed by the Department of Housing and Urban Development. If the proposed members of the Reorganized AHF Board refuse to serve on or resign from the Reorganized AHF Board, then the Proponents or the President of the Reorganized Debtor, as applicable, will select alternative members for the Reorganized AHF Board and submit such names to the Bankruptcy Court for approval. The Reorganized AHF Board will be the sole board responsible for supervising the operation of the Reorganized Debtor and the liquidation of the Retained Properties. Copies of resumes reflecting the experience and background of the proposed members of the Reorganized AHF Board are included in Exhibit G attached hereto.

The Creditors Committee believes that his "reconstituted" board of directors is in the best interests of the Estate. Currently, employees of AHF serve on the Board of Directors. The Creditors Committee does not believe that this is good management philosophy and therefore insisted on a reconstituted board that includes no AHF employees.

(e) **Management of the Reorganized Debtor.** Walter O'Cheskey will manage the Reorganized Debtor as its President and Chief Executive Officer. The President shall be responsible and report to the Reorganized AHF Board and see that the orders and resolutions of the Reorganized AHF Board are carried into effect. Subject to direction from the Reorganized AHF, the President will be responsible for administering the Plan on behalf of Reorganized

AHF, including, without limitation, taking all appropriate actions to transfer the Trust Assets to the Liquidating Trust, and managing the future operations of Reorganized AHF. The President shall also have general supervision and control of the Reorganized Debtor's affairs and all of its business. Among other things, the President shall have general authority to (a) administer the Plan on behalf of the Reorganized Debtor according to the Plan, including taking actions in the name of the Reorganized Debtor, (b) effectuate the terms of the Plan, (c) execute bonds, deeds, and contracts in the name of the Reorganized Debtor, (d) cause the employment or appointment of employees and agents of the Reorganized Debtor and to fix their compensation in his discretion, and (e) cause the suspension or termination of such employees and agents of the Reorganized Debtor in his discretion. However, the President may not, without obtaining prior approval from the Reorganized AHF Board, cause the Reorganized Debtor to be a party to (a) a single transaction with a purchase or sale price in excess of $100,000.00 or (b) any series of related transactions with an aggregate purchase or sale price in excess of $500,000.00. The President shall remain in place and continue his management until the earlier of (a) his death or resignation and (b) two years after the Effective Date, unless the President and the Reorganized AHF agree that the President shall continue after that 2-year period to fulfill the goals of this Plan. In the event of the President's death or resignation, the Reorganized AHF Board shall propose a successor President to the Bankruptcy Court for approval. After notice and hearing to all Creditors, the Bankruptcy Court shall have sole authority to approve the Reorganized AHF Board's selection of a successor President. Notwithstanding any language in this section to the contrary, the President may be terminated by the Bankruptcy Court after notice and hearing and only on a showing by clear and convincing evidence that the President is guilty of gross negligence or willful misconduct.

(f) **President's Compensation, Reimbursement, and Indemnification**. The President shall be compensated at a rate of $1,250.00 per week. The President shall be reimbursed for all out-of-pocket expenses reasonably incurred by the President in the performance of the President's duties. In addition, the President shall be indemnified by and receive reimbursement against and from any and all loss, liability, expense, or damage that the President may incur or sustain, in good faith and without fraud, willful misconduct, or gross negligence, in the exercise and performance of any of the President's powers and duties under the Plan. The amounts necessary for all such compensation, indemnification, and reimbursement and for all expenses of administration, including, without limitation, legal fees, shall be withdrawn by the President from the Assets.

(g) **Employees and Agents**. The President may hire employees and Professionals, including, without limitation, brokers, banks, custodians, investment advisors, attorneys, accountants, auditors, tax advisors, and other agents, in the President's discretion, and officers of the Reorganized Debtor with prior approval from the Reorganized AHF Board. The President shall not be liable for any loss to the Reorganized Debtor or any person interested therein by reason of any mistake or default of such agent, consultant, or officer as shall be selected and retained in good faith and without gross negligence. All employees and Professionals shall be compensated at an amount that is acceptable to the President in his discretion, and such compensation shall be paid by the President in the ordinary course of the Reorganized Debtor's business without the necessity for prior Bankruptcy Court approval.

(i) **Employment of Focus Management Group USA, Inc.**

The Reorganized Debtor will employ Focus Management Group USA, Inc. as its financial advisors after the Effective Date. Focus Management Group USA, Inc. served as financial advisors to the Chapter 11 Trustee during the Bankruptcy Case. Notwithstanding anything herein to the contrary, the terms of the Reorganized Debtor's engagement with Focus Management Group USA, Inc. will be subject to approval by the Reorganized AHF Board or, if Focus and the Reorganized AHF Board cannot agree on the terms of Focus' proposed engagement with the Reorganized Debtor, the Bankruptcy Court will decide such terms after recommendations from the president and the Reorganized AHF Board.

(ii) **Employment of Tarbox Law PC**. The Reorganized Debtor will employ Tarbox Law PC as its co-legal counsel after the Effective Date. Tarbox Law PC served as legal counsel to the Chapter 11 Trustee during the Bankruptcy Case. Notwithstanding anything herein to the contrary, the terms of the Reorganized Debtor's engagement with Tarbox Law PC will be subject to approval by the Reorganized AHF Board or, if Tarbox Law PC and the Reorganized AHF Board cannot agree on the terms of Tarbox Law PC's proposed engagement with the Reorganized Debtor, the Bankruptcy Court will decide such terms after recommendations from the President and the Reorganized AHF Board.

(iii) **Employment of Gardere Wynne Sewell LLP**. The Reorganized Debtor will employ Gardere Wynne Sewell LLP as its co-legal counsel after the Effective Date. Gardere Wynne Sewell LLP served as legal counsel to the Chapter 11 Trustee during the Bankruptcy Case. Notwithstanding anything herein to the contrary, the terms of the Reorganized Debtor's engagement with Gardere Wynne Sewell LLP will be subject to approval by the Reorganized AHF Board or, if Gardere Wynne Sewell LLP and the Reorganized AHF Board cannot agree on the terms of Gardere Wynne Sewell LLP's proposed engagement with the Reorganized Debtor, the Bankruptcy Court will decide such terms after recommendations from the President and the Reorganized AHF Board.

(h) **Continued Operations.** After the Effective Date, the Reorganized Debtor will continue its operations to stabilize and operate the Retained Properties pursuant to the Operating Budget and use its best efforts to sell the Retained Properties as either a "going-concern" or in various groups within twenty-four (24) months after the Effective Date, unless the Reorganized

AHF, the Liquidating Trustee, and the Trust Oversight Committee agree otherwise. In performing these duties, the Reorganized Debtor will take any action necessary to achieve maximum value for the liquidation of the Retained Properties and to dissolve upon such liquidation and distribution of the liquidation proceeds to the Liquidating Trust.

(i)     **Release of Liens and Cancellation of Lien Documents.** On the Effective Date, all notes, instruments, certificates and other documents evidencing Claims against the Debtor or Estate shall be cancelled and deemed terminated, and all Liens in or against the Assets shall be automatically, and without any further action required by any party or the Bankruptcy Court, deemed released or terminated, and all Collateral subject to such Liens shall be automatically released, and all guarantees of any of the Debtor or the Reorganized Debtor shall be automatically discharged and released; *provided, however,* that such Liens shall attach to any proceeds of the Collateral if and as provided in this Plan or Confirmation Order. In addition, all Lien Documents, if any, shall be deemed cancelled, discharged, released, terminated, and of no further force or effect, and this Plan shall operate to cancel all obligations of the Debtor and the Reorganized Debtor under such documents. Notwithstanding the foregoing, such cancellation of Lien Documents shall not impair the rights of holders of any Allowed Claims arising under or relating to such Lien Documents to receive Distributions on account of such Allowed Claims from the Liquidating Trust or as otherwise provided in this Plan.

(j)     **Settlement of Certain Claims, Including Soft Money Investor Claims, Project Partnership-Related Guaranty Claims, and General Unsecured Claims.** Pursuant to Bankruptcy Rule 9019, and in consideration for the benefits provided under the Plan, including classification, distribution, releases, upon the Effective Date, this Plan shall constitute a good-faith compromise and settlement of all Claims or controversies resolved, settled, and compromised pursuant to the Plan. All Distributions made to holders of Allowed Claims shall be final, and no Distribution to the holder of a Claim in one Class shall be subject to being shared with or reallocated to holders of any Claim in another Class by virtue of any prepetition agreement, shared collateral agreement, subordination agreement or other similar intercreditor arrangement.

(k)     **Dissolution of the Reorganized Debtor.** The Confirmation Order shall provide for the Reorganized Debtor's dissolution for all purposes without the necessity for any other or further action to be taken by or on behalf of the Reorganized Debtor pursuant to Article 4.14 of the Texas Business Corporation Act immediately when the Reorganized Debtor has performed all of its obligations under this Plan. The question of when and whether the Reorganized Debtor will be dissolved shall be decided by the President and the Reorganized AHF Board. If no agreement can be reached on that decision, the parties will ask the Bankruptcy Court to decide.

(l)     **Establishment of the Liquidating Trust.** On the Effective Date, the Chapter 11 Trustee, the Liquidating Trustee, and the members of the Reorganized AHF Board shall execute the Liquidating Trust Agreement, thereby establishing the Liquidating Trust. The Debtor, the Proponents, and all Creditors shall be deemed to have adopted and approved the Liquidating Trust Agreement, substantially similar to the form attached to the Plan as <u>Exhibit C</u>, as of the Effective Date.

(m)     **Purpose of the Liquidating Trust.**  The Liquidating Trust shall be established for the purpose of liquidating the Trust Assets and distributing the proceeds of such liquidation to holders of Allowed Claims not otherwise paid by the Chapter 11 Trustee prior to or on the Effective Date, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.  The Liquidating Trust shall not be deemed a successor-in-interest of the Debtor for any purpose other than as specifically set forth herein. The Liquidating Trust is intended to qualify as a "grantor trust" for federal income-tax purposes and, to the extent permitted by applicable law, state and local income-tax purposes, with the beneficiaries treated as grantors and owners of the trust.

(n)     **Transfer of Assets to the Liquidating Trust.**  On the Effective Date, all Trust Assets shall be transferred to and vest in the Liquidating Trust, free and clear of all Claims, Liens, interests and encumbrances, except as otherwise provided in the Plan.

(o)     **Satisfaction of Allowed Claims from Liquidating Trust.**  On the Effective Date, all Claims against the Debtor and its Estate, and all distribution rights conferred by the Plan on account thereof, shall be transferred to the Liquidating Trust.  On the Effective Date, all objections, counterclaims, rights of setoff, rights of recoupment, and other defenses held by the Debtor, the Estate, and the Proponents in relation to such Claims, in relation to such distribution rights, and in relation to the holders of such Claims and distribution rights, shall be preserved and transferred to the Liquidating Trust, and from and after the Effective Date, the Liquidating Trustee shall have authority and standing to assert, prosecute, and settle any and all of such objections, counterclaims, rights of setoff rights or recoupment, and other defenses.  Following the Effective Date, Claims that are or become Allowed Claims shall be satisfied from the Liquidating Trust in accordance with the provisions of the Plan, and the Debtor or Reorganized Debtor shall have no continuing liability on any Claims.

