

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 30, 2013**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| AMERICAN HOUSING FOUNDATION, | § | Case No. 09-20232-11 |
| | § | |
| DEBTOR. | § | |

**<u>MEMORANDUM OPINION</u>**

**I.**

The Court addresses the following fee applications: (1) *Second and Final Fee Application of Gardere Wynne Sewell LLP for Allowance of Fees and Reimbursement of Expenses* [Docket No. 1987]; (2) *Fourth and Final Motion for Approval of Fees and Expenses to Mullin Hoard & Brown, L.L.P., as Counsel for the Unsecured Creditors Committee* [Docket No. 1772]; (3) *Third and Final Fee Application for Allowance of Compensation and Reimbursement of Expenses of Focus Management Group USA, Inc., Financial Advisor for the Trustee* [Docket No. 1997]; (4) *Final Motion for Allowance of Compensation of Walter O'Cheskey, Chapter 11 Trustee* [Docket No. 1991]; and (5) *Fourth and Final Motion for Allowance of Compensation and Reimbursement of*

1

*Expenses of Tarbox Law, P.C., Counsel for the Trustee* [Docket No. 1988]. All such fee applications concern services provided through confirmation of the chapter 11 plan in this case. By the Court's prior interim order of September 7, 2011 [Docket No. 3198], it authorized interim payments on account of the fee applications to the various applicants and abated final decision on the fee applications pending conclusion of the trial in adversary proceedings *O'Cheskey v. Templeton* and *O'Cheskey v. Miller* [Adversary Nos. 10-02016 and 10-02017, respectively]. On December 19, 2012, the Court issued a second interim order [Docket No. 3472] that, in effect, increased the amount of the interim distributions to an amount equal to 85% of the preconfirmation fees requested by the moving parties.[1]

As the Court noted by its September 7, 2011 order, the fee applications in this case are highly contested and the hearings were consolidated to allow the Court to consider each fee application in context of all other fee applications. A major issue of contention concerns services provided in connection with the many adversary proceedings that have been filed by the Trustee in this case. In light of the Fifth Circuit's standard to be used by the Court in considering professional fees and expenses, the Court determined it should consider the outcome of certain pending litigation before it issued a final opinion on the fee applications. *See Andrews & Kurth, L.L.P. v. Family Snacks, Inc. (In re Pro-Snax Distribs., Inc.)*, 157 F.3d 414 (5th Cir. 1998). The Court issued its Findings of Fact and Conclusions of Law in the *O'Cheskey v. Templeton* adversary

---

[1] The moving parties addressed by such order were Gardere Wynne Sewell LLP ("Gardere"), Walter O'Cheskey, Chapter 11 Trustee ("Trustee"), Tarbox Law, P.C. ("Tarbox"), and Focus Management Group USA, Inc. ("Focus"). By separate orders, the Court had previously awarded Mullin Hoard & Brown, L.L.P. ("Mullin Hoard") approximately 81% of its total requested fees and 96% of its total requested expenses (*see* Docket Nos. 569, 931, 1434, and 1960).

Pursuant to prior orders of the Court, expenses have been paid to the moving parties in the following amounts: Gardere has received 89% of the total amount of expenses requested (*see* Docket Nos. 1934 and 2262); Tarbox has received 92% of the total amount of expenses requested (*see* Docket Nos. 1430, 1626, 1928, and 2118); O'Cheskey did not request reimbursement for any expenses (*see* Docket No. 1991); and Focus has received 100% of the total amount of expenses requested (*see* Docket Nos. 1627, 1929, and 2967).

proceeding on March 30, 2013 [Docket No. 299; Adv. No. 10-02016]; it is presently on appeal in the District Court.

Then, as the Court stated in its March 28, 2013 Interim Order [Docket No. 3498], it was concerned with the sheer amount of fees being incurred in connection with the many adversary proceedings that have been filed by the Trustee. Both the number of adversary proceedings filed and the time devoted to the litigation raised by the adversary proceedings has far exceeded what the Court anticipated or expected at the time of confirmation of the chapter 11 plan. The Court set a hearing at which time the Trustee and Trustee's counsel provided a status of the case to date. Trustee's counsel provided an analysis of claims allowed and disallowed, assets available for distributions, and a plan for completion of this case. Such hearing was held on July 15, 2013. Each of the applications under consideration were reopened for purposes of the Court receiving and considering the information provided at the status hearing.