(p)     **Liquidating Trustee.**  The Liquidating Trust shall be administered by the Liquidating Trustee, who shall administer the Liquidating Trust consistent with terms of the Plan, the Confirmation Order, and Liquidating Trust Agreement, and shall have all of the rights, obligations, powers and duties as set forth in the Plan and Liquidating Trust Agreement.  The Liquidating Trustee shall be approved by the Bankruptcy Court in the Confirmation Order.  The appointment of the Liquidating Trustee shall be effective as of the Effective Date.  Any successor Liquidating Trustee shall be appointed by the Bankruptcy Court after notice and hearing and consistent with the terms of the Liquidating Trust Agreement.  Upon Walter O'Cheskey's resignation as Liquidating Trustee, Walter O'Cheskey and the Trust Oversight Committee shall each nominate a potential successor Liquidating Trustee to the Bankruptcy Court.  Upon Walter O'Cheskey's death or inability to serve as Liquidating Trustee as determined by a court of competent jurisdiction, the Trustee Oversight Committee and the U.S. Trustee shall each nominate a potential successor Liquidating Trustee to the Bankruptcy Court.

(q)     **Appointment of the Liquidating Trustee.**  On the Effective Date, and pursuant to the Confirmation Order, Walter O'Cheskey shall be appointed the initial Liquidating Trustee.

(r)     **Compensation of the Liquidating Trustee.**  To maximize the dollar amount of Trust Assets available for Distributions on account of Allowed Claims, the Liquidating Trustee shall be compensated as follows:

(i)     A flat rate of $5,000.00 per month; and

(ii)    A commission equal to 3% of all disbursements paid
        pursuant to the terms and conditions of this Plan, less the
        balance of the funds in the registry of the Court on the
        Effective Date.  To be perfectly clear, for example, if
        $26,000,000 is distributed pursuant to the terms and
        conditions of this Plan, but there was $21,000,000 in the
        registry of the Court on the Effective Date, the Liquidating
        Trustee will get a 3% commission on $5,000,000.

In addition, the Liquidating Trustee shall be reimbursed 100% of all expenses incurred in the fulfillment of his duties pursuant to this Plan and the Liquidating Trust Agreement.  The Liquidating Trustee may receive compensation and expense reimbursements on a monthly basis at any time before the Liquidating Trust is terminated.

(s)     **Powers and Duties.**  The Liquidating Trustee shall have the powers and duties set forth in the Plan and the Liquidating Trust Agreement.  The Liquidating Trustee will be a representative of the Debtor and the Estate pursuant to section 1123(b)(3) of the Bankruptcy Code and, as such, will have the power to prosecute all Causes of Actions in the name of the Liquidating Trust or, as necessary, in the name of the Debtor.  The Liquidating Trustee shall be governed in all things by the terms of the Liquidating Trust Agreement and the Plan.  The Liquidating Trustee shall administer the Liquidating Trust and the Trust Assets and make Distributions in accordance with the Plan and the Liquidating Trust Agreement.  The Bankruptcy Court shall retain jurisdiction to supervise the Liquidating Trustee in the fulfillment of his duties pursuant to the Liquidating Trust Agreement.

(t)     **Employees and Agents.**  The Liquidating Trustee may hire employees and Professionals, including, without limitation, brokers, banks, custodians, investment advisors, attorneys, accountants, auditors, tax advisors, and other agents, in the Liquidating Trustee's sole discretion without approval from the Bankruptcy Court.  The Liquidating Trustee shall not be liable for any loss to the Liquidating Trust or any person interested therein by reason of any mistake or default of such agent or consultant as shall be selected and retained in good faith and without gross negligence.

(u)     **Duration of Liquidating Trust.**  The Liquidating Trust shall continue to exist until the Liquidating Trustee has (a) administered all Trust Assets and made a final Distribution to holders of Allowed Claims not paid by the Chapter 11 Trustee prior to or on the Effective Date, and (b) performed all other duties required by the Plan and the Liquidating Trust Agreement.

(v)     **Effectuating Documents; Further Transactions.**  On the Effective Date, the Liquidating Trust, the Liquidating Trustee, and the employees, agents, attorneys and Professionals of the Liquidating Trust shall be authorized and directed, without further Order of the Bankruptcy Court, to execute, deliver, file, and record all agreements, instruments, and contracts, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions, and consummate, the Plan or to otherwise comply with

applicable law to cause title to the Trust Assets to be transferred to the Liquidating Trust; however, notwithstanding the non-execution of such documents, title to the Trust Assets will automatically vest in the Liquidating Trust on the Effective Date.

(w)     **Preservation of Causes of Actions.** In accordance with section 1123(b)(3) of the Bankruptcy Code, the Liquidating Trust shall retain all of the Causes of Actions, including Avoidance Actions, and other similar claims, counterclaims, rights, defenses, setoffs, recoupments, and actions in law or equity arising under the Bankruptcy Code or applicable non-bankruptcy law. This reservation includes all current and pending litigation in which AHF is a party in the Bankruptcy Court or otherwise. The Liquidating Trustee and the Liquidating Trust shall have the authority and standing to enforce, sue on, settle, or compromise (or decline to do any of the foregoing) any of the Causes of Actions and other similar claims, counterclaims, rights, defenses, setoffs, recoupments, and actions, and may prosecute and enforce all defenses, counterclaims, and rights that have been asserted or could be asserted by the Debtor against or with respect to all Claims asserted against such Debtor or property of the Estate. A non-exclusive list of such Causes of Actions and other similar claims, counterclaims, rights, defenses, setoffs, recoupments, and actions in law or equity is attached hereto as <u>Exhibit E</u>, and is hereby incorporated by reference herein as if fully set forth in this Plan.

(x)     **Termination of Creditors Committee.** The Creditors Committee will exist until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code, and will perform such other duties as it may have been assigned by the Bankruptcy Court prior to the Effective Date. On the Effective Date, the Creditors Committee will be dissolved and its members will be deemed released by the Debtor and its Estate (a) of all their duties, responsibilities, and obligations in connection with the Bankruptcy Case, and (b) from all claims and causes of action relating to or arising directly or indirectly from services performed; *provided, however*, that this provision does not release members of the Creditors Committee from any Avoidance Action that may be asserted against them. On the Effective Date, the retention or employment of the Creditors Committee's Professionals and other agents will terminate, except as is necessary to address fee applications filed by the Creditors Committee or its Professionals. Upon dissolution of the Creditors Committee, no notice to the Creditors Committee that might otherwise be required pursuant to an order of the Bankruptcy Court shall be required.

(y)     **Trust Oversight Committee.** On the Effective Date, a Trust Oversight Committee shall be established and continue for the purpose of monitoring and not directing or supervising (a) the implementation of the Plan; (b) the Claims objection-and-resolution process; (c) the Distribution process, and (d) the pursuit and settlement of Causes of Action. The Liquidating Trustee shall consult with the Trust Oversight Committee on a quarterly basis or as otherwise agreed by the Liquidating Trustee and the Trust Oversight Committee. The Trust Oversight Committee shall continue to exist until such time as either the Trust Oversight Committee deems it appropriate by a majority vote to dissolve itself or all members of the Trust Oversight Committee resign; *provided, however*, that the Trust Oversight Committee shall be dissolved no later than the date on which the Final Decree is entered. The Trust Oversight Committee is authorized to hire Mullin, Hoard & Brown, L.L.P. or any other law firm as its counsel. Mullin, Hoard & Brown L.L.P.'s prior representation of the Creditors Committee in this Bankruptcy Case may provide a benefit to the Liquidating Trustee in his efforts to maximize

the value of the Trust Assets and, therefore, does not disqualify it from representing the Trust Oversight Committee. Attorney's fees and expenses incurred by the Trust Oversight Committee shall be paid from Trust Asset up to a maximum of $25,000.00. The Trust Oversight Committee shall have no power to direct or to control the actions taken by the Liquidating Trustee or the Reorganized Debtor.

    (z)    **Agents of the Liquidating Trustee.** As more fully described in the Liquidating Trust Agreement attached hereto as <u>Exhibit C</u>, the Liquidating Trustee may hire Professionals, including, without limitation, brokers, banks, custodians, investment advisors, attorneys, accountants, auditors, tax advisors, and other agents, in the Liquidating Trustee's sole and absolute discretion. Initially, the Liquidating Trustee will hire as co-counsel the law firms of Tarbox Law, PC and Gardere Wynne Sewell LLP to handle any litigation against or involving officers and directors, the Rice Trust, and the Mays Trust. The Liquidating Trust shall retain his authority to make professional-retention decisions from time to time in all matters affecting the Liquidating Trust. The Liquidating Trustee shall not be liable for any loss to the Liquidating Trust or any person interested therein by reason of any mistake or default of such agent, consultant, or officer as shall be selected and retained in good faith and without gross negligence.

    (aa)    **Compensation of Agents to the Liquidating Trustee.** The Liquidating Trustee may compensate Professionals on terms acceptable to him in his discretion. Unless otherwise agreed by the Professional and the Liquidating Trustee, all Professionals may be paid without Bankruptcy Court approval for services rendered and expenses incurred on a monthly basis. Before payment to the Professionals, the Liquidating Trustee shall serve a detailed statement of services rendered and expenses incurred by the Professional during the period requested (the "**Fee Statement**") via electronic mail, facsimile, or overnight mail to the members of the Trust Oversight Committee. Each member of the Trust Oversight Committee shall have 10 days after service of the Fee Statement to notify the Liquidating Trustee in writing of an objection to payment of the fees and expenses identified in the Fee Statement. If no such objection is received by the Liquidating Trustee, the Liquidating Trustee shall promptly pay the Fee Statement. If an objection to the Fee Statement is received by the Liquidating Trustee, the Liquidating Trustee may pay any unobjected-to amount on the Fee Statement without Bankruptcy Court approval. For any objected-to amount on the Fee Statement, the Liquidating Trustee shall file an application with the Bankruptcy Court to approve payment of such objected-to amounts and schedule a hearing on that application at least ten (10) days after the filing of such application.

## 6.05. Treatment of Executory Contracts and Unexpired Leases

    (a)    **General Treatment.** The Plan constitutes and incorporates a motion by the Chapter 11 Trustee to reject, as of the Effective Date, all Executory Contracts to which the Debtor is a party, except for Executory Contracts that (a) have been assumed or rejected pursuant to Final Order of the Bankruptcy Court, (b) are the subject of a separate motion pursuant to section 365 of the Bankruptcy Code to be filed and served by the Chapter 11 Trustee on or before the Confirmation Date, or (c) included in the Plan Supplement. The Confirmation Order shall constitute an order of the Bankruptcy Court under section 365 of the Bankruptcy Code approving the rejection or assumption, as applicable, of such Executory Contracts as of the Effective Date. For the avoidance of doubt, the Estate will not assume or reaffirm any guaranty

or partnership agreement related to or executed by a Special Purpose Entity listed as a Rejected Property.

(b) **Bar to Rejection Claims.** If the rejection of an Executory Contract results in a Rejection Claim, such Rejection Claim shall be forever barred and not be enforceable against the Debtor, or the properties or agents, successors, or assigns, including the Liquidating Trust, unless a proof of Claim is filed with the Bankruptcy Court and served on the Liquidating Trustee by the earlier of (a) thirty (30) days after the Effective Date and (b) such other deadline as the Bankruptcy Court may set for asserting a Claim for such damages.

(c) **Rejection Claims.** Except as limited by the provisions of sections 502(b)(6) and 502(b)(7) of the Bankruptcy Code and mitigation requirements under applicable law, any Rejection Claim shall be treated as a Class 17 General Unsecured Claim pursuant to the Plan. Nothing contained herein shall be deemed an admission by the Debtor, the Proponents, the Liquidating Trustee, or any other party in interest that such rejection gives rise to or results in a Rejection Claim or shall be deemed a waiver by the Debtor, the Proponents, the Liquidating Trust, or the Liquidating Trustee, or any other party in interest of any objection to such Rejection Claim, if asserted.