## II.

### A. The Statute

Section 330(a) of the United States Bankruptcy Code states:

(a)(1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee . . . or a professional person employed under section 327 or 1103--
     (A) reasonable compensation for actual, necessary services rendered by the trustee, . . . professional person, or attorney and by any paraprofessional person employed by any such person; and
     (B) reimbursement for actual, necessary expenses.
(2) The court may, on its own motion or on the motion of the United States Trustee, the United States Trustee for the District or Region, the trustee for the estate, or any other party in interest, award compensation that is less than the amount of compensation that is requested.
(3) In determining the amount of reasonable compensation to be awarded to [a] . . . trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including--
     (A) the time spent on such services;

3

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

(4)  (A) Except as provided in subparagraph (B), the court shall not allow compensation for--

(i) unnecessary duplication of services; or

(ii) services that were not--

(I) reasonably likely to benefit the debtor's estate; or

(II) necessary to the administration of the case.

(B) In a chapter 12 or chapter 13 case in which the debtor is an individual, the court may allow reasonable compensation to the debtor's attorney for representing the interests of the debtor in connection with the bankruptcy case based on a consideration of the benefit and necessity of such services to the debtor and the other factors set forth in this section.

(5) The court shall reduce the amount of compensation awarded under this section by the amount of any interim compensation awarded under section 331 and, if the amount of such interim compensation exceeds the amount of compensation awarded under this section, may order the return of the excess to the estate.

(6) Any compensation awarded for the preparation of a fee application shall be based on the level and skill reasonably required to prepare the application.

(7) In determining the amount of reasonable compensation to be awarded to a trustee, the court shall treat such compensation as a commission, based on section 326.

11 U.S.C. § 330(a).

## B.  Fifth Circuit Case Law

### 1.  *Pro-Snax*

The Fifth Circuit addressed two issues concerning § 330(a) in the *Pro-Snax* case: (1) whether a chapter 11 debtor's attorney could be paid for work done after a trustee was appointed, and (2) what standard should be applied in assessing whether to compensate attorneys for work

done prior to the trustee's appointment. *Pro-Snax*, 157 F.3d 414. The court did an extensive

analysis of the first issue, holding that debtor's counsel is precluded from receiving an award of

attorneys' fees for services rendered after the appointment of the chapter 11 trustee. *Id.* at 416.

As to the second issue, which is of concern here, the court addressed the standard to be used in

determining Andrews & Kurth's fees for services provided before the trustee was appointed in the

case. *Id.* at 426. Andrews & Kurth argued that the proper test was whether the services provided

were "objectively beneficial toward the completion of the case at the time they were performed."

*Id.* The creditors advocated for a more stringent test: whether the services "resulted in an

identifiable, tangible, and material benefit" to the estate. *Id.* The Fifth Circuit stated that the

stricter test was the correct measure and that it was "disinclined to hold that any services

performed at any time need only be reasonable to be compensated." *Id.* The court further stated

that any work performed for the debtor's counsel must be of "material benefit to the estate." *Id.*

(citing *In re Melp, Ltd.*, 179 B.R. 636 (E.D. Mo. 1995)).

### 2. Lower Court Decisions

Following the *Pro-Snax* decision, a number of lower courts, including this Court (*In re*

*Quisenberry*, 295 B.R. 855, 865 (Bankr. N.D. Tex. 2003)), interpreted the case to adopt the

material benefit test in the Fifth Circuit. *See Kaye v. Hughes & Luce, LLP*, No. 3:06-cv-01863-B,

2007 WL 2059724, at *7 (N.D. Tex. July 13, 2007) (Boyle, J.) (citing multiple lower court cases

that applied the material benefit test based on *Pro-Snax*). In *Quisenberry*, this Court stated that

the material benefit test does not look to the reasonableness of the services or expenses at the time

that they were rendered, but instead whether an "identifiable, tangible, and material benefit to the

bankruptcy estate" was achieved, regardless of their reasonableness at the time they were incurred.

295 B.R. at 865. The Court addressed the issue again in *In re JNS Aviation, LLC.*, No. 04-21055,

5

2009 WL 80202 (Bankr. N.D. Tex. Jan. 9, 2009). A creditor objected to the fees requested by the trustee, arguing they provided no identifiable, tangible benefit to the estate and that the fees represented time spent as a trustee not as an attorney. *Id.* at \*3. The Court stated that while it must consider the benefit and necessity of the services in hindsight, it would not second guess every decision or position taken by the trustee. *Id.* at \*8. "[T]he benefits analysis [does not] require that each expenditure of time result in a quantifiable benefit to the estate." *Id.*