(d) **Compensation, Benefit, and Indemnification Programs.** All employee-compensation, employee-benefit, and employee-indemnification program or obligations of the Debtor, if any, that the Debtor entered into before the Petition Date and not previously terminated, shall be deemed to be, and shall be treated as though they are, Executory Contracts that are rejected and terminated under the Plan as of the Effective Date.

### 6.06. Effects of Confirmation

(a) **Discharge.** Except as provided in the Bankruptcy Code, the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims against the Debtor, the Estate, and the Reorganized Debtor of any nature whatsoever, whether known or unknown, or against the Assets or properties of the Debtor, the Estate, or the Reorganized Debtor that arose before the Effective Date. Except as provided in the Bankruptcy Code, the Plan or the Confirmation Order, upon the Effective Date, entry of the Confirmation Order acts as a discharge and release under section 1141(d)(1)(A) of the Bankruptcy Code of all Claims against the Debtor and the Assets and properties, arising at any time before the Effective Date, regardless of whether a proof of Claim was filed, whether the Claim is Allowed, or whether the holder of the Claim votes to accept the Plan or is entitled to receive a Distribution under the Plan. Except as provided in the Plan or the Confirmation Order, upon the Effective Date, any holder of the discharged Claim will be precluded from asserting such Claim against the Debtor, the Estate, the Reorganized Debtor, or any of their assets or properties any other or further Claim based on any document, instrument, act, omission, transaction or other activity of any kind or nature that occurred before the Effective Date. Except as provided in the Plan and the Confirmation Order, and subject to the occurrence of the Effective Date, the Confirmation Order will be a judicial determination of discharge of all the Debtor's liabilities to the extent allowed under section 1141, and the Debtor will not be liable for any Claim and will only have the obligations as specifically provided in the Plan. Notwithstanding the foregoing, the discharge granted under this section

shall not impair the rights of holders of any Allowed Claims to receive Distributions on account of such Allowed Claims from the Liquidating Trust or as otherwise provided in this Plan.

(b) **Binding Effect.** From and after the Effective Date, the Plan shall be binding on and inure to the benefit of the Proponents, the Estate, the Reorganized Debtor, the Liquidating Trustee, all present and future holders of Claims, and their respective successors and assigns, and all other parties-in-interest in the Bankruptcy Case. Confirmation of the Plan binds each holder of a Claim to the terms and conditions of the Plan, whether or not such Creditor has accepted the Plan.

(c) **Injunction, Exculpation, and Limitation of Liability. The Plan provides for certain injunctions, limitations of recourse and liability, and exculpations that may affect your rights. Certain of the relevant provisions can be found in <u>Article IX</u> of the Plan. It is important that you carefully review the whole Plan, including <u>Article IX</u>.**

### 6.07. Retention of Jurisdiction

Under the Plan, notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction, to the fullest extent legally permitted, over the Bankruptcy Case, all proceedings arising under, arising in, or related to the Bankruptcy Case, the Confirmation Order, the Plan and administration of the Liquidating Trust. Some specific types of disputes and proceedings that the Bankruptcy Court shall retain jurisdiction over are identified in <u>Article XII</u> of the Plan.

### 6.08. Procedures for Treating and Resolving Disputed and Contingent Claims

(a) **Objection Deadline.** Except as otherwise set forth in the Plan or as otherwise extended or ordered by the Bankruptcy Court, all objections to Claims must be filed no later than ninety (90) days after the Effective Date (unless such day is not a Business Day; in which case, such deadline will be the next Business Day thereafter unless extended by an order of the Bankruptcy Court). An objection to a Claim will be deemed properly served on the holder thereof if service is effected by any of the following methods: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (b) to the extent counsel for a Claimant is unknown, by first-class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto; or (c) by first-class mail, postage prepaid, on any counsel that has appeared on the behalf of the Claimant in the Bankruptcy Case.

(b) **No Distribution on Disputed Claim Pending Allowance.** No Distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim. The Liquidating Trustee may, in his sole discretion, withhold Distributions otherwise due hereunder to the holder of a Claim until the Objection Deadline to enable the Liquidating Trustee to file a timely objection thereto. When a Disputed Claim becomes an Allowed Claim, the Liquidating Trustee shall make Distributions with respect to such Allowed Claim, without interest (except as otherwise provided in this Plan), net of any setoff and/or any required withholding of applicable taxes.

(c)     **Distribution Reserve Account.**  On or after the Effective Date, the Liquidating Trustee will establish a Distribution Reserve Account as is appropriate, in his sole and absolute discretion, from the Trust Assets for the benefit of holders of Disputed Claims pending the allowance thereof, the amount of which will be adjusted from time to time as appropriate.  A Claimant will not be entitled to receive or recover any amount in excess of the amount provided in the Distribution Reserve Account specifically reserved to pay such Claim unless permitted by Order of the Bankruptcy Court.  As stated above, nothing in the Plan will be deemed to entitle the holder of a Disputed Claim to postpetition interest on such Claim, if Allowed, unless otherwise required under the Bankruptcy Code or the Plan.

(d)     **Claim Estimation.**  The Reorganized Debtor or the Liquidating Trustee may request estimation or limitation of any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether that Claim was previously objected to or whether the Bankruptcy Court has ruled on any such objection; *provided, however,* that the Bankruptcy Court will determine (i) whether such Disputed Claims are subject to estimation pursuant to section 502(c) of the Bankruptcy Code and (ii) the timing and procedures for such estimation proceedings, if any.  The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtor or the Liquidating Trustee may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Plan or the Bankruptcy Court.

(e)     **Distribution After Allowance.**  Payments and Distributions from the Distribution Reserve Account to each respective holder of a Disputed Claim, to the extent it becomes an Allowed Claim, will be made in accordance with the provisions of the Plan that govern Distributions to such holders of Claims in the Class in which such Claimant is classified.  Unless otherwise provided in the Plan, as promptly as practicable after the date on which a Disputed Claim becomes undisputed, non-contingent, liquidated and Allowed, and in no event later than thirty (30) days after the Disputed Claim becomes an Allowed Claim, the Liquidating Trustee will distribute to the Claimant the property from the Distribution Reserve Account that would have been distributed to such Claimant had its Claim been an Allowed Claim on the date that Distributions were previously made to holders of Allowed Claims in the Class in which such Claimant is classified under the Plan.  After all Disputed Claims have been resolved and all such Claims that become Allowed Claims have been paid in full, any remaining property in the Distribution Reserve Account will be distributed Pro Rata to holders of Allowed General Unsecured Claims or Soft Money Investor Claims in accordance with the other provisions of the Plan.

(f)     **Allowance of Claims Subject to Section 502(d) of the Bankruptcy Code.**  Allowance of Claims will, in all respects, be subject to the provisions of section 502(d) of the

Bankruptcy Code, except as provided by a Final Order of the Bankruptcy Court or a settlement among the relevant parties.

### 6.09. Administrative Expenses, Professional Fee Claims, and Tax Priority Claims

(a) **Administrative Claims.** All requests for payment of Administrative Claims must be filed with the Bankruptcy Court and served on the Reorganized Debtor, the Proponents, the Liquidating Trustee, and the U.S. Trustee no more than thirty (30) days after the Effective Date. Any such Administrative Claim for which an application or request for payment is not filed by the Administrative Claim Bar Date shall be discharged and forever barred, and shall not be entitled to any Distributions under the Plan. On or as soon as reasonably practicable thereafter, the later of (a) the Effective Date, (b) the date such Administrative Claim becomes an Allowed Administrative Claim, and (c) the date such Administrative Claim becomes payable pursuant to any agreement between the holder of such Administrative Claim and the Debtor or the Reorganized Debtor, as applicable, the holder of each Allowed Administrative Claim shall receive in full satisfaction, release, settlement, and discharge of such Allowed Administrative Claim: (a) cash equal to the unpaid portion of such Allowed Administrative Claim; or (b) treatment in accordance with the terms of any written agreement between the Debtor or the Reorganized Debtor, as applicable, regarding such Allowed Administrative Claim; *provided, however*, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during this Bankruptcy Case will be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto.

(b) **Professional Fee Claims.** All requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court and served on the Reorganized Debtor, the Liquidating Trustee, and the U.S. Trustee no more than sixty (60) days after the Effective Date. Any such Professional Fee Claim for which an application or request for payment is not filed within that time period shall be discharged and forever barred, and shall not be entitled to any Distributions under the Plan. After the Effective Date, fees for Professionals may be paid by, as applicable, (a) the Reorganized Debtor in the ordinary course of business or (b) the Liquidating Trustee pursuant to the terms of the Liquidating Trust Agreement. No Professional Fee Claims shall be Allowed on account of any services rendered or expenses incurred by a Professional prior to the Effective Date that have not been approved by the Bankruptcy Court.

(c) **Priority Tax Claims.** On or as soon as reasonably practicable after, the later of (a) the Effective Date and (b) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Liquidating Trustee, (a) Cash equal to the due and unpaid portion of such Allowed Priority Tax Claim, (b) treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code, or (c) such different treatment as to which such holder and the Debtor or the Reorganized Debtor, as applicable, will have agreed on in writing. To the extent an election is made under section 1129(a)(9)(C) of the Bankruptcy Code for Priority Tax Claims to be paid by regular installment payments in Cash, the holder of an Allowed Priority Tax Claim will receive quarterly payments on the last day of each quarter, of principal and interest, at an interest rate of six and one-half percent (6 ½ %) per annum with the final payment

due on or before ▓▓▓▓▓▓▓▓▓. The first installment will be made at the end of the first full quarter after the Effective Date.

(d)     **U.S. Trustee Fees.**  The Reorganized Debtor shall be responsible for timely payment of U.S. Trustee quarterly fees incurred pursuant to 28 U.S.C. § 1930(a)(6) after the Confirmation Date.   Any fees due as of the most recent quarterly invoice prior to the Confirmation Date will be paid in full within thirty (30) days after the Effective Date. Thereafter, the Reorganized Debtor will pay all U.S. Trustee quarterly fees as they accrue until the Bankruptcy Case is closed.

# ARTICLE VII.
# LITIGATION AND PRESERVED CAUSES-OF-ACTION SUMMARY

## 7.01.   Preservation of All Causes of Action Owned by the Estate

The Plan provides for all Causes of Action, including Avoidance Actions, owned by the Estate to be preserved and conveyed into the Liquidating Trust to be administered by the Liquidating Trustee in accordance with the Plan and the Liquidating Trust Agreement for the benefit of Creditors.  This preservation includes all current and pending litigation in which AHF is a party in the Bankruptcy Court or otherwise.  The term "Causes of Action" is given its broadest possible meaning and includes, without limitation, everything listed on <u>Exhibit E</u> attached hereto and:

Generally, any action, cause of action, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, right to payment, and Claim, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured, and whether asserted or assertable directly or indirectly or derivatively, in law, equity or otherwise, including:

(a)     damages (general, exemplary, or both) relating to or based on (i) fraud, negligence, gross negligence, willful misconduct, or any tort actions, (ii) violations of state or federal securities or tax laws, (iii) violations of applicable corporate or partnership laws, (iv) breaches of fiduciary or agency duties, or (v) causes of action based upon alter ego or other liability theories;

(b)     damages based on any other claim of the Debtor, to the extent not specifically compromised or released pursuant to the Plan or an agreement referred to, or incorporated into, the Plan, or pursuant to an agreement approved by the Bankruptcy Court by a Final Order entered after notice and opportunity for hearing to creditors and interested parties;

(c)     any claims of the Debtor for equitable subordination under Section 510(c) of the Bankruptcy Code or under other applicable laws;

(d)     any claim of the Debtor to recharacterize one or more Claims;

(e)     any objection to any Disputed Claim which includes as a basis any counterclaim by the Debtor or the Estate for affirmative relief, and which is pending and unresolved as of the

Effective Date, together with any liability of the Debtor or the Estate on account of such Disputed Claim;

(f)     all claims and defenses asserted by the Debtor and/or the Proponents in an adversary proceeding or other civil litigation pending as of the Effective Date;

(g)     all tort and common law claims held by the Debtor against any person;

(h)     claims for preferences and fraudulent conveyances/transfers or obligations;

(i)     all claims held by the Debtor whether in contract, tort, or statutory law against the Debtor's: (a) customers, (b) Creditors, (c) former and current officers and directors, (d) suppliers (including any person with whom the Debtor ever did business, (e) former employees, (f) former managers and affiliates, (g) Insurers (including, without limitation, for Directors and Officers liability coverage, business interruption, or similar claims), (h) persons that were or are joint venturers or partners with, or controlling persons of the Debtor, (i) Governmental Units, including taxing authorities and the United States, and (j) The Debtor's prior professionals, including the Debtor's former attorneys and accountants.