a. *In re Gadzooks, Inc. / Kaye*

Though a few lower courts had held that *Pro-Snax* made the material benefit test the law of the Fifth Circuit, one Northern District bankruptcy court addressed the issue in depth, concluding that only in dictum did the Fifth Circuit say the material benefit test should be the standard. *In re Gadzooks, Inc.*, 352 B.R. 796, 809 (Bankr. N.D. Tex. 2006). The court went on to apply the reasonableness test and approved the fees of Hughes & Luce, who was counsel for the Committee of Equity Security Holders. *Id.* at 811. In reviewing the bankruptcy court's decision, the district court was doubtful that the adoption of the material benefit test was dictum but stated that even if it was, it was judicial dictum, which is entitled to greater weight. *Kaye,* 2007 WL 2059724, at \*6–7. The district court stated that the rationale in *Melp* (cited in *Pro-Snax*) and in *In re Xebec*, 147 B.R. 518 (9th Cir. BAP 1992) (cited by *Melp*)—that the work in question in those cases was performed by debtor's counsel *after* the trustee's appointment and should thus be scrutinized more closely—does not apply to work performed prior to the appointment of the trustee; however, the court stated, "whatever its reasons for doing so, the Fifth Circuit has chosen to apply the material benefit test to services performed by an attorney for the debtor prior to the appointment of a trustee." *Kaye*, 2007 WL 2095724, at \*8. The court went on to say that even if it was inclined to disagree with the adoption of the stricter test, it is, regardless, the law of the Fifth Circuit until

overruled. *Id.* The court held that § 330 and the material-benefit test can be harmonized by applying a two-step analysis. *Id.* at *9. First, the court must determine whether the services rendered were "actual and necessary"; to be "actual and necessary," the services must satisfy the "identifiable, tangible, and material benefit to the estate" test. *Id.* When this analysis is complete, then the court determines if the fees were reasonable by calculating the lodestar: the product of multiplying the reasonable number of hours spent by the reasonable hourly rate in the area. *Id.*

### b. *In re Broughton Ltd. Partnership*

Yet another court in the Northern District of Texas addressed the *Pro-Snax* issue in *In re Broughton Ltd. Partnership*. 474 B.R. 206 (Bankr. N.D. Tex. 2012). Before the court was an application for special counsel's fees filed for work done primarily by Randal Schmidt which was opposed by the United States Trustee (UST). *Id.* at 208. As part of their efforts to reorganize, the debtors found a potential buyer, Standard Pacific of Texas, Inc. (SPOT), and hired Schmidt and his firm to negotiate with SPOT. *Id.* The SPOT deal eventually fell through when a condition of purchase was not achieved, and no further work was performed by Schmidt or his firm. *Id.* at 208–09. The UST objected to the fees for work performed arguing that it had not resulted in an "identifiable, tangible, and material benefit to the estate." *Id.* at 209. The court acknowledged that *Pro-Snax* has been viewed as requiring the court to assess the benefits to the estate from "the Monday after" vantage point. *Id.* In a footnote, the court noted that while all courts interpreting *Pro-Snax* have held that some degree of retrospective analysis is required, the decisions can be classified into three general approaches: (1) those applying a pure hindsight test, (2) those saying they apply a pure hindsight approach, but "implicitly employ a prospective analysis," and (3) those

applying a hybrid approach to combine both prospective and retrospective analysis. *Id.* n.5 (citing various Texas lower courts for each approach).

The UST first asserted that the court was not required to engage in a retrospective analysis because Schmidt should have ascertained early-on that no benefit was likely to result from the SPOT deal. *Id.* at 210. The court disagreed, stating that at the time, the court and various other parties considered the deal a key to potential reorganization and that "just because a transaction was a difficult one to put together and that the idiosyncrasies of the parties might frustrate the efforts of counsel does not mean that counsel was required to cease work and give up." *Id.* The court said that as long as the attorney was following the direction of the principal and there was a reasonable prospect of success, the attorney is permitted to work with the expectation of receiving payment. *Id.* at 210–11. Having determined that Schmidt and his firm had satisfied the prospective test, the court then addressed whether they were entitled to payment for their work under *Pro-Snax*. *Id.* at 211.

The court noted that the other circuits have generally rejected a hindsight evaluation, and accordingly, it is appropriate to perform the retrospective analysis as required by *Pro-Snax* in such a manner to minimize, rather than maximize, the differences in results by the Fifth Circuit and other circuits. *Id.* at 212–13. The court rejected the idea that an "identifiable, tangible, and material" benefit had to be something that directly augmented the estate. *Id.* at 213. The court pointed out that many critical functions performed by professionals do not reduce claims or increase the estate, yet are required in administering a chapter 11 case. *Id.* at 213–14. Work professionals undertake is not guaranteed to succeed, i.e., litigation may offer a potential for substantial recovery but is not sure to be won. *Id.* at 214. The fact that the Code permits, but does not require, a professional to take a matter on a contingency basis is an indication that it was

not Congress's intent to make compensation for all professional services contingent on success.