(j)     Specifically, the Plan provides that, except as expressly stated otherwise in the Plan, on and after the Effective Date, all Causes of Action shall be conveyed into the Liquidating Trust and the Liquidating Trustee shall have authority and standing, as provided in the terms and provisions of the Liquidating Trust, to prosecute, enforce, pursue, sue on, settle or compromise, such Causes of Action.

**THE PLAN EXPRESSLY REJECTS ANY _RES-JUDICATA_ OR PRECLUSIVE EFFECT THAT CONFIRMATION OF THE PLAN MIGHT OTHERWISE HAVE ON ANY SUCH CLAIMS, CAUSES OF ACTION OR PERSONAL CLAIMS KNOWN OR UNKNOWN THAT ARE TRANSFERRED AND ASSIGNED TO THE LIQUIDATING TRUST. WITH THE EXCEPTION OF THOSE CAUSES OF ACTION THAT ARE EXPRESSLY RELEASED OR WAIVED UNDER THE TERMS OF THE PLAN. ALL CAUSES OF ACTION OF THE DEBTOR AND ITS ESTATE, WHETHER OR NOT REFERENCED OR DESCRIBED HEREIN, WILL BE PRESERVED AND TRANSFERRED TO THE LIQUIDATING TRUST CREATED UNDER THE PLAN. THE LACK OF DISCLOSURE OF ANY PARTICULAR CAUSE OF ACTION SHALL NOT BE DEEMED TO PRECLUDE OR CONSTITUTE _RES JUDICATA_, RELEASE OR WAIVER OF ANY SUCH CAUSE OF ACTION AS IT IS THE INTENTION OF THE PLAN PROPONENT TO PRESERVE AND TRANSFER TO THE LIQUIDATING TRUST ANY AND ALL CAUSES OF ACTION OWNED BY THE DEBTOR OR ITS ESTATE.**

### 7.02.   Summary of Status of Litigation Funding the Liquidating Trust

This section of the Plan and Disclosure Statement sets forth a brief summary of certain specific Causes of Action held by the Estate and which shall be preserved under the Plan for assertion by the Liquidating Trust in accordance with its terms.

The following is a brief summary of the status of the claims owned by AHF which are being investigated and/or prosecuted, and which will be conveyed into and administered as an asset of the Liquidating Trust:

| CAUSE NUMBER | PLAINTIFF | DEFENDANT | COURT | NATURE OF SUIT |
|---|---|---|---|---|
| ADV. PRO. NO. 10-02011 | Walter O'Cheskey, Chapter 11 Trustee | Robert L. Templeton | United States Bankruptcy Court for the Northern District of Texas, Amarillo Division | Avoidance of Guarantees as Fraudulent Obligations, Subordination of Allowed Claims, Avoidance and Recovery of Fraudulent and Preferential Transfers, and Claims Objections |
| ADV. PRO. NO. 10-02017 | Walter O'Cheskey, Chapter 11 Trustee | David Miller | United States Bankruptcy Court for the Northern District of Texas, Amarillo Division | Avoidance of Guarantees as Fraudulent Obligations, Subordination of Allowed Claims, Avoidance and Recovery of Fraudulent Transfers, and Claims Objections |
| ADV. PRO. NO. 10-02018 | Walter O'Cheskey, Chapter 11 Trustee | Terrill J. Horton | United States Bankruptcy Court for the Northern District of Texas, Amarillo Division | Avoidance of Guaranty as Fraudulent Obligations, Subordination of Allowed Claim, and Claim Objections |
| C.A. NO. 2:09-CV-231 | See ADV. PRO. NO. 09-2005 below | See ADV. PRO. NO. 09-2005 below | United States District Court for the Northern District of Texas, Lubbock Division | See ADV. PRO. NO. 09-2005 below |
| ADV. PRO. NO. 09-2005 (CON. W/ C.A. NO. 2:09-CV-231) | Robert L. Templeton, Independent Executor-President of Frances E. Maddox Estate-Foundation; Paul King; Frances Maddox Estate; Heron Land Company; Don Storseth; Clay Storseth; Storseth Family Trust; David Miller; Susan S. Miller; | American Housing Foundation; Sterquell Irrevocable Life Insurance Trust; Housing for Texas Foundation; Housing for Texans Charitable Trust d/b/a Housing for Texas Foundation; Steven Wright Sterquell, II; Marshallette S. Sterquell; Elizabeth Ann Bunn; Alvin Johnson, individually and as | United States Bankruptcy Court for the Northern District of Texas, Amarillo Division | Lien Validity and Priority, Declaratory Action, Injunctive Relief |

| CAUSE NUMBER | PLAINTIFF | DEFENDANT | COURT | NATURE OF SUIT |
|---|---|---|---|---|
| | Dennis Dougherty; Attebury Family Partnership, L.P.; William Scott; Herring Bank; Vaudrey Capital, L.P.; Louise Johnson Thomas Trust; Cornelia J. Slemp Trust; Jessie Herring Johnson Estate Trust No. 2; Jessie Herring Johnson Estate Trust No. 1; Herring Financial Services; Charlotte Burgess Griffiths; Keevin Clark; Chain-C, Inc.; Burgess Trust No. 4; Carson Burgess, Inc.; Carson Herring Burgess; Campbell Burgess; C.C. Burgess; Terrill J. Horton; Robert L. Templeton | trustee of Housing for Texans Charitable Trust d/b/a Housing for Texas Foundation; Metropolitan Life Insurance Company; New England Life Insurance Company; and Lincoln Benefit Life Insurance Company | | |
| **ADV. PRO. No. 09-2007** (CON. W/ C.A. NO. 2:09-CV-231) | AHF | Sterquell Irrevocable Life Insurance Trust; Housing for Texans Charitable Trust d/b/a Housing for Texas Foundation; Steven Wright Sterquell, II; Marshallette S. Sterquell; Elizabeth Ann Bunn; Metropolitan Life Insurance Company; New England Life Insurance Company; and Lincoln Benefit Life Insurance Company | United States Bankruptcy Court for the Northern District of Texas, Amarillo Division | Lien Validity and Priority, Declaratory Action, Injunctive Relief |
| **C.A. No. 2:09-CV-233** (CON. W/ C.A. NO. 2:09-CV- | *See* **ADV. PRO.** | *See* **ADV. PRO. NO.** | United States | *See* **ADV. PRO. NO. 09-** |

| CAUSE NUMBER | PLAINTIFF | DEFENDANT | COURT | NATURE OF SUIT |
|---|---|---|---|---|
| 231) | NO. 09-2007 above | 09-2007 above | District Court for the Northern District of Texas, Lubbock Division | 2007 above |
| ADV. PRO. NO. 09-2025 | Robert L. Templeton and Don Storseth, Individually and Trustee of the Storseth Family Trust | Happy State Bank | United States Bankruptcy Court for the Northern District of Texas, Amarillo Division | Civil Conspiracy, Money Had and Received, Unjust Enrichment, Constructive Trust, Declaratory Judgment, Accounting, Attorneys' Fees |
| ADV. PRO. NO. 09-2026 (CON. W/ ADV. PRO. NO. 09-2025) | Shaun Donovan, Secretary, U.S. Dept. of Housing and Urban Devel. | Happy State Bank; American Housing Foundation and Multi-Family Rehab Partners | United States Bankruptcy Court for the Northern District of Texas, Amarillo Division | Unjust Enrichment, Equitable Estoppel, Declaratory Judgment |
| ADV. PRO. NO. 09-2027 (CON. W/ ADV. PRO. NO. 09-2025) | SLP, Inc.; MMA Santa Maria, LLC; MMA Fairway Village, LLC; MMA Robinson Garden, LLC; MMA Financial Housing Investments I, a limited partnership; THOF V, Ltd.; Southwest Housing Opportunity Fund VI, Ltd.; Texas Housing Finance Corporation Special; and THOF IV, Ltd | Happy State Bank and American Housing Foundation | United States Bankruptcy Court for the Northern District of Texas, Amarillo Division | Declaratory Judgment, Money Had and Received, Attorneys' Fees |
| Cause No. 2005-2197-1 | American Housing Foundation et al | McLennan County Appraisal District | In the 19th District Court, McLennan County, TX | Judicial Review of McLennan County Appraisal District's Denial of 2005-2006 Tax Exemption. |
| Cause No. GN300987 | American Housing Foundation et al | Travis County Appraisal District | In the 353rd District Court, Travis County, TX | Suit Seeking Tax Exemption for 2002-2003 and Subsequent Tax Years. |
| Cause No. 06-002020-CV-361 | American Housing Foundation College Station | Brazos County Appraisal District | | Judicial Review of Tax Exemptions 2004, 2005 & 2006. |

| CAUSE NUMBER | PLAINTIFF | DEFENDANT | COURT | NATURE OF SUIT |
|---|---|---|---|---|
| | Southgate Village Ltd. | | | |
| Appellate Docket No. 02-05-00496-CV | TRO Captain's Landing LP & American Housing Foundation | Galveston Central Appraisal District | In the Court of Appeals First District, Houston, TX | Suit Seeking Tax Exemption for Year of 2003. |
| Cause No. 2003-69254-A | Brandywood Housing Ltd & American Housing Foundation | Harris County Appraisal District | In the 190th District Court, Harris County, TX | Suit Seeking Judicial Review of Harris County Appraisal District's Denial of 2002 & 2003 Tax Exemption Applications. |
| Cause No. 06-002010-CV-361 | American Housing Foundation et al | McLennan County Appraisal District | | Suit Seeking Judicial Review of the Brazos County Appraisal District's Denial of 2004, 2005 & 2006 Tax Exemption Applications. |
| Cause No. 2006-79105 | Brandywood Housing Ltd & American Housing Foundation | Harris County Appraisal District | In the 127th District Court, Harris County, TX | Suit Seeking Judicial Review of Harris County Appraisal District's Denial of 2004 & 2005 Tax Exemption Applications |
| Cause No. 2008-3270-4 | Suit Seeking Judicial Review of the Brazos County Appraisal District's Denial 2004, 2005 & 2006 Tax Exemption Applications | McLennan County Appraisal District | In the 170th District Court, Harris County, TX | Suit Seeking Judicial Review of McLennan County Appraisal District's Denial of American Housing Foundation's 2007 & 2008 Tax Exemption Applications |
| | NWTH Meridian Ltd | | | Potential Claim Against American Housing or NWTH Meridian Ltd Arising Out of the 4/19/07 Fire at the Meridian Apartments. 2201 W. 6th Avenue, Amarillo, TX. |
| #24628 | Tavia Taylor, Individually as Next Friend of Derrik Taylor, a Minor and as Heir to the Estate of Robert Samuel Taylor, Deceased | THEOP, LLC, Cindy Boehme, Administaff Companies and ADP Total Source | | |

| CAUSE NUMBER | PLAINTIFF | DEFENDANT | COURT | NATURE OF SUIT |
|---|---|---|---|---|
| #24794 | Genevive Anyzeski | Amarillo Affordable Housing dba Three Fountains Property Group, LP, Simpson Property Group, LP & Walden Affordable Group | | |
| | Lorraine Mayo & John Mayo | American Housing Foundation, Amarillo Affordable Housing LLC | | |
| #26416 | Walden Affordable Group LLC | | | |
| #26546 | Alpachino McFadden | AHF Community Development | | |
| #33142 | Esther Maye Malison | AHF Tulsa, LLC | | |

### 7.03. Successful Litigation to Collect Life Insurance Proceeds

On May 18, 2009 the petitioning creditors filed Adversary Proceeding, No. 09-2005-rlj, in the AHF involuntary case asserting that $24 million in life insurance proceeds on the life of Steve W. Sterquell, deceased was property of AHF.