*Id.*

To determine what a professional must show to satisfy the "identifiable, tangible, and material benefit" requirement, the court looked to *Melp*, as it was cited in *Pro-Snax* and in Judge Boyle's opinion in *Kaye*. In *Melp*, the court provided the following factors to consider in determining if the "identifiable, tangible, and material benefit" test had been satisfied:

> (1) whether the debtor's attorney's actions duplicated the duties of the trustee or the trustee's counsel under 11 U.S.C. § 1106; (2) whether the services have in fact, obstructed or impeded the administration of the estate; and (3) whether the debtor's attorney's actions are consistent with the debtor's duties under 11 U.S.C. § 521.

*Melp*, 179 B.R. at 640. In *Kaye*, Judge Boyle stated that the best reading of *Pro-Snax* is that it "plac[es] a gloss on [the terms of § 330(a)(1)(A)] such that services are actual and necessary, and hence compensable, only insofar as they result in an identifiable, tangible, and material benefit to the estate." 2007 WL 2059724 at *9.

After referencing *Melp* and *Kaye*, Judge Lynn proceeded to compare the term "actual, necessary" to its use in § 503(b)(1)(A)[2], where it is not limited to only administrative expenses that add to or at least preserve the estate. *Broughton*, 474 B.R. 216–17. The court explained that in the context of a professional of the debtor, just because the value from an asset may not eventually

---

[2] Section 503(b)(1)(A) states:

> After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
>
> (1) (A) the actual, necessary costs and expenses of preserving the estate including—
>
>   (i) wages, salaries, and commissions for services rendered after the commencement of the case; and
>
>   (ii) wages and benefits awarded pursuant to a judicial proceeding or a proceeding of the National Labor Relations Board as back pay attributable to any period of time occurring after commencement of the case under this title, as a result of a violation of Federal or State law by the debtor, without regard to the time of the occurrence of unlawful conduct on which such award is based or to whether any services were rendered, if the court determines that payment of wages and benefits by reason of the operation of this clause will not substantially increase the probability of layoff or termination of current employees, or of nonpayment of domestic support obligations, during the case under this title[.]

be realized does not mean that an investigation and liquidation should not be pursued, assuming "the chances of success . . . outweigh the costs of pursuing the action," as referenced by the *Pro-Snax* court. *Id.* at 217. Accordingly, the court stated, "[s]uccess cannot be a prerequisite to compensation outside of a contingency arrangement. Rather, the conclusion that a professional was justifiably pursuing a legitimate, realizable goal of the fiduciary client should be enough benefit to the estate to satisfy *Pro-Snax*." *Id.* at 218. The court held that an "identifiable, tangible and material benefit" is provided if the services help administer a bankruptcy estate's asset, "whether or not the effect of administration of the asset is enhancement of the estate, so long as the professional's services are performed at the direction of the estate representative and the estate representative is acting in accordance with the Code and its sound business judgment." *Id.*

### c.  Cases Applying a Hybrid Approach

Some lower courts within the Fifth Circuit apply a hybrid standard in which the court considers both whether the services in question benefited the progression of the case at the time rendered and also whether they resulted in an "identifiable, tangible, and material benefit" to the bankruptcy estate. *See*, *e.g.*, *In re Spillman Dev. Grp., Ltd.*, 376 B.R. 543 (Bankr. W.D. Tex. 2007) (Monroe, J.), *In re Cyrus II Partnership*, Nos. 05-39854, 05-39858, 2009 WL 2855725 (Bankr. S.D. Tex. Sept. 1, 2009) (Isgur, J.), *In re MSB Energy, Inc.*, 450 B.R. 659 (Bankr. S.D. Tex. 2011) (Bohm, J.).

A recent case highlighted pros of both the retrospective and prospective views:

Considerations favoring a retrospective view are as follows:

(1) *Pro–Snax* requires that counsel's services "*result* ... in a ... material benefit to the estate." *In re Cyrus II Partnership et al.,* 2009 WL 2855725, at *3 (Bankr. S.D. Tex. Sept. 1, 2009) (emphasis in original).

(2) In *Pro–Snax* the Fifth Circuit also affirmed the district court's instruction to the bankruptcy court, to consider strongly the debtor's lack of success in confirming a chapter 11 plan. *Id.*

(3) The *Pro–Snax* Court's rejection of the reasonableness test in determining whether services were objectively beneficial at the time they were performed. *Id.*

Considerations favoring a prospective view are that:

(1) The *Pro–Snax* Court acknowledged that at the time services are rendered, the likelihood of success must outweigh the cost. *Id.*

(2) The plain language of § 330(a)(3)(C) provides that in determining the amount of reasonable compensation courts should consider "whether the services were necessary ... at the time at which the service was rendered."