On June 11, 2009, AHF also filed Adversary Proceeding, No. 09-20373, in its voluntary bankruptcy case alleging claims similar to those raised in the petitioning creditors' adversary proceeding in the involuntary case.

On June 11, 2009, a hearing was set on the Plaintiffs' Motion for a Preliminary Injunction in Adversary Proceeding No. 09-2005-rlj. The Plaintiffs, AHF, Housing for Texans Charitable Trust and the Sterquells announced to the Court that they had reached an agreement with respect to the Plaintiffs' Motion for Temporary Injunction, and recited the agreement into the record relating to approximately $27 million in insurance policies on the life of Steve W. Sterquell, described as Category I policies ($21 million), Category II policies ($3 million), and Category III policies ($3 million plus an Administaff Group Insurance Plan Policy).

On July 13, 2009, based on the June 11, 2009 agreement, the Court signed an Agreed Order on Plaintiffs' Motion for a Preliminary Injunction in Adversary Proceeding No. 09-02005-rlj, which provided that the proceeds of the Category I, Category II, and Category III policies would be deposited into the Registry of the Court, pending further order of the Court, except that the proceeds of the Administaff Group Insurance Plan Policy and $75,000 from the proceeds of one of the Category III policies would be distributed to Marshallette Sterquell. Pursuant to the Agreed Order, $26,925,000 in life insurance proceeds have been deposited into the Registry of the Court, and the proceeds of the Administaff Group Insurance Plan Policy and $75,000 from the proceeds of the one of the Category III policies were distributed to Marshallette Sterquell.

On July 17, 2009, the United States Bankruptcy Court for the Northern District of Texas entered an order consolidating the voluntary petition for relief, Case No. 09-20373, into the AHF involuntary petition for relief, Case No. 09-20232-11, and the consolidated AHF bankruptcy proceedings continued under Case No. 09-20232.

On or about September 25, 2009, the United States District Court for the Northern District of Texas entered an order consolidating Adversary Proceeding No. 09-20373 into Adversary Proceeding No. 09-2005-rlj.

On September 25, 2009, the United States District Court withdrew the reference with respect to both such adversary proceedings, which consolidated adversary proceedings are currently pending in the United States District Court for the Northern District of Texas in Civil Action No. 2:09-CV-231-C (the "**Life Insurance Action**").

On December 14, 2009, the United States District Court in the Life Insurance Action granted AHF's Motion of Summary Judgment and declared that AHF was entitled to the proceeds of the Category I policies ($21 million).

Counsel for AHF and the Creditors Committee have now obtained a final judgment that will order the release of the $21 million to AHF, and have also entered into a compromise and settlement agreement with the Sterquell family and their related entities that, if fully and finally implemented, will result in an additional $3 million plus accumulated interest becoming property of the bankruptcy estate.

Texas Capital Bank has asserted a lien on the proceeds of the life insurance and filed a motion for summary judgment seeking to establish the validity of the lien. In addition to an asserted lien and security interest in the life insurance proceeds, Texas Capital Bank asserts a security interest and lien in certain Estate assets, including, without limitation, its deed-of-trust lien against Brandywood, the Life Insurance Proceeds, and all accounts, cash, inventory, and general intangibles.

Texas Capital Bank asserts a claim against the Estate in an amount in excess of $9 million. To secure repayment of that claim, Texas Capital Bank asserts a security interest and lien in certain Estate assets, including, without limitation, its deed-of-trust lien against Brandywood, the Life Insurance Proceeds, and all accounts, cash, inventory, and general intangibles. A current estimate of value for assets claimed by Texas Capital Bank as collateral includes: (a) $25.8 million related to Life Insurance Proceeds, (b) $1.2 million to $3 million related to Brandywood, (c) $1.5 million related to all payment rights to AHF (exclusive of Life Insurance Proceeds), and (d) $2.3 million related to promissory-note receivables from the AIMCO Portfolio.

The Proponents dispute the validity, priority, and extent of Texas Capital Bank's asserted lien and security interest in Estate assets. For some time, Texas Capital Bank and the Estate have been involved in various existing and potential litigation related to their respective positions on the validity, priority, and extent of Texas Capital Bank's asserted lien and security interests in Estate assets. The Proponents are confident in the Estate's position against Texas Capital Bank on the validity, priority, and extent of Texas Capital Bank's asserted lien. However, after good-

faith, arms-length negotiations, to avoid the expense, inconvenience, delay, and uncertainty of further prosecuting or pursuing the claims by and against Texas Capital Bank and the Estate, Texas Capital Bank and the Estate have agreed to fully and completely resolve their respective disputes and claims. A copy of the settlement agreement between the Estate and Texas Capital Bank will be included in the Plan Supplement. The terms of that compromise and settlement are as follows:

a. On the Effective Date, Texas Capital Bank shall have an Allowed Class 3 Claim in the amount of $4,500,000.00.

b. On account of such Allowed Class 3 Claim, and in full satisfaction, release, and discharge of and exchange for such Claim, and the release of all Liens affecting property of the Debtor and Brandywood, Texas Capital Bank shall receive $4,500,000.00 in Cash on the Effective Date.

c. Upon receipt of $4,500,000.00, Texas Capital Bank will (i) release all Liens against Estate assets and Brandywood, including the Brandywood Property, (ii) release all Claims against the Debtor, the Estate, the Chapter 11 Trustee, the Creditors Committee, Reorganized AHF, Liquidating Trust, Trust Assets, the Liquidating Trustee, Brandywood, and the Brandywood Property, (iii) assign to the Liquidating Trust all of its claims and causes of action related to the amounts requested or asserted in its existing proof of claim filed against the Estate in this Bankruptcy Case or associated with such indebtedness in any way or against any party, including causes of action held by TCB against or related to any mortgagee title-insurance policy, title-insurance company, law firm, etc., (iv) assign and transfer all of its rights in the Brandywood Property to the Reorganized AHF and forego any right to further payment from or related to Brandywood and the Brandywood Property, and (v) dismiss with prejudice the TCB Litigation.

d. The Debtor, the Estate, the Chapter 11 Trustee, the Creditors Committee, Reorganized AHF, the Liquidating Trust, the Liquidating Trustee, Brandywood, and the Brandywood Property, and each holder of a Claim that does not vote to reject the Plan shall forever release, acquit and discharge Texas Capital Bank and its affiliates, subsidiaries, parents, predecessors, successors, assigns, officers, directors, shareholders, employees, agents, and attorneys, (the "**TCB Release**") of and from any claims, actions, demands and/or causes of action, asserted or unasserted, specifically including, without limitation, any claims asserted or that could have been asserted in the TCB Litigation, the Bankruptcy Case, or arising out of or in any way related to the negotiation, formulation, or

preparation of the Plan, the TCB Litigation, the Bankruptcy Case, the Brandywood Property, or Brandywood as well as claims arising under any circumstance known and existing as of the date and time of execution hereof, save and except for the obligations specifically outlined under the Plan, and any claims and/or causes of action, that are or may be related to any breach, enforcement, or interpretation of the Plan or the obligations of the Parties thereunder.

The Proponents believe that the terms of the TCB Settlement are fair and equitable and in the best interests of the Estate. As a result, the TCB Settlement should be approved by the Bankruptcy Court in the Confirmation Order pursuant to Bankruptcy Rule 9019(b).

### 7.04. Litigation Involving Other Claims Against Sterquell Family and Sterquell Entities

Counsel for the Creditors Committee has prepared a draft complaint against the Sterquell Family and various Sterquell Entities seeking to recover damages for breach of fiduciary duties and fraud by Steve W. Sterquell and various Sterquell related entities including the Steve W. Sterquell, C.P.A. Profit Sharing Plan, Credit Realty Investments, Inc., and the Sterquell Family Life Insurance Trust.

On or about December 9, 2009, counsel for the Creditors Committee provided counsel for the Sterquells and certain of the Sterquell Entities a draft Complaint For Damages For Fraud, Breach Of Fiduciary Duty, Aiding And Abetting Breach Of Fiduciary Duty, And Aiding And Abetting Fraud On Creditors, And For Recovery Of Property Fraudulently Conveyed, And For A Declaratory Judgment To Determine The Nature And Extent Of Ownership Interests In Life Insurance Policies, And For The Imposition Of Constructive Trusts And Other Equitable Relief which asserted claims against the Category III policies, the Sterquell Entities and Steve W. Sterquell II (the "**Draft Complaint**"). The Draft Complaint was provided to counsel for the Sterquells and their entities and settlement negotiations ensued which resulted in a compromise and settlement agreement being entered into between AHF and the Sterquell Family and Sterquell Entities. This settlement agreement, which provides for an additional $3 million to be paid to the estate, was approved by the Bankruptcy Court on or around April 10, 2010. Because the Chapter 11 Trustee was not involved in the Bankruptcy Case when that settlement was presented to and approved by the Bankruptcy Court, he has filed a motion seeking clarification and direction from the Bankruptcy Court regarding execution of documents related to this settlement. In response to that motion, the Bankruptcy Court entered an order authorizing and directing the Chapter 11 Trustee to execute all documents necessary, in his discretion, to implement the settlement agreement and finding that:

    a. as a result of that timing and other reasons expressed by the Chapter 11 Trustee at the hearing on that motion, the Chapter 11 Trustee had legitimate concerns about the disclosure of the assets owned by the entities identified on <u>Exhibit D</u> to the settlement agreement to be transferred to individual creditors and not the AHF bankruptcy estate;

b. as a result of that concern, the filing of the motion and the scheduling of a hearing thereon with this Court by the Chapter 11 Trustee was a prudent exercise of the Chapter 11 Trustee's business judgment; and

c. it still believes the settlement agreement is in the best interests of the AHF bankruptcy estate.

### 7.05. Complaint Against Former AHF Directors

Counsel for the Creditors Committee has prepared a complaint against former directors of AHF, including Randy Sharp, Scott Rice, and James Fletcher to recover $50 million damages for gross negligence in the management of AHF. The draft complaint has been sent to counsel for the defendants, with a demand for payment of the $2 million policy limits on the AHF D&O policy. At this time, the demand was not accepted, Counsel for the Creditors Committee estimates the value of the claim at $2 million plus the recoverable personal assets of the defendants, which are unknown at this time. Estimated time for recovery on this claim is between 12 and 24 months.