*In re NC12, Inc.*, NO. 11-38794, 2013 WL 753540, at *2 (Bankr. S.D. Tex. Feb. 27, 2013) (Isgur, J.). The court also noted that several cases seeking clarification of *Pro-Snax* are on appeal to the Fifth Circuit but that no opinions had been issued at the time of the court's ruling. *Id.*

### C. Standards Applied by other Circuits

As previously noted, generally courts in other circuits have rejected the material benefit test. *Broughton*, 474 B.R. at 212 & n.14; *Kaye*, 2007 WL 2059724, at *8.

In reviewing the fees awarded for pursuing preference claims, which effectively drained the entire estate, the Seventh Circuit stated, "[t]he standard is an objective one: did a time come when a reasonable lawyer would have abandoned the suit? . . . When reasonable professionals could differ over the right course, the professional is not to be penalized . . . ." *In re Taxman Clothing Co.*, 49 F.3d 310, 315 (7th Cir. 1995), *overruled on other grounds by Lamie v. U.S. Tr.*, 540 U.S. 526 (2004). The court determined the lawyer in question should have abandoned the preference action when it became reasonably obvious that continuing would cost more in fees than it was likely to recover for the estate. *Id.* at 315–16.

The Second Circuit weighed in on the issue of whether an actual benefit must be shown and

11

held contrary to the *Pro-Snax* decision. *In re Ames Dept. Stores, Inc.*, 76 F.3d 66 (2d Cir. 1996), *overruled on other grounds by Lamie*, 540 U.S. 526. In *Ames*, the district court had stated that the firm, Skadden, Arps, was not entitled to attorneys' fees because the appeal had "accomplished nothing, and was worth nothing to the estate." *Id.* at 70. The district court stated that there must be found some benefit to the bankruptcy estate for recovery of attorneys' fees to be merited. *Id.* On appeal, the Second Circuit rejected the approach taken by the district court requiring an actual benefit to the estate; the court relied heavily on *Collier's* and stated that it made no sense to treat debtor's attorneys differently than other retained professionals. *Id.* at 71–72. The court believed that if the services in question were "reasonably likely to benefit the debtor's estate, they should be compensable." *Id.* at 72. The court further explained that the court should apply this standard in an objective manner, considering "what services a reasonable lawyer or legal firm would have performed in the same circumstances." *Id.* (citing *Taxman Clothing*, 49 F.3d at 315).

The Tenth Circuit B.A.P. stated that a court cannot limit its evaluation to whether an actual benefit to the estate occurred. *In re Double J Cattle Co.*, 226 B.R. 284, 1997 WL 837762, at *5 (B.A.P. 10th Cir. Oct. 24, 1997). The court must also consider whether or not it was reasonably likely to benefit the estate. *Id.* The court expounded that the benefit to the estate is not limited to an economic interpretation. *Id.* at *6.

In *In re Top Grade Sausage*, the district court had affirmed the bankruptcy court's determination that the debtor's attorney must show an actual benefit to the estate. 227 F.3d 123 (3d Cir. 2000). The circuit court disagreed and instead stated that applications for fees should be assessed according to the terms set out in § 330(a)(4)(A) and "not by some heightened standard or by hindsight." *Id.* at 132. Accordingly, the court required that the debtor's attorney show that the services were reasonably likely to benefit the debtor's estate. *Id.*

The Ninth Circuit considered whether § 330 requires a showing of an actual "identifiable, tangible, and material benefit" to the estate for attorney's fees to be awarded. *In re Smith*, 317 F.3d 918, 926 (9th Cir. 2002), *overruled on other grounds by Lamie*, 540 U.S. 526. The court held that services that were reasonably likely to provide such a benefit may be compensated, regardless of whether they actually provide an "identifiable, tangible, and material benefit." *Id.* In reaching this decision, the court stated that *Xebec* (cited by *Melp*, which in turn was cited by the Fifth Circuit in *Pro-Snax*) was superseded and overruled to the extent it was inconsistent with § 330(a)(4)(A). *Id.* at 926–27.