### 7.06. AHF action against Bank of America Securities ("BOA")

AHF filed suit in the District Court of Dallas County, Texas on November 16, 2009. The action was removed to the United States District Court for the Northern District of California, San Francisco Division. AHF has filed a motion for remand to the Texas state court. AHF alleges misrepresentation by BOA because BOA said that auction-rate securities would have liquidity and that BOA would maintain a market in such securities. The auction-rate securities interest rates set from time to time were used as the floating rate of interest on the mortgages used to finance the purchase of **"Walden II properties"** in December 2008 − 18 properties in four states. The market for auction-rate securities ultimately failed, which significantly increased the interest rates on the mortgages. AHF suffered considerable losses, interest costs, and other damages as a result of the failure of BOA to maintain liquidity and marketability. Estimated time for recovery on this claim is between be 12 and 36 months. All such claims are expressly preserved and reserved for the Liquidating Trustee under the Plan.

### 7.07. Fraudulent Transfers and Preference Claims

The Proponents have not yet finalized their review of potential fraudulent and preferential-transfer causes of action. Their preliminary review revealed that significant fraudulent and preferential-transfer causes of action could exist. Based on that preliminary analysis, the Proponents believe some of those fraudulent and preferential-transfer cause of actions ("**Avoidance Actions**") include the following: One Avoidance Action could be against former AHF director Scott Rice and his trust, the 2001 Scott Rice Trust, and the Housing for Texans Charitable Trust, to recover $600,000 in preferential payments made to him in the one year before bankruptcy. Another Avoidance Action could be against former AHF director Randy Sharp or the Mays Trust to recover $500,000 in preferences paid to one or both of them. Another Avoidance Action could be against AHF Development, Ltd. to set aside a $16 million account payable as well as to recover preferences and fraudulent transfers made by AHF

Development, Ltd. Another would be against the Simpsons to recover a $2 million payment in exchange for a $5.7 million subordinated Series E Bond on the Simpson portfolio, which the Proponents believed had no value at the time of transfer. Other Avoidance Actions include those against soft-money investors – such as Robert Templeton, David Miller, Terrill Horton, the Louise Johnson Thomas Trust, and the Cornelia Slemp Trust. The Proponents, their respective counsel, and respective financial advisors continue to investigate additional Avoidance Actions. The Plan and Disclosure Statement are intended to preserve all Causes of Action and transfer them to the Liquidating Trust, including Avoidance Actions and others specifically and generally described herein (and the exhibits attached hereto) and the Plan.

### 7.08. Other Claims

Counsel continues to evaluate whether AHF has other claims, tortious, contractual or statutory against creditors or alleged creditors of AHF, or against other persons who did business with AHF. All such claims, as well as all claims herein, are expressly preserved and reserved for the Liquidating Trustee under the Plan.

### 7.09. Claims Against AHF Auditors

Counsel continues to investigate whether AHF has valid claims against AHF's auditors. Such claims are expressly preserved and reserved for the Liquidating Trustee under the Plan.

(a)     **Preservation of All Causes of Action Not Expressly Settled or Released.** The Proponents have attempted to disclose certain Causes of Action, including Avoidance Actions and other Causes of Action held by the Estate against third parties. However, the Proponents have not performed an exhaustive investigation or analysis of potential claims and Causes of Action against third parties. Under the Plan, that investigation and analysis will be performed after the Confirmation Date by the Liquidating Trustee. You should not rely on the omission of any specific disclosure of a claim or Cause of Action to assume that the Estate holds no claim or Cause of Action against any third-party, including, without limitation, any Creditor that may be reading this Disclosure Statement or casting a Ballot.

Unless expressly and conspicuously released by the Plan or by an order of the Bankruptcy Court, the Debtor may hold claims or Causes of Action against a holder of a Claim, and the Liquidating Trustee may pursue such claims, including, without limitation, the following:

- Preference claims;

- Fraudulent-transfer/obligation claims;

- Unauthorized postpetition-transfer claims;

- Claims asserted in current litigation, whether commenced before or after the Petition Date; and

- Counterclaims asserted in current litigation

The Liquidating Trust shall be appointed as the representative of the Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Causes of Action. On the Effective Date, all Causes of Action shall vest in the Liquidating Trust and the Liquidating Trustee may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Causes of Action. The Liquidating Trustee shall be vested with authority and standing to prosecute any Causes of Action. The Proponents, the Reorganized Debtor, or its existing and former directors, existing and former officers, and Professionals shall have no liability for pursuing or failing to pursue any such Causes of Action.

The Proponents' failure to specifically identify a claim or Cause of Action herein is not a waiver of any claim or Cause of Action. The Proponents will not ask the Bankruptcy Court to rule or make findings with respect to the existence of any Cause of Action or the value of the entirety of the Estate at the Confirmation Hearing; accordingly, except claims or Causes of Action that are expressly and conspicuously released by the Plan or by an Order of the Bankruptcy Court, the Proponents' failure to identify a claim or Cause of Action herein shall not give rise to any defense of any preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches with respect to claims or Causes of Action that could be asserted against third parties, including Creditors of the Debtor that may read this Disclosure Statement or cast a Ballot except where such claims or Cause of Action has been expressly and conspicuously released in the Plan or the Confirmation Order.

In addition, the Debtor, Reorganized Debtor, Proponents, and the Liquidating Trustee, as applicable, expressly reserve the right to pursue or adopt any claim alleged in any lawsuit in which the Debtor or the Estate is a party. A non-exclusive list Causes of Action and other similar claims, counterclaims, rights, defenses, setoffs, recoupments, and actions in law or equity preserved by the Proponents is attached hereto as <u>Exhibit E</u>, and hereby incorporated by reference herein as if fully set forth.

## ARTICLE VIII.
## CERTAIN FEDERAL INCOME-TAX CONSEQUENCES OF THE PLAN

### 8.01.   General Information

The following discussion summarizes certain United States federal income-tax consequences of the implementation of the Plan to the Debtor and certain holders of Claims. This summary is for general information purposes only, and should not be relied on for purposes of determining the specific tax consequences of the Plan with respect to any particular holder of a Claim. This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

The discussion is based on the Internal Revenue Code, Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS as in effect on the date hereof. Legislative, judicial, or administrative changes or new interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income-tax consequences of the Plan. Any

such changes or new interpretations may have retroactive effect and could significantly affect the federal income-tax consequences of the Plan.

The federal income-tax consequences of the Plan are complex and are subject to significant uncertainties. The Proponents have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS or a court will adopt. In addition, this discussion does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income-tax consequences of the Plan to (a) special classes of taxpayers (such as Persons who are related to the Debtor within the meaning of the Internal Revenue Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities and holders of Claims who are themselves in bankruptcy) or (b) holders not entitled to vote on the Plan, including holders whose Claims are entitled to reinstatement or payment in full in cash under the Plan or holders whose Claims are to be extinguished without any Distribution.

This discussion assumes that holders of Claims hold only Claims in a single Class. Holders of multiple Classes of Claims should consult their own tax advisors as to the effect such ownership may have on the federal income-tax consequences described below.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME-TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED ON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED ON, AND CANNOT BE RELIED ON, BY ANY HOLDER OF A CLAIM FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS OF CLAIMS UNDER THE INTERNAL REVENUE CODE, (2) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE CONFIRMATION OF THE PLAN TO WHICH THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT ARE ANCILLARY, AND (3) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM THEIR OWN TAX ADVISOR.

### 8.02. Potential Tax Consequences to the Debtor

Under the Internal Revenue Code, a taxpayer generally must recognize Cancellation-of-Debt ("COD") Income to the extent that its indebtedness is discharged during the taxable year. COD Income generally equals the excess of the adjusted issue price of the indebtedness discharged over the sum of (a) the amount of cash, (b) the issue price of any new debt, and

(c) the fair market value of any other property (including stock) transferred by the debtor in satisfaction of such discharged indebtedness. COD Income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged.

Section 108(a)(l)(A) of the Internal Revenue Code provides an exception to this rule, however, when a taxpayer is in bankruptcy and a discharge is granted, or is effected, pursuant to a plan approved by the bankruptcy court. In that case, instead of recognizing income, the taxpayer is required, under section 108(b) of the Internal Revenue Code, to reduce certain of its tax attributes by the amount of COD Income. The attributes of the taxpayer are to be reduced in the following order: Net Operating Losses, general-business and minimum-tax credit carryforwards, capital-loss carryforwards, the basis of the taxpayer's assets, passive-activity losses and passive-activity credit carryovers, and finally, foreign tax-credit carryforwards. Section 108(b)(5) of the Internal Revenue Code permits a taxpayer to elect to first apply the reduction to the basis of the taxpayer's depreciable assets, with any remaining balance applied to the taxpayer's other tax attributes in the order stated above. In addition to the foregoing, section 108(e)(2) of the Internal Revenue Code provides a further exception to the realization of COD Income upon the discharge of debt to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for federal income-tax purposes.

The Proponents expect the Debtor to realize a significant amount of COD Income as a result of the Plan. The ultimate amount of COD income realized is uncertain. Regardless of the amount of the Debtor's COD Income, the Debtor will not be required to include COD Income in gross income because the indebtedness will be discharged while the Debtor is under the jurisdiction of a Bankruptcy Court in a Title 11 case. Accordingly, the Proponents expect that there will be no United States federal income taxes payable by the Debtor in respect of the COD Income. However, certain tax attributes of the Debtor will be reduced or eliminated. The Proponents do not currently anticipate that the Debtor will make the election under section 108(b)(5) of the Internal Revenue Code to apply any required attribute reduction first to the basis of the Debtor's depreciable property. The Debtor will avoid recognition of COD Income and reduction of tax attributes pursuant to section 108(e)(2) of the Internal Revenue Code only to the extent that the discharge is of amounts that the Debtor would have been entitled to deduct if the Debtor had paid such amounts.

A recently enacted amendment to the COD Income rules, in section 108(i) of the Internal Revenue Code, provides that taxpayers, including taxpayers operating under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code, that recognize COD Income in 2009 or 2010 may elect to forgo the COD-Income exclusion and attribute reduction rules described above and instead take the COD Income into taxable income in equal installments in 2014 through 2018 (that is, the taxpayer would report 20% of the COD Income in each such year). The election to defer the taxable income, which may be made on an instrument-by-instrument basis, must be made on the taxpayer's tax return for the year that includes the transaction which creates the COD Income (in this case, the year in which the Effective Date occurs). The Proponents have not yet determined if the Debtor will elect to defer COD Income, in whole or in part, under this new provision or instead have the exclusion and attribute reduction rules apply.

### 8.03. Tax Consequences of the Liquidating Trust

(a)  **Classification of the Liquidating Trust.**  The Liquidating Trust will be organized for the primary purpose of liquidating the Trust Assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Thus, the Liquidating Trust is intended to be classified for federal income tax purposes as a "grantor trust" within the meaning of sections 671 et seq. of the Internal Revenue Code. For federal income-tax purposes, the transfer of assets of the Debtor and its Estate to the Liquidating Trust will be treated as a "deemed transfer" of the Assets by the Debtor and its Estate directly to the holders of the Allowed Claims, followed by a "deemed transfer" of the Assets by such holders to the Liquidating Trust in satisfaction of the Allowed Claims. Under the Plan, all parties are required to treat the Liquidating Trust as a "grantor trust," subject to definitive guidance to the contrary from the IRS. The Liquidating Trust is not a separate taxable entity.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust. If the IRS were to challenge successfully the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the holders of Allowed Claims in Classes 14, 15, 16, 17, and 18 could vary from those discussed herein (including the potential for an entity-level tax).