The Eighth Circuit held that it was a mischaracterization of the standard laid forth in § 330 to require that the services actually benefit the estate for the fees to be compensable. *In re DLC, Ltd.*, 295 B.R. 593, 608 (8th Cir. 2003). The court further noted that the trustee's attorney had been met with "vociferous opposition" to what was a good case and had been "challenged by the appellants at every turn, causing litigation expenses to explode." *Id.* at 609. Accordingly, the court believed that while the fees were high, under the special circumstances of the case, they were reasonable and necessary and the bankruptcy estate was benefitted, even if the trustee and his counsel were the only ones to be compensated in the end because otherwise the debtor would have had no incentive to settle with the primary creditor. *Id.*

The Sixth Circuit agreed that services must be reasonably likely to benefit the estate to be compensable. *In re Veltri Metal Prods., Inc.*, 189 F. App'x 385, 389 (6th Cir. 2006). In determining whether the counsel for the unsecured creditors should be compensated, the court stated an attorney's work may benefit the case even when the Code's payment priorities mean there is no reasonable probability of distribution to the class of unsecured creditors. *Id.*

## III.

### A.

This case has generated an extraordinary amount of fees for which compensation is sought. For the period of July 1, 2009 through November 30, 2010, Mullin Hoard has requested fees of $1,993,032.50 and reimbursement of expenses of $153,684.67; the Court has allowed interim compensation of fees and reimbursement of expenses of $1,590,496.22 and $146,912.81, respectively. The balances of unpaid fees and expenses are $383,854.31 and $6,771.86. Gardere, for the period of May 7, 2010 through December 31, 2010, has requested fees of $1,926,462.00 and reimbursement of expenses of $85,564.92; the Court has allowed interim compensation of fees and reimbursement of expenses of $1,637,492.70 and $75,816.62, respectively. The balances unpaid are $288,969.30 and $9,748.30. Tarbox, for the period of April 27, 2010 through December 31, 2010, has requested fees of $213,556.34 and reimbursement of expenses of $10,237.47; the Court has allowed interim compensation of fees and reimbursement of expenses of $181,522.89 and $9,407.98, respectively. The balances unpaid are $32,033.45 and $829.49. O'Cheskey, for the period of April 28, 2010 through December 31, 2010, has requested fees of $326,145.00 and has not requested reimbursement of any expenses; the Court has allowed interim compensation of fees of $277,223.25. The balance of unpaid fees is $48,921.75. Focus, for the period of May 24, 2010 through December 31, 2010, has requested fees of $902,659.50 and reimbursement of expenses of $102,517.30; the Court has allowed interim compensation of fees and reimbursement of expenses of $767,260.58 and $102,517.30, respectively. The balances unpaid are $135,398.92 and $0.00.

### B.

The Court has, by its prior decisions, applied the material benefit test articulated in

*Pro-Snax* (*In re Quisenberry*, 295 B.R. 855), but has also recognized that such assessment need not devolve into a determination of whether each expenditure of time results in a quantifiable benefit to the estate. *In re JNS Aviation*, 2009 WL 80202. Neither *Quisenberry* nor *JNS Aviation* was as complicated or as costly as this case, however. In applying the required *Pro-Snax* standard, the Court finds helpful the decisions in both *Kaye*, 2007 WL 2059724, and in *Broughton*, 474 B.R. 206. In assessing the fees and expenses here, the Court looks to § 330 of the Bankruptcy Code and determines, first, whether the services were "actual and necessary," meaning they must have provided an "identifiable, tangible, and material benefit" to the estate; next, the Court determines if the fees are reasonable given the rate and time expended. In determining whether the services resulted in a material benefit to the estate, the Court applies the nuanced, less strict reading of the *Pro-Snax* standard set forth in *Broughton*. As the consideration of a fee application, in particular a review of the almost endless catalog of actual time entries, can be an overwhelming task, the Court considers the views of other parties in the case and gives some deference to their respective determinations of the propriety of fees requested.

C.

1. Mullin Hoard Fee Application

Mullin Hoard seeks final approval of $1,993,032.50 in fees and $153,684.67 in expenses. Attebury Family Partnership, LP ("Attebury"), an unsecured creditor in the case, objected to Mullin Hoard's fees. Attebury asserts that many charges did not benefit the estate but, rather, resulted from services rendered at the behest of Robert L. Templeton ("Templeton"), former chairman of the Unsecured Creditors Committee ("Committee"), and as a means for Templeton and the Committee to maintain control over the case. Attebury was frustrated by a lack of detail in Mullin Hoard's descriptions of its services and objected to Mullin Hoard's use of multiple

15

attorneys in preparation for and in the handling of hearings before the Court. The Trustee likewise objected but basically deferred to the Court's assessment of Mullin Hoard's fees and its discretion in awarding (or not) such fees.