(b)  **Allocation of Liquidating Trust Taxable Income and Loss and Disposition of Trust Assets.** Each holder of an Allowed Claim must report on its federal income-tax return its allocable share of income, gain, loss, deduction, and credit on a current basis, if any, recognized or incurred by the Liquidating Trust. Moreover, upon the sale or other disposition of any Trust Asset, each holder of an Allowed Claim receiving a Distribution from the Liquidating Trust must report on its federal income-tax return its share of any gain or loss measured by the difference between (a) its Pro Rata share of the amount of cash and/or the fair market value of any property received by the Liquidating Trust in exchange for the Trust Asset so sold or otherwise disposed of and (b) such holder's adjusted tax basis in its share of such Trust Asset. The character of any such gain or loss to any such holder will be determined as if such holder itself had directly sold or otherwise disposed of the Trust Asset. The character of items of income, gain, loss, deduction, and credit to any holder of an Allowed Claim receiving a Distribution from the Liquidating Trust, and the ability of such holder to benefit from any deductions or losses, may depend on the particular circumstances or status of such holder.

As a grantor trust, each holder of an Allowed Claim receiving a Distribution from the Liquidating Trust has an obligation to report its share of the Liquidating Trust's tax items (including gain on the sale or other disposition of a Trust Asset) that is not dependent on the distribution of any Cash or other Trust Assets by the Liquidating Trust. Accordingly, a holder of an Allowed Claim receiving a Distribution from the Liquidating Trust may incur a tax liability as a result of owning a share of the Trust Assets, regardless of whether the Liquidating Trust distributes Cash or other Trust Assets to the holders.

### 8.04. Information Reporting and Backup Withholding

Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting by the Debtor to the IRS. Moreover, such reportable payments may be subject to backup withholding (currently at a rate of 28%) under certain circumstances. Backup withholding is not an additional tax. Rather, amounts withheld under the backup withholding rules may be credited against a holder's federal income-tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing an appropriate claim for refund with the IRS (generally a U.S. federal income tax return). The Proponents intend to comply with all applicable reporting withholding requirements of the Internal Revenue Code.

Holders of Allowed Claims should consult their own tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

The Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income-tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. Holders of Allowed Claims should consult their own tax advisors regarding these Treasury Regulations and whether the exchanges contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holders' tax returns.

### 8.05. Importance of Obtaining Professional Tax Assistance

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AS MANDATED BY SECTION 1125 OF THE BANKRUPTCY CODE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## ARTICLE IX.
## THE BEST-INTERESTS-OF-CREDITORS TEST

### 9.01. Best-Interests Test

The Bankruptcy Code requires that the Bankruptcy Court find that the Plan is in the best interest of all holders of claims against and equity interests in the Debtor that are "impaired" by the Plan and that have not accepted the Plan as a requirement to confirm the Plan. The "best-interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires the Bankruptcy Court to find that either (a) all members of an impaired class of claims or equity interests have accepted the Plan or (b) the Plan will provide a member who has not accepted the Plan with a recovery of property of value, measured as of the effective date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To calculate the probable distribution to members of each Impaired Class of Claims if the Debtor were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the disposition of the Debtor's assets if liquidated in chapter 7 cases under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to holders of unsecured Claims against the Debtor would be reduced first by the Claims of secured creditors (to the extent of the value of their collateral), the costs and expenses of liquidation, and then by other administrative expenses and costs of the chapter 7 cases. Liquidation costs of the Debtor under chapter 7 of the Bankruptcy Code would include the compensation of a chapter 7 trustee and his or her counsel and other professionals, asset-disposition expenses, and litigation costs. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay unsecured Claims. The liquidation would also prompt the rejection of all executory contracts and unexpired leases and thereby increase by a significant amount unsecured Claims.

In chapter 7 liquidation, no junior class of Claims may be paid unless all classes of Claims senior to such junior class are paid in full. Section 510(a) of the Bankruptcy Code provides that subordination agreements are enforceable in a bankruptcy case to the same extent that such subordination is enforceable under applicable non-bankruptcy law. Therefore, no class of Claims that is contractually subordinated to another class would receive any payment on account of its Claims unless and until such senior classes were paid in full.

Once the Bankruptcy Court ascertains the liquidation recoveries of the Debtor's secured and priority Creditors, it could then determine the probable distribution to unsecured Creditors from the remaining available proceeds of that liquidation. If this probable distribution has a value greater than the value of distributions to be received by the unsecured Creditors under the Plan, then the Plan is not in the best interests of Creditors and cannot be confirmed by the Bankruptcy Court.

As shown in the Liquidation Analysis attached hereto as <u>Exhibit A</u>, the Proponents believe that each member of each Class of Impaired Claims will receive at least as much, if not more, under the Plan than it would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. This is true for a few reasons.

### 9.02. Chapter 7 Liquidation Analysis

The Proponents believe that under the Plan all holders of Impaired Claims will receive property with a value greater than or equal to the value each such holder would receive in a liquidation of the Debtor under chapter 7 of the Bankruptcy Code. The Proponents' belief is based primarily on the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of Impaired Claims, including:

(a) increased costs and expenses of a liquidation under chapter 7 arising from fees payable to one or more chapter 7 trustees and professional advisors to such trustee(s), who may

not be as familiar with the Debtor's industry and business operations as the current Professionals;

(b)     erosion in value of assets in a chapter 7 case in the context of the rapid liquidation required under chapter 7 and the "forced-sale" atmosphere that would prevail in today's negative depressed economic environment;

(c)     significant adverse effects on the Debtor's operations necessary for an orderly liquidation as a result of the likely departure of key employees;

(d)     substantial increases in Claims, as well as substantially increased estimated contingent Claims; and

(e)     substantial delay in distributions, if any, to the holders of Claims that would likely ensue in a chapter 7 liquidation; and

The Proponents believe that any liquidation analysis includes some speculation as such an analysis is necessarily premised on assumptions and estimates that are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Proponents. Thus, there can be no assurance as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Proponents' conclusions or concur with such assumptions in making its determinations under section 1129(a)(11) of the Bankruptcy Code.

For example, the Liquidation Analysis attached as <u>Exhibit A</u> necessarily contains an estimate of the amount of Claims that will ultimately become Allowed Claims. No order or finding has been entered by the Bankruptcy Court or any other court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Proponents have projected an amount of Allowed Claims within a reasonable range such that, for purposes of the Liquidation Analysis, the largest possible liquidation dividend to holders of Allowed Claims can be assessed. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including any determination of the value of any distribution to be made on the account of Allowed Claims under the Plan.

The Liquidation Analysis attached as <u>Exhibit A</u> is provided solely to disclose the effects of a liquidation of the Debtor pursuant to the terms of the Plan, subject to the assumptions set forth therein, to the holders of Claims against the Debtor. A liquidation under chapter 7 would produce, in the Debtor's opinion, a significantly lower dividend to general unsecured creditors.

## ARTICLE X.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Proponents believe that the Plan affords holders of Claims the potential for the greatest realization on the Debtor's assets and, therefore, is in the best interests of such holders. However, if not enough acceptances from Classes 3 through 18 are received by the Proponents to confirm the Plan, or the Plan is not subsequently confirmed and consummated, the theoretical alternatives include: (a) formulation of an alternative chapter 11 plan, or (b) liquidation of the Debtor under chapter 7 or 11 of the Bankruptcy Code.

## 10.01. Alternative Plan(s)

If enough acceptances to confirm the Plan are not received or if the Plan is not confirmed, the Proponents could attempt to formulate and propose a different chapter 11 plan. Such a plan or plans would involve a resolution distinct from the one proposed in the Plan.

The Chapter 11 Trustee filed his Chapter 11 Plan of Liquidation [Docket No. 1496] on August 11, 2010. The Creditors Committee did not support the initial chapter 11 plan filed by the Chapter 11 Trustee. As such, it has filed a competing plan, which is referred to as the *Official Committee of Unsecured Creditors' First Amended Plan of Reorganization* [Docket No. 1539] (the "**Committee Plan**"). The parties could not agree on the all the terms in the Chapter 11 Trustee's initial plan or in the plan filed by the Creditors Committee. So, in an attempt to save significant legal expenses incurred to litigate competing plans, the Creditors Committee and the Chapter 11 Trustee worked hard to agree to a "joint plan" that was designed to maximize value for legitimate creditors and to return that value to legitimate creditors as soon as reasonably practicable. The Creditors Committee and the Chapter 11 Trustee believe that this Plan is that "joint plan" and that the Creditors should vote to accept this Plan.

## 10.02. Liquidation Under Chapter 7

Proceeding under chapter 7 of the Bankruptcy Code would impose significant additional costs on the Estate. Under chapter 7, one or more trustees would be elected or appointed to administer the Estate, to resolve pending controversies, including Disputed Claims against the Debtor and Claims of the Estate against other parties, and to make Distributions to holders of Claims. A chapter 7 trustee would be entitled to compensation in accordance with the scale set forth in section 326 of the Bankruptcy Code, and the chapter 7 trustee would also incur significant administrative expenses. There is a strong probability that a chapter 7 trustee would not possess any particular knowledge about the Debtor. As a result, the Proponents assert that the value of the Debtor's assets would be greatly diminished thereby. Additionally, a chapter 7 trustee would probably seek the assistance of professionals who may not have any significant background or familiarity with this Bankruptcy Case. The chapter 7 trustee and any professionals retained by the trustee likely would expend significant time familiarizing themselves with this Bankruptcy Case. This could result in duplication of effort, increased expenses, and delay in payments to Creditors.

For any chapter 7 liquidation analysis, it must be recognized that additional costs in both time and money are inevitable. In addition to the time and monetary costs, there are other problems in a chapter 7 liquidation that would result in a substantially smaller recovery for holders of Claims against the Debtor than are not likely under the Plan.

Further, distributions under the Plan probably would be made earlier than they would be made in a chapter 7 case. The Liquidating Trustee intends to make interim distributions as quickly as possible, with a goal of making an interim distribution of as much as possible no later than 90 days after the Effective Date. Distributions of the proceeds of a chapter 7 liquidation might be significantly delayed after liquidation to afford the chapter 7 trustee the opportunity to resolve claims and prepare for such distributions.

THE PROPONENTS BELIEVE THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER RECOVERY TO HOLDERS OF CLAIMS AGAINST THE DEBTOR THAN SUCH HOLDERS WOULD RECEIVE IF THE DEBTOR WERE LIQUIDATED UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

In the Liquidation Analysis, the Proponents have taken into account the nature, status, and underlying value of the Debtor's assets, the ultimate realizable value of such assets, and the extent to which the assets are subject to liens and security interests. In the Proponents' opinion, the recoveries projected to be available in liquidation under chapter 7 of the Bankruptcy Code will not be greater to the recoveries to be generated and distributed under the Plan. For an explanation of that opinion, please see Exhibit A attached hereto.

## ARTICLE XI.
## CERTAIN RISK FACTORS TO BE CONSIDERED

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. HOWEVER, THESE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION. ADDITIONAL RISKS AND UNCERTAINTIES NOT PRESENTLY KNOWN TO THE PROPONENTS OR THAT THE PROPONENTS CURRENTLY DEEM IMMATERIAL MAY ALSO HARM THE DEBTOR, THE REORGANIZED DEBTOR, THE LIQUIDATING TRUST, OR THE LIQUIDATING TRUSTEE.

### 11.01. General Risks

It is possible that the Bankruptcy Case could adversely affect (a) the Debtor's relationship with key vendors, (b) the Debtor's relationship with customers or tenants, (c) the Debtor's relationships with employees, and (d) the legal rights and obligations of the Debtor under agreements that may be in default as a result of this Bankruptcy Case.