Upon a review of Mullin Hoard's services and the fees sought, in light of the articulated standard set forth above, and within the context of fees sought by other professionals in this case, the Court concludes that the vast majority of the fees are compensable. As set forth in their fee applications, Mullin Hoard represented the Committee in the recovery of the life insurance proceeds that triggered the filing of the AHF involuntary case. Mullin Hoard was obviously successful in its efforts as approximately $24 million were recovered for the benefit of the estate. Mullin Hoard also responsibly handled its duties as counsel to the Committee and vigorously represented the interests of the Committee.

There are three areas of concern, however. First, the Court questions the extent of services provided in connection with the motion of Texas Capital Bank seeking appointment of a chapter 11 trustee in the case. Mullin Hoard, at the behest of the Committee, was the first chair, primary objector on the trial of this issue. The Committee knew, as was articulated by its counsel at times during the proceedings, that AHF, as a debtor-in-possession, was floundering in its efforts to comply with the many requirements imposed on a debtor-in-possession. It had failed to file complete schedules and disavowed the very schedules that it did file; it was also making no real effort to file complete schedules with the Court. The Committee was effectively running the case, which was of concern to the Court and was a basis for the Court's appointment of a trustee. It was clear from the outset of this case that members of the Committee held claims that required review. While impossible to quantify, the Court is convinced that part of the services provided reflected the motive on part of particular members of the Committee to avoid intense scrutiny of their

16

claims.   This no doubt placed counsel in a difficult position.   Counsel knew that AHF as a debtor-in-possession was essentially rudderless and that a trustee was needed.   Despite this, the stated basis for opposing the appointment of a trustee was the additional expense associated with a trustee.   The Court is not sympathetic to this view.   AHF, as a debtor in possession, did not have sufficient, objective leadership or guidance in place.   The Committee knew this.

The Court is concerned with counsel's statement of the facts concerning the amount of fees arising from the litigation on the motion to appoint trustee.   The third interim request, filed June 2, 2010 [Docket No. 1233], included the trustee dispute within the general category of "Case Administration" for which over $377,000 in fees were charged and requested.   The trustee dispute was a major, discrete part of the case.   At the hearing on the fee applications, Mullin Hoard then broke-out the fees associated with the trustee dispute, which it then stated were approximately $58,000.   The Court did its own review of Mullin Hoard's invoices and has determined that approximately $102,000 in services were provided that in some fashion dealt with the potential trustee appointment.   The Court will disallow $40,000.00 in fees as a result of excess services in connection with the possible appointment of a trustee.   Such services, in part, were neither reasonable at the time provided nor beneficial to the estate.

The second problem area concerns the Committee's nonstop dispute with the Trustee regarding the Trustee's chapter 11 plan.   Again, the Committee's efforts were made principally to avoid losing control over the case.   It was apparent within a few months after this case was filed that a trustee was needed.   AHF was not fulfilling the most basic requirements of a chapter 11 debtor-in-possession.   The Committee tried to essentially fill this role; this was not the role of the Committee.   The Committee should have likewise pressed for the appointment of a trustee.   The Committee's efforts to block the trustee appointment were not insignificant.   It escalated the

17

estate's expenses well beyond any expressed concern of the Committee regarding expenses. In addition, once the Trustee was appointed, the Committee and counsel should have deferred to the Trustee's efforts to fulfill his basic statutory role as a fiduciary of the estate. This does not diminish the role of a Creditors Committee; it allows the Trustee to do his job. The Court disallows fees of $25,000.00 in light of its concerns on this point.

The third area of concern relates to Mullin Hoard's charge of $34,473.00 for *preparation* of its fee applications. This has been a complicated case, but this amount is excessive. The Court will allow $14,000.00 for preparation of fee applications.

2. <u>Fee Applications by Gardere, Tarbox, O'Cheskey, and Focus Management</u>

Templeton was the primary objector to Gardere's application and was joined by Marty Rowley, as Trustee of the Schooler/Conley Creditors' Liquidation Trust ("Rowley"), and the so-called Burgess Group. Attebury filed a separate objection. Templeton objected to both the overall extent and nature of Gardere's services, as well as several specific areas of services.

Templeton's objections reflect his frustration and disagreement with both the Trustee's appointment and the role of the Trustee after he was appointed. He also alleged that Gardere, and by implication the Trustee, used the case as a "unique revenue opportunity." This is a preposterous charge and colors the Court's view of Templeton's objections overall. The Court concludes that Templeton's objections were motivated more by self-interest than estate interest. The Court allowed the litigation to go forward before making its final determination on Gardere's fees.