The extent to which the chapter 11 case has and will continue to disrupt the Debtor's business and operations will likely be directly related to the length of time it takes to complete this case. If the Proponents are unable to confirm the Plan on a timely basis because of a challenge to the Plan or a failure to satisfy the conditions to the Plan, the Debtor may be forced to operate in chapter 11 for an extended period while the Proponents try to develop a different chapter 11 plan that can be confirmed. That extended period would likely increase both the probability and the magnitude of the adverse effects described in this Disclosure Statement.

### 11.02. Certain Business and Industry Risks Affecting the Debtor, the Reorganized Debtor, or the Liquidating Trustee

Global financial markets and economic conditions have recently been, and continue to be, disrupted and volatile. The debt and equity capital markets have been exceedingly distressed. The housing market has similarly suffered. Among others, these issues pose significant challenges to the operation of any business.

There can be no assurance that funding will be available to the Reorganized Debtor if needed, and to the extent required, on acceptable terms. If funding is not available as needed, or is available only on unfavorable terms, the Reorganized Debtor may be unable to meet its obligations as they come due, stabilize the Retained Properties, or sell the Retained Properties within the timeframe allotted in the Plan.

## 11.03. Certain Bankruptcy-Law Considerations

(a) **The Proponents May Not be Able to Confirm the Plan.** The Proponents cannot ensure that the Plan will receive enough acceptances to be confirmed. In addition, even if the Plan receives enough acceptances to be confirmed, there is no guarantee that the Bankruptcy Court will confirm the Plan. Even if enough acceptances are received and, with respect to those Classes deemed to have rejected the Plan, the requirements for "cramdown" are met, the Bankruptcy Court is a court of equity and may, therefore, exercise its discretion to not confirm the Plan, or the Bankruptcy Court may require additional solicitations or consents prior to confirmation of the Plan. Section 1129 of the Bankruptcy Code requires, among other things, that the value of distributions to dissenting holders of Claims be not less than the value such holders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. Although the Proponents believe that the Plan will meet such tests, there is no guarantee that the Bankruptcy Court will reach the same conclusion.

The Proponents' ability to propose and confirm an alternative chapter 11 plan is uncertain. Confirmation of any alternative chapter 11 plan would likely take significantly more time and result in delays in the ultimate distributions to the holders of Claims. If confirmation of an alternative plan is not possible, the Debtor would likely be liquidated. Based on the Proponents' Liquidation Analysis, liquidation under chapter 7 would result in distributions of reduced value, if any, to holders of Claims against the Debtor.

(b) **Failure to Consummate or Effectuate the Plan.** Consummation of the Plan is conditioned on, among other things, entry of the Confirmation Order and an order, which may be the Confirmation Order, approving any transactions contemplated thereunder. As of the date of this Disclosure Statement, there is no guarantee that any or all of the foregoing conditions will be met or waived, or that the other conditions to consummation, if any, will be satisfied. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there is no guarantee that the Plan will be consummated and effectuated.

(c) **Risk of Non-Occurrence of the Effective Date.** Although the Proponents believe that the Effective Date may occur within a reasonable time following the Confirmation Date, there is no guarantee of such timing.

(d) **Claims Estimation.** There is no guarantee that the estimated amount of Claims are correct, and the actual Allowed amounts of such Claims will not differ from estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. If one or more of these risks or uncertainties materialize or if the underlying assumptions prove incorrect, the actual Allowed amounts of Claims against the Debtor may vary from those estimated herein.

### 11.04. Certain Tax Considerations, Risks, and Uncertainties

THERE ARE A NUMBER OF MATERIAL INCOME-TAX CONSIDERATIONS, RISKS, AND UNCERTAINTIES ASSOCIATED WITH CONSUMMATION OF THE PLAN. INTERESTED PARTIES SHOULD READ CAREFULLY THE DISCUSSION SET FORTH IN ARTICLE VIII OF THIS DISCLOSURE STATEMENT FOR A DISCUSSION OF CERTAIN FEDERAL INCOME-TAX CONSEQUENCES OF THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN TO BOTH THE DEBTOR AND TO HOLDERS OF CLAIMS THAT ARE IMPAIRED UNDER THE PLAN.

## ARTICLE XII.
## THE SOLICITATION; VOTING PROCEDURES

### 12.01. Voting Deadline

The Voting Deadline, which is the period by which Ballots with respect to the Plan will be accepted, will terminate on [VOTING DEADLINE DATE].  Except to the extent permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used in connection with the Proponents' request for Confirmation of the Plan or any permitted modification thereof.

### 12.02. Voting Procedures

Under the Bankruptcy Code, for purposes of determining whether enough acceptances have been received, only holders of Claims who actually vote will be counted.  The failure of a holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

The Proponents are providing a Solicitation Package to holders of Claims whose names appear as of [VOTING RECORD DATE] in the records maintained by the Debtor.  Holders of Claims against the Debtor should provide all of the information requested by the Ballot and return all Ballots in the return envelope provided with each such Ballot.

### 12.03. Miscellaneous

Additional Voting and Solicitation information is contained in the Solicitation Order.

### 12.04. Fiduciaries and Other Representatives

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another acting in a fiduciary or representative capacity, such Person should indicate such capacity when signing and, unless otherwise determined by the Proponents, must submit proper evidence satisfactory to the Proponents of authority to so act.  Authorized signatories should submit the separate Ballot of each beneficial owner for whom they are voting.

UNLESS THE APPLICABLE BALLOT BEING FURNISHED IS TIMELY SUBMITTED TO GARDERE ON OR PRIOR TO THE VOTING DEADLINE, SUCH

BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN. IN NO CASE SHOULD A BALLOT BE DELIVERED TO ANY ENTITY OTHER THAN THE NOMINEE OR GARDERE.

### 12.05. Parties Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or equity interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or equity interest, the plan cures all existing defaults, other than defaults resulting from the occurrence of events of bankruptcy, and reinstates the maturity of such claim or equity interest as it existed before the default.

In general, a holder of a claim or equity interest may vote to accept or to reject a plan if the claim or equity interest is "allowed," which means generally that no party in interest has objected to such claim or equity interest, and the claim or equity interest is Impaired by the plan. However, if a holder of an Impaired claim or equity interest will not receive or retain any distribution under the plan on account of such claim or equity interest, the Bankruptcy Code deems such holder to have rejected the plan; accordingly, holders of such claims and equity interests do not actually vote on the plan. If a claim or equity interest is not Impaired by the plan, the Bankruptcy Code deems the holder of such claim or equity interest to have accepted the plan; accordingly, holders of such claims and equity interests are not entitled to vote on the plan.

Classes 1 and 2 of the Plan are Unimpaired. Accordingly, under section 1126(f) of the Bankruptcy Code, all such Classes of Claims are deemed to have accepted the Plan and are not entitled to vote in respect of the Plan.

Classes 3 through 18 of the Plan are Impaired. Therefore, the holders of Claims in these Classes are being solicited for votes in favor of the Plan.

The Debtor is a tax-exempt entity under Internal Revenue Code section 501(c)(3). Therefore, there are no Allowed Interests in the Debtor. However, if such Interests exist, they are Impaired under the Plan. Holders of Class 19 Interests will receive nothing under the Plan; as a result, they are deemed to have rejected the Plan and are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

### 12.06. Agreements upon Submitting Ballots

The delivery of an accepting Ballot to Gardere by a holder of Claims pursuant to one of the procedures set forth above will constitute the agreement of such holder to accept (a) all of the terms of, and conditions to, the solicitation outlined in the Solicitation Order or motion approved by the Solicitation Order and (b) the terms of the Plan; provided, however, all parties-in-interest retain their right to object to Confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

### 12.07.  Waiver of Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility, acceptance, and revocation or withdrawal of Ballots will be determined by the Proponents in their sole discretion, which determination will be final and binding.  As indicated in Section 11.8 of this Disclosure Statement, effective withdrawals of Ballots must be delivered to Gardere prior to the Voting Deadline.  The Proponents reserve the absolute right to contest the validity of any such withdrawal.  The Proponents also reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Proponents or the Proponents' respective counsel, be unlawful.  The Proponents further reserve the right to waive any defects, irregularities, or conditions of delivery as to any particular Ballot.  The interpretation (including of the Ballot and the respective instructions thereto) by the Proponents, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Proponents or the Bankruptcy Court determine.  Neither the Proponents nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished and as to which any irregularities have not theretofore been cured or waived will be invalidated.

### 12.08.  Withdrawal of Ballots; Revocation

Any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to Gardere at any time prior to the Voting Deadline.  To be valid, a notice of withdrawal, must (a) contain the description of the Claim(s) to which the withdrawal relates and the aggregate principal amount represented by such Claim(s), (b) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (c) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (d) be received by Gardere in a timely manner at the address set forth in section 1.5 of this Disclosure Statement.  The Proponents will consult to determine whether any withdrawals of Ballots were received and whether enough acceptances of the Plan have been received.  As stated above, the Proponents expressly reserve the absolute right to contest the validity of any such withdrawals of Ballots.

A purported notice of withdrawal of Ballots that is not received in a timely manner by Gardere will not be effective to withdraw a previously cast Ballot.

Any party who has previously submitted a properly completed Ballot to Gardere prior to the Voting Deadline may revoke such Ballot and change his, her, or its vote by submitting to Gardere prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan.  In the case where more than one timely, properly completed Ballot is received, only the Ballot that bears the latest date will be counted for purposes of determining whether enough acceptances have been received pursuant to section 1126 of the Bankruptcy

Code. The Proponents will pay all costs, fees and expenses relating to solicitation of the Disclosure Statement and Plan.

### 12.09. Further Information; Additional Copies

If you have any questions or require further information about the voting procedure for voting your Claim against the Debtor, or about the Solicitation Package, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, the Plan Supplement, or any exhibits to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d)), please contact Gardere:

> Gardere Wynne Sewell LLP
> Attn: Mo Alturk
> 1601 Elm Street, Suite 3000
> Dallas, Texas 75201-4761
> Telephone: 214.999.3000
> Facsimile: 214.999.4667

## ARTICLE XIII.
## PROPONENTS' RECOMMENDATION

The Proponents believe that the Plan is in the best interests of all holders of Claims and urges the holders of Impaired Claims in Classes 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, and 18 to vote to accept the Plan and to evidence such acceptance by returning their Ballots in accordance with the Disclosure Statement Order no later than [⬛⬛⬛⬛⬛⬛⬛⬛⬛, 2010].

Dated: October 1, 2010

Respectfully Submitted,

/s/ Max R. Tarbox
Max R. Tarbox (TX 19639950)
TARBOX LAW, P.C.
2301 Broadway
Lubbock, Texas 79401
Phone: 806.686.4448
Fax: 806.368.9785

and

/s/ Marcus A. Helt
Stephen A. McCartin (TX 13374700)
Marcus A. Helt (TX 24052187)
GARDERE WYNNE SEWELL LLP
1601 Elm Street, Suite 3000
Dallas, Texas 75201-4761
Telephone: 214.999.3000
Facsimile: 214.999.4667

**COUNSEL FOR WALTER
O'CHESKEY, CHAPTER 11 TRUSTEE**


/s/ David R. Langston
David C. Mullin (TX 14651600)
David R. Langston (TX 11923800)
MULLIN, HOARD & BROWN, L.L.P.
P.O. Box 2585
Lubbock, Texas 79408
Telephone: 806.765.7491
Facsimile: 806.765.0553

**COUNSEL FOR THE OFFICIAL
COMMITTEE OF UNSECURED
CREDITORS**


**CHAPTER 11 TRUSTEE:**


/s/ Walter O'Cheskey
Walter O'Cheskey, Chapter 11 Trustee for
American Housing Foundation