Templeton's objections go to Gardere's services through confirmation of the chapter 11 plan. Gardere, in its representation of the Trustee, was obviously successful in obtaining confirmation of a chapter 11 plan within approximately eight months after the Trustee was

appointed. This was no small feat in light of the Committee's and Templeton's opposition throughout the process. As is now apparent, the Trustee has been largely successful in the adversary proceedings triggered by the many claims objections. This has been a necessary, albeit painful, difficult, and expensive process. From a big-picture perspective, the most recent status report to the Court on July 15, 2013 reflects that through the efforts of the Trustee, now as Trustee of the AHF Liquidating Trust, and Gardere, the anticipated dividend to creditors is in the range of 24% to 61%. This is significantly better than what was expected at the time of confirmation.

The evidence simply does not support the bulk of Templeton's objections. When fees are as extensive as they are here, it is not possible to assess the benefit from each discrete service provided by each attorney working on the case. And, indeed, the Court does not consider this necessary. The Court has presided over every hearing and trial in this case. The services provided by Gardere reflected the statutory dictates imposed on the Trustee. Charging the Trustee here with improper motives and misguided efforts is, at best, a refusal to recognize the duties imposed on a chapter 11 trustee. At worst, such charges reflect personal and non-estate concerns and are made in bad faith. The Court will not sanction such objections.

Parties complained of Gardere's rates, which are significantly higher than rates charged by the largest firms within this Court's divisions. Gardere is based in Dallas and has many more attorneys and provides services in many more areas of the law than do the largest firms that typically appear before the Court. As is apparent, this case required the services and expertise of a large firm. Gardere's rates fall within the ranges of rates charged by other comparably sized firms in the larger Texas markets. Gardere is expensive, but it provided a high level of expertise to the many matters that arose in this case through confirmation. It is not the Court's prerogative to set *a rate*, and the Court does not adopt the view that a *local* rate must be charged. The Court

19

concludes that the requested fees of Gardere by its Second and Final Fee Application reflect reasonable, necessary services that conferred a material benefit to the estate. Gardere's fees will be allowed as requested.

Templeton made similar objections to Tarbox's fee application. The Court's comments and conclusions regarding Templeton's objections to Gardere's fee applications apply equally to Tarbox's, as well. The objections are fused with the same self-interests and cynicism. The Court's review of Tarbox's fee requests, with the evidence presented, refutes Templeton's objections. There is, no doubt, some overlap of services between Tarbox and Gardere, but that does not automatically cause disallowance of fees for such services. Tarbox's services were generally helpful to effect a confirmed plan. Tarbox's fees will be allowed as requested.

The fees of O'Cheskey are based on time expended at a certain rate charged by O'Cheskey. Templeton, again joined by Rowley and the Burgess Group, objected, asserting that "the entire endeavor regarding the Adversary Proceedings . . . was the part of an overall scheme to confirm a plan in this case that would preserve the fee interest of [O'Cheskey & Gardere]," and therefore, they argue, the fees related to the litigation and the disclosure statement and plan should be disallowed. As an alternative, Templeton asserted that the Court should defer its decision until conclusion of the litigation. This is precisely what the Court did, and, as stated above, the litigation has mostly ended before this Court with decisions that have vindicated the Trustee's position.

O'Cheskey's request for fees is not based upon the standard statutorily defined commission. *See* 11 U.S.C. § 326. O'Cheskey seeks compensation based upon a lodestar method—time expended times the rate charged—because the Committee opposed his use of the standard commission as set forth at § 326 of the Bankruptcy Code. The Committee did not want

20

O'Cheskey obtaining a commission upon the approximate $24 million in life insurance that the Committee and its counsel, Mullin Hoard, recovered for the estate in the life insurance litigation. O'Cheskey agreed to this. O'Cheskey's daily services as Trustee are not attacked as unnecessary or improper. Templeton contends that O'Cheskey's description of such services fail to describe how they benefit the estate. As stated, the Court does not atomistically review the Trustee's time entries in an attempt to quantify the benefit achieved by each entry. The Trustee's services were necessary at the time they were provided, and the Court is satisfied that such services benefitted the estate. The Trustee's services assuaged the Court's concerns regarding AHF as a chapter 11 debtor-in-possession. The Trustee's request will be approved.

Similar objections were raised by Templeton, Rowley, and the Burgess Group to Focus Management's final fee request. Focus's services, and particularly of its principal, Alan Weiner, brought order to the case and laid the ground-work for the plan that was presented to and approved by the Court. Most creditors have praised the work of Focus. Such services benefitted the estate and, as with the Trustee, assuaged the Court's concerns regarding the case. The Focus fees will be allowed.

### End of Memorandum Opinion ###